UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:
Sixty Sixty Condominium Association, Inc.              Case No. 16-26187-RAM
                                                       Chapter 11

            Debtor-in-Possession.
_____/

### DECLARATION OF MARIA VELEZ IN SUPPORT OF
### CHAPTER 11 PETITION AND FIRST DAY MOTIONS

1.      My name is Maria Velez.  I am the President of the Sixty Sixty
Condominium Association, Inc. a Florida not-for-profit corporation (the "Association" or
the "Debtor"). I am familiar with the Debtor's day-to-day operations, business affairs,
and the available books and records.  I serve as an integral member of the Debtor's
management team.

2.      On December 5, 2016, the Debtor filed a voluntary petition for relief
under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with
unanimous written consent of the Association's board of directors.  The Debtor continues
in the possession of certain of its properties and the management of its businesses as
debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  In
order to enable the Debtor to operate effectively and avoid the adverse effects of the
Chapter 11 filing, the Debtor has filed various types of relief in "first-day" applications
and motions filed with the Court.

3.      I submit this Declaration in support of the Debtor's Chapter 11 petition
and first-day applications and motions (collectively the "First Day Motions") in the
above-captioned Chapter 11 case.  Any capitalized term not expressly defined herein
shall have the meaning ascribed to that term in the relevant First Day Motion.  Except as

1

otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration.

4.     Part I of this Declaration describes the Association's operations and the circumstances surrounding the filing of its Chapter 11 petition. Part II sets forth the relevant facts in support of Debtor's various first-day applications and motions filed concurrently herewith.

### Background

**A.     Introduction and Overview – From 10,000 Feet**

5.     The Debtor is a condominium association for the Sixty Sixty Condominium (the "Condominium"). The Condominium's governing documents include its charter, the Declaration of Sixty Sixty Condominium (the "Declaration").

6.     The Declaration created what now appears to be an unworkable arrangement where a for-profit entity (referred to as the Hotel Unit, the "HU") has ownership and control of the common elements of the building, but the unit owners (including the Debtor) are burdened with all of the related expenses.

7.     In 2013, during litigation with a prior HU owner over the rights and responsibilities under the Declaration, the current HU owner (the "HUO") presented itself as a white knight. He promised to work cooperatively with the Debtor to make the Condominium great again.

8.     Naively, the Debtor also contracted with a HUO affiliate to begin

managing the Debtor in March of 2013 (the affiliate was terminated in early 2016).

9.    Despite promises, the HUO owner did not come to the Condominium's rescue.

10.    No hero, the Debtor found itself dealing with a Machiavellian businessman. The HUO has singlehandedly chilled the market for Condominium units (through websites, you tube videos, and threatening e-mails)[1] and appears eager to acquire units at artificially depressed prices.

11.    After purchasing its interest in the HU, the HUO (without Debtor or unit owner involvement, oversight or approval) incurred millions of dollars of expenses renovating and repairing the HU. The HUO passed 100% of those expenses along to the Debtor and other unit owners. Chief among these appear to be claims of Florida Building and Supply, Inc. ("FB&S"). FB&S claims it is presently owed approximately $963,334 for work provided to the HU.

12.    For over a year and half (since about April 2015), the Condominium has been closed. The HUO has failed to take appropriate steps to open the building and, since on or around February of 2016, prohibited the unit owners and Debtor from accessing their units.

13.    Upon information and belief, in February of 2016 the HUO claimed that the Condominium was closed because it did not have the $17,500 necessary to satisfy a City of Miami requirement. In March of 2016, a certain unit owner transferred the

---

[1] https://www.youtube.com/watch?v=-ofFhpJgi4A (Cost of Ownership does not stop with the purchase price); https://www.youtube.com/watch?v=ogosh6wSxA0 (NEW 2017 Owners Presentation 6060); https://www.youtube.com/watch?v=1UOeu0QFqw8 ("Many owners have seen their individual units decline in value over the past two years to the point of being almost "worthless" as no buyer in his or her right mind would purchase a unit at the Sixty-Sixty after reading and understanding the Condo Documents an the horrific financial crisis created by unit owners not paying their monthly assessments to the HU for almost two years."); www.sixtysixtycondo.com.

3

$17,500 to the HUO for the express purpose of, and conditioned upon, re-opening the Condominium. It is believed that the HUO agreed to do so.

14.     However, after receiving the earmarked $17,500, the HUO failed and refused to open the Condominium.

15.     Word of HUO's deceitful action spread like wildfire through the unit owners.

16.     Unit owners were also offended that notwithstanding the Condominium was closed and its operational costs decreased, the HUO's dues stayed the same and unit owners were prevented from generating rental income to pay such dues.

