**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

In re:

Sixty Sixty Condominium Association, Inc.            Case No. 16-26187-RAM

        Debtor-in-Possession.            Chapter 11

_____/

**DEBTOR'S *EXPEDITED* MOTION FOR ENTRY OF AN ORDER:**
**(I) APPROVING JASON WELT AND TRUSTEE REALTY, INC. AS DEBTOR'S REAL**
**ESTATE PROFESSIONAL;  (II) APPROVING PROPOSED BIDDING PROCEDURES;**
**(III) APPROVING FORM AND NOTICE THEREOF; AND (IV) SCHEDULING**
**HEARING TO CONSIDER APPROVAL OF "HIGHEST AND BEST" BID**

> **Expedited Hearing Requested on or Before April 17, 2017**
>
> **Through this Motion, Debtor seeks, among other things, (i) authority to engage a real estate professional to facilitate a process to obtain a "highest and best" binding letter of intent and a purchase and sale agreement consistent with same, to facilitate a bulk sale of the residential and commercial units within the Condominium; and (ii) approval of the process. Debtor seeks to provide an opportunity for prospective purchasers to make "higher or better" proposals to those already received by Debtor. Debtor requests that such proposals be delivered to Jason Welt, Debtor's proposed realtor, on or before <u>4:30 pm EST on May 12, 2017</u> pursuant to the terms herein. Debtor's reorganization, particularly as it relates to the exclusivity periods of 11 U.S.C. 1121(c), augers heavily in favor of advancing on an expedited basis.  Accordingly, Debtor requests that the hearing be held on this motion on or before April 17, 2017 and a final hearing on or before May 24, 2017.**

Sixty Sixty Condominium Association, Inc., the Chapter 11 debtor and debtor-in-possession herein (the "Debtor"), by and through undersigned counsel, pursuant to Sections §§ 327, 330, 331, 363(b), 363 (f), 365 and 1123(b) of the United States Bankruptcy Code and Rules 2002(a)(2), 2002(c)(1), 2014 and 6004 of the Federal Rules of Bankruptcy Procedure, and Rule 6005-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Florida, applies for the entry of an Order:[1] (i) approving the retention of Jason Welt and

---

[1] Pursuant to Local Rule 6005-1, a proposed form of order is annexed hereto as **Exhibit "A"**.

Trustee Realty, Inc. (together, "Broker") as Debtor's real estate broker to assist in and to facilitate a process to sell Debtor's real property and provide an option to residential unit owners within the Condominium (defined herein) to participate in a Bulk Sale (defined herein), subject to the terms and conditions delineated herein (the "Process"); (ii) approving proposed Process; (iii) approving form and notice of the Process; and (iv) scheduling a hearing to consider approval of "highest and best" offer and setting an objection deadline regarding same (this "Motion"), and in support thereof states as follows:

## I.    PRELIMINARY STATEMENT

Throughout this case, in an effort to maximize value, the Debtor has been negotiating with potential purchasers and/or managers of its real property, to sell or rent same, to provide a means to effectuate a reorganization of the Debtor's financial affairs.

During this process the Debtor has learned, among other things: (i) that a vibrant market for the Debtor's units existed only as part of a bulk sale (requiring a minimum number of residential units to participate, the "Bulk Sale"); (ii) that buyers would not dedicate the resources necessary to perform adequate due diligence unless they obtained certain buyer protections (in the form of exclusive rights to make offers to residential unit owners to participate in the Bulk Sale with the Debtor's cooperation); and (iii) Debtor would be greatly benefitted by the support of a real estate professional to assist in and facilitate a Process to achieve a "highest and best" offer.

Presently, the *Letter of Intent* tendered by Kingfisher Island, Inc. ("KFI") attached as **Exhibit "B"** hereto (the "LOI") represents a "highest and best" letter of intent. The LOI is subject to "higher and better" offers.

2

The Debtor seeks to create a transparent process for the other potential purchasers who seek to make offers for a Bulk Sale to submit a "best and final" offer on terms "higher and better" than the LOI (including KFI, a "Potential Purchaser").

Accordingly, Debtor seeks authority to engage the Broker to carry out a Process to obtain a "highest and best" offer, approval of the Process, approval of the form of notice of the Process, setting a hearing to approve the "highest and best" offer received as a result of the Process and a deadline to object to same, and for related relief.

## II.     JURISDICTION AND BACKGROUND

1.     On December 5, 2016, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. (ECF No. 1).

2.     The Debtor is a Florida not-for-profit corporation; a condominium association for a building located at 6060 Indian Creek Drive in Miami Beach, Florida (the "Condominium").

3.     The Condominium is composed of 87 "units", which includes: (i) 82 residential units (the "Residential Units") that are owned by the Residential Unit owners (the "RUOs");[2] (ii) four commercial units (the "Commercial Units")[3] and, (iii) generally speaking, all areas not within a Residential Unit or Commercial Unit are deemed to be a part of a hotel unit (the "HU") owned and operated by the Schecher Group, Inc. (the "HUO"). The principal of the HUO is Richard Schecher ("Schecher").[4]

4.     The Debtor owns, among other things, Residential Unit 505 and the four Commercial Units within the Condominium (together, the "Units").

---

[2] The Debtor owns one of the Residential Units; Residential Unit 505.

[3] The Commercial Units are comprised of a restaurant space (the "Restaurant") and three open terraces (the "Terraces" that have challenges as it relates to income producing possibilities.

[4] *See* www.Richard-j-schecher.com.

5.      <u>In discussions with the HUO's counsel, the HUO has represented that it has no interest in participating cooperatively with the Association to try to facilitate a bulk sale of the Condominium.</u> Rather, upon information and belief, the HUO is rushing to foreclose upon the Residential Units with the objective of packaging same for its own bulk sale.

6.      In other words – instead of seeing the Debtor's bankruptcy filing as an opportunity to "work-out" the challenges facing the Debtor, the HUO has chosen to act directly adverse to the Debtor and the RUOs.

7.      Prior to the Petition Date, the HUO represented to RUOs that it was coordinating with a bulk purchaser of Residential Units. The HUO represented that the bulk purchaser would pay $60,000 for such units on a "Take It Or Leave It Basis". *See* E-mail from rschecher@xxxx.com to XXXXXX XXXXX, dated November 11, 2016 at 14:57, Subject: "Re: NEW BUDGET EFFECTIVE 12/1/2016 TO 12/31/2017":

> RUO: "In case we decide to sell, may you send the name and telephone number of Contact to me?
>
> Schecher: THERE IS NO NAME OR CONTACT NUMBER TO SEND. AT THE PRESENT TIME THERE IS ONLY ONE BUYER AND HIS PRICE IS A **FLAT $60,000 PER UNIT ON A TAKE IT OR LEAVE IT BASIS**. THIS IS THE BULK BUYER AND HE MAY NOT BE AVAILABLE MUCH LONGER AS HIS LAST PURCHASE FROM A BANK WAS DONE AT $50,000 SO THE PRICES ARE DROPPING AS THE DELINQUENCIES OF THE OWNERS ARE INCREASING. THE BOTTOM LINE HERE IS THAT NOBODY IN THEIR RIGHT MIND WILL BUY A UNIT AT SIXTY SIXTY AFTER READING THE CONDO DOCUMENTS AND REVIEWING THE HORRIFIC DELINQUENCY RECORD OF THE CURRENT OWNERS. ALL BUYERS HAVE WALKED AWAY AND MY FEAR IS THAT THE BULK BUYER MAY DO THE SAME IN THE UPCOMING WEEKS" (capitalization in original, emphasis added).[5]

---

[5] *See also* e-mail from rschecher@xxxx.com to XXXX XXXX, dated November 14, 2016 at 15:36, Subject: "Re: NEW BUDGET EFFECTIVE 12/1/2016 TO 12/31/2017" ("The Bulk Buyer is offering $60,000 and from the looks of things, nobody else is willing to buy the units at any price). The subject correspondences are attached hereto as **Exhibit "C"**.

8.    The Debtor filed its *Plan of Reorganization of Sixty Sixty Condominium Association, Inc.* (ECF No. 149) (the "Plan") and its *Disclosure Statement in Support of Plan of Reorganization of Sixty Sixty Condominium Association, Inc.* (ECF No. 150) (the "DS") on March 17, 2017. The Plan and DS contemplate a process to facilitate a Bulk Sale of Residential Units and Commercial Units at no less than $120,000 per unit.

9.    As of the date hereof, no creditors' committee has been appointed in this case.  In addition, no trustee or examiner has been appointed.

10.    This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(A), (N) & (O).

### III.    RELIEF REQUESTED

**A.    Employment of Broker as Debtor's Real Estate Professional**

11.    Section 327(a) of the Bankruptcy Code authorizes "a trustee, with court approval, to employ one or more attorneys, accountants, appraisers, auctioneers or other professional persons that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties."

12.    Debtor has the powers of a trustee under 11 U.S.C. § 1107.

13.    Debtor desires to employ Broker as a real estate professional to assist in and facilitate a Process to obtain the "highest and best" offer for the purchase and sale of Debtor's Units and the other Residential Units as part of a Bulk Sale (a "Highest and Best LOI"), subject to the terms and conditions delineated in this Motion.

14.    Debtor has selected Broker due to his excellent reputation and experience with distressed sales, particularly in the bankruptcy context.

5

15.     Broker also has vast local experience in dealing with court-ordered sales in many bankruptcy and insolvency cases. Additionally, the Bulk Sale contemplated herein is attractive to a particularly niche market within which the Broker has experience.

16.     Retention of Broker is in the best interest of the estate.  Broker will set forth a targeted marketing plan designed to organize the potential buyers who have expressed an interest in the Bulk Sale as well as other capable buyers and carry out the Process.  Finally, Broker will work with the Debtor to coordinate specific dates and times which potential buyers can inspect and preview the Units.

### *The Broker's Disinterestedness*

17.     As stated in the Declaration of Broker, attached hereto as **Exhibit "D"**, the Broker does not hold or represent an interest adverse to Debtor's estate and is "disinterested" within the meaning of sections 101(14) and 327(a) of the Bankruptcy Code.

18.     Subject to Court approval, the terms of Broker's engagement are as follows:

a.  Term: the term of the engagement shall be for twelve months commencing upon court approval.

b.  Services: Broker shall enlist best efforts to secure a satisfactory purchaser for the Bulk Sale and shall cooperate with all licensed brokers. Broker shall provide information to Potential Purchasers, as available, to assist them in preparing a Highest and Best LOI. Broker shall advise Debtor as to the distinctions between offers and shall assist in Debtor's analysis of a Highest and Best LOIs.

c.  Authority: Debtor discloses, among other things, that it does not have power or authority to sell any unit within the Condominium other than the Units that it owns. Accordingly, any Bulk Sale will require the voluntary consent and participation of Residential Unit owners. Moreover, any sale of the Units is subject to Bankruptcy Court approval.

d.  Access: Debtor shall provide access to Broker and Potential Purchasers of its Units upon reasonable notice and in coordination with the HUO.