17.     Despite unit owner objections, the HUO continued to incur debt to repair and renovate the HU. It also continued to accrue assessments against the unit owners and the Debtor for the costs of same. The HUO did not foreclose on any unit at that time. It let months pass and allowed the unpaid assessments to grow.

18.     Instead of taking prompt legal action against the few delinquent unit owners, the HUO issued additional special assessments to further burden the current unit owners (and increasing the debts of the delinquent unit owners). The HUO repeated this cycle several times.

19.     Now, on the eve of re-opening the "almost brand new building with a new pool, new air-conditioning improvements, new elevator improvements, and basically a new building…"[2], the HUO has filed approximately 28 foreclosure actions against unit owners and explained to unit owners that their units are "all but worthless…."[3] The HU

---

[2] E-mail from rschecher@███████ to bubehae@███████ with copies to many unit owners, dated December 8, 2016 at 12:25 pm, Subject: "Re: BANKRUPTCY FILING OF THE SIXTY SIXTY ASSOCIATION".
[3] E-mail from rschecher@███████ to Maria Velez, with copies to many unit owners, dated December 6, 2016 at 11:41 PM, Subject: "Re: Bankruptcy Filing of the Sixty Sixty Association".

has offered, among other things, to accept deeds to *qualifying* units in lieu of foreclosure and coordinated with a "bulk buyer" who purportedly offered to purchase units for $40,000-60,000 (most units were originally sold in the $150,000-185,000 range).

20.    On June 20, 2016, FB&S commenced two lawsuits against the Debtor claiming nearly a million dollars in damages and liens against Debtor and unit owner property.

21.    The HUO claims that that Debtor owes it hundreds of thousands of dollars and has threatened to foreclose against Debtor property.

22.    Faced with the FB&S lawsuits and other threatened suits, the Debtor commenced the instant bankruptcy to reorganize its affairs.

**B.    Creation and Structure of the Condominium – The Details**

23.    In 1992 a waterfront Holiday Inn hotel was built in Miami Beach just east of Allison Island and located at 6060 Indian Creek Drive in Miami Beach, Florida. In 2006, the developer, Indian Creek Investors, Ltd., converted the hotel to a hybrid condominium/hotel.

24.    On or about April 10, 2006, the Condominium was officially created by recording the Declaration in the Official Records Book 24411, Page 1780 of the Public Records of Miami-Dade County, Florida.

25.    The Condominium is composed of 87 "units", which includes: (i) 82 residential units (the "Residential Units") that are privately owned by the Residential Unit owners (the "RUOs");[4] (ii) four commercial units (the "Commercial Units")[5] presently

---

4 The Debtor owns one of the Residential Units; unit 505 (and possibly units 1605 and 1606, certain records reflect Debtor's ownership of same but the public records do not).
[5] The Commercial Units are comprised of a restaurant space (the "Restaurant") and three open terraces (the "Terraces" that have no limited income producing possibilities.

owned by the Debtor (in this capacity, the "CUO"), and, (iii) generally speaking, all areas not within a Residential Unit or Commercial Unit are deemed to be a part of the HU owned and operated by the HUO, Schecher Group, Inc. The principal of the HUO is Richard Schecher ("Schecher").[6]

26.     The Declaration created a very unusual ownership, control and management structure that, absent complete transparency and good faith, was doomed to failure.

*(i)*     ***The Association's Role, Authority and Obligations – Seemingly Ordinary***

27.     On the side of normalcy, the Debtor is a not-for-profit corporation; a condominium association. It is responsible for, among other things, the management, operation, and maintenance of the Condominium's "Common Elements" (as defined in the Declaration §2.12), and other obligations imposed by state statute. Under the Declaration, the Condominium has very few Common Elements. The principal Common Element is an easement of support in every portion of a unit which contributes to the support of the Condominium. *See* Declaration §2.12.

28.     To fund the expenses of Debtor's operations (the "Common Expenses"), the Declaration empowers the Debtor to assess and specially assess the RUOs, the CUO, and the HU (the "Association Assessments"). Declaration §2.13. The Association Assessments are allocated across all unit owners pursuant to **Exhibit 3** of the Declaration (the "Common Expense Allocation"). Under the Declaration, the Association holds a lien against all units for unpaid Common Expenses dating back to the date of the Declaration.

29.     Under the Common Expense Allocation, the HUO is responsible for

---

[6] *See* Richard-j-schecher.com.