6

    e.  Commission:

        i.  The Broker's compensation will be based upon a "contingency fee" model. That is, the Broker is entitled to a fee in an amount equal to one percent (1.0%) of the final purchase price of all units participating in the Bulk Sale.[6]

        ii.  Any "Cooperating Broker"[7] shall not be paid out of the sale proceeds; rather such payment shall be borne solely by the Potential Purchaser. Broker's compensation will be paid upon closing out of the proceeds of a successful Bulk Sale.

        iii.  However, if the KFI LOI is ultimately the Highest and Best LOI, Broker shall only be entitled to a quarter of a percent (.25%) commission.

        iv.  In the event a Highest and Best LOI is approved and executed by the Debtor but (i) the Bulk Sale does not close and (ii) any deposit is retained by the Debtor, the commission to be paid Broker shall be the lesser of: one-half (1/2) of the amount of the deposit, or $6,000 (the potential commission of a sale of the Units based on the LOI).

### *Broker's Report*

19.    Following completion of the Process, the Broker will file with this Court a report (the "Broker's Report") summarizing the number of Potential Purchasers contacted and the number of LOIs submitted, and stating the fees earned and to be paid to Broker at the closing of the Bulk Sale. The Broker's Report will be served on the U.S. Trustee, Debtor, and any other interested party who specifically requests a copy thereof.

### B.   **Approval of Proposed Process**

20.    Section 363 of the Bankruptcy Code authorizes "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…" 11 U.S.C. § 363(b)(1) and 11 U.S.C. § 1107(a). The standard applicable to a motion under section 363(b)(1) of the Bankruptcy Code is whether the proposed sale serves a sound

---

[6] The 1% Broker's compensation shall be paid out of the proceeds of each separately sold unit including all Residential Units who participate in the Bulk Sale and the Debtor's Units.

[7] A "Cooperating Broker" is any duly licensed real estate broker who properly registers a client who purchases the Property. The present LOI does not contemplate a broker's commission. Accordingly, Debtor requests that any Cooperating Broker fee be paid directly from the proposed purchaser and not from the sale proceeds.

business purpose. *In re BDK Health Mgmt., Inc*., Nos. 98-00609-6B1, 98-00610-6B1, 98-00612-6B1, 98-00613-6B1, 98-00614-6B1, 1998 WL 34188241, at *5 (Bankr. M.D. Fla. Nov. 16, 1998). Courts have held that this standard is satisfied when: (a) the sale is supported by the sound business judgment of the debtor's management; (b) interested parties are provided with adequate and reasonable notice of the sale; (c) the sale price is fair and reasonable; and (d) the purchaser is acting in good faith.  *See In re Delaware & Hudson Ry. Co*., 124 B.R. 169 (D. Del. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (D. Del. 1987).

21.     Debtor has the powers of a trustee under 11 U.S.C. § 1107.

### *The KFI LOI*

22.     The Debtor received an offer submitted by KFI in the form of the LOI.

23.     The key terms of the LOI include the following:

(a)     Purchase Price. One Hundred and Twenty Thousand Dollars ($120,000) per Residential and Commercial Unit. If all Units are purchased, the total purchase price shall be Ten Million Three Hundred and Twenty Thousand Dollars ($10,320,000);

(b)     Due Diligence Period. The Proposed Purchaser is required to conduct its due diligence within 90 days of the later of: (i) the date of the delivery of the due diligence materials; or (ii) execution of a formal purchase and sale agreement;

(c)     $50,000 earnest money deposit upon signing purchase and sale agreement which shall become non-refundable upon the expiration of the due diligence period;

(d)     Dispute Resolution Contingency. Purchaser and Sellers acknowledge that the Units are subject to certain disputes and the bankruptcy proceeding. KFI will seek to settle all outstanding claims with the HUO (including the elimination of the "Administrative Fee" charged by the Hotel Unit operator pursuant to certain rules and regulations imposed by the HUO) and amend or create certain documents to maintain control of the Units. If a resolution is not negotiated or adjudicated by a court of competent jurisdiction upon the expiration of the Due Diligence Period, Proposed Purchaser has the right to extend due diligence period for an additional sixty (60) day period (the "Extended DD Period");

(e)    **Exclusivity. Purchaser shall have an exclusive 180 day period to solicit RUOs to participate in the bulk sale commencing on the date of the acceptance of the LOI (the "Sale Offer Period"). ;**

(f)    The Participation Requirement. A minimum of 58 of the Residential Units and 4 Commercial Units must agree to the terms of the bulk sale (the "Minimum Unit Participation");

(g)    Anticipated Closing Date. The transaction will close thirty (30) days following the later of: (i) the expiration of Due Diligence Period; (ii) if elected by Purchaser, the Extended DD Period, or (iii) receipt of approvals from the Minimum Unit Participation to sell their Units;

(h)    Broker. No broker fees or costs; and

(i)    Bankruptcy Court Approval.

### *"Best and Final" Offer Submission Procedures*

24.    Upon approval of his employment, Broker shall commence his marketing activities and communicate with prospective Proposed Purchasers regarding the Bulk Sale.

25.    From commencement of his engagement through 9:30 am EST on May 12, 2017, Broker shall communicate with any and all Proposed Purchasers and provide any information relevant and available to the Broker with respect to the Bulk Sale.

26.    Proposed Purchasers, must deliver[8] an underlined offer "higher and better" than the LOI in substantially the same form as attached hereto as **Exhibit "E"** (a "Best and Final Offer")[9] **between the hours of 10:00 am EST and 4:30 pm EST on May 12, 2017** to the Broker via e-mail (the "Submission Window").[10] Broker shall not communicate with any Proposed Purchaser from 9:30 am EST on May 12, 2017 until 4:00 pm EST on May 17, 2017 (at which point the identity of the "highest and best" Best and Final Offer will be disclosed) except to confirm that Broker is in receipt of its Best and Final Offer.

---

[8] Proposed Purchasers are encouraged to call the Broker to confirm receipt of their Best and Final Offer prior to the end of the Submission Window.

[9] Debtor reserves the right to consider all nonconforming letters of intent in its sole and exclusive discretion.

[10] Broker's e-mail address is jw@jweltpa.com.

27.     For consideration, a Best and Final Offer must submitted during the Submission Window and be accompanied by: (i) proof of funds or financing sufficient to evidence the Proposer Purchaser's ability to close on the Best and Final Offer, in the Debtor's sole and exclusive judgment; (ii) proof of an escrow deposit in the amount of at least $50,000; (iii) an executed confidentially agreement in substantially the form as attached hereto as **Exhibit "F"**; and (iv) Proposed Purchasers are required to disclose any relationship to the Debtor, any creditor, any Residential Unit owner or any of such parties' principals (the "Bid Qualifications").

28.     The "highest and best" Best and Final Offer, in the Debtor's sole and exclusive determination (the "Winning LOI"), shall be submitted to the Court at the Final Approval Hearing (defined herein) whereupon Debtor shall request authority to enter into the Winning LOI on the terms therein and a Purchase and Sale Agreement consistent with same (a "PSA").

29.     The terms of all Best and Final Offers shall be kept confidential until May 17, 2017 at 4:00 pm EST upon which time the terms of the Winning LOI shall be available for disclosure to any Prospective Purchaser who submitted a Best and Final Offer and the Court. Best and Final Offers shall not contain confidentially provisions that would interfere with this process.

30.     The determination of the Winning LOI shall take into consideration, among others, the following non-exclusive criteria, in no certain order:

  a.  Total purchase price for the Residential Units;
  b.  Total purchase price for all Commercial Units;
  c.  Length of due diligent period;
  d.  Number of units satisfying a Minimum Participation Requirement;
  e.  Fewest contingencies, if any;
  f.  Experience and reputation of Proposed Purchaser and its agents.

### *Final Approval Hearing on Shortened Notice*

31.     Debtor requests that a hearing to approve the Winning LOI and authority for the

Debtor to enter into a PSA on substantially the same terms (the "Final Approval Hearing") be conducted on or before May 24, 2017.

32.    Debtor respectfully requests that this Court shorten the notice period provided by Rule 2002(a)(2), if applicable,[11] to permit the Final Approval Hearing to take place on or before May 24, 2017. The relief sought herein is consistent with the Plan and DS which was filed on March 17, 2017 and disclosed the terms of the LOI. By May 24, 2017, interested parties would have had over sixty days to interpose an objection to the sale contemplated herein.

33.    Setting the Final Approval Hearing on an expedited time frame maximizes efficiencies, minimizes administrative burdens on the estate, and does not prejudice any party in interest. The Debtor submits that "cause" exists to shorten the notice period on these facts. Fed. R. Bank. Pro. 2002(a)(1) (debtor shall give "all creditors and indenture trustees at least 21 days notice by mail of … (2) a proposed use, sale, or lease of property of the estate … **unless the court for cause shown shortens the time**…")(emphasis added).

### *Sale Implementation*

34.    Following the approval of the Winning LOI at the Final Hearing, Debtor will be authorized to take all commercially reasonable and necessary steps to complete and implement the transaction contemplated by the Winning LOI including, among other things, entering into a PSA and facilitating communication between the RUOs and the holder of the Winning LOI.

### *Approval of the  Process is in the Best Interest of the Estate*

35.    It is common for a significant component of debtor's assets be offered for sale pursuant to an auction process. *See, e.g., In re Dorado Marine, Inc*., 332 B.R. 637, 639 (Bankr.

---

[11] At the Final Approval Hearing, Debtor shall request, among other things, authority to enter into the Winning LOI. Upon satisfaction of any and all contingencies contained within the Winning LOI, consistent with the DS and Plan, Debtor would then seek final approval of a sale pursuant to a purchase and sale agreement on terms substantially similar to the Winning LOI. Accordingly, Rule 2002(a)(2) may not apply to the Final Approval Hearing.

M.D. Fla. 2005) (describing the auction sale of assets of manufacturer of custom boats*); In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 497, 503-04 (Bankr. N.D. Ala. 2002).

36.     Additionally, a court may approve bidding procedures pursuant to Section 105(a) of the Bankruptcy Code, which authorizes a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code." 11 U.S.C. § 105(a). Indeed, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *In re Integrated Resources, Inc.,* 147 B.R. 650, 659 (S.D.N.Y. 1992) (such procedures "encourage bidding and maximize the value of the debtor's assets."). Historically, bankruptcy courts have approved bidding procedures under the business judgment rule, "under which the courts defer to the actions of corporations taken in good faith and in the exercise of honest judgment." *See. e.g., In re 955 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992).

37.     The Process is designed to encourage qualified buyers to submit bids and facilitate a fair and robust silent auction process. Any interested party may submit a Highest and Best Offer provided only that they satisfy the Bid Qualifications set forth herein during the Submission Window. Parties that submit a Highest and Best Offer that satisfy the Bid Qualifications will participate without further qualification. Debtor submits that these procedures are not onerous or restrictive requirements and will ideally generate multiple bids to participate as the Proposed Purchaser in connection with a Bulk Sale.