64.5962%, the RUOs for 29.8763%, and the CUO for 5.5275% of the Common Expenses.

30.    According to records available to the Debtor, the HUO has not paid its share of the Common Expenses since March 21, 2013. The HUO appears to owe the Debtor in excess of $350,000.

31.    The Declaration also contains material nonstandard provisions that create the aberrant ownership, management and control issues mentioned above.

**(ii)    *The Hotel Unit's Role, Authority and Obligations – Where This Turns Sideways***

32.    Under the Declaration, substantially all elements ordinarily comprising "common elements" (e.g., hallways, pool areas, staircases, life safety systems, HVAC, etc.) are part of the HU (the "Aberrational Ownership Structure"). And, notwithstanding that such elements are owned exclusively by the HUO: (i) the Declaration ironically defines these elements as "*Shared* Components" (Declaration §2.32); and (ii) shifts 100% of the costs related to the *Shared* Components (the "*Shared* Costs") to the RUOs and CUOs (the "Aberrational Cost Structure"). Declaration §2.33 & 12.1.

33.    As a result, a for-profit entity without unit owner oversight sits in a position meant for a not-for-profit association controlled by unit owner members.

34.    The HU does not include a single inhabitable hotel room and has no power to compel a RUO or CUO to participate in its "hotel program". Assuming that the *Shared* Costs are dollar-for-dollar flow-though costs (as they would be under ordinary conditions), it is unclear how the HUO is designed to legitimately profit.

35.    The Declaration also purports to empower the Hotel Unit to assess and specially assess the underlined other unit owners for all of the *Shared* Costs. The *Shared* Costs are

allocated to RUOs and the CUOs in percentages contained within **Exhibit 7** of the Declaration (the "*Shared* Cost Allocation"). Presently, under the *Shared* Cost Allocation, the RUOs are responsible for 83.3599% and the Debtor is responsible for 16.6401%[7] of the *Shared* Costs.

36.    At present, upon information and belief, the HUO claims that the Debtor owes it in excess $650,000[8] on account of its allocable share of the *Shared* Costs.

37.    The <u>exclusive consideration</u> given to the unit owners in exchange for the powers bestowed upon the HU are <u>easement rights</u> of passage across HU property (hallways, stairways, elevators, etc.) necessary to access their units (the "Easement Rights"). Declaration §§3.4 and 7.3.

**C.    Fundamental Flaw of the Expense Allocations of HUO and Association**

38.    On the facts here, the Common Expense Allocation and *Shared* Cost Allocation can never result in either the HUO or the Debtor collecting 100% of its budget in terms of real dollars.

39.    For example: if the Debtor creates a $100,000 budget, the Common Expense Allocation would require the HUO to pay the Debtor approximately $64,596.20 and the other unit owners $35,403.80. The HUO would consider the $64,596.20 it owed the Debtor a *Shared* Cost allocable to the RUOs and CUOs (the Debtor). The *Shared* Cost Allocation of the $64,596.20 would require the Debtor to pay the HUO $10,748.87.

40.    In total, on a $100,000 Debtor budget, the most the Debtor could recover in terms of real dollars, is $89,251.13 ($64,596.20 + $35,403.80 - $10,748.87, or approximately 89.25% of the budget) assuming 100% collections from unit owners.

---

[7] The CUs are allocated 15.1626% and Unit 505 is allocated 1.0275%.
[8] Correspondence November 10, 2016 "Demand Letter" from Shecher to Velez.

41.     In order for the Debtor or HUO to create a budget sufficient to pay their obligations, they would have to impose a budget exceeding 100% of their actual expected expenses. The Declaration prohibits the Debtor from passing a budget that exceeds its actual expected expenses (except for reserve accounts for potential future expenses). Declaration, Exhibit "4" §10.1.    Upon information and belief, the HUO takes the position that the Declaration does not impose the same limitations upon the HUO.

42.     The same circuitous (and broken) formula applies to a budget of the HUO.[9]

43.     This issue is exacerbated where, as here, the HUO issues special assessments against the Debtor for hundreds-of-thousands-of-dollars.  *Id.*

44.     Moreover, notwithstanding: (i) the inherent flaw and affect on the calculations by both the Debtor and the HUO; and (ii) that **HUOs affiliate managed the Debtor for nearly three years**, the HUO has taken the incredible position that the Debtor's budget infirmities are squarely to blame upon the current board of directors.