38.     Bidder protections such as the blind bidding process and Bid Qualifications proposed herein are of substantial benefit to Debtor, its creditors and the estate*. See, e.g., In re Integrated Resources, Inc*., 147 B.R. at 660; *In re Kmart Corp*., Case No. 02-B-02474 (SPS)

12

(Bankr. N.D. Ill. Aug. 9, 2002) (finding proposed termination fee to be of substantial benefit to debtor's estate). Bidding incentives, such as the exclusivity offered in the form letter of intent, encourage a potential purchaser to invest the requisite time, money and effort to conduct preliminary due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process. *See, e.g., 995 Fifth Ave. Assocs., L.P.*, 96 B.R. at 28 (finding that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citations omitted).

39.     The KFI LOI has established a floor for further bidding on the opportunity to participate as the holder of the Winning LOI.  Accordingly, Debtor submits that the bidding protections proposed hereby are reasonable and necessary to achieve the highest and best offer for the same.

### *Notice of Bidding Procedures and Sale Hearing*

40.     Federal Rule of Bankruptcy Procedure 6004(a) provides that notice of a proposed sale of property, other than in the ordinary course of business, shall be given to all known creditors and parties in interest. Fed. R. Bankr. P. 2002(a)(2) & (c)*; see also In re Performance Materials, Inc*., 309 B.R. 819, 823 (Bankr. M.D. Fla. 2004). Rule 2002 further provides that not less than 21 days' notice by mail shall be given of a proposed sale of property other than in the ordinary course of business unless the Court, for cause shown, shortens the time or directs another method of giving notice.

41.     Debtor will ensure that notice of the sale and procedures sought hereby is timely submitted to creditors and other parties in interest entitled to notice.

42.     Federal Rule of Bankruptcy Procedure 2002(c)(1) governs the contents of the

notice of a proposed sale and requires that the notice include, inter alia, the time and place of any sale and the time fixed for filing objections. A general description of the property to be sold is also required. A copy of the proposed notice is attached hereto as **Exhibit "G"** hereto (the "Bidding Procedures Notice").

43.      Debtor proposes to serve the Bidding Procedures Notice, which includes the time and place to tender a Highest and Best Offer, a summary of the Process, the form of proposed letter of intent, and the time fixed for submitting objections to the Winning LOI (the "Objection Deadline"), via First Class U.S. Mail, within three business days after approval of the Process, upon the following parties:

    a.   All creditors and other parties in interest entitled to notice;
    b.   Any parties whom Debtor believes may have an interest in purchasing the Parcel;
    c.   KFI;
    d.   The United States Trustee's Office; and
    e.   All parties that have requested notice pursuant to Bankruptcy Rule 2002.

44.      Debtor believes that the foregoing notice is sufficient to provide effective notice of the Process, the Final Approval Hearing, and the Objection Deadline to all parties in interest.

45.      Debtor requests that the Court find that the Bidding Procedures Notice constitutes good and sufficient notice to creditors and parties in interest, and that no further notice of the Bidding Procedures, Final Approval Hearing, or Auction is required.

46.      Debtor hereby requests that the Court grant this Motion after notice to parties-in-interest and upon an expedited hearing.  In order to preserve and maximize the value of the Units, it is critical for the Debtor to obtain authority to engage a broker, enter into a LOI to begin the Bulk Sale process.

WHEREFORE, the Debtor respectfully requests that this Court enter an Order in substantially the form attached hereto as **Exhibit "A"** (i) granting this Motion; (ii) authorizing

14

the Debtor to engage the Broker on the terms provided herein; (iii) approving the Process and

form of the Notice of same; (iv) setting a Final Approval Hearing on or before May 24, 2017 and

an Objection Deadline at 4:00 pm EST two business days prior to the Final Approval Hearing;

and (v) granting such other and further relief as the Court deems just and proper.

Respectfully submitted this 7th day of April, 2017.

MESSANA, PA
*Counsel for the Debtor*
401 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, FL 33301
Telephone: (954) 712-7400
Facsimile: (954) 712-7401
Email: blieberman@messana-law.com

/s/ Brett D. Lieberman
Thomas M. Messana
Florida Bar No. 991422
Brett D. Lieberman
Florida Bar No. 69583

15

**EXHIBIT A**
**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

In re:

Sixty Sixty Condominium Association, Inc.                Case No. 16-26187-RAM

        Debtor-in-Possession.                                      Chapter 11

_____/

**ORDER GRANTING *DEBTOR'S EXPEDITED MOTION FOR ENTRY OF AN ORDER:***
***(I) APPROVING JASON WELT AND TRUSTEE REALTY, INC. AS DEBTOR'S REAL***
***ESTATE PROFESSIONAL; (II) APPROVING PROPOSED BIDDING PROCEDURES;***
***(III) APPROVING FORM AND NOTICE THEREOF; AND (IV) SCHEDULING HEARING***
***TO CONSIDER APPROVAL OF "HIGHEST AND BEST" BID***

THIS MATTER came before the Court on April _____, 2017 at 2:00 p.m., upon *Debtor's*

*Expedited Motion For Entry Of An Order: (i) Approving Jason Welt And Trustee Realty, Inc. as*

*Debtor's Real Estate Professional; (ii) Approving Proposed Bidding Procedures; (iii) Approving*

*Form And Notice Thereof; and (iv) Scheduling Hearing To Consider Approval of "Highest And*

*Best" Bid* (ECF No. ____) (the "Motion") the Court, having reviewed the Motion and the

Broker's[1] Declaration of Disinterestedness attached as Exhibit "D" thereto, having heard

argument and proffer of counsel for the Debtor and others, finding that due and adequate notice

was provided to all parties-in-interest, finding that the Process is reasonably calculated to obtain

a highest and best offer for a potential Bulk Sale that would be presented to RUOs to participate

---

[1] Capitalized terms shall have the same meaning as ascribed to them in the Application.

1

at their option, that the Sale Process is reasonable, appropriate and within the Association's and Broker's authority, and otherwise finding good cause to grant the relief requested, it is

**ORDERED** as follows:

1.      The Motion is Granted in its entirety.

2.      Debtor is authorized to retain Jason Welt and Trustee Realty, Inc. (together, "Broker"), as Debtor's real estate broker and to assist in and facilitate the Process pursuant to the terms of the Motion (the "Agreement"), and the payment terms referenced in the Motion are hereby approved.

3.      This Court finds that the Process is fair and reasonable and is approved in its entirety. The Debtor and the Broker are authorized to take any and all steps reasonable and necessary to implement the Process.

4.      The form of Bidding Procedures Notice is approved.

5.      The Final Approval Hearing to determine and approve the Winning LOI and authorize the Debtor to enter into a PSA consistent with the Winning LOI shall be held on _____ at __:__ _.m. at the C. Clyde Atkins United States Courthouse, 301 North Miami Avenue, Courtroom 4, Miami, Florida 33128. This Court finds good cause to shorten the notice period.

6.      Any objection to be considered at the Final Approval Hearing shall be filed on or before 4:00 pm EST two business days prior to the Final Approval Hearing.

### ###

Submitted by:  Brett D. Lieberman, Esq., Messana, P.A., 401 East Las Olas Boulevard, Suite 1400, Fort Lauderdale, Florida 33301, Telephone:  954-712-7400, Facsimile:  954-712-7401, Email:  blieberman@messana-law.com

Copy furnished to Brett D. Lieberman, Esq., who is directed to serve a conformed copy of this order on all interested parties and file a certificate of service with the Court.

2

**EXHIBIT B**
**FKI Letter of Intent**

February 24, 2017

Brett Lieberman
Messana, P.A.
401 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, FL 33301

### RE:  6060 Association and Residential Units, Miami Beach, FL.

▇▇▇▇▇▇▇▇▇▇▇ ("**KFI**") is pleased to submit this letter of intent ("**LOI**"), on behalf of a to be formed entity ("**Purchaser**"), for the purchase of condominium interests (the "**Transaction**") in the 82 Residential Units ("**Residential Units**") and 4 Commercial Units ("**Commercial Units**", together with the 82 Residential Units, the "Property") located at 6060 Indian Creek Road, Miami Beach, FL and all other improvements located thereon, to Sixty Sixty Condominium Association and its' Residential Unit owners (the "**Sellers**").

Please note the following:

- The Purchaser would consider acquiring the Property for a total consideration of Ten Million Three Hundred Twenty Thousand Dollars ($10,320,000).

- The Purchaser would deposit into escrow, a Fifty Thousand ($50,000) earnest money deposit upon signing a Purchase and Sale Agreement which deposit shall become non-refundable upon the expiration of the Due Diligence Period (defined below) in the event that the Purchaser elects to proceed with the Transaction.

- The Debtor shall execute this LOI immediately upon Court Approval and sign a Purchase and Sale Agreement (PSA) consistent with same.

- The Sixty Sixty Condominum is governed by its Declaration and other governing documents found in the Official Records Book 24411, Page 1780 of the Public Records of Miami-Dade County, Florida.

This approach provides the Sellers with the certainty of close and the comfort of dealing directly with a high quality counterparty that can purchase the Property in a compressed time-line and not be reliant on capital market vagaries.

The following is an outline of the indicative terms and conditions underlying this expression of interest, which are subject to change and modification, completion of tax, legal and commercial due diligence, and final investment committee approval:

**Purchaser:**  Newly formed entity affiliated with KFI.

**Property:**  The Property is so many of those certain condominium interests in a hotel resort consisting of 82 Residential Units and 4 Commercial Units as will participate in the bulk sale contemplated by this LOI. The condominium also includes a Hotel Unit, but the purchase and sale of such Hotel Unit is not contemplated by this LOI. The Property is located at 6060 Indian

Creek Road, Miami Beach, FL. The Property shall be sold free and clear of all liens and encumbrances.

**Purchase Price:**  One Hundred Twenty Thousand Dollars ($120,000) per Residential and Commercial Unit. If all Units are purchased, the total purchase price for the entire Property shall be Ten Million Three Hundred Twenty Thousand Dollars ($10,320,000).

**Deposit:**  Fifty Thousand Dollars ($50,000) (the "**Deposit**"), to be deposited with First American Title upon signing the PSA, which will become non-refundable at the end of the Due Diligence Period.  The deposit shall either (i) be refunded to Purchaser in the event a condition precedent of the Purchase and Sale Agreement has not been met or (ii) will act as a credit to the Purchase Price at closing.

**Due Diligence:**  Ninety (90) days (the "**Due Diligence Period**") following the later of i) delivery of the due diligence materials to Purchaser and ii) the execution of a Purchase and Sale Agreement.  In addition to standard legal and property due diligence, KFI will include the satisfactory review of the condominium documents and rules and regulations.

**Dispute Resolution Contingency:** Purchaser and Sellers acknowledge that the Property is subject to certain disputes and bankruptcy proceedings. Purchaser will seek to settle any outstanding claims with the Hotel Unit owner (including the elimination of the "Administrative Fee" charged by the Hotel Unit operator pursuant to certain rules and regulations imposed by the Hotel Unit Owner) and amend or create certain documents to maintain control of the Residential and Commercial Units. If a resolution is not negotiated or adjudicated by a court of competent jurisdiction upon the expiration of the Due Diligence Period, Purchaser has the right to extend due diligence for an additional sixty (60) day period (the "**Extended DD Period**").