**D.    Chronology of Events Leading Up to the Bankruptcy Filing**

**(i)    *2011 Lawsuit Against Optima Hospitality, LLC and Introduction to HUO***

45.     The developer, Indian Creek Hotel Investors, Inc. (the "Developer") was the original HUO. Declaration §1.2.

46.     On October 4, 2007, public records reflect that the HU was transferred

---

[9] If the HUO creates a $100,000 budget, the *Shared* Cost Allocation would require the Debtor to pay the HUO approximately $16,640.10 and the other RUOs $83,359.90. The $16,640.10 *Shared* Cost borne by the Debtor would be considered a Common Expense. The Common Expense Allocation for that $16,640.10 would then require the HUO to pay the Debtor $10,748.87. In total, on a $100,000 Debtor budget, the most it could ever expect to recover in terms of real dollars, is $89,251.13 (or approximately 89.25% of the budget) assuming 100% collections from RUOs.

from the Developer to Optima Hospitality, LLC ("Optima").[10]

47.    On account of, among other things, the Debtor's position that the Declaration violated Florida condominium law by implementing the Aberrational Ownership and Cost Structures, on July 11, 2011, the Debtor commenced a lawsuit against Optima (the "Optima Lawsuit").[11]

48.    During the course of the litigation, on February 8, 2013, the Debtor and the HUO's affiliate, Condominium Hotel Management Corporation, Inc. ("CHMC"), entered into an agreement that would be effective if CHMC or an affiliate acquired the HU (the "Operations Agreement").

49.    On or about March 20, 2013, the HUO, an affiliate of CHMC, acquired the HU.

50.    That same day, the Debtor entered into: (i) a *Condominium Management Agreement* with CHMC to manage the Debtor; and (ii) an addendum to the Operations Agreement with CHMC through which the HUO agreed to be bound by the Operations Agreement. The Operations Agreement included, among other things, critical reporting obligations on behalf of the HUO in favor of the RUOs and Debtor.

51.    After participating in mediation and being swooned by the HUO's beneficent promises, the parties entered into a settlement agreement and stipulated to a dismissal of the Optima Lawsuit on March 26, 2013.

(ii)    **The $1,955,099 Emergency Special Assessment of 2014**

52.    As part of the discussions between the Debtor and HUO, there was

---

[10] Miami-Dade Public Records, Book 26012, Pages 1626-1628. A "Corrected Special Warranty Deed" with respect to the HU appears to have been signed on June 20, 2011 and recorded on August 20, 2012, from the Developer to Optima Hospitality Associates, LLC, Miami-Dade Public Records, Book 28234, Page 3692.
[11] Case No. 11-21320-CA-01, in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida.

consensus that the HUO would pass an emergency special assessment for building repairs to be paid by unit owners over a 9 month period (the "2013 ESA"). On May 8, 2013 it is believed the 2013 ESA was recalled and credited as prepayments of the Unit Owners.

53.     But, by early 2014, the HUO unilaterally issued a second emergency assessment (the "2014 ESA"). This time, the HUO imposed a special assessment against the RUOs and Debtor in the amount of $1,955,000 purportedly to update, repair and renovate the HU. The 2014 ESA started to be invoiced on January 2014.

54.     Most RUOs and the Debtor could not bear the expense. Tensions between the RUOs and the HUO began to rise. During this time, the Debtor was being managed by HUO's affiliate CHMC.

55.     In addition to the unilateral actions taken by the HUO to implement incredibly expensive renovations at the expense of the RUOs and Debtor, CHMC failed and refused to provide transparent accounting to the RUOs.

### (iii)        *The June 2014 Flood Event*

56.     Adding to the tensions, in June of 2014, a Residential Unit on the 9th floor under CHMC's stewardship had a significant plumbing issue. The plumbing issue caused material water damage to floors 5-9 of the Condominium (the "Flood Event").

57.     As a result of the Flood Event and CHMC's and the HUO's failure to timely remedy same (including permitting certain wires to be exposed in connection with unpermitted demolition), the Fire Marshall issued a Cease & Desist Order on August 21, 2014.

58.     The Cease & Desist Order required evacuation of all units on floors 5, 6, 7, 8, and 9 through the end of October 2014. A 24 hour Fire Marshall watch was imposed

by the City of Miami Beach.

59.    After October 2014, the majority of the units on the floors affected by the Flood Event re-opened.  Approximately ten units remained closed due to the damage. Because of unauthorized demolitions (RUO's did not give permission or were not even told what was happening in their units) within these units by HUO and CHMC, it is believed that these RUO's have pending fines and violations with the City of Miami Beach.  CHMC had promised the RUO's that insurance proceeds would be dedicated to repair their units.  This did not happen.