**Exclusivity:**  Purchaser shall have the exclusive right to purchase the Property for 180 days from the acceptance of this LOI (the "**Exclusivity Period**"). The Association shall not solicit or provide any Property or ownership information to any parties other than Purchaser during the Exclusivity Period.

**Minimum Purchase Units:** Purchaser is paying a premium for the Property and, therefore, requires that it will purchase no less than a minimum of 58 of the Residential Units and all four of the Commercial Units. Purchaser's intent is to purchase all of the residential and commercial units and if Purchaser is unable to purchase One Hundred Percent (100%) of the commercial and residential units, Purchaser reserves the right to adjust the Purchase Price accordingly.

**Anticipated Closing Date:** The transaction will close Thirty (30) days following the later of (i) expiration of Due Diligence Period (ii) if elected by Purchaser, the Extend DD Period, (iii) receipt of approvals from the Minimum Purchase Units to sell their Units.

**Governing Law & Jurisdiction:**  This LOI shall be governed by Florida Law.

**Confidentiality:**  This LOI, is delivered to the Association and Purchaser on the condition that neither Seller nor Purchaser shall not issue any press release or make public disclosure as to  the existence of this LOI except: (i) to the owners of the Commercial and Residential Units; (ii) to the extent necessary to seek and obtain bankruptcy court approval in that certain bankruptcy case, *In re: Sixty Sixty Condominium Association, Inc.,* Case No. 16-26187-RAM, pending before the United States Bankruptcy Court Southern District of Florida (including attaching a copy of this LOI to a motion seeking authority for the Debtor to execute this LOI, any related Purchase and Sale Agreement, and advance with a bulk sale process of the Commercial and Residential Units

(the "LOI Motion")). It is expressly contemplated that said LOI Motion will contemplate the opportunity for other potential bulk sale purchasers to make offers higher and better than this LOI and the Purchaser expressly reserves the right to revise and modify the terms of this LOI at or before any hearing on the LOI Motion.

Except as expressly set forth herein, this LOI is not intended to be binding and, except for the Confidentiality provisions, shall not give rise to any legal right or obligation between Purchaser and Seller. A binding obligation between the parties will be created only upon the execution of a subsequent formal written PSA, delivered and executed by both parties.

**IN WITNESS WHEREOF**, each of the parties has caused this LOI to be duly executed on its behalf as of the day and year first above written.

Very truly yours,

By: _____

Name: Jonathan Reever

Title: Authorized Agent

**AGREED AND ACCEPTED**

**Sixty Sixty Condominium Association, Inc.**
By:_____

Print Name:_____

Print Title:_____

Date of Execution:_____, 2017

**EXHIBIT C**
**Schecher E-mails**



**De:** Richard Schecher [mailto:rschecher@_____.com]
**Enviado el:** viernes, 11 de noviembre de 2016 15:36
**Para:** _____
**Asunto:** Re: NEW BUDGET EFFECTIVE 12/1/2016 TO 12/31/2017

| UNIT | 2015 Monthly Maintenance Fee | SA Monthly Fee | SA Months Remaning | Total Due Special Assessment | Amount Due HU Owner | Misc. |
|------|------|------|------|------|------|------|
| | Charges   HU COLLECTION & LEGAL FEE | BP Legal | | | **Total Due Time of Sale** | |

The above is the current Estoppel Worksheet for your unit.  At the present time you owe $50,578.92 and the amount is increasing each month and especially when the fees increase next month as outlined in the last update to owners.  The Bulk Buyer is offering $60,000 and from the looks of things, nobody else is willing to buy the units at any price. The above is calculated as of Nov 2016.

Best Regards,

_____
Richard J. Schecher, Sr.
**THE SCHECHER GROUP**
**HOSPITALITY DIVISION**
**SIXTY SIXTY SHARED COMPONET**

**De:** Richard Schecher [mailto:rschecher@
**Enviado el:** viernes, 11 de noviembre de 2016 14:57
**Para:**
**CC:** Mily Gomez
**Asunto:** Re: NEW BUDGET EFFECTIVE 12/1/2016 TO 12/31/2017

PLEASE SEE THE ANSWERS TO YOUR QUESTIONS BELOW

Best Regards,

_____

Richard J. Schecher, Sr.
**THE SCHECHER GROUP**
**HOSPITALITY DIVISION**
**SIXTY SIXTY SHARED COMPONET**
█████████████

On Nov 11, 2016, at 2:28 PM, ███████████████████████████████wrote:

*Mr. Schecher ,*

*Good evening, I received new agreement I have some questions, may you kindly make clear answer to me.*

*1.   How many owners are signed this new agreement? To go ahead they  must be 55 units right? What happened if nor reach this number?*

I AM NOT AT LIBERTY TO RELAESE THE NUMBER THAT HAVE ALREADY SIGNED. WE HAVE ENOUGH UNITS TO MOVE FORWARD TO OPEN THE BUILDING AND WE ARE DOING JUST THAT.  I HAVE SECURED THE FUNDS TO GET US OPEN AND WE ARE CURRENTLY IN THE PRCESS OF OPENING AND IMPROVING THE BUILDING TO A HIGHER STANDARD TO SECURE HIGHER RATES FOR THE HOTEL OPERATOR AND ALL OWNERS. THOSE THAT HAVE SIGNED AND MADE ARRANGEMENTS TO PAY OR SELL ARE HAVING THEIR FORECLOSURE PROCESS SUSPENDED UNTIL THE BALANCE IS PAID OR THE UNIT CLOSING TAKES PLACE. HOWEVER, TO DATE, EVERY BUYER HAS WALKED AWAY FROM THE SALES CONTRACT WITH INDIVIDUAL BUYERS AND NOBODY HAS ANYTHING OTHER THAN WITH THE BULK BUYER. WE ARE MOVING FORWARD AND WILL BE OPEN FOR HIGH SEASON AND WE ARE CURRENTLY TAKING RESERVATIONS TO FILL THE 50 UNITS ON THE HOTE PROGRAM.

*2.   What about future owner profitability? Do you have an estimate future income per unit? I mean, if I decide to continue participating in 6060 Hotel, signing agreement and paying our balance (actually it´s  a lot of money) . Have you calculate future incomes,  will we get some profit? There is much to do to get high hotel level. So, maybe we don't get income for  long long time , but monthly, would  lease  amount be enough to pay SG shared component?*

WE ARE NOT MAKING ANY LONG TERM PROJECTIONS AT THIS TIME. OWNERS NOW REALIZE THAT THEIR UNIT IS BASICALLY WORTHLESS AS NOBODY IS WILLING TO BUY AND IF OUR BULK BUYER PULLS OUT THE FUTURE FOR SELLERS GETS EVEN WORSE.  THE HOTEL PROGRAM WILL PROVIDE OWNERS WITH A MEANS TO REDUCE THEIR DEBT BUT IT WILL NOT PAY OFF THE DEBT BY ITSELF.  WE DO HAVE MAJOR PLANS TO IMPROVE THE BUILDING WHICH WILL GENERATE MUCH HIGHER RATES THAN BEFORE AND MUCH HIGHER OCCUPANCY WHICH ALL GOES TO BETTER RETURNS FOR THOSE OWNERS IN THE HOTEL RENTAL PROGRAM.  WITH THE NEW RULES AND REGULATIONS THE ONLY LOGICAL WAY YOU CAN RENT YOUR HOTEL UNIT IS ON THE HOTEL PROGRAM AS THE COSTS ASSOCIATED WITH TRYING TO DO IT ON YOUR OWN DO NOT MAKE IT VERY

LOGICAL. (PLEASE SEE ALL THE UPDATES SENT IN THE PAST).  PAYING THE MONTHLY SHARED COMPONENT MAY COME FROM A COMBINATION OF THE HOTEL REVENUE PLUS OUT OF POCKET.  EITHER WAY, IT IS BETTER THAN 100% OUT OF POCKET AND FORECLOSURE BECAUSE BASICALLY EVERY HOTEL UNIT IN THE BUILDING NOW HAS A LIEN ON IT AND WILL BE FACING FORECLOSURE.

3.   *In case we decide  to sell, may you send name and telephone number of contact to me?*

   THERE IS NO NAME OR CONTACT NUMBER TO SEND.  AT THE PRESENT TIME THERE IS ONLY ONE BUYER AND HIS PRICE IS A FLAT $60,000 PER UNIT ON A TAKE IT OR LEAVE IT BASIS.  THIS IS THE BULK BUYER AND HE MAY NOT BE AVAILABLE MUCH LONGER AS HIS LAST PURCHASE FROM A BANK WAS DONE AT $50,000 SO THE PRICES ARE DROPPING AS THE DELINQUENCIES OF THE OWNERS ARE INCREASING.  THE BOTTOM LINE HERE IS THAT NOBODY IN THEIR RIGHT MIND WILL BUY A UNIT AT SIXTY SIXTY AFTER READING THE CONDO DOCUMENTS AND REVIEWING THE HORRIFIC DELINQUENCY RECORD OF THE CURRNT OWNERS.  ALL BUYERS HAVE WALKED AWAY AND MY FEAR IS THAT THE BULK BUYER MAY DO THE SAME IN THE UPCOMING WEEKS.

*Thanks in advance for your answer.*

*Best Regards*

████████████

**De:** Richard Schecher [mailto:rschecher████████████]
**Enviado el:** viernes, 11 de noviembre de 2016 4:13
**Para:** Mily Gomez; Aida Vazquez; Gabriel Espino; rj@schecher████.com; cnapoles@sgresorts████████.com
**Asunto:** NEW BUDGET EFFECTIVE 12/1/2016 TO 12/31/2017

**NEW BUDGET ANNUAL HU BUDGET EFFECTIVE 12/1/2016**

The Budget for 2017 has been created in full compliance with the Sixty Sixty Condominium Declarations  and includes funding for building reserves as described in the Sixty Sixty Declarations.  The creation of a proper budget is imperative to avoid any future special assessments to cover costs that have not been budgeted or considered when creating an annual budget to address the operational needs of our building.

This budget is for the Hotel HU Shard Component Only and does not include any charges or costs related to the Sixty Sixty Condominium Association or any budget items related to the Condominium Associations duties, obligations, or responsibilities as outlined in the Sixty Sixty Condominium Declarations.  It is important to note that the Association has failed to provide an adequate budget since 2005 and as such created a huge financial liability to all individual hotel unit owners which is on average $4,500. This amount will be due and payable at the time of a sale and this amount increases until such time as the Association takes action to correct their budget deficiencies.  I DO HAVE A PLAN that will eliminate this debt and save every owner on average $4,500 in current charges as well as future charges.  My plan requires approval from the Sixty Sixty Board of Directors which is currently self managing our Association and in my opinion doing a very bad job.

I have called an Emergency Meeting of all Owners to address the issue of removing this illegal Board from office and taking immediate steps to STOP and PREVENT further unnecessary charges imposed by the Board of Directors which works against the best interest of every hotel unit owner at the Sixty Sixty Condominium Association. I urge every owner to attend or contact me for a Proxy to demand this Board be removed from office.

We believe in the analysis and review of all the individual budget components and line items addressed in our new annual budget that the future will be come financially stable as all known building costs have been considered and addressed in this new budget. We believe the new budget presented today will be adequate to cover the operational needs of our building while remaining in full compliance with the Sixty Sixty Condominium Documents.