60.    Upon information and belief, insurance has paid the HUO and/or its contractors, directly or indirectly, approximately $760,056 in connection with the Flood Event.

### (iv)    *The Negligently Destroyed Fire Panel*

61.    Upon information and belief, A1 Fire & Security ("A1") was engaged by CHMC to repair or update certain fire safety features.

62.    Upon information and belief, on or about April 6, 2015, A1 removed the custom smoke alarm panel and wrongfully discarded it.

63.    Only a few short months after being shut down for the Flood Event, on April 13, 2015, the Condominium was again shut down and closed in its entirety by the City of Miami Beach Building Department as an Unsafe Building due to the following reasons:

> *Fire alarm panel was removed* and new panel still not in service Corridor walls and unit demising wall have been removed on units from 5th to the 9th floor Interior demo of all units from 5 to 9, smoke control system not functioning, exhaust vents from baths not protected and no damper shown from floor to floor, penetrations between floor not

> properly fire stopped, water lines from floor to floor corroded.

(emphasis added).[12]

    *(v)*        ***The $375,000 Emergency Special Assessment of 2015***

64.    Shortly thereafter, the HUO issued an additional emergency special assessment in the amount of $375,000 (the "2015 ESA") to be paid by the RUOs and Debtor "in one lump sum payment due and payable by June 1, 2015."[13]

65.    At this point, relations between the RUOs, CHMC, HUO and Debtor were incredibly strained.

66.    Escalating the discord between the RUOs and HUO caused by HUO's unilateral special assessments, the HUO and CHMC breached the Operations Agreement.[14] The HUO and CHMC failed and refused to deliver transparent financial information supporting the costs of the HUO's emergency assessments. The RUOs demanded that he HUO demonstrate the purpose of the special assessments, the contracts for the repairs, and the competitive bids they received.

67.    The RUOs also wanted an explanation of why RUOs and the Debtor were being asked to pay for Flood Event damages if such damages were covered by insurance.

68.    The Debtor and RUOs generally felt that CHMC and the HUO had failed and breached their duties under the Declaration and common law.

---

[12] City of Miami Case Description, Case No. BV15000767.

[13] Undated letter signed by Mirko Morales, Property Manager (CHMC) on behalf of the HUO.

[14] Paragraph 3, subsections (h)-(g) of the Operations Agreement require the HUO to provide audited financial statements of the Shared Costs annually to the unit owners, provide a monthly accounting to the unit owners of Shared Costs and Common Expenses, and provide the Association with copies of any and all agreements with third-party vendors providing services to the Condominium (including the Shared Components).

    *(vi)*       ***The Insider Loan of August 2015 and Schecher Self Dealing***

69.     On August 20, 2015, it appears that the HUO borrowed $650,000 at 18% interest (the "Insider Loan") from APO Annuity Manager, LLC ("APO").

70.     Relevant here, the Insider Loan provides for payments to:

      A.     $137,432 to Casablanca Rental Services ("Casablanca");
      B.     $208,249.47 to CHMC; and
      C.     $155,864 for "Management Discretion from List Approved"

71.     Schecher is the CEO of the HUO.

72.     Schecher is the Manager/Director of APO.

73.     Schecher is the CEO of Casablanca.

74.     Schecher is the Director of CHMC.

75.     Essentially, Schecher's HUO borrowed $650,000 at 18% from Schecher's APO to pay Schecher's Casablanca and CHMC.

76.     On August 26, 2015, Bridgeport Capital Funding, LLC ("Bridgeport") recorded a UCC-1 claiming a security interest in all assets of the Debtor. Schecher is a director of Bridgeport Capital Services, Inc. The address of Bridgeport on its UCC-1 filing is the same as Schecher's address on APO's 2016 Annual Report.

    *(vii)*      ***The $975,000  Emergency Special Assessment of 2016***

77.     On February 26, 2016, the HUO sent another notice of an emergency special assessment to RUOs and the Debtor in the amount of $975,000 due by March 1, 2016 for, among other things, costs allegedly associated with the closing of the building, the repairs needed to open the building and for legal fees and other miscellaneous costs (the 2016 ESA").

(viii)      **_The $17,500 HUO Deception_**

78.     Upon information and belief, in early 2016 the HUO claimed that the Condominium was closed because it did not have $17,500 necessary to satisfy a City of Miami requirement. After speaking with representatives of the HUO and CHMC daily to re-open the building, certain unit owners committed to pay the $17,500 requested by the HUO.