**The New HU Monthly Fees presented below are effective 12/1/2016** and will remain in force until 12/31/2017 when a new annual budget will be established based upon the prior 12 months performance of the current budget. It is also important to note, as stated above, that the HU Fee is for the Shared Component Charges Only and does not fall under the Florida Condominium 718 requirements for the Condo Association.

It is important to note that out of approximately $1,000,000 due on a monthly basis to cover our building costs in the 2016 Budget Owners have only paid about $350,000 total leaving a huge financial deficit which has resulted in liens being placed on our building and this is the reason our building was not able to re-open when it was closed by the City of Miami Beach.

As a direct result of this financial shortage all delinquent owners are now in collection with unit liens and facing immediate foreclosure. You can avoid the extra costs of legal & collection by paying your account current today. Moving forward any owner delinquent more than 30 days will be placed into foreclosure without exception. However, TODAY, every unit in our Association has a lien on it and is facing foreclosure.

Please pay up or sell out and get out because the delinquency is not acceptable and your delinquency is forcing your neighbors to pay more to cover those deadbeat owners who do not pay what the Sixty Sixty Declarations require them to pay.

***Please make your check made payable to:*** SG Shared Component

**A- Units**
(501,502,601,602,701,702,801,802,901,1001,1002,1101,1102,1201,1202,1401,1402,1501,1502)
will be **$1,382 per month.**

**B-Units** (503,506,507,603,606,607,703,706,707,803,806,807,903,906,907,1003,1006,1007,1103,1106,1107,1203,1206, 1207,1406,1407,1506,1507) will be **$1,324 per month**

**C-Units**
(504,604,704,804,904,1004,1104,1204) will be **$1,121 per month**

**D-Units**
(505,605,705,805,905,1005, 1105,1205,1405,1505) will be **$1,361 per month**

**E-Units**
(508,608,708,808,908,1008,1108,1208,1408,1508) will be $**1,387 per month**

**F- Units** (1403,1503) will be **$2,674 per month**

5

**G-Units** (1605) will be **$1,266 per month**

**H-Units** (1607) will be **$1,273 per month**

**I-Units** (1606) will be **$1,331 per month**

**J-Units** (1608) will be **$1,371 per month**

**CU-1** will be **$7,840 per month \***

**CU-2** will be **$6,912 per month \***

**CU-3** will be **$3,165 per month \***

**CU-4** will be **$5,515 per month \***

• *Represents a pass thru to the individual hotel unit owners which has not been included in the past budgets of the Sixty Sixty Condominium Association. As of 10/2016 the outstanding balance is in excess of $685,000 which is now due and payable by each individual hotel unit owner based upon the units CE% which is set by the Sixty Sixty Declarations. This amount must be paid at the time of a sale or by "Special Assessment". **I HAVE A PLAN TO ELIMINATE** THIS AND SAVE EVERY OWNER ON AVERAGE $4,500 NOW! You must vote to appoint new Board Members to replace the current illegally sitting Board and the Board President. Email* mgomez@schecher████.com *for details and learn how you can start the process of saving and reducing your costs.*

**THE ABOVE FEES ARE EFFECTIVE 12/1/2016**

Best Regards,

_____

Richard J. Schecher, Sr.
**THE SCHECHER GROUP**
    **HOSPITALITY DIVISION**
**SIXTY SIXTY SHARED COMPONET**
**Email:** rschecher@schech██████.com
**Cell:** 954-304-4956
**Fax:** 954-212-0118

**EXHIBIT D**
**Broker Declaration of Disinterestedness**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

In re:

Sixty Sixty Condominium Association, Inc.　　　　　Case No. 16-26187-RAM

　　　　　Debtor-in-Possession.　　　　　　　　　Chapter 11

_____/

## DECLARATION OF JASON WELT OF TRUSTEE REALTY, INC., PROPOSED REAL ESTATE BROKER FOR DEBTOR AND DEBTOR-IN-POSSESSION

I, Jason Welt, declare and state as follows pursuant to 28 U.S.C. § 1746:

1.　　I am an authorized agent of Trustee Realty, Inc. ("Broker"), with offices located at 2200 North Commerce Parkway, Suite 200, Weston, FL 33326.  I am also a licensed real estate associate and have many years of experience.

2.　　I am familiar with the matters set forth herein and make this Declaration in support of Sixty Sixty Condominium Association, Inc.'s (the "Debtor") *Debtor's Expedited Motion For Entry Of An Order: (i) Approving Jason Welt And Trustee Realty, Inc. as Debtor's Real Estate Professional; (ii) Approving Proposed Bidding Procedures; (iii) Approving Form And Notice Thereof; and (iv) Scheduling Hearing To Consider Approval of "Highest And Best" Bid* (the "Application").

3.　　Neither I nor Broker hold or represent any interest adverse to the estate, and we are disinterested within the meaning of 11 U.S.C. § 327(a).  We have not represented any of Debtor's creditors in any related or unrelated matters.

4.　　Broker has agreed to provide brokerage services to the Debtor in the above-captioned Chapter 11 case before this Court, pursuant to the terms and conditions contained in the Application pertaining to the sale of certain real property including 82 Residential Units and 4 Commercial Units (or of so many of the Residential Units as participated) located at 6060

1

Indian Creek Road, Miami Beach, FL and all other improvements located thereon (the "Property"). Insofar as I have been able to ascertain, Broker is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code in that Broker:

      (a)      is not a creditor, equity security holder or insider of the Debtor;

      (b)      is not and was not, within two (2) years before the date of the filing of the petitions, a director, officer, or employee of the Debtor; and

      (c)      does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor, or for any other reason.

2.      Neither I, Broker, nor any other officer of Broker, insofar as I have been able to ascertain, holds or represents any interest adverse to the Debtor herein or its estate in the matters upon which Broker is to be engaged.

3.      Neither I, Broker, nor any officer of Broker insofar as I have been able to ascertain have any connection with the Debtor except as follows: Debtor's counsel, Messana, P.A., has been engaged by Kenneth Welt in his capacity as a chapter 7 Trustee in certain of his cases and I am Kenneth Welt's son.

4.      To the best of my knowledge, Broker has not represented the Debtor's creditors, equity security holders, or any other parties in interest, or their respective attorneys and accountants, the United States Trustee for the Southern District of Florida, or any person employed in the Office of the United States Trustee, in any matters relating to the Debtor or its estate.

5.      No agreement presently exists to share any compensation received by Broker for its services with any other person or firm.  If any such agreement is entered into, Broker will

undertake to amend and supplement this Declaration to disclose the terms of any such agreement. No promises have been received by Broker or by any member or employee thereof as to compensation in connection with these cases other than in accordance with the provisions of the Bankruptcy Code.

6.      To the best of my knowledge, information and belief, Broker is disinterested and neither holds nor represents any materially adverse interest as to the matters upon which Broker is to be retained. To the extent I discover any facts bearing on these matters described herein during the period of the Broker's retention, I will supplement the information contained in this Declaration.

7.      I have read the Application and agree to be bound by the terms and conditions represented therein.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 7, 2017.

_____
Jason Welt

**EXHIBIT E**
**Form Letter of Intent**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

In re:

Sixty Sixty Condominium Association, Inc.      Case No. 16-26187-RAM

      Debtor-in-Possession.      Chapter 11

_____/

## FORM LETTER OF INTENT

_____ ("**Purchaser**") hereby submits this letter of intent ("**LOI**"), subject to the terms of the *Debtor's Expedited Motion For Entry Of An Order: (i) Approving Jason Welt And Trustee Realty, Inc. as Debtor's Real Estate Professional; (ii) Approving Proposed Bidding Procedures; (iii) Approving Form And Notice Thereof; and (iv) Scheduling Hearing To Consider Approval of "Highest And Best" Bid* (the "Motion") and the Order approving same, for the bulk purchase and acquisition (the "**Bulk Sale**") of the 82 Residential Units ("**Residential Units**") and 4 Commercial Units ("**Commercial Units**", together with the 82 Residential Units, the "**Property**") located at 6060 Indian Creek Road, Miami Beach, FL (the "**Condominium**") and all other improvements related thereto, subject to the terms herein, to the Sixty Sixty Condominium Association, Inc. (the "**Debtor**") and the Condominium's Residential Unit owners (the "**Sellers**").

## <u>Terms:</u>

**Purchaser:**  Purchaser or an entity to be formed and controlled by Purchaser is the purchaser. The rights and obligations under this LOI are otherwise not-transferrable.

**Property:**  The Property is so many of the 82 Residential Units and 4 Commercial Units as will participate in a simultaneously closed Bulk Sale contemplated by this LOI. Acquisition of the Hotel Unit within the Condominium is not contemplated by this LOI. The Property is located at 6060 Indian Creek Road, Miami Beach, FL.

**As-is/Where-is:** The Property will be acquired in "as is" condition, without any representations or warranties whatsoever except that title would be conveyed by a special warranty deed from the seller(s) to Purchaser or its designee;

**Purchase Price:**  _____ Dollars ($_____) per Residential Unit and _____ Dollars ($_____) per Commercial Unit. If all units are purchased, the total purchase price for the entire Property shall be _____ Dollars ($_____).

**Deposit:**  _____ Dollars ($_____) (the "**Deposit**"), to be deposited with _____ an accredited escrow agent or Florida licensed attorney upon tendering this LOI, of which __% is non-refundable upon acceptance of this LOI, the balance shall be non-refundable at the end of the Due Diligence Period.  The refundable portion of the Deposit shall either (i) be refunded to Purchaser in the event a condition precedent of the Purchase and Sale Agreement has not been met or (ii) will act as a credit to the Purchase Price at closing.

**Due Diligence:**  _____ days (the "**Due Diligence Period**") following the later of: i) delivery of the due diligence materials to Purchaser and ii) the execution of a Purchase and Sale Agreement on substantially the same terms as in this LOI.

1

**Exclusivity:**  Purchaser shall have the Debtor's exclusive cooperation in connection with the acquisition of the Property for ___ days from the acceptance of this LOI (the "**Sale Offer Period**"). The Debtor shall not solicit or provide any Property or ownership information to any party in connection with the potential Bulk Sale other than Purchaser during the Sale Offer Period.

**Minimum Purchase Units:** Purchaser requires that no less than a minimum of ___ Residential Units and all four of the Commercial Units participate in the Bulk Sale (the **Minimum Participation Requirement**").

**Anticipated Closing Date:** The transaction will close Thirty (30) days following the later of (i) expiration of Due Diligence Period, (ii) receipt of approvals from the Residential Unit owners to satisfy the Minimum Participation Requirement, or (iii) or another date as is mutually agreed upon by the Purchaser and the Debtor.

**"Other" Contingencies:** _____.

**Governing Law & Jurisdiction:**  This LOI shall be governed by Florida Law and any dispute arising from same shall be determined by the Bankruptcy Court (defined herein).