79.     In March of 2016, certain unit owners transferred the $17,500 to the HUO for the express purpose of, and conditioned upon, re-opening the Condominium. It is understood that the HUO agreed to do so.

80.     However, after receiving the earmarked $17,500, the HUO failed and refused to open the Condominium.

81.     Word of HUO's deceitful action spread like wildfire through the unit owners. Having breached the unit owners' trust, many unit owners refused to pay the HUO and responded to the HUO's lockout with a rent strike.

(ix)      **_The 2015-2016 Lawsuit Against HUO_**

82.     On August 28, 2015, the Debtor commenced a lawsuit against CHMC, the HUO, and A1 Fire & Security, LLC claiming, among other things, the appointment of a receiver, an injunction, an accounting, negligence, breach of fiduciary duty, breach of contract, and breach of good faith and fair dealing (the "HUO Lawsuit").

83.     On October 12, 2015, the Court in the HUO Lawsuit compelled the "audit of the Hotel Unit's financial statements of the Shared Costs for the remainder of 2013 and for 2014 will be completed by November 10, 2015."[15] HUO Lawsuit, _Order on_

---

[15] Attached hereto as Exhibit "A" is a copy of the October 12, 2015 _Order on October 9, 2015 Status Conference_, compelling, among other things, that the "audit of the Hotel Unit's financial statements of the

*October 9, 2015 Status Conference.*

84.     The HUO failed to deliver an audit of the HU's financial statements by the November 10, 2015 deadline.   To date, Debtor has not received an audit of HU's financial statements of Shared Costs for 2013 or 2014.

85.     Instead, it appears that the HUO caused to be delivered audits of the <u>Debtor's</u> financial statements. The audits of the Debtor's financials do not appear to investigate or audit the HUs Shared Costs or the HUO's financial statements.

86.     Nevertheless, on March 8, 2016, the parties to the HUO Lawsuit participated in mediation and came to a resolution (the "Settlement"). Among other things, the HUO and CHMC agreed to: (i) provide open and transparent financial information; (ii) to allow RUOs a payment plan with respect to the charges of the HU; and (iii) to pursue a lawsuit against A1. The Debtor agreed to dismiss the HUO Lawsuit without prejudice.

87.     The Settlement also provides that all of the parties to the HUO Lawsuit, including the HUO (the "HUO Legal Fees"), were to bear their own legal fees and costs. However, it appears that the HUO included the HUO Legal Fees in its calculation of *Shared* Costs and assessed same against, among others, the Debtor.

**(x)**          <u>***The Florida Building and Supply Lawsuits (the "FB&S Lawsuits")***</u>

88.     In December 2014, at the direction of CHMC it appears that the Debtor executed a contract (the "Disputed Contract") with Florida Building & Supply, Inc. ("FB&S") for certain <u>repairs to the HU</u>. The Debtor denies that the signatory to the Disputed Contract had the authority to sign same and further disputes, among other things, the validity and enforceability of the Disputed Contract.

Shared Costs for the remainder of 2013 an 2014 will be completed by November 10, 2015." At ¶8.

89. On or about February 4, 2015, FB&S claims to have furnished labor, services and materials for the benefit of the HU pursuant to the Disputed Contract. On or about April 6, 2016, FB&S filed a claim of lien against all units in the Condominium purporting to secure its claim of approximately $83,799.64 for unpaid goods and services rendered to the HU on an oral contract with the Debtor (the "FB&S Disputed Lien #1"). Then on April 20, 2016, FB&S filed a claim of lien against all units in the Condominium purporting to secure its claim of approximately $963,334.19 for unpaid goods and services rendered to the HU pursuant to the Disputed Contract (the "FB&S Disputed Lien #2", together with FB&S Disputed Lien #1, the "FB&S Disputed Liens").

90. On June 20, 2016, FB&S filed two lawsuits against the Debtor.

91. The first lawsuit[16] claims that the Debtor breached an oral contract with FB&S and claims damages in the amount of approximately $83,799 and to foreclose upon FB&S Disputed Lien #1. The second lawsuit[17] claims, among other things, that Debtor breached the Disputed Contract with FB&S and claims damages in the amount of approximately $963,334 and to foreclose FB&S Disputed Lien #2.

92. On September 1, 2016, the Debtor filed Motions to Dismiss both FB&S Lawsuits.

93. On October 19, 2016, the Court in the 'oral contract' FB&S Lawsuit entered an order abating said lawsuit until the HUO was made a party and compelled all parties to mediation.

94. Also, on October 19, 2016, the Court in the 'Disputed Contract' FB&S

---

[16] Case No. 2016-15645-CA-01, before the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida.