**Confidentiality:**    The Debtor may disclose the identity of the Purchaser, the source of Purchaser's funds or funding, and that this LOI exists. Unless this LOI is the Winning LOI (as defined in the Motion), neither Debtor nor Purchaser shall issue any press release as to the terms of this LOI except: (i) to the owners of the Commercial and Residential Units; (ii) to the extent necessary to seek and obtain bankruptcy court approval of any purchase and sale of the Property in any way connected to that certain bankruptcy case, *In re: Sixty Sixty Condominium Association, Inc.,* Case No. 16-26187-RAM, pending before the United States Bankruptcy Court Southern District of Florida (the "Bankruptcy Court"), including attaching a copy of this LOI to a motion seeking authority for the Debtor to execute any LOI or any other disclosure required to obtain Bankruptcy Court approval to approve a sale of the Property to any purchaser, (iii) to the extent necessary to obtain Bankruptcy Court approval of any related Purchase and Sale Agreement, or as is otherwise necessary to facilitate a Bulk Sale of the Commercial and Residential Units.

Except as expressly set forth herein, this LOI is not intended to be binding and, except for the Confidentiality provisions, shall not give rise to any legal right or obligation between Purchaser and Seller.  A binding obligation between the parties will be created only upon the execution of a subsequent formal written PSA, delivered and executed by both parties with Bankruptcy Court approval.

**IN WITNESS WHEREOF**, each of the parties has caused this LOI to be duly executed on its behalf as of the day and year first above written.

Submitted by,

___[Purchaser]_____

By:_____

Name:_____

Title:_____  Date:_____

**AGREED AND ACCEPTED**

**Sixty Sixty Condominium Association, Inc.**

By:_____

Print Name:_____

Print Title:_____Date:_____

**EXHIBIT F**
**Confidentiality Agreement**

## CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT

This Confidentiality and Nondisclosure Agreement (this "Agreement") is dated this this day of _____, 2017 by and between _____ (the "Receiving Party") and Sixty Sixty Condominium Association, Inc. ("Disclosing Party").

WHEREAS, in order to facilitate the possibility of entering into a mutually beneficial business relationship, and if entered into, the execution of such business relationship, the parties may disclose certain non-public or proprietary information to the other party and its representatives; and

WHEREAS, the Disclosing Party wishes to preserve the confidentiality and prevent the unauthorized disclosure and use of any such non-public or proprietary information disclosed to the Receiving Party and its representatives.

NOW THEREFORE, for valuable consideration, and as a condition to such information being disclosed by or on behalf of the Disclosing Party, the parties agree as follows:

1.     "Information" means all non-public or proprietary information disclosed by the Disclosing Party in connection with this Agreement and shall include, but not be limited to, information regarding the Disclosing Party's and its subsidiaries and affiliated entitles (and information related to the Schecher Group, Inc. and its affiliates and subsidiaries) assets, liabilities, financial and other conditions, insurance, reinsurance, employees, consultants, operations, prospects, business plans and customer lists.

2.     As a condition to receiving the Information which the Disclosing Party may furnish to the Receiving Party and its representatives or to which the Receiving Party and its representatives are afforded access, directly or indirectly, the Receiving Party and its representatives shall keep the Information confidential and not to disclose such Information except as permitted under this agreement.

3.     Information does not include information that:

   a.   has been or becomes published or is now or in the future publicly available without breach of this Agreement or breach of a similar agreement by a third party or through no wrongful act of the Receiving Party or its representatives;

   b.   is known to the Receiving Party prior to the time such information was acquired from the Disclosing Party under this Agreement as evidenced by the Receiving Party's contemporaneous written records;

   c.   is independently developed and prepared by the Receiving Party not in reliance upon or reflecting any Information disclosed pursuant to this Agreement; or

   d.   subsequent to disclosure, is lawfully received from a third party having rights therein without restriction (to the best of the Receiving Party's knowledge) on the right of such third party or the Receiving Party to disseminate the information and without notice of any restriction against its further disclosure.

1

4.      Information shall not, without the prior written consent of the Disclosing Party, be disclosed to any person or entity other than the Receiving Party's and its representatives' employees (including outside legal counsel, actuaries and accountants) who need to know the Information and in those instances only to the extent of such need. The Receiving Party agrees to keep all Information confidential, and further agrees to use Information solely for the evaluation stated above, and for no other purpose. The Receiving Party agrees that its and its representatives' employees (including outside legal counsel, actuaries and accountants) shall be informed of the terms of this Agreement.

5.      All Information shall remain the exclusive property of the Disclosing Party, and the Receiving Party shall have no rights, by license or otherwise, to use Information except as expressly provided herein.

6.      The Receiving Party agrees on its own behalf and on behalf of its representatives to return to the Disclosing Party or destroy, and verify in writing such destruction, all written, tangible or otherwise accessible material in any form (including electronic media such as computer diskettes, CD-ROM, electronic copies or any material resident in the hard or external drive of any computer) containing or reflecting any Information (including all copies, summaries, excerpts, extracts, notes or other reproductions) promptly following a request of the Disclosing Party. All information retained by the Receiving Party pursuant to this Section 6 shall remain subject to the confidentiality and nondisclosure obligations of this Agreement. Notwithstanding anything to the contrary in this Agreement, the Receiving Party may retain one copy of Information that has become part of a file that the Receiving Party, in its reasonable judgment, is required to retain and/or make available for examination by government regulatory or investigatory agencies, or retain and/or produce by an order of a court or insurance regulatory agency.

7.      Nothing in this Agreement shall impose any obligation upon either party to consummate a transaction, to enter into any discussion or negotiations with respect thereto, or to take any other action not expressly agreed to herein.

8.      In the event that the Receiving Party receives a request to disclose all or any part of the Information as part of a governmental investigation or under the terms of a subpoena or order issued by a court or governmental body, the Receiving Party will take all reasonable steps to notify the Disclosing Party promptly in writing of such request in order to allow the Disclosing Party an opportunity to resist or narrow such request and will reasonably cooperate, at the Disclosing Party's expense, with the Disclosing Party and its representatives in connection with the Disclosing Party's efforts to resist or narrow such request. In the event that the Disclosing Party elects to waive the provisions of this Section 8 or is otherwise unsuccessful in resisting such request, the Receiving Party shall only disclose the Information that it determines it is legally required to disclose after consultation with competent counsel.

9.      This Agreement and the Receiving Party's obligations with respect to the Information, shall continue until terminated in writing by the Disclosing Party.

10.     Except as required by applicable law or court or arbitral order, neither party shall in any way or in any form disclose (except as necessary to such party's outside legal counsel, actuaries

2

and accountants), publicize or advertise in any manner the discussions or negotiations concerning the business purpose underlying this Agreement, or the status of any such discussions or negotiations without the consent of the other party.

11. This Agreement shall be deemed to be a contract made under the laws of the State of Florida, and for all purposes shall be construed in accordance with the laws of the State of Florida. The parties agree that any and all disputes between the parties under or relating to the terms and conditions of this Agreement shall be fully and completely adjudicated in the federal or state courts of the State of Florida, County of Broward.

12. Any provision of this Agreement which may be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

13. This Agreement shall inure to the benefit of and be binding upon each of the parties and their respective successors and permitted assigns. Neither party may assign this Agreement or any provision hereof, in whole or in part, without the prior written consent of the other party.

14. This Agreement shall constitute the full agreement between the parties with respect to Information, and shall supersede any and all prior agreements relating thereto.

15. No amendment to any provision of this Agreement shall be binding and enforceable unless in writing and signed by both of the parties and specifically referencing this Agreement.

16. Neither party makes any representations or warranties, express or implied, as to the accuracy or completeness of the Information, and undertakes no duty to amend or update the Information; *provided. however,* that Disclosing Party represents and warrants that (a) the Information that has been and will be provided to the Receiving Party pursuant to this Agreement is not subject to an obligation of confidentiality or nondisclosure other than under this Agreement and (b) it owns or has sufficient rights to disclose such Information pursuant to the terms of this Agreement.

17. Each of the parties acknowledges and agrees that remedies at law may be inadequate to protect the other party against any actual or threatened breach of this Agreement by the other party or its representatives, and, without prejudice to any other rights and remedies otherwise available to the other party (including, without limitation, monetary damages), the parties agree to the granting of specific performance and injunctive or other equitable relief in the other party's favor without proof of actual damages and each of the parties further agrees to waive, and to use all reasonable efforts to cause its representatives to waive, any requirement for the securing or posting of any bond in connection with any such remedy.

18. Each of the parties agrees that no failure or delay by the other party in exercising any right or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise of any right or remedy hereunder.

19. This Agreement may be executed in counterparts.

[Signature Page to Follow]

3

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their authorized representatives on the date first above written.

Receiving Party: _____

By: _____

Name:

Title:

Disclosing Party:

Sixty Sixty Condominium Association, Inc.

By: _____

Name:

Title:

**EXHIBIT G**
**Bidding Procedures Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

In re:

Sixty Sixty Condominium Association, Inc.                    Case No. 16-26187-RAM

        Debtor-in-Possession.                    Chapter 11

_____/

### NOTICE OF OFFER SUBMISSION PROCEDURES

Sixty Sixty Condominium Association, Inc., the Chapter 11 debtor and debtor-in-possession herein (the "Debtor"), hereby gives notice of the offer submission procedures (the "Submission Procedures") for any interested party (a "**Proposed Purchaser**") to make offers to participate as a Proposed Purchaser of 82 Residential Units, or so many of them as choose to participate in a simultaneously closed Bulk Sale[1] ("**Residential Units**") and 4 Commercial Units ("**Commercial Units**", together with the Residential Units, the "**Property**") located at 6060 Indian Creek Road, Miami Beach, FL (the "**Condominium**")[2] and all other improvements related thereto (as hereinafter defined), and states as follows:

#### Submission Procedures

1.      Proposed Purchasers are bidding on: (i) the opportunity to have the Debtor's exclusive cooperation as a potential buyer of the Property subject to the terms of a proposed letter of intent that will provide the material terms and framework of a purchase and sale agreement to be offered to all Residential Unit owners; and (ii) the Debtor's commitment to sell its Residential Unit 505 and the Commercial Units (the "**Transaction**").

2.      Proposed Purchasers are encouraged to speak with the Debtor's broker, Jason

---

[1]     All capitalized terms not defined herein shall have the same meaning ascribed to them in *Debtor's Expedited Motion For Entry Of An Order: (i) Approving Jason Welt And Trustee Realty, Inc. as Debtor's Real Estate Professional; (ii) Approving Proposed Bidding Procedures; (iii) Approving Form And Notice Thereof; and (iv) Scheduling Hearing To Consider Approval of "Highest And Best" Bid* (the "Motion").

[2] The Declaration of Sixty Sixty Condominium can be found in the Official Records Book 24411, Page 1780 of the Public Records of Miami-Dade County, Florida.

1

Welt, Trustee Realty, Inc. (the "Broker"),[3] to discuss the Transaction through and until 9:30 EST on May 12, 2017 at 9:30 am.

3.      Proposed Purchasers, must deliver[4] an <u>executed</u> offer "higher and better" than the letter of intent attached hereto as **Attachment "1"** in substantially the same form as the form letter of intent attached hereto as **Attachment "2"** (a "Best and Final Offer")[5] **between the hours of 10:00 am EST and 4:30 pm EST on May 12, 2017** (the "Submission Window") to the Broker via e-mail.