17 Case No. 2016-15653-CA-01, before the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida.

Lawsuit entered an order of dismissal for failing to join an indispensable party; the HUO.

### (xi) *The Building is Still Closed*

95. During all this time, since April of 2015, the Condominium has been closed.

96. The RUOs and Debtor have had absolutely no access to the Condominium, or their units, and were **prevented from exercising their Easement Rights**. The Declaration makes clear that the Easement Rights are the sole consideration provided to RUOs and CUOs by the HUO.

97. Nevertheless, it appears that the HUO issued assessments and special assessments well exceeding a million dollars against the RUOs and the Debtor for, among other things, renovations to its HU **while denying the RUOs and Debtor their Easement Rights**. During all of this time, the HUO had not pursued a single foreclosure action against a delinquent RUO.

98. Only now, on the eve of re-opening the "almost brand new building with a new pool, new air-conditioning improvements, new elevator improvements, and basically a new building…",[18] the HUO has filed approximately 28 foreclosure actions against RUOs and explained to RUOs that their units are "all but worthless…."[19] The HU has offered, among other things, to accept deeds to *qualifying* Residential Units in lieu of foreclosure and coordinated with a "bulk buyer" who purportedly offered to purchase Residential Units for $40,000-60,000 (most units were originally purchased in the $150,000-185,000 range).

99. The HUO has e-mail blasted the RUOs with threats of foreclosure,

---

[18] See FN #2.
[19] E-mail from rschecher@█████████ to Maria Velez, with copies to many unit owners, dated December 6, 2016 at 11:41 PM, Subject: "Re: Bankruptcy Filing of the Sixty Sixty Association".

claiming that the RUOs investment in Residential Units are at "rock bottom",[20] and responded to a RUO's proposed solution with, "What you propose is not only idiotic but it is totally out of the realm of reality."[21]

100.    The HUO's intimidation tactics continue unabated.

101.    Upon information and belief, after the Debtor filed its bankruptcy petition, the HUO held a closed door meeting of unit owners at the Debtor's property without its permission and after being advised of the automatic stay.

**(xii)        _The Debtor's Bankruptcy Filing_**

102.    On November 15, 2016, the board of directors of the Debtor unanimously voted to seek Chapter 11 protection.

103.    Recognizing that a Chapter 11 proceeding is an invitation to negotiate, the Debtor intends reorganize by, among other things:

> (i)    rehabilitating its RUO's and HUO's ability and willingness to fund operations by:
>> a.    amending the Debtor's charter through a Chapter 11 Plan, and
>> b.    enforcing the Easement Rights to make units accessible for the Debtor and the RUOs;
> (ii)   organizing and appropriately analyzing claims to eliminate duplicative, erroneous or unreasonable claims;
> (iii)  selling property free of claims and liens for the benefit of all constituencies; and
> (iv)   monetizing all claims held by the Debtor in a single forum.

104.    Once these steps are taken, the Debtor believes it will be able to pay all allowed claims in full over a reasonable plan term and continue healthy operations thereafter.

---

[20] E-mail from rschecher@███████ to was913@████████ with copies to many unit owners, dated December 7, 2016 at 7:39 PM, Subject: "Re: Bankruptcy Filing of the Sixty Sixty Association".

[21] E-mail from rschecher@████████ to flaviaicc@█████████ with copies to many unit owners, dated December 7, 2016 at 10:41 PM, Subject: "Re: Bankruptcy Filing of the Sixty Sixty Association".

## II.    Facts in Support of First Day Motions

105.    Concurrently with the filing of this Declaration, the Debtor will file a number of applications seeking entry of orders (the "First Day Orders"), which the Debtor believes are necessary to enable it to operate in Chapter 11 with a minimum of disruption and loss of productivity.  The Debtor respectfully requests that each of the First Day Orders be entered as a critical element in stabilizing and facilitating the Debtor's operations during this Chapter 11 case.  A brief description of the relief requested and the facts supporting each of the First Day Orders is set forth below.

### A.    Application to Employ Messana, P.A. as General Bankruptcy Counsel

106.    By this application, the Debtor seeks to retain Brett D. Lieberman and the law firm of Messana, P.A. as its general bankruptcy counsel. The Debtor has contracted with Messana, P.A. to provide the needed services outlined in the application and requests a court order approving the same.

### B.    Application to Employ Eisinger, Brown, Lewis, Frankel & Chaiet, P.A. as Special Condominium Law Counsel

107.    By this application, the Debtor seeks to retain Alessandra Stivelman and the law firm of Eisinger, Brown, Lewis, Frankel & Chaiet, P.A. ("Eisinger Law") as its special condominium counsel. The Debtor has contracted with Eisinger Law to provide the needed services outlined in the application and requests a court order approving the same.