4.      Broker shall not communicate with any Proposed Purchaser from 9:30 am EST on May 12, 2017 until 4:00 pm EST on May 17, 2017 (at which point the identity of the "highest and best" Best and Final Offer will be disclosed) except to confirm that Broker is in receipt of its Best and Final Offer and accompanying documents.

### *Best and Final Offer Qualifications*

5.      For consideration, a Best and Final Offer must submitted during the Submission Window and be accompanied by:

> i.    proof of funds or financing sufficient to evidence the Proposer Purchaser's ability to close on the Best and Final Offer, in the Debtor's sole judgment;
> ii.   proof of an escrow deposit in the amount of at least $50,000;
> iii.  an executed confidentially agreement in substantially the form as attached hereto as **Attachment "3"**; and
> iv.   Proposed Purchasers are required to disclose any relationship to the Debtor, any creditor, any Residential Unit owner or any of such parties' principals

(together, the "**Bid Qualifications**").

6.      The terms of all Best and Final Offers shall be kept confidential until May 17, 2017 at 4:00 pm EST upon which time the "highest and best" Best and Final Offer, in the

---

[3] Broker's e-mail address is jw@jweltpa.com.
[4] Proposed Purchasers are encouraged to call the Broker to confirm receipt of their Best and Final Offer prior to the end of the Submission Window.
[5] Debtor reserves the right to consider all nonconforming letters of intent in its sole and exclusive discretion.

Debtor's sole determination (the "**Winning LOI**"), shall be available for disclosure to any Prospective Purchaser who submitted a Best and Final Offer and to the Court.  Best and Final Offers shall not contain confidentially provisions that would interfere with this process.

7.      The Winning LOI shall be submitted to the Bankruptcy Court at the Final Approval Hearing (which Debtor has requested be held on or before May 24, 2017).  At the Final Approval Hearing Debtor shall request authority to enter into the Winning LOI on the terms therein and authority to enter into a Purchase and Sale Agreement consistent with same (a "PSA").

8.      The determination of the Winning LOI shall take into consideration, among other things, the following non-exclusive criteria, in no certain order:

     i.   Total purchase price for the Residential Units;
    ii.   Total purchase price for all Commercial Units;
   iii.   Length of due diligent period;
   iv.   Number of units satisfying a Minimum Participation Requirement;
    v.   Fewest contingencies;
   vi.   Experience and reputation of Proposed Purchaser and its agents.

9.      For any inquires regarding the Submission Procedures, the Property or the Transaction, please contact the Debtor's real estate professional, Jason Welt, Trustee Realty, Inc.

Dated: April 7, 2017                         Respectfully submitted,

                                    MESSANA, P.A.
                                    *Counsel for Debtor*
                                    401 East Las Olas Boulevard
                                    Suite 1400
                                    Fort Lauderdale, FL 33301
                                    Telephone: (954) 712-7400
                                    Facsimile: (954) 712-7401
                                    Email: blieberman@messana-law.com

                                    /s/ Brett D. Lieberman
                                    Thomas M. Messana
                                    Florida Bar No. 0991422
                                    Brett D. Lieberman
                                    Florida Bar No. 69583

**Attachment 1**
**FKI Letter of Intent**

February 24, 2017

Brett Lieberman
Messana, P.A.
401 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, FL 33301

## RE: 6060 Association and Residential Units, Miami Beach, FL.

▓▓▓▓▓▓▓▓▓▓▓▓ ("**KFI**") is pleased to submit this letter of intent ("**LOI**"), on behalf of a to
be formed entity ("**Purchaser**"), for the purchase of condominium interests (the "**Transaction**")
in the 82 Residential Units ("**Residential Units**") and 4 Commercial Units ("**Commercial
Units**", together with the 82 Residential Units, the "Property") located at 6060 Indian Creek
Road, Miami Beach, FL and all other improvements located thereon, to Sixty Sixty
Condominium Association and its' Residential Unit owners (the "**Sellers**").

Please note the following:

- The Purchaser would consider acquiring the Property for a total consideration of Ten
  Million Three Hundred Twenty Thousand Dollars ($10,320,000).

- The Purchaser would deposit into escrow, a Fifty Thousand ($50,000) earnest money
  deposit upon signing a Purchase and Sale Agreement which deposit shall become non-
  refundable upon the expiration of the Due Diligence Period (defined below) in the event
  that the Purchaser elects to proceed with the Transaction.

- The Debtor shall execute this LOI immediately upon Court Approval and sign a
  Purchase and Sale Agreement (PSA) consistent with same.

- The Sixty Sixty Condominum is governed by its Declaration and other governing
  documents found in the Official Records Book 24411, Page 1780 of the Public Records
  of Miami-Dade County, Florida.

This approach provides the Sellers with the certainty of close and the comfort of dealing directly
with a high quality counterparty that can purchase the Property in a compressed time-line and not
be reliant on capital market vagaries.

The following is an outline of the indicative terms and conditions underlying this expression of
interest, which are subject to change and modification, completion of tax, legal and commercial
due diligence, and final investment committee approval:

**Purchaser:** Newly formed entity affiliated with KFI.

**Property:** The Property is so many of those certain condominium interests in a hotel resort
consisting of 82 Residential Units and 4 Commercial Units as will participate in the bulk sale
contemplated by this LOI. The condominium also includes a Hotel Unit, but the purchase and
sale of such Hotel Unit is not contemplated by this LOI. The Property is located at 6060 Indian

Creek Road, Miami Beach, FL. The Property shall be sold free and clear of all liens and encumbrances.

**Purchase Price:**   One Hundred Twenty Thousand Dollars ($120,000) per Residential and Commercial Unit. If all Units are purchased, the total purchase price for the entire Property shall be Ten Million Three Hundred Twenty Thousand Dollars ($10,320,000).

**Deposit:**   Fifty Thousand Dollars ($50,000) (the "**Deposit**"), to be deposited with First American Title upon signing the PSA, which will become non-refundable at the end of the Due Diligence Period.  The deposit shall either (i) be refunded to Purchaser in the event a condition precedent of the Purchase and Sale Agreement has not been met or (ii) will act as a credit to the Purchase Price at closing.

**Due Diligence:**   Ninety (90) days (the "**Due Diligence Period**") following the later of i) delivery of the due diligence materials to Purchaser and ii) the execution of a Purchase and Sale Agreement.   In addition to standard legal and property due diligence, KFI will include the satisfactory review of the condominium documents and rules and regulations.

**Dispute Resolution Contingency:**  Purchaser and Sellers acknowledge that the Property is subject to certain disputes and bankruptcy proceedings. Purchaser will seek to settle any outstanding claims with the Hotel Unit owner (including the elimination of the "Administrative Fee" charged by the Hotel Unit operator pursuant to certain rules and regulations imposed by the Hotel Unit Owner) and amend or create certain documents to maintain control of the Residential and Commercial Units. If a resolution is not negotiated or adjudicated by a court of competent jurisdiction upon the expiration of the Due Diligence Period, Purchaser has the right to extend due diligence for an additional sixty (60) day period (the "**Extended DD Period**").

**Exclusivity:**  Purchaser shall have the exclusive right to purchase the Property for 180 days from the acceptance of this LOI (the "**Exclusivity Period**"). The Association shall not solicit or provide any Property or ownership information to any parties other than Purchaser during the Exclusivity Period.

**Minimum Purchase Units:** Purchaser is paying a premium for the Property and, therefore, requires that it will purchase no less than a minimum of 58 of the Residential Units and all four of the Commercial Units. Purchaser's intent is to purchase all of the residential and commercial units and if Purchaser is unable to purchase One Hundred Percent (100%) of the commercial and residential units, Purchaser reserves the right to adjust the Purchase Price accordingly.

**Anticipated Closing Date:** The transaction will close Thirty (30) days following the later of (i) expiration of Due Diligence Period (ii) if elected by Purchaser, the Extend DD Period, (iii) receipt of approvals from the Minimum Purchase Units to sell their Units.

**Governing Law & Jurisdiction:**  This LOI shall be governed by Florida Law.

**Confidentiality:**  This LOI, is delivered to the Association and Purchaser on the condition that neither Seller nor Purchaser shall not issue any press release or make public disclosure as to  the existence of this LOI except: (i) to the owners of the Commercial and Residential Units; (ii) to the extent necessary to seek and obtain bankruptcy court approval in that certain bankruptcy case, *In re: Sixty Sixty Condominium Association, Inc.,* Case No. 16-26187-RAM, pending before the United States Bankruptcy Court Southern District of Florida (including attaching a copy of this LOI to a motion seeking authority for the Debtor to execute this LOI, any related Purchase and Sale Agreement, and advance with a bulk sale process of the Commercial and Residential Units

(the "LOI Motion")). It is expressly contemplated that said LOI Motion will contemplate the opportunity for other potential bulk sale purchasers to make offers higher and better than this LOI and the Purchaser expressly reserves the right to revise and modify the terms of this LOI at or before any hearing on the LOI Motion.

Except as expressly set forth herein, this LOI is not intended to be binding and, except for the Confidentiality provisions, shall not give rise to any legal right or obligation between Purchaser and Seller. A binding obligation between the parties will be created only upon the execution of a subsequent formal written PSA, delivered and executed by both parties.

**IN WITNESS WHEREOF**, each of the parties has caused this LOI to be duly executed on its behalf as of the day and year first above written.

Very truly yours,

By: _____

Name: Jonathan Reever

Title: Authorized Agent

**AGREED AND ACCEPTED**

**Sixty Sixty Condominium Association, Inc.**
By:_____

Print Name:_____

Print Title:_____

Date of Execution:_____, 2017

**Attachment 2**
**Form Letter of Intent**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

In re:

Sixty Sixty Condominium Association, Inc.                Case No. 16-26187-RAM

      Debtor-in-Possession.                Chapter 11

_____/

FORM LETTER OF INTENT

_____ ("**Purchaser**") hereby submits this letter of intent ("**LOI**"), subject to the terms of the *Debtor's Expedited Motion For Entry Of An Order: (i) Approving Jason Welt And Trustee Realty, Inc. as Debtor's Real Estate Professional; (ii) Approving Proposed Bidding Procedures; (iii) Approving Form And Notice Thereof; and (iv) Scheduling Hearing To Consider Approval of "Highest And Best" Bid* (the "Motion") and the Order approving same, for the bulk purchase and acquisition (the "**Bulk Sale**") of the 82 Residential Units ("**Residential Units**") and 4 Commercial Units ("**Commercial Units**", together with the 82 Residential Units, the "**Property**") located at 6060 Indian Creek Road, Miami Beach, FL (the "**Condominium**") and all other improvements related thereto, subject to the terms herein, to the Sixty Sixty Condominium Association, Inc. (the "**Debtor**") and the Condominium's Residential Unit owners (the "**Sellers**").

### Terms:

**Purchaser:**  Purchaser or an entity to be formed and controlled by Purchaser is the purchaser. The rights and obligations under this LOI are otherwise not-transferrable.