### C.    Motion to Compel Turnover of Debtor's Books and Records

108.    Through this Motion, Debtor seeks turnover of books and records of the Debtor held by its former manager, CHMC.

109.    I have personally requested that CHMC deliver all of Debtor's books and

20

records in its possession and, to date, all of such books and records have not been delivered.

110.    Such books and records are necessary for the Debtor to have a fulsome understanding the Debtor's finances from the time period during which CHMC managed the Debtor.

111.    Additionally, in that CHMC failed to file the Debtor's federal tax returns while it was managing the Debtor, Debtor requires such historical information in order to prepare such outstanding federal tax returns.

Wherefore, for the reasons stated herein and in each of the First Day Motions, the Debtor respectfully requests that First Day Motions be approved.

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge based on the information available to me after reasonable review.**

_____          Dec 12/16
Maria Velez, President                                    Date

21

# Exhibit "A"

*Order on October 9, 2015 Status Conference*

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2015-019981-CA-01

SIXTY SIXTY CONDOMINIUM
ASSOCIATION, INC., a Florida not
for profit corporation,

      Plaintiff,

vs.

CONDOMINIUM HOTEL MANAGEMENT
CORPORATION, INC., a Florida corporation,
SCHECHER GROUP, INC., a Florida Corporation,
And A1 FIRE & SECURITY LLC,

      Defendants.

_____/

## ORDER ON OCTOBER 9, 2015 STATUS CONFERENCE

**THIS CAUSE** came before the Court on the 9th day of October, 2015 for Status Conference, and the Court having heard argument of counsel, reviewed the record and being otherwise advised in the premises, it is hereupon

**ORDERED and ADJUDGED** as follows:

1.      The parties shall appear for a status conference at 1:30 p.m. on October 23, 2015 (or 1:00 p.m. upon notice by Plaintiff's counsel to accommodate her schedule), including:

      a.  A corporate representative of Plaintiff Sixty Sixty Condominium Association ("Plaintiff" or the "Association"), Inc. shall appear on behalf of Plaintiff;

      b.  Richard Schecher shall appear on behalf of Defendant Schecher Group Inc. ("Schecher Group"); and

      c.  Mirko Morales shall appear on behalf of Defendant, Condominium Hotel Management Corporation, Inc. ("CHMC").

2.      The Court defers on setting a hearing on Plaintiff's Motion to Appoint Receiver and for Temporary Injunction ("Receivership Motion") at this time, and the Court will re-address

if and when to set such a hearing on the Receivership Motion at the October 23rd status conference.

3.     CHMC and Schecher Group shall have through and including October 21, 2015 to respond to Plaintiff's Complaint.

4.     CHMC and Schecher Group are not required to respond to Plaintiff's Receivership Motion to Appoint Receiver and for Temporary Injunction at this time, and the Court will re-address if and/or when they will be required to file such a response at the October 23rd status conference.

5.     The depositions currently scheduled in this matter by Schecher Group of certain Association board members, Plaintiff's corporate representative, A1 Fire's representative, the City of Miami Beach Fire Marshall, and Karen Lippman are cancelled, and the Court will re-address issues relating to these depositions, as well as the deposition of Maria Velez, at the hearing on October 23rd. The Association's motion for protective order is moot.

6.     CHMC agrees to not proceed with the annual meeting of the Association based on the Association's instruction. The Association shall take further action with respect to the setting or cancelling of this meeting.

7.     CHMC and Schecher Group have agreed to provide, and did provide, a copying service with copies of all of the documents outlined in their counsel's letter dated October 7, 2015, including all financial documents through August 2015, and the Association's counsel agreed to make arrangements with said copy service for payment, manner of production, and delivery.

8.     The audit of the Hotel Unit's financial statements of the Shared Costs for the remainder of 2013 and for 2014 will be completed by November 10, 2015.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 10/12/15.

JOHN W. THORNTON
CIRCUIT COURT JUDGE           **ORIGINAL**

JUDGE JOHN W. THORNTON JR.

**No Further Judicial Action Required on THIS MOTION**

CASE NO.: 2015-019981-CA-01

> ## CLERK TO <u>RECLOSE</u> CASE <u>IF</u> POST JUDGMENT

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.  The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed and stamped original Order sent to court file by Judge Thornton's staff.

**Copies furnished to**:

All counsel of record