**Property:**  The Property is so many of the 82 Residential Units and 4 Commercial Units as will participate in a simultaneously closed Bulk Sale contemplated by this LOI. Acquisition of the Hotel Unit within the Condominium is not contemplated by this LOI. The Property is located at 6060 Indian Creek Road, Miami Beach, FL.

**As-is/Where-is:** The Property will be acquired in "as is" condition, without any representations or warranties whatsoever except that title would be conveyed by a special warranty deed from the seller(s) to Purchaser or its designee;

**Purchase Price:**  _____ Dollars ($_____) per Residential Unit and _____ Dollars ($_____) per Commercial Unit. If all units are purchased, the total purchase price for the entire Property shall be _____ Dollars ($_____).

**Deposit:**  _____ Dollars ($_____) (the "**Deposit**"), to be deposited with _____ an accredited escrow agent or Florida licensed attorney upon tendering this LOI, of which __% is non-refundable upon acceptance of this LOI, the balance shall be non-refundable at the end of the Due Diligence Period.  The refundable portion of the Deposit shall either (i) be refunded to Purchaser in the event a condition precedent of the Purchase and Sale Agreement has not been met or (ii) will act as a credit to the Purchase Price at closing.

**Due Diligence:**  _____ days (the "**Due Diligence Period**") following the later of: i) delivery of the due diligence materials to Purchaser and ii) the execution of a Purchase and Sale Agreement on substantially the same terms as in this LOI.

**Exclusivity:**  Purchaser shall have the Debtor's exclusive cooperation in connection with the acquisition of the Property for ___ days from the acceptance of this LOI (the "**Sale Offer Period**"). The Debtor shall not solicit or provide any Property or ownership information to any party in connection with the potential Bulk Sale other than Purchaser during the Sale Offer Period.

**Minimum Purchase Units:** Purchaser requires that no less than a minimum of ___ Residential Units and all four of the Commercial Units participate in the Bulk Sale (the **Minimum Participation Requirement**").

**Anticipated Closing Date:** The transaction will close Thirty (30) days following the later of (i) expiration of Due Diligence Period, (ii) receipt of approvals from the Residential Unit owners to satisfy the Minimum Participation Requirement, or (iii) or another date as is mutually agreed upon by the Purchaser and the Debtor.

**"Other" Contingencies:** _____.

**Governing Law & Jurisdiction:**  This LOI shall be governed by Florida Law and any dispute arising from same shall be determined by the Bankruptcy Court (defined herein).

**Confidentiality:**   The Debtor may disclose the identity of the Purchaser, the source of Purchaser's funds or funding, and that this LOI exists. Unless this LOI is the Winning LOI (as defined in the Motion), neither Debtor nor Purchaser shall issue any press release as to the terms of this LOI except: (i) to the owners of the Commercial and Residential Units; (ii) to the extent necessary to seek and obtain bankruptcy court approval of any purchase and sale of the Property in any way connected to that certain bankruptcy case, *In re: Sixty Sixty Condominium Association, Inc.,* Case No. 16-26187-RAM, pending before the United States Bankruptcy Court Southern District of Florida (the "Bankruptcy Court"), including attaching a copy of this LOI to a motion seeking authority for the Debtor to execute any LOI or any other disclosure required to obtain Bankruptcy Court approval to approve a sale of the Property to any purchaser, (iii) to the extent necessary to obtain Bankruptcy Court approval of any related Purchase and Sale Agreement, or as is otherwise necessary to facilitate a Bulk Sale of the Commercial and Residential Units.

Except as expressly set forth herein, this LOI is not intended to be binding and, except for the Confidentiality provisions, shall not give rise to any legal right or obligation between Purchaser and Seller.  A binding obligation between the parties will be created only upon the execution of a subsequent formal written PSA, delivered and executed by both parties with Bankruptcy Court approval.

**IN WITNESS WHEREOF**, each of the parties has caused this LOI to be duly executed on its behalf as of the day and year first above written.

Submitted by,

__[Purchaser]_____

By:_____

Name:_____

Title:_____ Date:_____

**AGREED AND ACCEPTED**

**Sixty Sixty Condominium Association, Inc.**

By:_____

Print Name:_____

Print Title:_____Date:_____

**Attachment 3**
**Confidentiality Agreement**

## CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT

This Confidentiality and Nondisclosure Agreement (this "Agreement") is dated this this day of _____, 2017 by and between _____ (the "Receiving Party") and Sixty Sixty Condominium Association, Inc. ("Disclosing Party").

WHEREAS, in order to facilitate the possibility of entering into a mutually beneficial business relationship, and if entered into, the execution of such business relationship, the parties may disclose certain non-public or proprietary information to the other party and its representatives; and

WHEREAS, the Disclosing Party wishes to preserve the confidentiality and prevent the unauthorized disclosure and use of any such non-public or proprietary information disclosed to the Receiving Party and its representatives.

NOW THEREFORE, for valuable consideration, and as a condition to such information being disclosed by or on behalf of the Disclosing Party, the parties agree as follows:

1. "Information" means all non-public or proprietary information disclosed by the Disclosing Party in connection with this Agreement and shall include, but not be limited to, information regarding the Disclosing Party's and its subsidiaries and affiliated entitles (and information related to the Schecher Group, Inc. and its affiliates and subsidiaries) assets, liabilities, financial and other conditions, insurance, reinsurance, employees, consultants, operations, prospects, business plans and customer lists.

2. As a condition to receiving the Information which the Disclosing Party may furnish to the Receiving Party and its representatives or to which the Receiving Party and its representatives are afforded access, directly or indirectly, the Receiving Party and its representatives shall keep the Information confidential and not to disclose such Information except as permitted under this agreement.

3. Information does not include information that:

    a. has been or becomes published or is now or in the future publicly available without breach of this Agreement or breach of a similar agreement by a third party or through no wrongful act of the Receiving Party or its representatives;

    b. is known to the Receiving Party prior to the time such information was acquired from the Disclosing Party under this Agreement as evidenced by the Receiving Party's contemporaneous written records;

    c. is independently developed and prepared by the Receiving Party not in reliance upon or reflecting any Information disclosed pursuant to this Agreement; or

    d. subsequent to disclosure, is lawfully received from a third party having rights therein without restriction (to the best of the Receiving Party's knowledge) on the right of such third party or the Receiving Party to disseminate the information and without notice of any restriction against its further disclosure.

1

4.      Information shall not, without the prior written consent of the Disclosing Party, be disclosed to any person or entity other than the Receiving Party's and its representatives' employees (including outside legal counsel, actuaries and accountants) who need to know the Information and in those instances only to the extent of such need. The Receiving Party agrees to keep all Information confidential, and further agrees to use Information solely for the evaluation stated above, and for no other purpose. The Receiving Party agrees that its and its representatives' employees (including outside legal counsel, actuaries and accountants) shall be informed of the terms of this Agreement.

5.      All Information shall remain the exclusive property of the Disclosing Party, and the Receiving Party shall have no rights, by license or otherwise, to use Information except as expressly provided herein.

6.      The Receiving Party agrees on its own behalf and on behalf of its representatives to return to the Disclosing Party or destroy, and verify in writing such destruction, all written, tangible or otherwise accessible material in any form (including electronic media such as computer diskettes, CD-ROM, electronic copies or any material resident in the hard or external drive of any computer) containing or reflecting any Information (including all copies, summaries, excerpts, extracts, notes or other reproductions) promptly following a request of the Disclosing Party. All information retained by the Receiving Party pursuant to this Section 6 shall remain subject to the confidentiality and nondisclosure obligations of this Agreement. Notwithstanding anything to the contrary in this Agreement, the Receiving Party may retain one copy of Information that has become part of a file that the Receiving Party, in its reasonable judgment, is required to retain and/or make available for examination by government regulatory or investigatory agencies, or retain and/or produce by an order of a court or insurance regulatory agency.

7.      Nothing in this Agreement shall impose any obligation upon either party to consummate a transaction, to enter into any discussion or negotiations with respect thereto, or to take any other action not expressly agreed to herein.

8.      In the event that the Receiving Party receives a request to disclose all or any part of the Information as part of a governmental investigation or under the terms of a subpoena or order issued by a court or governmental body, the Receiving Party will take all reasonable steps to notify the Disclosing Party promptly in writing of such request in order to allow the Disclosing Party an opportunity to resist or narrow such request and will reasonably cooperate, at the Disclosing Party's expense, with the Disclosing Party and its representatives in connection with the Disclosing Party's efforts to resist or narrow such request. In the event that the Disclosing Party elects to waive the provisions of this Section 8 or is otherwise unsuccessful in resisting such request, the Receiving Party shall only disclose the Information that it determines it is legally required to disclose after consultation with competent counsel.

9.      This Agreement and the Receiving Party's obligations with respect to the Information, shall continue until terminated in writing by the Disclosing Party.

10.     Except as required by applicable law or court or arbitral order, neither party shall in any way or in any form disclose (except as necessary to such party's outside legal counsel, actuaries

2

and accountants), publicize or advertise in any manner the discussions or negotiations concerning the business purpose underlying this Agreement, or the status of any such discussions or negotiations without the consent of the other party.

11.    This Agreement shall be deemed to be a contract made under the laws of the State of Florida, and for all purposes shall be construed in accordance with the laws of the State of Florida. The parties agree that any and all disputes between the parties under or relating to the terms and conditions of this Agreement shall be fully and completely adjudicated in the federal or state courts of the State of Florida, County of Broward.

12.    Any provision of this Agreement which may be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

13.    This Agreement shall inure to the benefit of and be binding upon each of the parties and their respective successors and permitted assigns. Neither party may assign this Agreement or any provision hereof, in whole or in part, without the prior written consent of the other party.

14.    This Agreement shall constitute the full agreement between the parties with respect to Information, and shall supersede any and all prior agreements relating thereto.

15.    No amendment to any provision of this Agreement shall be binding and enforceable unless in writing and signed by both of the parties and specifically referencing this Agreement.

16.    Neither party makes any representations or warranties, express or implied, as to the accuracy or completeness of the Information, and undertakes no duty to amend or update the Information; *provided. however,* that Disclosing Party represents and warrants that (a) the Information that has been and will be provided to the Receiving Party pursuant to this Agreement is not subject to an obligation of confidentiality or nondisclosure other than under this Agreement and (b) it owns or has sufficient rights to disclose such Information pursuant to the terms of this Agreement.

17.    Each of the parties acknowledges and agrees that remedies at law may be inadequate to protect the other party against any actual or threatened breach of this Agreement by the other party or its representatives, and, without prejudice to any other rights and remedies otherwise available to the other party (including, without limitation, monetary damages), the parties agree to the granting of specific performance and injunctive or other equitable relief in the other party's favor without proof of actual damages and each of the parties further agrees to waive, and to use all reasonable efforts to cause its representatives to waive, any requirement for the securing or posting of any bond in connection with any such remedy.

18.    Each of the parties agrees that no failure or delay by the other party in exercising any right or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise of any right or remedy hereunder.

19.    This Agreement may be executed in counterparts.

[Signature Page to Follow]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their authorized representatives on the date first above written.

Receiving Party: _____

By: _____

Name:

Title:

Disclosing Party:

Sixty Sixty Condominium Association, Inc.

By: _____

Name:

Title:

4