UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re: Sixty Sixty Condominium
Association, Inc.

Case No. 16-26187-RAM

      Debtor-in-Possession.

Chapter 11

_____/

_____

**FIRST AMENDED DISCLOSURE STATEMENT IN SUPPORT OF FIRST AMENDED
PLAN OF REORGANIZATION OF
SIXTY SIXTY CONDOMINIUM ASSOCIATION, INC.**
_____


DATED:     May 26, 2017

**Messana, P.A.**
*Attorneys for Debtor*
Thomas M. Messana
Brett D. Lieberman
401 East Las Olas Blvd
Suite 1400
Fort Lauderdale, FL  33301
Telephone No.:  (954) 712-7400
Fax No.:  (954) 712-7401
Email:  blieberman@messana-law.com

**SIXTY SIXTY CONDOMINIUM ASSOCIATION, INC.**, the Debtor and Debtor-in-Possession ("Debtor") in the above referenced bankruptcy case, files this amended disclosure statement ("First Amended Disclosure Statement") pursuant to 11 U.S.C. §1125 and Bankruptcy Rule 3016(c), in conjunction with the *First Amended Plan of Reorganization of Sixty Sixty Condominium Association, Inc.* filed by Debtor, dated March 23, 2017, for the reorganization of the association ("First Amended Plan"). All capitalized terms not defined in the First Amended Disclosure Statement shall have the definition set forth in the First Amended Plan and Annexes thereto.

**DEBTOR RESERVES THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED FIRST AMENDED DISCLOSURE STATEMENT AT OR BEFORE THE CONFIRMATION HEARING.**

## I.    INTRODUCTION

Debtor filed for relief under Chapter 11, Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code" or "Code") in the United States Bankruptcy Court for the Southern District of Florida, Miami-Dade Division on December 5, 2016 (the "Petition Date").

### A.    Purpose of First Amended Disclosure Statement:

Debtor's purpose in providing this First Amended Disclosure Statement is to provide the holders of Claims and interests with adequate information about the First Amended Plan to enable creditors and other parties-in-interest to make an informed judgment on the merits of the First Amended Plan.

This First Amended Disclosure Statement does not replace the First Amended Plan and therefore creditors and parties-in-interest are urged to carefully read both the First Amended Plan and this First Amended Disclosure Statement and consult with counsel concerning the impact that these documents have upon their legal rights.

Debtor submits this First Amended Disclosure to all known Creditors and Interest Holders of Debtor whose Claims are affected under the First Amended Plan and certain other interested parties who may have claims related to the condominium located at located at 6060

Indian Creek Drive in Miami Beach, Florida (the "Condominium").  The purpose of this First Amended Disclosure Statement is to present all information which the Bankruptcy Court has determined to satisfy the requirements of the Bankruptcy Code and to enable Creditors and Interest Holders to make and form prudent decisions in exercising their rights to accept or reject the First Amended Plan.   By approving this First Amended Disclosure Statement, the Bankruptcy Court neither recommends acceptance nor rejection of the First Amended Plan.  The hearing on the First Amended Disclosure Statement is to determine whether the First Amended Disclosure Statement contains "adequate information" as that term is defined in 11 U.S.C. §1125(a)(1), and approval of same is not tantamount to a decision by the Bankruptcy Court on the merits of the First Amended Plan.  THIS FIRST AMENDED DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT, BUT WILL BE SUBJECT TO APPROVAL AT A HEARING.

> **B.**    **Source of Information Contained in the First Amended Disclosure Statement:**

The information contained in this First Amended Disclosure Statement has been developed based upon a thorough review and analysis of Debtor's financial condition based on books and records available to the Debtor as of the filing of this First Amended Disclosure Statement.  Certain information contained in this First Amended Disclosure Statement has not been subject to audit by independent certified public accountants.  Accordingly, the Debtor is unable to warrant or represent that the information concerning the Debtor or its financial condition is accurate or complete. The projected information contained in this First Amended Disclosure Statement has been presented for illustrative purposes only, and, because of the uncertainty and risk factors involved, the Debtor's actual results may not be as projected herein. Although an effort has been made to be accurate, the Debtor does not warrant or represent that

the information contained in this First Amended Disclosure Statement or its Exhibits is correct. Debtor believes the information contained in this First Amended Disclosure Statement is substantially accurate and may be relied upon in formulating a decision to accept or reject the First Amended Plan.  The books and records of Debtor are not warranted or represented to be complete and historically accurate.

The First Amended Plan filed in connection with this First Amended Disclosure Statement is an integral part of the First Amended Disclosure Statement and each Creditor and interested party is urged to review the First Amended Plan prior to casting its vote.

All information herein is set forth as required pursuant to 11 U.S.C. §1125 and is not to be construed as a representation of management of Debtor or to be used as an admission in any litigation.

C.    **Explanation of the Chapter 11 Case and the Plan Confirmation Process:**

The First Amended Plan sets forth the means for satisfying Claims against a Debtor under Chapter 11 of the Bankruptcy Code.  Chapter 11 does not require that each holder of a Claim against a Debtor vote in favor of the First Amended Plan in order for a Bankruptcy Court to confirm the First Amended Plan.  The First Amended Plan must be accepted, however, by the holders of at least one impaired Class without considering claims of an "insider" within the meaning of the Bankruptcy Code.  A holder of an impaired Claim, as defined in 11 U.S.C. §1124, or Interest is entitled to vote to accept or reject the First Amended Plan if such Claim or Interest has been allowed under §502 of the Bankruptcy Code.  In order for an impaired Class of Creditors or Class of Interest Holders to be deemed to have accepted a First Amended Plan, a majority number of holders of Claims and two-thirds in dollar amount of the total Allowed Claims or Interests actually voting in the Class must vote in favor of the First Amended Plan.

Even if all Classes of Claims and Interests accept Debtor's First Amended Plan, the Court may not confirm it under certain circumstances. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation. Among other things, that section requires that the First Amended Plan be in the best interest of Creditors and Interest Holders and that the value to be distributed to Creditors and Interest Holders be not less than the value those parties would receive if Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The Bankruptcy Court may confirm the First Amended Plan even though less than all of the Classes of impaired Claims or Interests accept it, so long as one Class of impaired Claims or Interests (excluding insider Claims) accepts the First Amended Plan. Confirmation of the First Amended Plan over the objection of one or more Classes or Claims or Interests is generally referred to as *Cramdown*. The circumstances under which the Court may confirm Debtor's First Amended Plan over the objection of a Class of Claims or Interests are set forth in §1129(b) of the Bankruptcy Code (the "Cramdown Provisions"). The First Amended Plan may be confirmed under the Cramdown Provisions, if, in addition to satisfying the usual requirements of §1129 of the Bankruptcy Code, it (i) does not discriminate unfairly, and (ii) is fair and equitable with respect to each Class of Claims or Interests that is impaired under, and has not accepted, the First Amended Plan. 11 U.S.C. §1129(b).

For purposes of seeking confirmation under the Cramdown Provisions, should that alternative be necessary, Debtor reserves the right to modify or vary the treatment of any Class, as provided in the First Amended Plan. Confirmation of Debtor's First Amended Plan is binding upon Debtor, all Creditors, all Interest Holders and all other parties in interest, regardless of whether or not they have accepted the First Amended Plan.

**D.**     **Procedure for Filing Proof of Claim and Proof of Interest:**

Except for a Governmental Unit, the Bar Date for filing a Proof of Claim or Proof of Interest was April 11, 2017.  If a Creditor is listed in Debtor's bankruptcy schedules as holding non-contingent, liquidated and undisputed Claims in an amount certain, that Creditor was not required to file a Proof of Claim and may therefore have elected not to file such a Proof of Claim.  Debtor's bankruptcy schedules are on file at the Bankruptcy Court and are available for inspection during regular business hours.

## II.     VOTING INSTRUCTIONS

The First Amended Plan divides the Claims of Creditors and Interest Holders into **thirteen (13) classes**.  Only classes of Creditors and Interest Holders with claims or interests that are impaired under the First Amended Plan are entitled to vote on a First Amended Plan. Generally, and subject to the specific provisions of the Bankruptcy Code, this includes creditors and interest holders whose claims or interests, under a First Amended Plan, may be modified in terms of principal, interest, length of time for payment, or a combination of the above.  Each holder of a Claim in a class that is not impaired under the First Amended Plan is conclusively presumed to have accepted the First Amended Plan, and solicitation of the acceptances from the holders of such claims is not required and will not be undertaken. Certain Claims, in particular Administrative Claims, remain unclassified in accordance with section 1123(a)(1) of the Bankruptcy Code.

**A.**     **Unimpaired Classes:**

Claims in classes 7, 8 and 12 are unimpaired and therefore not entitled to vote.

B.    **Impaired Classes:**

i.    **Impaired Voting Classes.**  Claims in Classes 1, 2, 3, 4, 5, 6, 9, 10, 11, and 13 are impaired under the First Amended Plan, and therefore, holders of Claims and Interests in such classes are entitled to vote to accept or reject the First Amended Plan.

ii.    **Impaired Non-Voting Class.**

After carefully reviewing the First Amended Plan, this First Amended Disclosure Statement and its exhibits, each holder of a Claim or Interest which has been impaired under the First Amended Plan, may vote on acceptance or rejection by completing, dating and signing the ballot, which will be mailed to them after the Court approves this First Amended Disclosure Statement, and returning it to the Clerk of the Bankruptcy Court at the following address:

CLERK OF THE COURT
UNITED STATES BANKRUPTCY COURT
C. Clyde Atkins U.S. Courthouse
301 North Miami Avenue
Miami, FL 33128

In order to be counted, ballots must be received by the Bankruptcy Clerk no later than 5:00 p.m. Eastern Time on _____, 2017.

PLEASE VOTE EVERY BALLOT YOU RECEIVE.  Completed ballots for holders of all Claims and Interests should be returned and MUST BE RECEIVED BY THE DEADLINE SET FORTH IN THE ORDER SETTING CONFIRMATION HEARINGS AND OTHER DEADLINES.  If you have Claims or Interests in more than one Class under the First Amended Plan, you will receive multiple ballots.

IF A BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, CALL:

Brett D. Lieberman
Messana, P.A.
954-712-7400

### III.    HISTORY OF DEBTOR

**A.    General Information:**

In 1992 a waterfront Holiday Inn hotel was built in Miami Beach just east of Allison Island and located at 6060 Indian Creek Drive in Miami Beach, Florida. In 2006, the developer, Indian Creek Investors, Ltd., converted the hotel to a hybrid condominium/hotel; the Sixty Sixty Condominium (the "Condominium").

On or about April 10, 2006, the Condominium was officially created by recording its charter, the Declaration in the Official Records Book 24411, Page 1780 of the Public Records of Miami-Dade County, Florida (the "Declaration").

The Condominium is composed of 87 "units", which includes: (i) 82 residential units (the "Residential Units") that are privately owned by the Residential Unit owners (the "RUOs"); (ii) four commercial units (the "Commercial Units") presently owned by the Debtor (in this capacity, the "CUO"), and, (iii) generally speaking, all areas not within a Residential Unit or Commercial Unit are deemed to be a part of a hotel unit (the "HU") owned and operated by Schecher Group, Inc. (the "HUO"). The principal of the HUO is Richard Schecher ("Schecher").

The Declaration created a very unusual ownership, control and management structure that, absent complete transparency and good faith, created an opportunity for mismanagement and self-dealing by the HUO.

*(i)    The Association's Role, Authority, and Obligations*

The Debtor is a not-for-profit corporation; a condominium association. It is responsible for, among other things, the management, operation, and maintenance of the Condominium's

"Common Elements" (as defined in the Declaration §2.12), the Commercial Units, Unit 505 (a Residential Unit within the Condominium), and other obligations imposed by state statute.

Under the Declaration, the Condominium has very few Common Elements. The principal Common Element is an easement of support in every portion of a unit which contributes to the support of the Condominium.  See Declaration §2.12.

To fund the expenses of Debtor's operations (the "Common Expenses"), the Declaration empowers the Debtor to assess and specially assess the RUOs, the CUO, and the HUO (the "Association Assessments"). Declaration §2.13. The Association Assessments are allocated across all unit owners pursuant to Exhibit 3 of the Declaration (the "Common Expense Allocation"). Under the Declaration, the Association holds a lien against all units for unpaid Common Expenses dating back to the date of the Declaration and enjoys a priority over all other liens except for certain first position mortgage holders.

Under the Common Expense Allocation, the HUO is responsible for 64.5962%, the RUOs for 29.8763%, and the CUO for 5.5275% of the Common Expenses.

According to records available to the Debtor, the HUO has not paid its share of the Common Expenses for many years. **The HUO appears to owe the Debtor nearly $900,000.**

The Declaration also contains material nonstandard provisions that create an aberrant ownership, management and control structure of the Condominium.

### (ii)    The Hotel Unit's Role, Authority and Obligations

Under the Declaration, substantially all elements ordinarily comprising "common elements" (e.g., hallways, pool areas, staircases, life safety systems, HVAC, etc.) are part of the HU (the "Aberrational Ownership Structure"). Notwithstanding that such elements are owned exclusively by the HUO: (i) the Declaration defines these elements as "*Shared* Components"

(Declaration §2.32); and (ii) allocates 100% of the "costs incurred by the HUO in (or reasonably allocated to) the repair, replacement, improvement, maintenance, management, operation, ad valorem tad obligations and insurance of the Shared Components" (the "*Shared* Costs") to the RUOs and CUOs (the "Aberrational Cost Structure"). Declaration §12.1.

In addition to *Shared* Costs, the HU has also impermissibly imposed charges against the RUOs and CUOs for HUO costs that are not for "repair, replacement, improvement, maintenance, management, operation, ad valorem tax obligations and insurance of the Shared Components" (the "Impermissible Costs").   An affiliate of the HUO, Casablanca Rental Services, Inc. ("HM"), purports to operate a "Hotel Program" for the HUO and the RUOs who participate in the program.

The HU does not include a single inhabitable Residential Unit and has no legitimate power to compel a RUO or CUO to participate in the Hotel Program. RUOs, including the Debtor, have every right to rent their properties to tenants without joining the Hotel Program.

However, the HUO has purposefully imposed certain rules and regulations (the "HU Rules and Regs")[1] to circumvent the RUOs rights to make it economically impossible for RUOs to rent out their Residential Units. See ECF #92.

**In that *Shared* Costs are only supposed to be dollar-for-dollar reimbursements of costs "incurred by the Hotel Unit Owner", it is unclear: (i) how the HUO is designed to legitimately profit; and (ii) why the HU would have any value independent of a Hotel Program.**

The Declaration also purports to empower the HUO to assess and specially assess the RUOs and CUOs for *Shared* Costs. *Shared* Costs are allocated to RUOs and the CUOs in

---

[1] http://www.sixtysixtycondo.com/rules--regulations/ (last viewed 3-10-2017).

percentages contained within Exhibit 7 of the Declaration (the "*Shared* Cost Allocation"). Presently, under the *Shared* Cost Allocation, the RUOs are responsible for 83.3599% and the Debtor is responsible for 16.6401% of the *Shared* Costs.

According to certain claims of lien filed by the HUO in the public record for Miami-Dade County, Florida, the HUO previously asserted that the Debtor owes it in excess $497,818  on account of its allocable share of the *Shared* Costs.[2]

The exclusive consideration given to the unit owners in exchange for the powers bestowed upon the HU are easement rights of passage across HU property (hallways, stairways, elevators, etc.) necessary to access their units (the "Easement Rights"). Declaration §§3.4 and 7.3.

**B.      Circular Assessment Problem**

The HUO is responsible for paying approximately 64.596% of the Common Expenses. The HUO passes along 100% of its Common Expense obligations to RUOs and the Debtor/CUO as *Shared* Costs. <u>The HUO does not contribute in any way to the financial wellbeing of the Condominium.</u>

In that the Debtor is the owner of the Commercial Units and Unit 505, a certain portion of the Common Expenses matriculates through the HUO and is charged back against the Debtor in the form of *Shared* Costs (the "Circular Assessment").

Accordingly, the Debtor is responsible for the impossible; paying itself a portion of its own Common Expenses.

The Circular Assessment can be demonstrated by the following flow chart:

_____

[2] Attached hereto as Exhibit "A" are copies of the claims of lien filed by the HUO against the Debtor.



"Circular Assessment" Issue Demonstrative Flow Chart on
Hypothetical $100,000 Association Budget for Common Expenses

Residential Unit Owners

$53,848 of Common Expenses Assessed to RUOs as *Shared* Costs by HUO

$35,404 Common Expenses assessed to RUOs

$53,848 paid by RUOs to HUO

$35,404 paid directly by RUOs to Association

$10,748 of Common Expenses Assessed to Association as *Shared Costs* By HUO

Hotel Unit Owner

Schecher Croup, Inc.

(Pass through)

$64,596 Common Expenses Assessed to HUO

$53,848 Paid to Association by RUOs indirectly through HUO

Hypothetical $100,000 Budget Shortfall Analysis

$35,404 paid by RUOs as Common Expenses
+ $53,848 paid by RUOs as *Shared Costs*

= $89,252 in total "real" dollars

−$10,748 (10.7%) Budget Shortfall

Debtor

Sixty Sixty Condominium Association, Inc.

$10,748 Common Expenses Paid by Association to HUO as *Shared Costs*

The same circuitous (and broken) formula applies to a budget of the HUO.[3]

The Circular Assessment issue is exacerbated where, as here, the HUO issues special assessments against the Debtor for hundreds-of-thousands-of-dollars.  *Id.*

Moreover, notwithstanding: (i) the inherent flaw and affect on the calculations by both the Debtor and the HUO; and (ii) that **HUOs affiliate, CHMC, managed the Debtor for nearly three years**, the HUO has taken the incredible position that the Debtor's budget infirmities are squarely to blame upon the current board of directors.

### C.    **Management of Debtor**

From approximately March 2013 through at least the end of 2015, the Debtor was managed by an affiliate of the HUO; Condominium Hotel Management Corporation, Inc. ("CHMC").

Upon formal termination in February of 2016, the Debtor's collection and accounting activities were managed by Oxygen Association Services, LLC ("Oxygen").

In connection with this bankruptcy case, the Debtor sought to engage Michael Marcusky and the accounting firm of Juda Eskew & Associates, PA (the "Accountant") as its accountant and to oversee the day-to-day collections of assessments. ECF #60.

Schecher objected to the Accountant's retention.

On January 23, 2017, the Bankruptcy Court overruled Schecher's objection and granted the Debtor's motion to employ the Accountant. ECF #88.

---

[3] If the HUO creates a $100,000 budget, the *Shared* Cost Allocation would require the Debtor to pay the HUO approximately $16,640.10 and the other RUOs $83,359.90. The $16,640.10 *Shared* Cost borne by the Debtor would be considered a Common Expense. The Common Expense Allocation for that $16,640.10 would then require the HUO to pay the Debtor $10,748.87. In total, on a $100,000 Debtor budget, the most it could ever expect to recover in terms of real dollars, is $89,251.13 (or approximately 89.25% of the budget) assuming 100% collections from RUOs.

As to other matters, Debtor is managed by a Board of Directors comprised of: Maria Velez as President; Lionel Gossa as Vice President; Henryk Kwiatsowski a Director, and SE Velez-Giraldo as Secretary/Treasurer. None of the members of the Board of Directors receive compensation for their efforts.

**D.**    **Pre-Petition Events Leading up to Chapter 11 Filing**

*(i)*    *2011 Lawsuit Against Optima Hospitality, LLC and Introduction to HUO*

The developer, Indian Creek Hotel Investors, Inc. (the "Developer") was the original HUO. Declaration §1.2.  On October 4, 2007, public records reflect that the HU was transferred from the Developer to Optima Hospitality, LLC ("Optima").

On account of, among other things, the Debtor's position that the Declaration violated Florida condominium law by implementing the Aberrational Ownership and Cost Structures, on July 11, 2011, the Debtor commenced a lawsuit against Optima (the "Optima Lawsuit").

During the course of the litigation, on February 8, 2013, the Debtor and the HUO's affiliate, CHMC, entered into an agreement that would be effective if CHMC or an affiliate acquired the HU (the "Operations Agreement").

On or about March 20, 2013, an affiliate of CHMC, the HUO, acquired the HU.

That same day, the Debtor entered into: (i) a Condominium Management Agreement with CHMC to manage the Debtor; and (ii) an addendum to the Operations Agreement with CHMC through which the HUO agreed to be bound by the Operations Agreement. The Operations Agreement included, among other things, critical reporting obligations on behalf of the HUO in favor of the RUOs and Debtor.

The HUO did not satisfy its reporting requirements under the Operations Agreement.

After participating in mediation and being swooned by the HUO's promises, the parties

entered into a settlement agreement and stipulated to a dismissal of the Optima Lawsuit on March 26, 2013.

*(ii)*      ***The $1,955,099 Emergency Special Assessment of 2014***

As part of the discussions between the Debtor and HUO, there was consensus that the HUO would pass an emergency special assessment for building repairs to be paid by unit owners over a 9 month period (the "2013 ESA"). On May 8, 2013 it is believed the 2013 ESA was recalled and credited as prepayments of the Unit Owners.

But, by early 2014, the HUO unilaterally issued a second emergency assessment (the "2014 ESA"). This time, the HUO imposed a special assessment against the RUOs and Debtor in the amount of $1,955,000 purportedly to update, repair and renovate the HU. The 2014 ESA started to be invoiced on January 2014.

Most RUOs and the Debtor could not bear the expense. Tensions between the RUOs and the HUO began to rise. During this time, the Debtor was being managed by CHMC.

In addition to the unilateral actions taken by the HUO to implement incredibly expensive renovations at the expense of the RUOs and the Debtor, CHMC failed and refused to provide transparent accounting to the RUOs.

*(iii)*      ***The June 2014 Flood Event***

Adding to the tensions, in June of 2014, a Residential Unit on the 9th floor under CHMC's stewardship had a significant plumbing issue. The plumbing issue caused material water damage to floors 5-9 of the Condominium (the "Flood Event").

As a result of the Flood Event and CHMC's and the HUO's failure to timely remedy same (including permitting certain wires to be exposed in connection with unpermitted demolition), the Fire Marshall issued a Cease & Desist Order on August 21, 2014.

The Cease & Desist Order required evacuation of all units on floors 5, 6, 7, 8, and 9 through the end of October 2014. A 24 hour Fire Marshall watch was imposed by the City of Miami Beach.

After October 2014, the majority of the units on the floors affected by the Flood Event re-opened. Approximately ten units remained closed due to the damage. Because of unauthorized demolitions (RUO's did not give permission or were not even told what was happening in their units) within these units by HUO and CHMC, these RUO's may have pending fines and violations with the City of Miami Beach. CHMC had promised the RUO's that insurance proceeds would be dedicated to repair their units. This did not happen.

**Upon information and belief, insurance has paid the HUO and/or its contractors, directly or indirectly, approximately $760,056 in connection with the Flood Event**.

(iv)    *The Negligently Destroyed Fire Panel*

Upon information and belief, A-1 Fire & Security ("A-1") was engaged by CHMC to repair or update certain fire safety features.

Upon information and belief, on or about April 6, 2015, A-1 removed the custom smoke alarm panel and wrongfully discarded it (the "Fire Panel Event").

Only a few short months after being shut down for the Flood Event, on April 13, 2015, the Condominium was again shut down and closed in its entirety by the City of Miami Beach Building Department as an Unsafe Building due to the following reasons:

> Fire alarm panel was removed and new panel still not in service Corridor walls and unit demising wall have been removed on units from 5th to the 9th floor Interior demo of all units from 5 to 9, smoke control system not functioning, exhaust vents from baths not protected and no damper shown from floor to floor, penetrations between floor not properly fire stopped, water lines from floor to floor corroded.

> (emphasis added).

On February 20, 2017, the HUO and HM filed a complaint against A-1 in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Case No. 2016 CA 029937 alleging, among other things, A-1's negligence with respect to the smoke alarm panel, breach of contract and other causes of action (the "A-1 Complaint"). Contrary to the March 8, 2016 mediation agreement, the A-1 Complaint does not appear to seek remedies for the RUOs or CUOs for the damages they incurred on account of A-1's wrongful actions.

(v)    <em>The $375,000 Emergency Special Assessment of 2015</em>

Shortly after the Fire Panel Event, the HUO issued an additional emergency special assessment in the amount of $375,000 (the "2015 ESA") to be paid by the RUOs and Debtor "in one lump sum payment due and payable by June 1, 2015."

At this point, relations between the RUOs, CHMC, HUO and Debtor were incredibly strained.

Escalating the discord between the RUOs and HUO caused by HUO's unilateral special assessments, the HUO and CHMC breached the Operations Agreement. The HUO and CHMC failed and refused to deliver transparent financial information supporting the costs of the HUO's emergency assessments. The RUOs demanded that the HUO demonstrate the purpose of the special assessments, the contracts for the repairs, and the competitive bids they received.

The RUOs also wanted an explanation of why RUOs and the Debtor were being asked to pay for Flood Event damages if such damages were covered by insurance.

The Debtor and RUOs generally felt that CHMC and the HUO had failed and breached their duties under the Declaration and common law.

(vi)    <em>The Insider Loan of August 2015 and Schecher Self Dealing</em>

On August 20, 2015, it appears that the HUO borrowed $650,000 at 18% interest (the

"Insider Loan") from APO Annuity Manager, LLC ("APO").

Relevant here, the Insider Loan provides for payments to:

- $137,432 to the HM
- $208,249.47 to CHMC; and
- $155,864 for "Management Discretion from List Approved"

Schecher is the CEO of the HUO.

Schecher is the Manager/Director of APO.

Schecher is the CEO of the HM.

Schecher is the Director of CHMC.

Essentially, Schecher's HUO borrowed $650,000 at 18% from Schecher's APO to pay Schecher's HM and CHMC.

On August 26, 2015, Bridgeport Capital Funding, LLC ("Bridgeport") recorded a UCC-1 claiming a security interest in all assets of the Debtor. Schecher is a director of Bridgeport Capital Services, Inc. The address of Bridgeport on its UCC-1 filing is the same as Schecher's address on APO's 2016 Annual Report.

### (vii) The $975,000 Emergency Special Assessment of 2016

On February 26, 2016, the HUO sent another notice of an emergency special assessment to RUOs and the Debtor in the amount of $975,000 due by March 1, 2016 for, among other things, costs allegedly associated with the closing of the building, the repairs needed to open the building and for legal fees and other miscellaneous costs (the 2016 ESA").

### (viii) The $17,500 HUO Deception

Upon information and belief, in early 2016 the HUO claimed that the Condominium was closed because it did not have $17,500 necessary to satisfy a City of Miami requirement. After speaking with representatives of the HUO and CHMC daily to re-open the building, RUO Ralph

Bauchrowitz, committed to pay the $17,500 requested by the HUO to reopen the building. See ECF #37, Affidavit of Ralph Bauchrowitz at ¶7.

In March of 2016, Mr. Bauchrowitz transferred the $17,500 to the HUO for the express purpose of, and conditioned upon, re-opening the Condominium. *Id.* at ¶9. It is understood that the HUO agreed to do so.

However, after receiving the earmarked $17,500, the HUO failed and refused to open the Condominium. *Id.* at ¶12.

Word of HUO's deceitful action spread like wildfire through the RUOs. Having breached the RUOs' trust, many RUOs refused to pay the HUO and responded to the HUO's lockout with a rent strike.

### (ix)    *The 2015-2016 Lawsuit Against HUO*

On August 28, 2015, the Debtor commenced a lawsuit against CHMC, the HUO, and A-1 claiming, among other things, the appointment of a receiver, an injunction, an accounting, negligence, breach of fiduciary duty, breach of contract, and breach of good faith and fair dealing (the "HUO Lawsuit").

On October 12, 2015, the Court in the HUO Lawsuit compelled the "audit of the Hotel Unit's financial statements of the Shared Costs for the remainder of 2013 and for 2014 will be completed by November 10, 2015."   HUO Lawsuit, Order on October 9, 2015 Status Conference.

The HUO failed to deliver an audit of the HU's financial statements by the November 10, 2015 deadline.  To date, Debtor has not received an audit of HU's financial statements of Shared Costs for 2013 or 2014.

Instead, it appears that the HUO caused to be delivered audits of the Debtor's own

financial statements. The audits of the Debtor's financials do not appear to investigate or audit the HUs *Shared* Costs or the HUO's financial statements.

Nevertheless, on March 8, 2016, the parties to the HUO Lawsuit participated in mediation and came to a resolution (the "Settlement"). Among other things, the HUO and CHMC agreed to: (i) provide open and transparent financial information; (ii) to allow RUOs a payment plan with respect to the charges of the HU; and (iii) to pursue a lawsuit against A-1. The Debtor agreed to dismiss the HUO Lawsuit without prejudice.

The Settlement also provides that all of the parties to the HUO Lawsuit, including the HUO (the "HUO Legal Fees"), were to bear their own legal fees and costs. However, the HUO included the HUO Legal Fees in its calculation of *Shared* Costs and assessed same against the RUOs and the Debtor.

### *(x)    The Florida Building and Supply Lawsuits (the "FB&S Lawsuits")*

In December 2014, at the direction of CHMC it appears that the Debtor executed a contract (the "Disputed Contract") with Florida Building & Supply, Inc. ("FB&S") for certain repairs to the HU. The Debtor denies that the signatory to the Disputed Contract had the authority to sign same and further disputes, among other things, the validity and enforceability of the Disputed Contract.

On or about February 4, 2015, FB&S claims to have furnished labor, services and materials for the benefit of the HU pursuant to the Disputed Contract. On or about April 6, 2016, FB&S filed a claim of lien against all units in the Condominium purporting to secure its claim of approximately $83,799.64 for unpaid goods and services rendered to the HU on an oral contract with the Debtor (the "FB&S Disputed Lien #1"). Then on April 20, 2016, FB&S filed a claim of lien against all units in the Condominium purporting to secure its claim of approximately

$963,334.19 for unpaid goods and services rendered to the HU pursuant to the Disputed Contract (the "FB&S Disputed Lien #2", together with FB&S Disputed Lien #1, the "FB&S Disputed Liens").

On June 20, 2016, FB&S filed two lawsuits against the Debtor.

The first lawsuit claims that the Debtor breached an oral contract with FB&S and claims damages in the amount of approximately $83,799 and to foreclose upon FB&S Disputed Lien #1. The second lawsuit claims, among other things, that Debtor breached the Disputed Contract with FB&S and claims damages in the amount of approximately $963,334 and to foreclose FB&S Disputed Lien #2.

On September 1, 2016, the Debtor filed Motions to Dismiss both FB&S Lawsuits.

On October 19, 2016, the Court in the 'oral contract' FB&S Lawsuit entered an order abating said lawsuit until the HUO was made a party and compelled all parties to mediation.

Also, on October 19, 2016, the Court in the 'Disputed Contract' FB&S Lawsuit entered an order of dismissal for failing to join an indispensable party; the HUO.

### (xi)    *Building Closure and Prohibited Access*

Until late December 2016, the Condominium was closed.

The RUOs and Debtor have had absolutely no access to the Condominium, or their units, and were prevented from exercising their Easement Rights. The Declaration makes clear that the Easement Rights are the sole consideration provided to RUOs and CUOs by the HUO.

Nevertheless, it appears that the HUO issued assessments and special assessments well exceeding a million dollars against the RUOs and the Debtor for, among other things, renovations to its HU while denying the RUOs and Debtor their Easement Rights. During all of this time, the HUO had not pursued a single foreclosure action against a delinquent RUO.

On the eve of re-opening the "almost brand new building with a new pool, new air-conditioning improvements, new elevator improvements, and basically a new building…",  the HUO filed approximately 28 foreclosure actions against RUOs and explained to RUOs that their units are "all but worthless…."  The HU has offered, among other things, to accept deeds to qualifying Residential Units in lieu of foreclosure and coordinated with a "bulk buyer" who purportedly offered to purchase Residential Units for $40,000-60,000 (most units were originally purchased in the $150,000-185,000 range).

The HUO has e-mail blasted the RUOs with threats of foreclosure, claiming that the RUOs investment in Residential Units are at "rock bottom",  and responded to a RUO's proposed solution with, "What you propose is not only idiotic but it is totally out of the realm of reality."

The HUO's intimidation tactics continue unabated.

**D.    Post Petition Events:**

Debtor commenced this Chapter 11 bankruptcy case on the Petition Date, December 5, 2016.[4]  Debtor's *Plan of Reorganization of Sixty Sixty Condominium Association, Inc.* (ECF #149) (the "Plan") and *Disclosure Statement in Support of Plan of Reorganization of Sixty Sixty Condominium Association, Inc.* (ECF #150) (the "Disclosure Statement") were filed on March 17, 2017 in compliance with the deadlines established by the Bankruptcy Code. Debtor's First Amended Plan and First Amended Disclosure Statement are being filed in compliance with the deadlines established by the Bankruptcy Code and applicable Bankruptcy Court orders.

---

[4] Debtor's counsel will furnish any creditor upon written request a copy of any document filed in Court and specifically referenced herein.

### (i)    Retention of Debtor's Professionals

Throughout the Bankruptcy Case, Debtor, as a not-for-profit Florida corporation, relied upon the assistance of professionals to assist it with the bankruptcy process, including the filing of the bankruptcy petition and bankruptcy schedules, following additional accounting requirements incumbent upon a debtor in bankruptcy, filing monthly Debtor-in-Possession Operating Reports, negotiating with creditors, developing an exit strategy, and formulating a plan.

On December 21, 2016, the Bankruptcy Court considered the applications of Brett D. Lieberman of Messana, P.A. ("Messana") as general bankruptcy counsel[5] and Alessandra Stivelman of Eisinger, Brown, Lewis, Frankel & Chaiet, P.A. ("Eisinger Law") as its special condominium counsel. ECF ## 9 & 10. The day prior to the hearing on the applications, the Schecher Group, Inc. (the "Hotel Owner" or "HUO"), filed an objection to the applications of Eisinger Law. ECF #30. During the hearing on the application of Messana, the Hotel Owner voiced an oral objection to the application of Messana.

On December 29, 2016, the Bankruptcy Court entered its order authorizing Debtor to hire Brett D. Lieberman and the law firm of Messana, P.A. ("Messana") as its general bankruptcy counsel on an interim basis. ECF #41. The hearing on the final approval of Messana as general bankruptcy counsel and for Eisinger Law as special counsel was held on January 12, 2017. On January 23, 2017, this Court entered final orders approving the retention of Messana and Eisinger Law as general and special counsel to the Debtor over Schecher's objection. ECF ## 89 & 90.

---

[5] On April 7, 2017, Messana filed tis *Notice of Filing Updated Declaration of Thomas M. Messana, Esq., Managing Shareholder of Attorney for Debtor in Possession, Messana, P.A.* ECF #176.

Messana is entitled to an administrative claim for services performed. To date, Messana has not received an interim distribution for legal services rendered or costs incurred during the Bankruptcy Case. Messana anticipates asserting an administrative claim in the amount of its fees and costs. To date, and pending the preparation of a formal fee application, the Debtor estimates Messana's current fees and costs earned and incurred are approximately $200,000.

Likewise, Eisinger Law is entitled to an administrative claim for services performed. To date, Eisinger has not received an interim distribution for legal services rendered or costs incurred during the Bankruptcy Case. Eisinger anticipates asserting an administrative claim in the amount of its fees and costs. To date, and pending the preparation of a formal fee application, the Debtor estimates Eisinger Law's current fees and costs earned and incurred are approximately $42,000.

On January 9, 2017, debtor filed its motion to retain the Accountant as its accountant. ECF #60. The Court entered an order approving the retention of the Accountant over the HUO's objection on January 23, 2017. ECF #88. Accountant anticipates asserting an administrative claim in the amount of its unpaid fees and costs.

Debtor also anticipates hiring a real estate appraiser, forensic accountant and other professionals to be approved by the Bankruptcy Court on reasonable and customary terms, to help facilitate the Debtor's First Amended Plan.

### (ii)      *Access to Condominium*

On December 12, 2016, Debtor filed a motion for sanctions against the HUO and Schecher for (i) violating the automatic stay; and (ii) to compel the HUO to provide the RUOs and Debtor access to the Condominium (the "First Sanctions Motion"). ECF #13. On December 20, 2016, the HUO and Schecher filed their verified response to the First Sanctions Motion

denying, among other things, that they had prohibited RUOs and the Debtor from accessing their property (the "Response"). ECF #35.

On December 22, 2016, the Court granted the First Sanctions Motion "to the extent it seeks to compel access." ECF #38 (the "Access Order"). The Access Order generally provided, among other things, that the HUO must provide access to RUOs and the Debtor to their units.

However, the HUO willfully violated the Access Order.

On January 12, 2017, certain RUOs file their *Unit Owners' Motion for Sanctions Against Schecher Group, Inc. and Richard Schecher* (the "Second Sanctions Motion"). ECF #68.

The Second Sanctions Motion alleged, among other things, that the HUO had violated the Access Order by preventing certain RUOs from accessing their units.

On January 19, 2017, the HUO filed its response to the Second Sanctions Motion denying, among other things, that it had violated the Access Order. ECF #83.

On January 23, 2017, the Debtor filed its *Joinder in and Supplement to* [the Second Sanctions Motion] ECF #92 (the "Joinder"). The Joinder alleged that in addition to the HUO denying access, the HUO was denying the Debtor and RUOs use and enjoyment of their units by implementing unreasonable restrictions upon RUOs outside of the Hotel Program through the HUO's Rules and Regs. On January 24, 2017, the HUO filed a response to the Joinder denying, among other things, that the Rules and Regs were unreasonable. ECF #101.

On February 1, 2017, the Bankruptcy Court (i) set an evidentiary hearing on the Second Sanctions Motion and clarified the Access order (ECF #108); and (ii) denied the Joinder without prejudice on procedural grounds and directed that Debtor must seek the requested relief through an adversary proceeding (ECF #107).

Then, after an evidentiary hearing, on March 2, 2017, the Bankruptcy Court entered an order granting the Second Sanctions Motion (the "Sanctions Order"). ECF #140.

The Sanctions Order found that the HUO and HM willfully violated the Access Order and sanctioned the HUO and HM the amount of $10,000 and awarded the applicable RUOs $20,911.87 in legal fees. The Sanctions Order also imposed disclosure requirements upon the HUO and HM and reserved ruling on compensatory damages.

On March 20, 2017, the HUO filed certain disclosures with the Bankruptcy Court (the "Court Ordered Disclosures"). ECF #153.[6]

After the filing of the Court Ordered Disclosures, certain RUOs filed papers with the Bankruptcy Court contesting the representations made by the HUO in its Court Ordered Disclosures. *See* ECF #167 (alleging that Residential Unit 605 has "not signed a hotel agreement with Schecher or Casablanca … We have not had any statements or checks from any hotel group since or before the building was closed"); ECF #168 (alleging that unit 1207 is being "rented out, even though it has never ever been under a rental contract since [] bought, with anyone"); ECF #170 (alleging that "I cancelled my Hotel-Rental-program Contract on July 7th, 2015. Nevertheless, the Hotel Rental Program is now renting my Unit without my permission."); ECF #173 (alleging that Residential Unit 708 is being used as the HUO's "dump site"); and ECF #198 (alleging that "it has come to my attention that the Hotel Owner at Sixty Sixty is renting my unit [905] without our permission… I have not had any payments made to me or credited to me for the use of my Unit at the Sixty Sixty Condominium"))

---

[6] The HUO requested that the disclosures related to the Sanctions Order be kept confidential and, after filing such Court Ordered Disclosures in the public record with same being delivered to all those registered to receive service electronically in this case,, the Bankruptcy Court granted the HUO's request and sealed ECF #153. *See* ECF ## 151, 155, 156, and 157.

In connection with the Sanctions Order, the HUO filed a motion for reconsideration and the RUOs who filed the Second Sanctions Motion filed a responsive pleadings. *See* ECF ##147, 180, 181, 194, and 195.

Ultimately, on April 18, 2017, the Bankruptcy Court entered its *Order Liquidating Compensatory Damages and Granting In Part Motion for Reconsideration of Sanctions Order* (ECF #206) (the "Damages Order"). Among other things, the Damages Order fixed compensatory damages against the HUO in the amount of $1,316.08; fixed the attorney fees and cost award against the HUO at $20,911.87; fixed the punitive damages award against the HUO in the amount of $7,000, and denied the HUO's "set-off" request.

### (iii)    *Investigatory Efforts*

Debtor owns the CUs and Residential Unit 505.

From March of 2013 through at least December 2015, CHMC was the manager of the Debtor and held all of is books and records. Upon termination, Debtor demanded CHMC to deliver all of its books and records. However, CHMC failed and refused to do so and only delivered certain items to Oxygen. On December 12, 2016, Debtor filed its *Debtor's Motion to Compel Turnover of Books and Records from Hotel Condominium Management Corporation, Inc.* ("Motion to Compel"). ECF #11. On December 20, 2016, CHMC filed a response to the Motion to Compel alleging, among other things, that CHMC had delivered all of Debtor's books and records to Oxygen on or before February 2016 and CHMC did not retain any copies ("CHMC Response"). ECF #33. On December 20, 2016, Debtor filed an Affidavit of Mirko Morales, vice president of CHMC, stating, among other things, that as of April 2016, CHMC continued to hold many documents of Debtor. ECF #36. During the December 21, 2016 hearing

on the Motion to Compel, counsel to CHMC proffered that all Debtor documents had been delivered to Debtor. Based on said proffer, the Bankruptcy Court denied the Motion to Compel.

On December 15, 2016, Debtor filed its *Notice of Service of Subpoena* directed to Richard J. Schecher, Jr., Florida Building and Supply, Inc., and the Hotel Owner. ECF #22.

On December 16, 2016, Debtor filed its *Notice of Service of Subpoena* directed to CHMC. ECF #23.

Hotel Owner's deadline to produce responsive documents to Debtor was originally January 5, 2016. Debtor voluntarily extended a 10-day period for Hotel Owner to provide responsive documents. However, on January 6, 2017, Hotel Owner filed a motion requesting an additional 45-day period to provide Debtor responsive documents (the "HUO Motion to Extend"). ECF #52. The HUO Motion to Extend was granted in-part by the Court's January 16, 2017 entry of the *Order Granting Extension of Time and Setting Production Deadlines.* (ECF #72).

On January 19, 2017, Debtor filed its *Motion to Compel Production of Documents from [CHMC] Responsive to Subpoena and for Sanctions.* ECF #82.

According to CHMC, the HUO was in possession of all documents that would have been responsive to the subpoena served upon CHMC. ECF # 98.

Accordingly, on February 1, 2017, the Court entered its *Order Granting, in-part, Debtor's Motion to Compel Production of Documents from Condominium Hotel Management Corporation Responsive to Subpoena and For Sanctions* directing the HUO to deliver all documents responsive to discovery requests to Debtor's counsel on or before February 9, 2017. ECF #109.

The HUO did not timely comply. The HUO did not provide access to hardcopies until February 13, 2017 and did not deliver electronic documents until February 15, 2017. Nevertheless, the HUO filed a misleading *Schecher Group Inc.'s Second Notice of Compliance with Order [DE #72]* alleging that it had timely satisfied its discovery obligations. ECF #117.

Debtor has also asked for all financial statements from the HUO but, so far, has not received same.

**(iv)   Exclusive Period to File First Amended Plan and Solicit Acceptances Thereof**

In accordance with Section 1121 of the Bankruptcy Code, Debtor is given the exclusive right to file a plan for 120 days following the Petition Date and 60 additional days to solicit acceptances of that plan by the Classes ("Exclusivity Period").

During the Exclusivity Period, the HUO sought support for his own plan relating to the Debtor (the "Schecher Plan"). On February 2, 2017, the Debtor filed a *Motion for Contempt and Sanctions for Violating 11 U.S.C. §§ 1121 and 1125 Against Schecher Group Inc. and Richard Schecher* (the "Exclusivity Violation Motion"). ECF #112. The Exclusivity Violation Motion was set for hearing on February 22, 2017. ECF #113.

On February 19, 2017, the HUO and Schecher filed their response to the Exclusivity Violation Motion denying the allegations therein. ECF #122.

On March 3, 2017, the Bankruptcy Court entered an Order granting in-part and denying in-part the Exclusivity Violation Motion (the "Exclusivity Violation Order"). ECF #142. The Bankruptcy Court did not award monetary sanctions.

However, the Bankruptcy Court found that, "The Bankruptcy Code prohibits Schecher from proposing a plan of reorganization for the Debtor unless and until exclusivity expires and

also prohibits it from soliciting approval of a plan unless and until its plan is sent out to vote after approval of a disclosure statement." ECF #142 at p. 3.

Accordingly, the Bankruptcy Court granted prospective relief prohibiting Schecher from proposing a plan or plan structure and from soliciting same during the Exclusivity Period and imposing other requirements including requiring Schecher to include a particular disclaimer on his "budget" proposals (the "Disclaimer").

On March 17, 2017, within the Exclusivity Period, the Debtor filed its Plan and Disclosure Statement.

Objections to the Disclosure Statement were filed by FB&S (ECF #216) and by the HUO (ECF #218).

The Debtor filed its reply to the objections on April 28, 2017. ECF #224.

On May 2, 2017, the Bankruptcy Court held a hearing to, among other things, consider approval of the Disclosure Statement and the objections to same.

On May 3, 2017, the Bankruptcy Court entered an order continuing consideration of the Debtor's disclosure statement (ECF #230) (the "Order on First DS") and requiring Debtor to make certain amendments to the Disclosure Statement.

On May 8, 2017, the Debtor filed a motion to extend the Exclusivity Period pursuant to 11 U.S.C. §1121(d). ECF #235.

On May 15, 2017, the Bankruptcy Court entered an order granting the Debtor's request for an extension of the Exclusivity Period through and including August 2, 2017. ECF #237.

(v)    **Bulk Sale and Rental Program Negotiations**

Throughout this case, in an effort to maximize value, the Debtor has been negotiating with potential purchasers and/or managers of virtually all of its assets through an organized

process which would permit residential unit owners to "opt-in" to a sale or management program for their units. The First Amended Plan advances such negotiations. The First Amended Plan contemplates one of two options being effectuated. Either: (a) the Debtor along with a sufficient number of unit owners will participate in a bulk sale of their units to a bulk purchaser; or (b) the Debtor, along with other unit owners, will participate in a rental program managed by a Manager.

### *(A) Bulk Sale Alternative*

Debtor has received several offers for the purchase and sale of all of its property, including offers to purchase all residential units (the "Bulk Offers").

As of the filing of the Plan, the highest and best Bulk Offer had been submitted by Kingfisher Island, Inc. ("KFI"), presently the Proposed Purchaser (the "LOI"). The key terms of the LOI include the following:[7]

> (a)    Purchase Price. The purchase price for all units (commercial and residential) of $120,000 "minus customary prorations";
> (b)    As-Is/Where-Is: The units will be acquired by the Proposed Purchaser in "as is" condition, without any representations or warranties whatsoever except that title would be conveyed by a general warranty deed from seller(s) to Proposed Purchaser or its designee;
> (c)    Due Diligence Period. The Proposed Purchaser is required to conduct its due diligence within 90 days of the later of: (i) the date of the delivery of the due diligence materials; or (ii) execution of a formal purchase and sale agreement consistent with same (the "PSA").
> (d)    Bankruptcy Contingency. Purchaser and Sellers acknowledge that the Property and Units are subject to certain disputes and the bankruptcy proceeding. Purchaser will seek to settle all outstanding claims with Schecher (including the elimination of the "Administrative Fee" charged by the Hotel Unit operator pursuant to certain rules and regulations imposed by Schecher) and amend or create certain documents to maintain control of the Residential and Commercial Units. If a resolution is not negotiated or adjudicated by a court of competent jurisdiction upon the expiration of the Due Diligence Period, Purchaser has the

---

[7] Attached hereto as Exhibit "B" is a copy of the LOI. In the event of any inconsistency between the First Amended Plan and First Amended Disclosure Statement and the LOI, the terms of the LOI shall control.

right to extend due diligence for an additional sixty (60) day period (the "Extended DD Period").

(e)     Closing Date. The transaction will close thirty (30) days following the later of: (i) the expiration of Due Diligence Period; (ii) if elected by Purchaser, the Extend DD Period, or (iii) receipt of approvals from the Minimum Unit Participation to sell their Units.

(f)     Broker. There shall be not broker fees or costs.

(g)     Exclusivity. Purchaser shall have an exclusive 180 day period to solicit RUOs to participate in the Bulk Sale Alternative commencing on the date of the delivery of the PSA (the "Sale Offer Period").

(h)     The Participation Requirement. A minimum of 70% (or 58) of the Residential Units and 100% (or 4) Commercial Units must agree to the terms of the Bulk Sale Alternative (the "Minimum Unit Participation").

(i)     Bankruptcy Court Approval.

All RUOs would be invited to opt-in to the LOI and attendant PSA and participate in the Bulk Sale. If a sufficient number of unit owners opt-in to satisfy the Minimum Unit Participation requirement, the Debtor shall advance towards closing of the PSA.

Consistent with the Plan and to help facilitate and organize a bulk sale process, the Debtor filed its *Debtor's Expedited Motion for Entry of an Order: (I) Approving Jason Welt and Trustee Realty, Inc. As Debtor's Real Estate Professional; (ii) Approving Proposed Bidding Procedures; (III) Approving Form And Notice Thereof; And (Iv) Scheduling Hearing To Consider Approval Of "Highest And Best" Bid* on April 7, 2017 (ECF #174) (the "Motion to Employ Broker and Approve Bid Process").

The Motion to Employ Broker and Approve Bid Process sought, among other things, authority to: (i) engage Jason Welt of Trustee Realty, Inc. (together, the "Broker") as the Debtor's broker to help facilitate a bulk sale; (ii) approve a process to submit bids and approve the notice to Proposed Purchasers of the instructions detailing the proposed process (the "Bulk Sale Bid Process"); and (iii) setting a final hearing to approve a Proposed Purchaser.

The Motion to Employ Broker and Approve Bid Process was supported by several groups of unit owners (*See* ECF ##185 and 190), by FB&S (ECF #199), and others.

The HUO filed its objection to the Motion to Employ Broker and Approve Bid Process on April 12, 2017 (the "Bulk Sale Objection"). ECF #200. The HUO Bulk Sale Objection argues, among other things, that the proposed Bulk Sale Bid Process violates the HUO's right of first refusal provided in the Declaration (the "RoFR Issue"). The Debtor disagrees with the HUO's argument regarding the RoFR Issue. The RoFR Issue is discussed in more detail in section XVIII below.

KFI filed a limited objection to the Bulk Sale Bid Process and requested an opportunity to outbid any highest and best bid achieved through the Bulk Sale Bid Process. ECF #201.

On April 21, 2017, the Bankruptcy Court approved the Motion to Employ Broker and Approve Bid Process **<u>in-part</u>** and continued the hearing on the balance of the relief sought in the Motion to Employ Broker and Approve Bid Process (the "In-Part Broker Order"). ECF #212.

The In-Part Broker Order authorized the Debtor to engage Broker as its "real estate broker to explore Potential Purchasers for the opportunity to submit an LOI in the contemplated Bulk Sale of the Commercial Units and Residential Units" and approved the compensation structure of the Broker. In-Part Broker Order at ¶1(A) & (B).

The In-Part Broker Order continued the Motion To Employ Broker and Approve Bid Process with respect to the Bulk Sale Bid Process to May 2, 2017.  In-Part Broker Order at ¶3.

During the May 2, 2017 hearing on the Motion To Employ Broker and Approve Bid Process the Bankruptcy Court further continued the hearing on same to June 21, 2017 at 2:00 pm and required additional briefing from the Debtor and HUO with respect to, among other things, the RoFR Issue. ECF #230.

Subsequent to the filing of the Plan and the entry of the In-Part Broker Order, the Debtor engaged in extensive teleconferences with potential purchasers and the Broker conducted several

walk-throughs of the Condominium with same. The Debtor also received proposed LOIs with competitive bids.

Additionally, certain Potential Purchasers have directly contacted RUOs and the HUO without any formal process in place.

**Notably, subsequent to the filing of the Plan and entry of the In-Part Broker Order, the HUO has now published that the HU is available for sale through, among other methods, a video published on YouTube (the "HUO *Deal* Video").[8]**

Among other things, the HUO *Deal* Video appears to propose that Prospective Purchasers make a deal with the HUO rather than participating in a collaborative process with the RUOs and the Debtor.

Under the HUO *Deal* Video's option 1, a buyer would "take out HU Owner", "FORECLOSES ON RUOs" while earning "24% on $1,800,000" and "DRIVES DOWN RUO PRICES". *See Exhibit "C"* at 3:26 minutes (capitalization in original).

Under the HUO *Deal* Video's option 2, a buyer would enter into a joint venture agreement with the HUO that would include the buyer funding the "Legal Costs to Defeat Association and Capture Control" while earning "18% on All Advance Funding" to "Obtain Percentage To Close Out Association" "Collapse Condo Association" and buying "Out HU at Set Price". *Id.* at 5:00 minutes (capitalization in original).

The HUO *Deal* Video represents, among other things, that the HUO has a "majority of RUOs in Foreclosure" a "RUOs Receivable in Excess of $6 Million" "75% of the Process is Complete" and is "Just A Matter of Time". *Id.* at 9:25 minutes (capitalization in original).

---

[8]  Attached hereto as Exhibit "C" are screen shots from the HUO *Deal* Video posted on youtube (https://www.youtube.com/watch?v=XUp0YdOXUJM&feature=em-share_video_user), last checked on May 22, 2017 and appears to have been posted by Richard J. Schecher, Sr. or under his name

The Debtor has concerns regarding the HUO *Deal* Video particularly with respect to its disclosures and the suggestion that the Association would be "collapsed".

The Debtor believes that HUO *Deal* Video is inappropriate out-of-court interference with the Debtor's attempts to reorganize during the Exclusivity Period and may violate the Bankruptcy Court's Exclusivity Violation Order and the Automatic Stay.

### *(B) Rental Program*

In the event the Bulk Sale Alternative does not have sufficient unit owner participants, Debtor plans to facilitate the operation of a rental program that would be made available for all RUOs, including the Debtor (the "Rental Program"). Debtor has received several offers to manage the Association's property and any Residential Unit of RUOs who want to participate in the rental program (the "Management Offers"). To date, the most competitive Management Offer has been submitted by, Florida Luxury Rentals, presently the Proposed Manager (the "Management Proposal").[9]

The key terms of the Management Proposal include the following:

(a)    Management. The Proposed Manager shall manage, operate and maintain each unit in an efficient and satisfactory manner in accordance with this Agreement and all applicable laws, rules and regulations.  Proposed Manager shall act in a fiduciary capacity with respect to the proper protection of and accounting for each unit owners' assets. Throughout the term of the Management Proposal, Proposed Manager shall have responsibility for all management decisions consistent with industry standards and unit owners agree not to impede Proposed Manager, countermand instructions by Proposed Manager to its employees or otherwise interfere with Proposed Manager's performance of its duties.;

(b)    Term. The Proposed Manager's duties and responsibilities under this Agreement shall commence at the time and date approved by the Bankruptcy Court and shall expire on the date that is one (1) year after the commencement

---

[9] Attached hereto as Exhibit "D" is a copy of the Management Proposal. In the event of any inconsistency between the terms described in this First Amended Disclosure Statement and the Management Proposal, the Management Proposal shall govern.

date, unless sooner terminated as provided for in the Management Proposal. The Management Proposal includes an automatic renewal for one year.

(c)    Rents. Proposed Manager shall be responsible for collecting all rents and other income.

(d)    Competitive Bidding. All contracts for repairs, capital improvements, goods and services exceeding $2,000.00, if any are necessary, shall be awarded on the basis of competitive bidding, solicited in a manner more fully described in the Management Proposal.

(e)    Service Contracts. Proposed Manager shall not enter into any contract service for cleaning, maintaining, repairing or servicing the units under contract or any of the constituent parts of the units under contract except as consistent with the budget approved by unit owners and as allowed by the Declaration. Proposed Manager agrees to cooperate with the Hotel Owner in all ways to in order to facilitate the provision of necessary services.

(f)    Taxes. The Proposed Manager shall obtain and pay bills approved by Owner and for all Florida transient taxes (509) and remit to the State of Florida as necessary.

(g)    Lease. Debtor agrees to support all efforts of the Proposed Manager to obtain a lease with adequate space within the Condominium owned by Debtor for the sum no greater than Five Hundred Dollars per month ($500).

(h)    Management Fee. Each month the Proposed Manager shall receive a management fee for its services in managing the units in the amount of Fifty Percent (50%) of the Gross Revenue (defined in the Management Proposal) actually collected and remitted to the unit owners during the month. The term "Gross Revenue" for the purpose of calculating the monthly management fee includes all room rent. Additional accounting and late fees may apply.

In the event the Bulk Sale Alternative does not have sufficient unit owner participants, all residential unit owners would be invited to opt-in to the Management Proposal and participate in the Rental Program.

Consistent with the Plan, on April 7, 2017, in preparation for the potential Rental Alternative, the Debtor filed its *Debtor's Motion for Authority To Engage Property Manager and Approve Management Terms* (ECF #175) (the "Motion to Employ Manager").

The Motion to Employ Manager sought, among other things, authority, but not the obligation, to engage the Proposed Manager as the Debtor's manager and to help facilitate the Rental Program, if necessary.

The HUO filed its objection to the Motion to Employ Manager on April 28, 2017. ECF #223.

On May 2, 2017, the Bankruptcy Court heard argument with respect to the Motion to Employ Manager but did not render a ruling. The hearing on the Motion to Employ Manager was continued to June 21, 2017 at 2:00. ECF #230.

### (vi)    Debtor's Post Petition Operations and Collection Efforts

Since the Petition Date, the Debtor has continued to operate as Debtor and the Debtor-In-Possession. It has engaged appropriate professionals, acquired insurance (*see* ECF #66 & 73), and taken steps to reorganize its affairs including by passing the 2017 Budget (defined herein) and has taken efforts to collect its outstanding assessment receivables.

The Debtor's outstanding assessment receivables from RUO's total approximately $95,000 against approximately 54 Residential Units owned by approximately 47 separate RUOs (approximately $1,759 outstanding per Residential Unit). The largest outstanding assessment receivable against any individual Residential Unit appears to be approximately $4,300.

Working in coordination with the Accountant and Eisinger, the Debtor has communicated with many RUOs and urged said RUOs to pay their outstanding assessment obligations to the Debtor.  Many RUOs are complying and collections in April 2017 were approximately $14,864 (up from $7,708 in March, and $3,055 in February). Additionally, the Debtor has sent out eight demand letters and has submitted four claims of liens for recording.

Based on estimates received from special counsel, the Debtor believes that the cost of commencing foreclosure actions against the delinquent RUOs is approximately $2,000 – 3,000 per unit (approximately $108,000-162,000 for 54 units) plus costs and filing fees. While the Debtor believes that such costs and fees would ultimately be borne by the delinquent RUO in

foreclosure, the Debtor does not believe commencing foreclosure actions against the delinquent RUOs is an efficient or timely method of collecting the outstanding assessment receivables.

Critically, based on the books and records available to the Debtor, through March 31, 2017, the HUO owes the Association approximately $889,921 in unpaid assessments.

On March 10, 2017, the Debtor's special counsel, Eisinger, sent a *Notice of Intent to Record a Claim of Lien* letter to the HUO advising the HUO of, among other things, its outstanding debt to the Debtor and its obligation to pay same (the "Demand Letter"). On April 3, 2017, counsel to the HUO sent a response to the Demand Letter disputing the amount of the debts claimed therein and requesting verification of same.

### (vii) The Adversary Proceeding

In connection with its reorganization strategy, the Debtor believed it essential to have this Bankruptcy Court determine the HUO's claim against the Debtor (and, accordingly, against the RUOs that would likely fund the reorganization effort).

Since commencement, the Debtor advocated its position that a determination of the HUO's claim against the Debtor would have a collateral estoppel effect as to other RUOs.

Prior to the Petition Date, the HUO asserted claims against the Debtor and recorded liens against its assets in the approximate amount of $500,000 without sufficient support or explanation.

On April 11, 2017, the HUO filed its Proof of Claim ("POC #40) in the Debtor's bankruptcy case in the amount of $1,075,516.08.

The HUO's POC #40 alleges that its $1,075,516.08 claim is secured claim by Debtor's assets.  The HUO's POC #40 includes a *Statement of Claim* containing approximately 6 pages of

argument, a self-prepared chart purporting to reflect the HUO's claims, and the claims of liens that the HUO prepared and filed against the Debtor.

POC #40 does not attach a single source document to support the HUO's claim.

On April 13, 2017, in connection with other pending matters, the Debtor advised the Bankruptcy Court that it was preparing an objection to the HUO's POC #40 and would contest the claim.

On April 14, 2017, the Bankruptcy Court entered its *Order Setting Deadline for Debtor to file Adversary Proceeding* requiring Debtor to file an adversary proceeding against the HUO by April 27, 2017 (ECF #204).

On April 27, 2017, the Debtor filed its *Complaint to Determine Validity, Priority and Extent of Liens, Setoff, Objection to Claim & Request for Declaratory Judgment* (ECF #221) and commenced adversary proceeding Case No. 16-26187-RAM against the HUO (the "Adversary Proceeding").

The Adversary Proceeding includes five counts: Count 1: For Declaratory Relief To Determine The Validity Extent And Priority Of Liens, Claims And Encumbrances In the Debtor's Real Property; Count 2: Objection To The HUO's Claim; Count 3: For HUO's Improper Setoff; Count 4: To Avoid HUO's Preferential Liens Against Unit 505 And Commercial Units; and Count 5: To Avoid HUO's Improperly Perfected Liens Against Commercial Units And Unit 505.

In connection with the Adversary Proceeding, and those certain foreclosure proceedings commenced against certain RUOs by the HUO, certain RUO's filed a *Motion for Bankruptcy Court Direction to Circuit Court Regarding Pending and to be Pending Related Miami-Dade*

*Circuit Court Foreclosure Actions* (ECF #171), requesting that the Bankruptcy Report provide guidance to the Circuit Court overseeing certain related foreclosure actions.

On April 28, 2017, the Debtor filed the *Debtor's Response to Unit Owner's Motion for Bankruptcy Court Direction to Circuit Court Regarding Foreclosure Actions* arguing, among other things, that efficiencies (including avoiding inconsistent rulings) would be realized if the foreclosure actions were stayed while the Bankruptcy Court adjudicated the Baseline (as defined in ECF #225) the in the Adversary Proceeding. (ECF #225).

On April 28, 2017, the HUO filed its *Response by Schecher Group, Inc. to Motion for Bankruptcy Court Direction to Circuit Court Regarding Pending and to be Pending Related Miami-Dade Circuit Court Foreclosure Actions* arguing, among other things, that the Bankruptcy Court should not provide the direction requested by RUOs.

On May 4, 2017, the Bankruptcy Court entered its *Report to State Court on Pending Matters and Collateral Estoppel Effect of Bankruptcy Court Ruling* (ECF #232) (the "Report").

The Report provided "a status report on matters that are pending in th[e] bankruptcy case and [] describe[d] why this [Bankruptcy] Court's ruling in a pending adversary proceeding should have collateral estoppel effect and bind the Unit Owners and the Schecher Group on that same issue pending in each of the Foreclosure Cases." Report at p. 2. The Report concluded that the Bankruptcy Court's "determination of Shared Costs, a baseline number applicable to each Unit Owner's obligation, will be binding in the Foreclosure Cases on any Unit Owner who either intervenes as a plaintiff in the [Adversary Proceeding] or who stipulates in the Foreclosure Cases to be bound by the judgment." *Id.* at p. 2-3.

## IV.    SUMMARY OF DEBTOR'S ASSETS AND LIABILITIES

The assets and the liabilities of Debtor as of the filing of the Voluntary Petition herein are substantially as set forth in Bankruptcy Schedules A, B, D, E, and F.

Debtor's primary assets are the Commercial Units, Residential Unit 505, and assessment receivables from the HUO.

The Commercial Units include a restaurant unit (CU-1) and three outdoor terraces (CU-2, CU-3, and CU-4). CU-1 is approximately 2,149 square fee and the Miami-Dade property records reflect its 2016 assessed value of $261,201. CU-2 is an outdoor terrace contiguous with the Condominium's pool area of approximately 1,895 square feet, CU-3 is and outdoor rooftop terrace of approximately 868 Square feet and CU-4 is an outdoor rooftop terrace of approximately 756 square feet.  The Miami-Dade property records reflect nominal 2016 assessed values for CU-2, CU-3 and CU-4.  The values of CU-1, CU-2 and CU-3 are difficult to estimate and the Debtor believes that their value is maximized by selling the Commercial Units as part of a simultaneous organized sale of units as contemplated in in the Bulk Sale Alternative (defined herein).

Residential Unit 505 is an approximately 373 square foot studio and the Miami-Dade property records reflect a 2016 assessed value of $54,280. It was originally sold in 2006 for approximately $153,000. It was acquired by the Debtor in connection with a foreclosure proceeding in 2011.  It appears to be encumbered by a mortgage held by Bank of America. Bank of America did not file a proof of claim in this Bankruptcy Case, the deadline to do so was April 11, 2017.

In addition, Debtor has cash in the approximate amount of approximately $59,013, as of April 30, 2017.

Attached hereto as Exhibit "E" are copies of the summary page from each Debtor-in-Possession report filed by the Debtor from December 2016 through April 2017 which contain details of, among other things, the Debtor's assets including accounts receivables. ECF ##85, 123, 152, 210 and 242.

Additionally, Debtor is a not-for-profit condominium association. Under the Declaration, the Debtor has the power to assess RUO's, CUOs and the HUO for certain expenses. Presently, the assessment receivables are nearly a million dollars with the HUO owing the Association approximately $889,921 (comprised of assessments, late fees, interest, legal fees and penalties) and RUOs owing the Association approximately $95,000.

Finally, Debtor has conducted a preliminary analysis of potential litigation claims including claims potentially sounding in contract, tort, statute and other potential bases (the "Litigation Claims") against certain parties ("Litigation Targets"). The investigation and analysis of the Litigation Claims are ongoing. Accordingly, certain of the Litigation Claims have not been fully analyzed. Nevertheless, a preliminarily list of Litigation Targets is attached hereto as Exhibit "F". Any Litigation Claim not pursued prior to the hearing on confirmation of the First Amended Plan shall be, on the Effective Date, deemed to vest in the Reorganized Debtor.

## V.    SUMMARY OF FIRST AMENDED PLAN

**THE DESCRIPTION OF THE FIRST AMENDED PLAN AS CONTAINED IN THIS FIRST AMENDED DISCLOSURE STATEMENT SUMMARIZES ONLY CERTAIN PROVISIONS OF THE FIRST AMENDED PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OF THE FIRST AMENDED PLAN. THIS SUMMARY IS NOT INTENDED TO SUBSTITUTE FOR A READING OF THE FIRST AMENDED PLAN OR THE REMAINDER OF THIS FIRST AMENDED**

DISCLOSURE STATEMENT IN THEIR ENTIRETY.  THE FIRST AMENDED PLAN IS A LEGALLY BINDING DOCUMENT AND CREDITORS MAY WISH TO CONSULT WITH THEIR OWN ATTORNEYS, IF ANY, TO UNDERSTAND THE FIRST AMENDED PLAN MORE FULLY.

THE TERMS OF THE FIRST AMENDED PLAN WILL GOVERN THE RIGHTS OF THE PARTIES, AND PARTIES WITH IMPAIRED CLAIMS ARE THEREFORE URGED TO READ THE FIRST AMENDED PLAN OF REORGANIZATION IN ITS ENTIRETY.  CAPITALIZED TERMS NOT OTHERWISE DEFINED IN THE FIRST AMENDED DISCLOSURE STATEMENT SHALL HAVE THE MEANING ASCRIBED TO SUCH TERM IN THE FIRST AMENDED PLAN.

The First Amended Plan filed herein, a copy of which is attached hereto, divides creditors into thirteen (13) Classes as follows:

Classes of Claims against and Interests in Debtor are designated as follows:

| | |
|---|---|
| *Class 1* | Secured Claim of Schecher Group Inc.  Impaired—subject to objection, to the extent allowed, entitled to vote. |
| *Class 2* | Secured Claim of FB&S.  Impaired-- subject to objection, to the extent allowed, entitled to vote. |
| *Class 3* | Secured Claim of Bank of America. Impaired—subject to objection, to the extent allowed, entitled to vote. |
| *Class 4* | Secured Claim of Albert Acuna. Impaired—subject to objection, to the extent allowed, entitled to vote. |
| *Class 5* | Secured Claim of Christopher Trapani, PA. Impaired—subject to objection, to the extent allowed, entitled to vote. |
| *Class 6* | Secured Claim of Bridgeport Capital Funding. Impaired—subject to objection, to the extent allowed, entitled to vote. |
| *Class 7* | Secured Claim of City of Miami. Unimpaired—not entitled to vote. |
| *Class 8* | Unsecured Priority Claim of Florida Department of Revenue. Unimpaired—not entitled to vote. |

*Class 9*        General unsecured creditors. Impaired—entitled to vote.

*Class 10*       Unsecured claims of RUOs. Impaired—entitled to vote.

*Class 11*       Interests of the Schecher Group, Inc. Impaired—entitled to vote.

*Class 12*       Interests of the CUOs. Impaired—not entitled to vote.

*Class 13*       Interests of RUOs. Impaired— entitled to vote.

## VII.    MEANS OF IMPLEMENTATION AND FEASIBILITY OF THE FIRST AMENDED PLAN

A plan proponent must demonstrate as a condition of confirmation that each impaired Class of Creditors will receive at least as much as it would receive in a Chapter 7 liquidation proceeding.  Further, a plan proponent must also demonstrate that the First Amended Plan is "feasible".

**A.    Future Operation of Debtor's Business.**  At this time Debtor has approved a going forward budget sufficient to satisfy its future obligations and maintain its property. Attached hereto as Exhibit "G" is a copy of the Debtor's current budget (the "2017 Budget"). The Debtor's 2017 Budget calls for approximately $779,016 in annual assessments necessary to pay certain ongoing operating expenses and to satisfy certain contingent and disputed claims asserted against the Debtor. The Debtor's monthly assessments are equal to approximately $64,918 of which, the HUO is responsible for paying approximately $41,934 and the RUOs (other than the Debtor) are responsible for paying approximately $19,158 on a monthly basis.[10]

Debtor does not have any salaried employees.  Debtor's accounting operations are overseen by the Accountant. The Debtor has a voluntary board of directors that works for no

---

[10] The balance of the monthly assessment is technically owed by the owner of Residential Unit 505 and the Commercial Units and reflects issues exacerbating and related to the Circular Assessment Problem (described herein).

compensation. In the event the Bulk Sale alternative is successful, the Debtor anticipates that the Proposed Purchaser who acquires the Residential and Commercial Units will staff a new board of directors. In the event the Rental Program alternative is effectuated, the Debtor anticipates that the current board of directors will continue to serve the Debtor.  In all events, the Post-Confirmation Debtor will continue Debtor's duties and responsibilities pursuant to the First Amended Plan.

   **B.**  **<u>Bulk Sale/Rental Program Alternatives.</u>** Depending on whether the Minimum Participation Requirement and other requirements are met, the Debtor shall either facilitate the Bulk Sale of the units to the Proposed Purchaser or facilitate the operation of the Rental Program.

   **C.**  **<u>Source of Funding for First Amended Plan – Reorganization Special Assessment.</u>** Under the Bulk Sale Alternative, certain funding for the First Amended Plan shall be provided from the proceeds of the sales of the Residential and Commercial Units, the Reorganization Special Assessment (defined herein) and other future assessments, if necessary.

   It is anticipated that each Residential and Commercial Unit shall pay all liens encumbering their individual units at closing  necessary to satisfy their pro-rata share of any blanket liens against the Condominium, if any, thus satisfying certain potential unsecured claims against the Debtor related to same.

   With respect to the Debtor, the proceeds of the sale of the Commercial Units and Residential Unit 505 shall be used to satisfy and any all allowed secured claims against same (as any allowed claim exceeding the value of the Commercial Units and Residential Unit 505 would, by definition, not be secured as against the Debtor's property).

If the proceeds of the sale of the Commercial Units and Residential Unit exceed the allowed secured claims, such proceeds would be applied to reduce the amount of allowed unsecured claims as of the Effective Date. To the extent allowed unsecured claims remain unpaid as of the Effective Date (the "Bulk Sale Deficiency"), the Debtor shall, consistent with its governing documents, impose a special assessment against all unit owners pursuant to the allocations contained within Exhibit 3 of the Declaration in an amount equal to the Bulk Sale Deficiency (the "Reorganization Special Assessment"). The Reorganization Special Assessment shall be payable on a monthly basis in equal instalments over a period of one year.

Under the Rental Program Alternative, the funding for the First Amended Plan shall be provided by the Reorganization Special Assessment, the surrender of property to secured creditors, future assessments, and any proceeds from the Rental Program available to the Debtor.

Under the Rental Program Alternative, on or before the Effective Date, the Debtor shall calculate the undisputed and anticipated unsecured claims left unpaid after surrender of its property (the "Rental Program Deficiency").   Upon a determination of the Rental Program Deficiency, the Debtor shall, consistent with its governing documents, impose a special assessment against all unit owners pursuant to the proportions contained within Exhibit 3 of the Declaration in an amount equal to the Rental Program Deficiency (also, the "Reorganization Special Assessment"). The Reorganization Special Assessment shall be payable on a monthly basis in equal instalments over a period of one year.

If a unit owner fails to timely make payments to the Debtor for the Reorganization Special Assessment, the Debtor shall engage counsel to foreclose upon such unit owner.

**D.** **The Effective Date.** The Effective Date of the First Amended Plan means the 30 days after the Closing Date or 60 days after the Bulk Sale Termination Date (the date the

Proposed Purchaser gives notice that it is terminating the PSA), unless a later date is requested by the Debtor.

      **E.**    **Substantial Consummation.**  The First Amended Plan shall be deemed substantially consummated upon the Effective Date.

      **F.**    **Notice of Effective Date.**  Promptly after occurrence of the Effective Date, Debtor shall file with the clerk of the Bankruptcy Court a notice that the First Amended Plan has become effective; provided, however, that the failure to file such notice shall not affect the effectiveness of the First Amended Plan or the rights or substances obligations of any entity hereunder.

      **G.**    **Final Decree.**  After the Effective Date, Debtor may move for a final decree closing the case and requesting such other orders as may be necessary and appropriate.

      **H.**    **Conditions to Effective Date.**  The occurrence of the Effective Date shall be subject to the satisfaction, or waiver by Debtor and Lender, of each of the following conditions:

          (i)    The Confirmation Order shall be entered by the Bankruptcy Court and shall be effective and not stayed.

          (ii)    The closing of the transactions contemplated by either Article 4.1 in the event of the Bulk Sale Alternative or, the closing of the transactions contemplated by Article 4.2 in the event of the Rental Program Alternative.

          (iii)    All deliveries required to be made on the Effective Date have been made or waived by the party for whose benefit such delivery is intended.

      **I.**    **Waiver of Federal Rule of Civil Procedure 62(a).**  Debtor will request that the Confirmation Order include (i) a finding that Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order; (ii) authorization for the consummation of the First Amended Plan and the transactions contemplated by the First Amended Plan immediately after entry of the Confirmation Order pursuant to Bankruptcy Rule 3020(e).

**J.** **Disbursing Agent.** Debtor shall act as the Disbursing Agent. On or before ten (10) days after the Effective Date and thereafter, all funds available for distribution to creditors and payment of post-confirmation fees and expenses shall be available to the Debtor. The Debtor shall disburse cash in accordance with the terms of the First Amended Plan and the Bankruptcy Code. Debtor shall also pay all post-Effective Date U.S. Trustee's fees pursuant to 28 U.S.C. § 1930 to the extent required by law.

**K.** **Post Confirmation Debtor**. Following the Effective Date, all of Debtor's assets, including any and all litigation claims, shall immediately vest with the Reorganized Debtor without the need for any other or further Court order. Wherever the First Amended Plan refers to the authority, responsibilities, rights, powers or limitations of the Debtor on or after the Effective Date, such reference shall be deemed to be a reference to the Post-Confirmation or Reorganized Debtor. The Post-Confirmation/Reorganized Debtor shall have the same authority, responsibilities, rights, powers or limitations to discharge the duties of Debtor pursuant to the First Amended Plan. The Post-Confirmation/Reorganized Debtor shall be managed by the Debtor's board of directors, who will not receive compensation for acting as manager of the Post-Confirmation/Reorganized Debtor.

The Post-Confirmation Debtor may retain Professionals without the need for approval by the Bankruptcy Court to assist the Post-Confirmation Debtor with its duties and responsibilities under the First Amended Plan (the "Post-Confirmation Professionals"). Debtor may retain Debtor's pre-confirmation counsel as a Post-Confirmation Professional.

Post-Confirmation Debtor shall set aside sufficient funds for the retention and payment of post-confirmation fees payable to the U.S. Trustee, Post-Confirmation Professionals and other professionals, if any. Payment to the Post-Confirmation Professionals shall only be made upon

application to Bankruptcy Court pursuant to the procedures set forth herein (the "Application Procedures").  Not more than every thirty (30) days, the Post-Confirmation Professionals may submit an application with the Bankruptcy Court for compensation of reasonable fees and expenses in connection with implementing the First Amended Plan.  Such applications shall be served upon the Post-Confirmation Debtor, and any other party that specifically requests notice of such fee applications.  Any party may object to the application for compensation of the Post-Confirmation Professionals and the Disbursing Agent within ten (10) days of service of an application pursuant to these Application Procedures.  If a party in interest timely objects, the Post-Confirmation Debtor shall file a notice of contested matter with the Bankruptcy Court and request a hearing to resolve the objection.  If no party timely objects to any application pursuant to the Application Procedures, the Post-Confirmation Debtor may submit a proposed unopposed order granting the post-confirmation fee application and distribute cash sufficient to pay the Post-Confirmation Professional or other application, without need for further action or approval of the Bankruptcy Court.

**L.**    **Bond.**    Neither the Disbursing Agent nor Post-Confirmation Debtor shall be required to post a bond.

**M.**    **Classification and Treatment of Claims.**    Section 1122(a) of the Bankruptcy Code provides that a plan may place a Claim or Interest in a particular Class only if that Claim or Interest is substantially similar to the other Claims or Interests in such Class.  Classification is a method of recognizing differences in the rights of Creditors and Interests, which call for a difference in treatment of their respective Claims.

The First Amended Plan establishes ten (10) Classes of Claims and three (3) Classes of Interests.  If the Court confirms the First Amended Plan, the Class into which a Claim or Interest

falls will determine the treatment of such Claim or Interest.  The Classes of Claims and Interests as established in the First Amended Plan are summarized below.  Administrative Expense Claims and Priority Tax Claims are not classified pursuant to §1123(a)(1) of the Bankruptcy Code.

An Administrative Claim is defined in the First Amended Plan as a claim constituting a cost or expense of administration of Debtor's Chapter 11 case under Section 503(b) of the Bankruptcy Code and that is entitled to priority under Section 507(a) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the estate, and all fees and charges assessed against the bankruptcy estate under Chapter 123 of Title 28, United States Code.

All requests for payment of Administrative Claims, except for applications for payment of Professional Fee Claims, shall be filed with the Bankruptcy Court and served upon Debtors at least fourteen (14) days before the Confirmation Hearing or by such earlier deadline as may apply to such Administrative Claim pursuant to an order of the Bankruptcy Court.  Except as provided herein, any Administrative Claim for which an application or request for payment is not filed within such time period shall be discharged and forever barred. Holders of Allowed Administrative Claims (with the exception of professionals who will be paid 100% of the amount allowed by the Court upon application to the Court) shall be paid 100% of their respective Allowed Administrative Claims in cash, unless otherwise ordered by the Court, upon the later of: (i) the Effective Date; or (ii) the Closing Date.

Compensation of Professionals and reimbursement of Professionals are Administrative Claims pursuant to sections 503(b)(2), 503(b)(3), 503(b)(4) and 503(b)(5 of the Code (the "Professional fees and Expenses Claims"), which will include any Allowed Claims of Messana,

PA and Eisinger Law and any realtor or Accountant retained by Debtor. All payments to Professionals fro Professional Fees and Expense Claims will be made by the Debtor, or First Amended Plan Administrator our of Cash in accordance with the procedures established by he Code, the Rules and the Court relating to the payment of interim and final compensation for services rendered and reimbursement of expenses. The Court will review and determine all applications for compensation for services rendered and reimbursement of expenses.

All entities seeking an award by the Court of Professional Fees and Expenses shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expense incurred through the Effective Date, including an estimate of fees and expenses not yet earned or incurred, pursuant to section 330 of the Code and Rule 2016 by the date that is seven (7) days prior to the Confirmation Hearing or such other date as may be fixed by the Court. If estimated fees and costs are included in the final application, Messana and Eisinger shall file a supplement to their applications to demonstrate actual fees and costs incurred during by 4:00 pm the calendar day prior to the Confirmation Hearing. The time for filing objections to applications for allowance and payment of Professional Fees and Expenses, shall be three (3) days prior to the Confirmation Hearing.

     **N.**     **Unclassified Claims:**

     **i.**     **Treatment of Administrative Claims, Including Professional Fee Claims.**
Allowed Administrative Claims and Professional Fee Claims incurred through the Effective Date shall be paid by Debtor on or before the later of the Effective Date or the Allowance Date, except as such administrative or professional claimants agree to another treatment.

     **ii.**     **Treatment of Priority Unsecured Tax Claims.**     Allowed Priority Tax Claims shall be paid in full by the payment of Cash on the later of ten (10) days after the

Effective Date or the Allowance Date.  Debtor believes there are approximately $21,384 of claimed Priority Unsecured Tax Claims. Such claims are still being analyzed and objections are preserved. Debtor's secured tax claims shall be paid from cash at Closing.

> iii. **U. S. Trustee Fees And Reporting.**  The Debtor shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) within ten days of the entry of the confirmation order for pre-confirmation periods and simultaneously file with the Court the monthly operating reports for all pre-confirmation periods.  Furthermore, the Debtor shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) for post-confirmation periods and simultaneously file with the Court quarterly post-confirmation reports, until the earlier of the closing of this case by the issuance of a Final Decree by the Court, or upon the entry of an Order by this Court dismissing this case or converting this case to another chapter under the United States Bankruptcy Code.

> O.    **Classified Claims.**    For purposes of the First Amended Plan there shall be thirteen (13) Classes of Claims and Interests as follows:

> > *i.*  **The Bulk Sale – Alternative "A"**

> > 1.  Treatment of Class 1 Secured Claim of the Schecher Group, Inc**.** Allowed Secured Claims in Class 1 shall be completely and fully satisfied by the following treatment:

> > > a.    The Schecher Group Inc. shall have Allowed Secured Claims[11] in an amount equal to the lesser of: (i) an amount determined by the Bankruptcy Court after adjudication on the merits through the Adversary Proceeding that seeks, among other things, a determination of the total amount of legitimate claims the HU has against all RUOs and CUOs (the "Total Schecher Claim") and the Debtor's allocable proportion thereof on account of its ownership of the Commercial Units and Unit 505 (the "Allowed Schecher BK Claims"); or (ii) the value of the Schecher Group Inc.'s collateral for each of Schecher's Allowed Schecher BK Claims (the "Schecher Market Value Secured Claims"). For the purposes of

---

[11] Schecher Group, Inc.'s secured claims, if any, shall be allocated pro-rata to the Debtor's Commercial Units and Unit 505 consistent with Exhibit 7 of the Declaration.

confirmation and for voting, Debtor anticipates filing a *Motion to Estimate Claims of the Schecher Group Inc*. pursuant to 11 U.S.C. §502 and FRBP 3018.

b.    In full satisfaction of the Class Secured 1 Claim, out of the proceeds of the sale of the Commercial Units and Unit 505 to the Proposed Purchaser, the Debtor shall pay Schecher the lesser of the Allowed Schecher BK Claims or the Schecher Market Value Secured Claims in full within 10 business days of the later of: (i) if estimated, the later of (A) the Effective Date or (A) the Closing Date; or, (iii) if determined on the merits, the later of (A) the Closing Date; or (B) entry of a final order that is no longer subject to timely appeal determining the amount of the Allowed Schecher BK Claims.

c.    Schecher shall have an allowed Class 9 General Unsecured Claim in an amount equal to the difference between the Allowed Schecher BK Claims and the Schecher Market Value Secured Claims, if any.

d.    In exchange for its treatment under the First Amended Plan, the Schecher Group Inc.: (i) shall forebear from commencing lawsuits against RUOs on account of claims arising from or related to the Total Schecher Claim until 90 days after the later of: (A) the Effective Date; or (B) the Closing Date; and (ii) shall release its claims and liens against all Residential Units and RUOs participating in the Bulk Sale contemplated by this First Amended Plan in an amount equal to the Total Schecher Claim multiplied by the particular Residential Unit's percent of the *Shared Costs* as allocated in Exhibit 7 of the Declaration.

2. Treatment of Class 2 Secured Claim of FB&S. Allowed Secured Claims in Class 2 shall be completely and fully satisfied by the following treatment:

a.    FB&S shall have an Allowed Secured Claim in an amount equal to its total Allowed Claim multiplied by 16.87% [12] that is secured, pro rata, by the Commercial Units and Unit 505 as allocated in Exhibit 7 of the Declaration.

---

[12] On March 31, 2017 FB&S filed a proof of claim ("POC #6") against the Debtor in its bankruptcy case in the *secured* amount of $1,032,413.43. Pursuant to Exhibit 7 of the Disclosure Statement, the owner of the Commercial Units and Residential Unit 505 bear the burden to pay an aggregate of approximately 16.87% of the *Shared Costs*. FB&S claims to have a blanket lien over all units comprising the Condominium, including the Debtor's Commercial Units and Residential Unit 505. 16.87% of FB&S's claim of $1,032,413.43 is approximately $174,243.98. Pursuant to Florida Statute Section 718.121(3), a lien that becomes effective as to two or more condominium parcels may be satisfied by the owner of any parcel by paying the proportionate amount of the claim attributable to its parcel. Accordingly, the Debtor's position is that FB&S may not have a secured claim against the Debtor for any more than its allocable share of its total Allowed Claim based on the allocations of *Shared Costs*. The Debtor reserves all rights to dispute POC #6.

b.      In full satisfaction of the Class 2 Secured Claim, out of the proceeds of the sale of the Commercial Units and Unit 505 to the Proposed Purchaser, the Debtor shall pay $174,243.98 to FB&S within 10 business days of the later of: (i) the Effective Date; or (ii) the Closing Date.

c.      In exchange for its treatment under the First Amended Plan, FB&S: (i) shall forebear from commencing lawsuits against RUOs that participate in the Bulk Sale on account of claims arising from or related to the Disputed Contract until 90 days after the later of: (A) the Effective Date; or (B) the Closing Date; and (ii) shall release its claims and liens against all Residential Units and RUOs selling their units as part of the Bulk Sale contemplated by this First Amended Plan for a release price in an amount equal to FB&S total Allowed Claim times the particular Residential Unit's percent of *Shared Costs* as allocated in Exhibit 7 of the Declaration.

3. Treatment of Class 3 Secured Claim of Bank of America ("BOA"). Allowed Secured Claims in Class 3 shall be completely and fully satisfied by the following treatment:

a.      In full satisfaction of the Allowed Class 3 Secured Claim, if any, in connection with the sale of Unit 505 to the Proposed Purchaser, the Debtor shall pay $20,000 to BOA within 10 business days of the later of: (i) the Effective Date; or (ii) the Closing Date.

4. Treatment of Class 4 Secured Claim of Albert Acuna ("Acuna"). Allowed Secured Claims in Class 4 shall be completely and fully satisfied by the following treatment:

a.      In full satisfaction of the Allowed Class 4 Secured Claim, if any, in connection with the sale of Unit 505 to the Proposed Purchaser, the Debtor shall pay the amount of the Allowed Secured Claim to Acuna within 10 business days of the later of: (i) the Effective Date; or (ii) the Closing Date. Upon information and belief, Acuna does not hold a valid claim against the Debtor or Unit 505, any claim filed by Acuna would be objected to by the Debtor. Accordingly, Debtor does not anticipate making any payment to Acuna.

5. Treatment of Class 5 Secured Claim of Cristopher Trapani, PA ("Trapani"). Allowed Secured Claims in Class 5 shall be completely and fully satisfied by the following treatment:

b.      In full satisfaction of the Allowed Class 5 Secured Claim, if any, in connection with the sale of the Commercial Units and Unit 505 to the Proposed Purchaser, the Debtor shall pay $10,000 to Trapani within 10 business days of the later of: (i) the Effective Date; or (ii) the Closing Date.

a.      Trapani shall be deemed to have an Allowed Unsecured Class 10 Claim in the amount of $2,500.

6. Treatment of Class 6 Secured Claim of Bridgeport Capital Funding ("Bridgeport"). Allowed Secured Claims in Class 6 shall be completely and fully satisfied by the following treatment:

    a.    Bridgeport Capital Funding shall have an Allowed Secured Claim in an amount determined by the Bankruptcy Court after adjudication on the merits through a claims objection process and valuation of its collateral, if any, if a claim is timely filed by Bridgeport (the "Bridgeport Allowed Secured Claim"). Otherwise Bridgeport shall not be entitled to any claim and shall be compelled to file a satisfaction of its Florida UCC-1 within 14 days of the Confirmation Date.

    b.    In full satisfaction of the Class 6 Bridgeport Allowed Secured Claim, if any, the Debtor shall pay the value of the collateral securing the Allowed Bridgeport Secured Claim, if any, in full within 10 business days of the later of: (i) the Effective Date; (ii) or the Closing Date.

7. Treatment of Class 7 Secured Claim of City of Miami ("Miami"). Allowed Secured Claims in Class 7 shall be completely and fully satisfied by the following treatment:

    a.    Miami shall be deemed to have an Allowed Secured Claim in the amount of its Claim #2, or such other amount as is negotiated between by the Debtor that is less than the amount claimed in Claim #2.

    b.    In full satisfaction of the Class 7 Claim, in connection with the sale of the Commercial Units and Unit 505 to the Proposed Purchaser, the Debtor shall pay the Allowed Secured Class 7 Claim in full on the later of: (i) the Effective Date; or (ii) the Closing Date.

8. Treatment of Class 8 Priority Claim of Florida Department of Revenue ("FDOR"). Allowed Priority Claims in Class 8 shall be completely and fully satisfied by the following treatment:

    a.    FDOR shall be deemed to have an Allowed Priority Claim in the amount of its priority Claim #4, or such other amount as is negotiated between by the Debtor that is less than the amount claimed in Claim #4.

    b.    In full satisfaction of the Allowed Class 8 Priority Claim, the Debtor shall pay the Allowed Priority Class 8 Claim in full on the later of: (i) the Effective Date; or (ii) the Closing Date.

9. Treatment of Class 9 General Unsecured Claims. Allowed Class 9 Claims shall be completely and fully satisfied by the following treatment:

    a.    Each holder of an Allowed Class 9 Unsecured Claim shall receive a monthly distribution over a period of 36 months sufficient to pay such

allowed claim 100% of the dollar amount of such claim as of the petition date funded by any excess proceeds from the sale of Debtor's Commercial Units and Residential Unit 505, if available and the Reorganization Special Assessment.

10. Treatment of Class 10 Unsecured RUO Pre-Payment Claims. Allowed Unsecured Claims in Class 10 shall be completely and fully satisfied by the following treatment:

    a. Holders of Allowed Class 10 Unsecured RUO Pre-Payment Claims shall not receive any distribution from the Debtor. Rather, Holders of Allowed Class 10 Unsecured RUO Pre-Payment Claims, and their successors-in-interest, shall receive dollar-for-dollar credit against monthly and special assessments, including the Reorganization Special Assessment, of the Debtor that first became due post-petition. Such treatment may affect the price offered by the Proposed Purchaser for such units.

11. Treatment of Class 11 Interests of Schecher Group Inc. Allowed Class 11 Interests shall be completely and fully satisfied by the following treatment: In exchange for funding its allocable share of the Reorganization Special Assessment, the Schecher Group Inc. shall retain its rights and interests under the Declaration, whatever they may be.

12. Treatment of Class 12 Interests of CUOs. Allowed Class 12 Interests of CUOs shall be completely and fully satisfied by the following treatment: CUOs shall retain their rights and interests under the Declaration, whatever they may be. 13. Treatment of Class 13 Interests of RUOs. Allowed Class 13 Interests shall be completely and fully satisfied by the following treatment: In exchange for funding their allocable share of the Reorganization Special Assessment, the RUOs shall retain their rights and interests under the Declaration, whatever they may be.

### ii.     <u>The Rental Program – Alternative "B"</u>

1. Treatment of Class 1 Secured Claim of the Schecher Group, Inc. Allowed Secured Claims in Class 1 shall be completely and fully satisfied by the following treatment:

    a. The Schecher Group Inc. shall have Allowed Secured Claims[13] in an amount equal to the lesser of: (i) Allowed Schecher BK Claims; or (ii) the Schecher Market Value Secured Claims. For the purposes of confirmation and for voting, Debtor anticipates filing a *Motion to Estimate Claims of the Schecher Group Inc*. pursuant to 11 U.S.C. §502 and FRBP 3018.

    b. In full satisfaction of the Class 1 Claims against C-2, C-3 and C-4, Debtor shall surrender C-2, C-3 and C-4 to Schecher, subject to all claims liens

---

[13] Schecher Group, Inc.'s secured claims, if any, shall be allocated pro-rata to the Debtor's Commercial Units and Unit 505 consistent with Exhibit 7 of the Declaration.

and encumbrances and interests within 10 business days of the later of: (i) the Effective Date, if estimated or (ii) entry of a final order that is no longer subject to timely appeal determining the amount of the Allowed Schecher BK Claims and Schecher Market Value Secured Claims, if determined on the merits.

c.    In full satisfaction of the Class 1 Claims against C-1, Schecher shall retain any and all liens, claims and encumbrances against C-1, if any, and shall receive equal monthly payments over a period of five (5) years equal to the lesser of: (i) the Allowed Schecher BK Claims against C-1; or (ii) the Schecher Market Value Secured Claim against C-1.

d.    Schecher shall be allowed a Class 9 General Unsecured Claim in an amount equal to the difference between the Allowed Schecher BK Claims and the Schecher Market Value Secured Claims.

2. Treatment of Class 2 Secured Claim of FB&S. Allowed Secured Claims in Class 1 shall be completely and fully satisfied by the following treatment:

a.    FB&S shall be deemed to have an Allowed Secured Claim in an amount equal to the lesser of: (i) its total Allowed Claim multiplied by 16.87%[14]; or (ii) the value of its collateral (the "FB&S Market Value Allowed Secured Claim"), secured by, the Commercial Units and Unit 505.

b.    In full satisfaction of the Class 2 FB&S Market Value Allowed Secured Claim, FB&S shall retain any and all liens, claims and encumbrances against the Commercial Units and Unit 505, if any.

c.    FB&S shall have an allowed unsecured Class 9 General Unsecured Claim in an amount equal to its total Allowed Claim less the value of the FB&S Market Value Allowed Secured Claim.

d.    In exchange for its treatment under the First Amended Plan, FB&S shall forebear from commencing lawsuits against RUOs who participate in the Rental Program on account of claims arising from or related to the Disputed Contract so long Debtor complies with the payments to general unsecured creditors contemplated by the First Amended Plan and any amendment thereto.

3. Treatment of Class 3 Secured Claim of BOA. Allowed Secured Claims in Class 3 shall be completely and fully satisfied by the following treatment:

c.    In full satisfaction of the Allowed Class 3 Secured Claim, if any, Debtor shall surrender the Unit 505 to BOA, subject to all claims liens, encumbrances and interests, within 10 business days of the later of the Effective Date or shall sell

[14] See FN #*infra*.

Residential Unit 505 free and clear of all claims liens and encumbrances and distribute $20,000 to BOA

4. Treatment of Class 4 Secured Claim of Albert Acuna ("Acuna"). Allowed Secured Claims in Class 4 shall be completely and fully satisfied by the following treatment:

a.   In full satisfaction of the Allowed Class 4 Secured Claim, if any, Acuna shall retain any and all liens, claims and encumbrances Unit 505, if any. Upon information and belief, Acuna does not hold a valid claim against the Debtor or Unit 505, any claim filed by Acuna would be objected to by the Debtor. Accordingly, Debtor does not anticipate making any payment to Acuna.

5. Treatment of Class 5 Secured Claim of Trapani. Allowed Secured Claims in Class 5 shall be completely and fully satisfied by the following treatment:

a.   In full satisfaction of the Allowed Class 5 Secured Claim, if any, Trapani shall retain any and all liens, claims and encumbrances upon the Commercial Units and Unit 505.

b.   Trapani shall be deemed to have an Allowed Unsecured Class 10 Claim in the amount of $5,000.

6. Treatment of Class 6 Secured Claim of Bridgeport. Allowed Secured Claims in Class 6 shall be completely and fully satisfied by the following treatment:

a.   Bridgeport shall have an Allowed Secured Claim in an amount determined by the Bankruptcy Court after adjudication on the merits through a claims objection process and valuation of its collateral, if any, if a claim is timely filed by Bridgeport (the "Bridgeport Allowed Secured Claim"). Otherwise Bridgeport shall not be entitled to any claim and shall file a satisfaction of its Florida UCC-1 within 14 days of the Confirmation Date.

b.   In full satisfaction of the Class 6 Bridgeport Allowed Secured Claim, the Debtor shall surrender the collateral securing the Allowed Bridgeport Secured Claim, if any, in full within 10 business days of the later of: (i) the Effective Date; (ii) or the Closing Date.

7. Treatment of Class 7 Secured Claim of Miami. Allowed Secured Claims in Class 7 shall be completely and fully satisfied by the following treatment:

a.   Miami shall be deemed to have an Allowed Secured Claim in the amount of its Claim #2, or such other amount as is negotiated between by the Debtor that is less than the amount claimed.

b.   In full satisfaction of the Class 7 Claim, Miami shall retain any and all liens, claims and encumbrances upon its claimed collateral.

     c.   Miami shall be deemed to have an allowed Class 9 General Unsecured Claim in an amount equal to the amount of its Claim #2 less the value of its collateral.

    8. Treatment of Class 8 Priority Claim of FDOR.  Allowed Priority Claims in Class 8 shall be completely and fully satisfied by the following treatment:

     c.   FDOR shall be deemed to have an Allowed Priority Claim in the amount of its priority Claim #4, or such other amount as is negotiated between by the Debtor that is less than the amount claimed.

     d.   In full satisfaction of the Allowed Class 8 Priority Claim, the Debtor shall pay the Allowed Priority Class 8 Claim in full over a period of five (5) years funded by assessments and Rental Revenues.

    9. Treatment of Class 9 General Unsecured Claims.  Except to the extent that the holder of an Allowed Claim within Class 9 has been paid or agreed to a different treatment Allowed Class 9 Claims shall be completely and fully satisfied by the following treatment:

    Each holder of an Allowed Class 9 Unsecured Claim shall receive a monthly distribution over a period of 36 months sufficient to pay such Allowed Claim 100% of the dollar amount of such claim as of the Petition Date paid by the Reorganized Debtor out of collections from the Reorganization Special Assessment. Said payments shall commence within sixty (60) days of the Effective Date; thereafter, any time the Reorganized Debtor receives Surplus Cash, the Reorganized Debtor shall make a quarterly pro rata disbursement towards satisfaction of the Allowed Class 9 Claims. On the date that is five years after the Effective Date (the "Final Distribution Date"), the Reorganized Debtor must satisfy any remaining amounts due to holders of Allowed Class 9 claims through any reasonable means including financing, which financing will not require the approval otherwise necessary under the Declaration, in an amount equal to the remaining portion of the Allowed Claims Class 9 Claims the Reorganized Debtor must pay on the Final Distribution Date. 10. Treatment of Class 10 Unsecured RUO Pre-Payment Claims. Allowed Unsecured Claims in Class 10 shall be completely and fully satisfied by the following treatment:

    10. Treatment of Class 10 Unsecured RUO Pre-Payment Claims. Allowed Unsecured Claims in Class 10 shall be completely and fully satisfied by the following treatment:

Unsecured RUO Pre-Payment Claims shall not receive any distribution from the Debtor. Rather, Holders of Allowed Class 10 Unsecured RUO Pre-Payment Claims, and their successors-in-interest, shall receive dollar-for-dollar credit against monthly and special assessments of the Debtor that first became due post-petition.

    11. Treatment of Class 11 Interests of Schecher Group Inc.  Allowed Class 11 Interests shall be completely and fully satisfied by the following treatment: In exchange for funding its allocable share of the Reorganization Special Assessment, the Schecher Group Inc. shall retain its rights and interests under the Declaration, whatever they may be

12. Treatment of Class 12 Interests of CUOs. Allowed Class 12 Interests of CUOs shall be completely and fully satisfied by the following treatment: CUOs shall retain their rights and interests under the Declaration, whatever they may be

13. Treatment of Class 13 Interests of RUOs. Allowed Class 13 Interests shall be completely and fully satisfied by the following treatment: In exchange for funding their allocable share of the Reorganization Special Assessment RUOs shall retain their rights and interests under the Declaration, whatever they may be.

      iii.    **Impaired Classes to Vote.** Each impaired Class of Creditors with Claims against Debtor's estate will be entitled to vote separately to accept or reject the First Amended Plan.

      iv.    **Acceptance by Class of Creditors.** A Class of Claims will have accepted the First Amended Plan if the First Amended Plan is accepted by at least two-thirds ($^2/_3$) in amount of allowed Claims, and more than one-half (1/2) in number of Allowed Claims of such Class that have accepted or rejected the First Amended Plan.

P.    **Discharge of Debtor.** The rights afforded in the First Amended Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever against the Debtor and all of the Debtor's property. Upon the substantial consummation of the First Amended Plan, Debtor shall be discharged under Section 1141 of the Bankruptcy Code.

Q.    **Cramdown.** In the event that any impaired Class fails to accept the First Amended Plan in accordance with 11 U.S.C. §1129(a) of the Bankruptcy Code, Debtor will request the Bankruptcy Court to confirm the First Amended Plan in accordance with 11 U.S.C. §1129(b) of the Bankruptcy Code. This contemplates an evidentiary hearing by which creditors would be required to accept the First Amended Plan if it is determined to be fair and equitable and it is accepted by at least one impaired class. The determination of what is fair

and equitable varies depending on the classification of each creditor's claim. Generally, treatment of unsecured creditors is fair and equitable if such creditors receive a greater distribution under the First Amended Plan than they would receive under Chapter 7.

    **R.**  **Unclaimed or Undistributable Funds.** To the extent any funds are unclaimed or undistributable pursuant to the First Amended Plan, Bankruptcy Code Section 347, Bankruptcy Rule 3011, or Local Bankruptcy Rule 3011-1, such funds shall vest in the Post-Confirmation Debtor and such claims shall be deemed null and void.

## VIII. GENERAL PROVISIONS GOVERNING DISTRIBUTIONS BY DEBTOR PRIOR TO EFFECTIVE DATE

    **A.**  **Place and Manner of Payments or Distributions.** Under the Bulk Sale Alternative, the escrow agent or Post-Confirmation Debtor shall make Distributions to the holders of Allowed Administrative Claims, Professional Fee Claims, U.S. Trustee Fees, Priority Unsecured Tax Claims, and Allowed Claims, on or before fourteen (14) business days of the later of the Effective Date or Allowance Date, via delivery by either (i) mail to the Claimant at the address of such Claimant as listed in the Schedules of Assets and Liabilities, or a superseding address listed on any proof of claim filed by the Claimant, or (ii) by mail to such other address or by wire transfer to the destination that such Claimant shall have specified for payment purposes in a written notice to Debtor.

    Under the Rental Program Alternative, the escrow agent or Post-Confirmation Debtor shall make Distributions to the holders of Allowed Administrative Claims, Professional Fee Claims, U.S. Trustee Fees, and Priority Unsecured Tax Claims, on or before fourteen (14) business days of the later of the Effective Date or Allowance Date, via delivery by either (i) mail to the Claimant at the address of such Claimant as listed in the Schedules of Assets and Liabilities, or a superseding address listed on any proof of claim filed by the Claimant, or (ii) by

mail to such other address or by wire transfer to the destination that such Claimant shall have specified for payment purposes in a written notice to Debtor.   Under the Rental Program Alternative, the escrow agent or Post-Confirmation Debtor shall make Distributions to the holders of Allowed Claims within 30 days of receipt of the monthly payment of the Reorganization Special Assessment.

      **B.**    **Undeliverable Distributions.**  If a Distribution to any Claimant is returned as undeliverable, Post-Confirmation Debtor shall use reasonable efforts to determine such Claimant's current address, and no further Distributions shall be made to such Claimant unless and until Post-Confirmation Debtor is notified of such Claimant's current address.

      **C.**    **Treatment of Unclaimed or Undeliverable Distributions.**  If any Claimant entitled to Distributions under the First Amended Plan cannot be located prior to the Effective Date or Allowance Date or has its Distribution returned, then such Distribution shall be transferred to Post-Confirmation Debtor and, in the case of Cash, held in a non interest-bearing account or fund maintained by the Post-Confirmation Debtor for purposes of holding such distributions.  Post-Such distributions shall revest in the Debtor six months after the Effective Date.

      **D.**    **Tax I.D. Number Required**.   In lieu of backup withholding, the Post-Confirmation Debtor may suspend distribution to any Claimant that has not provided its Federal Tax Identification Number or Social Security Number, as the case may be.   Any such distributions that remain suspended as of the Effective Date or Allowance Date shall be transferred to the Post-Confirmation Debtor and held in a non interest-bearing account or fund maintained by the Post-Confirmation Debtor pending receipt by the Post-Confirmation Debtor of such information.

## IX.    INJUNCTION AGAINST ENFORCEMENT OF PRECONFIRMATION DEBT

Except as expressly provided herein, at all times on and after the Effective Date, all Persons who have been, are, or may be holders of Claims against or Interests in Debtor arising prior to the Effective Date, shall be enjoined from taking any of the following actions against the Debtor or affecting its property:

(a) commencing, conducting or continuing in any manner, directly or indirectly any suit, action, or other proceeding of any kind arising before the Confirmation Date against Debtor, Debtor's estate, or the Property, including the Acquired Assets (including, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date, shall be deemed to be withdrawn or dismissed with prejudice), including any suit, action or other proceeding which might affect the use or enjoyment of any portion of the Acquired Assets;

(b) enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree, or order against Debtor, Debtor's estate, or the Property, including the Acquired Assets, relating to any obligation which arose prior to the Effective Date;

(c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or Encumbrance against Debtor, Debtor's estate, or the Property, including the Acquired Assets;

(d) asserting any right of subrogation, or recoupment of any kind, directly or indirectly against any obligation due Debtor, Debtor's estate, or the Property, including the Acquired Assets;

(e) commencing, conducting or continuing in any manner, directly or indirectly any suit, action, or other proceeding of any kind against the Debtor under the First Amended Plan;

(f) commencing, conducting or continuing in any manner, directly or indirectly any suit, action, or other proceeding of any kind against Purchaser relating to any obligation of the Debtor or Post-Confirmation Debtor, other than an obligation arising under the PSA; and

(g) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the First Amended Plan.

## X.    <u>EFFECT OF CONFIRMATION</u>

Except as otherwise provided in the First Amended Plan or the order confirming the First Amended Plan, the confirmation of the First Amended Plan vests all of the property of the estate in the Reorganized Debtor free and clear of all Claims, liens and encumbrances arising prior to the Confirmation Date unless specifically provided for in the First Amended Plan.   The provisions of the First Amended Plan, if confirmed, shall bind Debtor, all Creditors, Interest Holders, and any entity acquiring property under the First Amended Plan, whether or not the Claim or Interest of such Creditor, Interest Holder, or entity is impaired under the First Amended Plan and whether or not such Creditor, Interest Holder, or entity has accepted the First Amended Plan.

## XI.    <u>BEST INTEREST OF CREDITORS AND FEASIBILITY STANDARD</u>

Under Section 1129(a)(7) of the Code, the Court must find that either all members of an impaired class of Claims or interests have accepted the First Amended Plan or that the First Amended Plan will provide a creditor who has not accepted the First Amended Plan with a recovery of property of a value, as of the effective date of the First Amended Plan, that is not less than the amount such holder would recover if Debtor were liquidated under Chapter 7 of the Code.  This requirement is called the "Best Interest of Creditors Test".

The analysis of a liquidation scenario/Best Interest of Creditors Test is complicated in this matter by, among other factors, (i) the pending and potential disputes regarding purportedly secured claims of the HUO and others; (ii) the difficulty of valuation of the Debtor's Commercial Units 2-4; (iii) the costs of collection of assessment receivables as compared to the amount of such receivable as against particular Residential Units; and (iv) the speculative nature of litigation and recoveries on same.

The purportedly secured claim of the HUO is presently the subject of the Adversary Proceeding contesting, among other things, the amount of the purported claims and the perfection of the security interests.

Additionally, in a liquidation scenario, the value of the Debtor's real property and the collectability of its receivables becomes less certain. Moreover, in the absence of funding that would be critical to advancing the Litigation Claims (as would likely be the case in a liquidation scenario), the recovery on the Litigations Claims (however meritorious) becomes speculative.

Debtor believes that the best interest of creditors test is satisfied because the First Amended Plan will provide a distribution to unsecured creditors whereas in a Chapter 7 liquidation creditors would be entitled only to amounts left over after payments of more senior claims. Debtor believes that in a Chapter 7 liquidation, general unsecured creditors would receive little, if any, distributions.

## XII.    OBJECTIONS TO CLAIMS

The Deadline to object to claims shall be fourteen (14) days prior to the Confirmation Hearing or such other date as established by Bankruptcy Court Order. A Claimant whose Claim has been objected to in accordance with Section 11.1 of the First Amended Plan, must file with the Court and serve upon the parties identified in Section 14.1 a response to such claim objection within 30 days after service of any objection to its Claim. Failure to file such a response within the 30-day time period shall be cause for the Bankruptcy Court to enter a default judgment against the non-responding Claimant and to thereby grant the relief requested in the Claim objection. Debtor may request the Bankruptcy Court to estimate any Claim for purposes of voting on this First Amended Plan or Allowance pursuant to Section 502(c) of the Bankruptcy Code.

Distributions made under the First Amended Plan shall be made only to the holders of Allowed Claims.  Until a Disputed Claim becomes an Allowed Claim, the holder of that Disputed Claim shall not receive the consideration otherwise provided to such Claimant under the First Amended Plan.

The Debtor shall deposit the Distributions reserved for the holders of Disputed Claims in a reserve fund called the Disputed Claims Reserve.  The Debtor shall hold the Disputed Claims Reserve in trust for the benefit of the holders of Allowed Claims whose Distributions are unclaimed and the holders of Disputed Claims pending determination of their entitlement thereto under the terms of the First Amended Plan.  When a Disputed Claim becomes an Allowed Claim, the Debtor shall release and deliver the Distributions reserved for such Allowed Claims from the Disputed Claims Reserve, together with any earned interest attributable to such Distribution.

## XIII.    <u>EXECUTORY CONTRACTS</u>

All Executory Contracts not otherwise assumed, assumed and assigned, or rejected pursuant to Section 365 of the Bankruptcy Code prior to the Effective Date shall be deemed rejected as of the Effective Date.  Exhibit "H" sets forth the treatment of Executory Contracts that have not been previously assumed, assumed and assigned, or rejected.  Prior to ten (10) days before the Confirmation Hearing, Exhibit "H" may be modified by the Debtor or Purchaser without Order of the Bankruptcy Court.  Within ten (10) days prior to the Confirmation Hearing, Exhibit "H" may be modified upon request of Debtor or Purchaser, subject to Bankruptcy Court approval.  After entry of the Confirmation Order, Exhibit "H" may be modified only upon request of Purchaser, subject to Bankruptcy Court approval.  In the event of any modification of Exhibit "H" that requires Bankruptcy Court approval, the Order of the Bankruptcy Court may

only be entered after notice and a hearing, as defined in Section 102(1) of the Bankruptcy Code, is provided to the counter-party to the Executory Contract affected by such modification.

Entry of the Confirmation Order shall constitute the approval, pursuant to Sections 363(b), (f) and (m) and 365(a) and (f) of the Bankruptcy Code, of the assumption, assumption and assignment, or rejection of the Executory Contracts as set forth on Exhibit "H", as same may be modified from time to time.

Unless the Bankruptcy Court, the Bankruptcy Code or the Bankruptcy Rules establish an earlier deadline with regard to the rejection of particular Executory Contracts, any Claims arising out of the rejection of Executory Contracts must be filed with the Bankruptcy Court and served upon Debtor no later than thirty days after entry of the Confirmation Order.  Any Claims not filed within such time will be forever barred and will not receive any distributions under the First Amended Plan.  All Claims arising from the rejection of an Executory Contract shall be treated in Class 2.

## XIV.        EXEMPTION FROM TRANSFER TAXES

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security under the First Amended Plan, or the making, delivery, or recording of an instrument of transfer in connection with (a) the sale of the CUs and Unit 505 and (b) financing, if any, extended by the Proposed Purchaser in connection with the acquisition of the CUs and Unit 505, shall not be taxed under any law imposing a stamp or similar tax, including but not limited to any documentary stamp taxes or intangible taxes, whether on any deed, leasehold, assignment, promissory note, security agreement or mortgage.

## XV.    RETENTION OF JURISDICTION

The Bankruptcy Court even after the case has been closed, shall have jurisdiction to the fullest extent of the law over all matters arising under, arising in, or relating to Debtor's chapter 11 cases, including proceedings to:

(a)    ensure that the First Amended Plan is carried out;

(b)    enter such orders as may be necessary or appropriate to implement, consummate, or enforce the provisions of the First Amended Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the First Amended Plan or the First Amended Disclosure Statement;

(c)    consider any modification of the First Amended Plan under Section 1127 of the Bankruptcy Code;

(d)    hear and determine all Claims, controversies, suits and disputes against Debtor to the extent permitted under 28 U.S.C. § 1334;

(e)    allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim, including the resolution of any and all objections to the allowance or priority of Claims;

(f)    hear, determine, and adjudicate any litigation involving the Avoidance Actions or other claims or causes of action constituting Estate Property;

(g)    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving Debtor that may be pending on or commenced after the Effective Date;

(h)    resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the First Amended Plan, or any entity's obligations incurred in connection with the First Amended Plan, or any other agreements governing, instruments evidencing, or documents relating to any of the foregoing, including the interpretation or enforcement of any rights, remedies, or obligations under any of the foregoing;

(i)    hear and determine all controversies, suits, and disputes that may arise out of or in connection with the enforcement of any and all subordination and similar agreements among various creditors pursuant to Section 510 of the Bankruptcy Code;

(j)     hear and determine all requests for compensation and/or reimbursement of expenses that may be made for fees and expenses incurred before the Effective Date;

(k)     enforce any Final Order, the Confirmation Order, the final decree, and all injunctions contained in those orders;

(l)     enter an order concluding and terminating this case;

(m)     correct any defect, cure any omission, or reconcile any inconsistency in the First Amended Plan or the Confirmation Order;

(n)     determine all questions and disputes regarding title to the Estate Property and any other assets of Debtor;

(o)     classify the Claims of any Claim holders and the treatment of these Claims under the First Amended Plan, to re-examine Claims that may have been allowed for purposes of voting, and to determine objections that may be filed to any Claims;

(p)     take any action described in the First Amended Plan involving the post-confirmation Debtor;

(q)     enter a final decree in Debtor's case as contemplated by Bankruptcy Rule 3022;

(r)     enforce, by injunction or otherwise, the provisions set forth in the First Amended Plan, the Confirmation Order, any final decree, and any Final Order that provides for the adjudication of any issue by the Bankruptcy Court; and

(s)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated.

If the Bankruptcy Court abstains or exercises discretion not to hear any matter within the scope of its jurisdiction, nothing in the First Amended Plan shall prohibit or limit the exercise of jurisdiction by any other tribunal of competent jurisdiction.

## XVI.     TAX ANALYSIS

**THE FOLLOWING DISCUSSION IS A SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES OF THE FIRST AMENDED PLAN TO**

HOLDERS OF CLAIMS AGAINST THE DEBTOR, BUT IS NOT A COMPLETE DISCUSSION OF ALL SUCH CONSEQUENCES. CERTAIN OF THE CONSEQUENCES DESCRIBED BELOW ARE SUBJECT TO SUBSTANTIAL UNCERTAINTY DUE TO THE UNSETTLED STATE OF THE TAX LAW GOVERNING BANKRUPTCY REORGANIZATIONS. NO RULINGS HAVE BEEN OR WILL BE REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "IRS") WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE FIRST AMENDED PLAN. FURTHER, THE TAX CONSEQUENCES OF THE FIRST AMENDED PLAN TO THE HOLDERS OF CLAIMS AGAINST THE DEBTOR MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. IN ADDITION, THERE MAY BE STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES OF THE FIRST AMENDED PLAN APPLICABLE TO PARTICULAR HOLDERS OF CLAIMS OR INTERESTS, NONE OF WHICH ARE DISCUSSED BELOW. THEREFORE, THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX FIRST AMENDED PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM, AND YOU ARE URGED TO CONSULT WITH YOUR OWN TAX ADVISORS CONCERNING THE INDIVIDUAL TAX CONSEQUENCES OF THE TRANSACTIONS CONTEMPLATED BY THE FIRST AMENDED PLAN, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

A portion of the consideration received pursuant to the First Amended Plan in payment of a Claim may be allocated to unpaid interest, and the remainder of the consideration will be allocated to the principal amount of the Claim. The tax consequences of the consideration

allocable to the portion of a Claim related to interest differ from the tax consequences of the consideration allocable to the portion of a Claim related to principal.

Holders of claims will recognize ordinary income to the extent that any consideration received pursuant to the First Amended Plan is allocable to interest, and such income has not already been included in such Creditor's taxable income.  The determination as to what portion of the consideration received will be allocated to interest is unclear, and may be affected by, among other things, rules in the Internal Revenue Code (the "Tax Code") relating to original issue discount and accrued market discount.  Holders of claims should consult their own tax advisors as to the amount of any consideration received under the First Amended Plan that will be allocated to interest.  If amounts allocable to interest are less than amounts previously included in the Creditor's taxable income, the difference will result in a loss.  Any amount not allocable to interest will be allocated to the principal amount of the Claim paid pursuant to the First Amended Plan, and will be treated as discussed herein.

Creditors receiving Cash generally will recognize gain or loss on the exchange equal to the difference between its basis in the Claim and the amount of Cash received that is not allocable to interest.  The character of any recognized gain or loss will depend upon the status of the Creditor, the nature of the Claim in its hands and the holding period of such Claim.  If a Creditor has treated a Claim as wholly or partially worthless and been allowed a bad debt deduction, the Creditor will include the amount of Cash received in income to the extent such Cash exceeds the Creditor's remaining tax basis in the Claim.

Creditors may be entitled to installment sales treatment or other deferral with respect to the distribution they receive subsequent to the Effective Date.  Creditors may already have claimed partial bad debt deductions with respect to their claims.  The IRS may take the position

that holders of Allowed claims cannot claim an otherwise allowable further loss in the year in which their Claim is allowed because they could receive further distributions. Thus, a Creditor could be prevented from recognizing a loss until the time when its Claim has been liquidated and distributions have been completed. If a Creditor is permitted to recognize a loss in the year of the Effective Date by treating the transaction as a "closed transaction" at such time, it may recognize income on any subsequent distribution.

In making distributions pursuant to the First Amended Plan, the Debtor will comply with all withholding and reporting requirements imposed by federal, state or local taxing authorities. All distributions pursuant to the First Amended Plan will be subject to all applicable withholding and reporting requirements.

## XVII.    GENERAL PROVISIONS

A.    **Notices.** Whenever the First Amended Plan requires notice to be given to Debtor or Disbursing Agent, such notice shall be given to the following parties at their respective addresses unless a prior notice of change of address has been served indicating a new address:

### Debtor or Post-Confirmation Debtor:

**Messana, P.A.**
Attn: Brett D. Lieberman, Esq.
P.O. Box 2485
Fort Lauderdale, Florida 33303 -2485
Facsimile : (954) 712-7401
E-mail: blieberman@messana-law.com

B.    **Dates.** The provisions of Bankruptcy Rule 9006 shall govern the calculation of any dates or deadlines referenced in the First Amended Plan.

C.    **Further Action.** Nothing contained in the First Amended Plan shall prevent Debtor from taking such actions as may be necessary to consummate the First Amended Plan, even though such actions may not specifically be provided for within the First Amended Plan.

D.    **Attachments.**  All attachments to the First Amended Plan are incorporated herein by reference and are intended to be an integral part of this document as though fully set forth in the First Amended Plan.  All exhibits to the First Amended Plan and Final Purchase and Sale Agreement shall be filed with the Bankruptcy Court no later than ten (10) days before the Confirmation Date.

E.    **First Amended Plan Amendments.**  Before the Confirmation Date, Debtor may modify, amend or withdraw the First Amended Plan pursuant to section 1127(a) of the Bankruptcy Code.   After the Confirmation Date, Debtor may modify or amend the First Amended Plan pursuant to section 1127(b) of the Bankruptcy Code.

F.    **Binding Effect.**  Upon occurrence of the Effective Date, the First Amended Plan shall be binding on, and inure to the benefit of, Debtor, the Proposed Purchaser, the Claim holders and Interest holders, and their respective successors and assigns, regardless of whether those parties voted to accept the First Amended Plan.

G.    **Governing Law.**  Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under the First Amended Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, without giving effect to any conflicts of law principles.

## XVIII.    RISK FACTORS

In deciding whether to accept or reject Debtor's First Amended Plan, a creditor or other claimant should consider risk factors.  Each creditor or other claimant should consult its own counsel and financial advisors regarding risk factors.  There are a number of conditions to performance under the First Amended Plan, including: the satisfaction of the Minimum Participation Requirement.  Also, each of the conditions of the LOI and PSA must be satisfied,

and an order must by entered by the Bankruptcy Court confirming this First Amended Plan must be entered.  Debtor cannot guarantee that each of these conditions will be satisfied or waived. Debtor believes that the primary risk of this First Amended Plan is that the First Amended Plan will not be confirmed or that one or more conditions to the Effective Date of the First Amended Plan will not occur.

Moreover, the Bankruptcy Court has requested that the Debtor and HUO provide supplemental briefing with respect to the RoFR Issue.  As discussed in its papers and subject to supplement, the Debtor's position is that the HUO may be entitled to exercise a right of first refusal subject to every term and condition of such offer. Assuming a highest and best LOI and related PSA obtained Bankruptcy Court Approval, Debtor's position is that the right of first refusal would require the HUO to match the purchase price for all of the Residential Units that would be included in the Bulk Sale.

The Debtor's further position is that the HUO is prohibited from choosing to accept certain favorable terms of a proposal while rejecting others.  In this context, the Declaration provides that if a RUO intends to accept an offer that triggers the right of first refusal the RUO must provide notice to the HUO of same and that such notice constitutes an offer to the HUO "upon the same terms and conditions as contained in [the qualifying] offer'". Declaration §17.1.

If the Debtor prevails on the RoFR issue, it is anticipated that the Bankruptcy Court would approve a process, perhaps the Bulk Sale Bid Process, to facilitate the Bulk Sale Alternative.

Essentially, the Debtor's understanding is that the HUO takes the position that the Declaration provides it a right of first refusal as to each separate Residential Unit and that even if a sale contract for such unit provided for the acquisition of the Residential Unit subject to a

Minimum Participation Requirement term and/or other essential condition requiring a simultaneous closing with a minimum number of other Residential Units that the HUO could except such terms and conditions from such offer and compel individual RUOs to sell their Residential Unit to the HUO at the same price as contained in the qualifying offer.

If the HUO prevails, the Debtor expects that the HUO would take the position that it can force the sale of any particular Residential Unit that has opted to participate in the Bulk Sale irrespective of the RUO's desire to do so.  Depending on the number of units comprising the Minimum Participation Requirement, if any, the HUO may attempt to acquire just enough Residential Units to cause the Bulk Sale Alternative to fail for insufficient RUO participation (even though a sufficient number of RUOs were willing to participate).

Presently, this term is unknowable on account of there being no Bankruptcy Court approved LOI, no defined Minimum Participation Requirement, and no Bankruptcy Court approved process to obtain an approved LOI.

If the HUO prevails on the RoFR Issue the Debtor may contemplate proposing an alternative sale strategy including, among other possibilities: (i) a sale of the single purpose entities owning Residential Units (rather than a sale of the Residential Units themselves) to which no right of first refusal applies; (ii) a transaction wherein RUOs contribute their interest in their Residential Units to a newly formed entity along with a potential joint venture partner in exchange for interests in such entity;[15] (iii) pursue the Bulk Sale Alternative to determine how many units the HUO will actually seek to acquire in connection with a bulk sale; or (iv) pursue some other strategy to reorganize its affairs.

Additionally, it may be that notwithstanding the Bankruptcy Court's determination of the

---

[15] Debtor's position is (would be) that such a transaction would not trigger the right of first refusal.

RoFR Issue, the HUO does not have the resources to fund the acquisition of Residential Units (which would largely render the issue moot as it would have no effect on the Debtor's Amended Plan).

Finally, with respect to the RoFR issue, it may be that the Debtor, the HUO, the RUOs, and a Proposed Purchaser can achieve a consensual resolution that renders the RoFR issue moot.

## XIX.      ALTERNATIVES TO CONFIRMATION

If this Case were converted to Chapter 7 liquidation, Debtor believes there would be no funds available for distribution to Debtor's Unsecured Creditors and that the value of its real property would be significantly diminished.  Under Chapter 7 liquidation, a bankruptcy trustee would be appointed to take possession and title of Debtor's property.  While the Chapter 7 trustee can obtain permission to operate a business for a short period of time while the business is being liquidated, continued operation of the Debtor is unlikely.  Rather, the Chapter 7 trustee would likely either (i) propose an auction sale of Debtor's limited assets or (ii) abandon same to the secured creditors.  Because the increased value of the Debtor's property results from the Bulk Sale proposal, unless the Chapter 7 trustee also negotiated a bulk sale, unsecured creditors would likely receive no distribution.  The appointment of a Chapter 7 trustee would further burden the estate and its creditors with additional administrative expenses above and beyond those administrative claims that have already been incurred.

A further alternative to confirmation would be stay relief for Debtor's secured creditors. In that instance, the secured creditors would likely obtain stay relief and proceed to foreclose upon its collateral.  This would likely leave no recovery for Debtor's estate or Debtor's other Creditors.

## XX.    RECOMMENDATION

Debtor believes that the First Amended Plan is in the best interest of all Creditors and constituencies and provides a recovery, where there otherwise might be no recovery.  Therefore, Debtor recommends Creditors and Interest Holders vote to accept the First Amended Plan.

## XXI.    DISCLAIMERS

THE STATEMENTS CONTAINED IN THIS FIRST AMENDED DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND UNLESS ANOTHER TIME IS SPECIFIED HEREIN, NEITHER THE DELIVERY OF THIS FIRST AMENDED DISCLOSURE STATEMENT NOR AN EXCHANGE OF RIGHTS MADE IN CONNECTION HEREWITH, SHALL UNDER ANY CIRCUMSTANCE, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF.

ANY BENEFITS OFFERED TO THE HOLDERS OF CLAIMS OR INTERESTS, IN ACCORDANCE WITH THE FIRST AMENDED PLAN, WHICH MAY CONSTITUTE SECURITIES, HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "COMMISSION"), OR BY ANY RELEVANT GOVERNMENT AUTHORITY OF ANY STATE OF THE UNITED STATES.  NEITHER THE COMMISSION, NOR ANY SUCH STATE AUTHORITY, HAVE PASSED UPON THE ACCURACY OF THIS FIRST AMENDED DISCLOSURE STATEMENT OR THE MERITS OF THE FIRST AMENDED PLAN.

NO REPRESENTATIONS CONCERNING DEBTOR, THE VALUE OF ITS PROPERTY, OR THE VALUE OF ANY BENEFITS OFFERED TO HOLDERS OF CLAIMS OR INTERESTS IN CONNECTION WITH THE FIRST AMENDED PLAN,

ARE AUTHORIZED BY DEBTOR, OTHER THAN AS SET FORTH IN THIS FIRST AMENDED DISCLOSURE STATEMENT.    ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCES WHICH ARE CONTRARY TO THE INFORMATION CONTAINED IN THIS FIRST AMENDED DISCLOSURE STATEMENT SHOULD NOT BE RELIED ON BY YOU IN ARRIVING AT ITS DECISION.   ANY SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR DEBTOR, BRETT D. LIEBERMAN, ESQ., MESSANA, P.A., P.O. DRAWER 2485, FT. LAUDERDALE, FL 33303.   THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECTED TO A CERTIFIED AUDIT.   WHILE DEBTOR'S REAL ESTATE HAS BEEN APPRAISED, OPINIONS OF VALUE MAY DIFFER AND CIRCUMSTANCES MAY CHANGE.

THIS FIRST AMENDED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.    THE APPROVAL OF THE BANKRUPTCY COURT OF THIS FIRST AMENDED DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE FIRST AMENDED PLAN, OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

[SIGNATURE PAGE TO FOLLOW]

**Sixty Sixty Condominium Association, Inc.**
**Debtor and Debtor-in-Possession**

By: _____
Name:   Maria Velez
Its:    President of the Board of Directors

**Messana, P.A.**
**Attorneys for Debtor**
**Thomas M. Messana**
**Brett D. Lieberman**
**401 East Las Olas Blvd**
**Suite 1400**
**Fort Lauderdale, FL 33301**
**Fax No.: (954) 712-7401**
**Email: blieberman@messana-law.com**

By: /s/ Brett D. Lieberman
Thomas M. Messana
Brett D. Lieberman

# Composite Exhibit "A"



CFN 2016R0326280
OR BK 30100 Pgs 1931-1932 (2Pgs)
RECORDED 06/03/2016 14:51:22
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

**THIS INSTRUMENT PREPARED BY:**

Gregory R. Elder

Law Offices of Gregory R. Elder, LLC

108 SE 8th Avenue, Suite 114

Fort Lauderdale, Florida 33301

## <u>CLAIM OF LIEN</u>

**KNOW ALL MEN BY THESE PRESENTS THAT:** Schecher Group, Inc., d/b/a SG Sixty Shared Components, a Florida Corporation, whose address is 120 Piper Blvd., Port Orange, Florida 32128, claims a lien against the following property:

Condominium Unit No. CU-1, in SIXTYSIXTY CONDOMINIUM, a Condominium, according to the Declaration of Condominium thereof, recorded April 10, 2016, in Official Records Book 24411, at Page 1780 of the Public Records of Miami-Dade County, Florida.

The record owner of such property is: SIXTY SIXTY CONDOMINIUM ASSOCIATION, INC .

The amount due as of June 3, 2016 is $163,494.99 as follows:

General and special charges...............$162783.99
Attorney's Fees and costs.....................<u>$711.00</u>
                          Total $163494.99

This Claim of Lien secures all unpaid general and special charges (hereinafter, collectively "Shared Costs") and legal fees incurred by the Schecher Group, Inc., d/b/a SG Sixty Shared Components, pursuant to the Declaration of Condominium and By- Laws, and applicable law.

DATED this 3rd day of June, 2016.

Signed, sealed and delivered by the Schecher Group, Inc., d/b/a SG Sixty Shared Components.

Presence of:

By:_____

Authorized Agent for Schecher Group, Inc.,

d/b/a SG SixtyShared Components

Richard Schecher

1 of 2

OR BK 30100 PG 1932
LAST PAGE

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

The foregoing instrument was acknowledged before me, a notary public, this 3rd day of June, 2016, by _Arnst Rojas_ , who is personally known to me and who did take an oath.

_____
Notary

Gregory R. Elder
COMMISSION # FF047737
EXPIRES: AUG. 22, 2017
WWW.AARONNOTARY.com

2 of 2

https://www2.miami-dadeclerk.com/officialrecords/PrintDocument.aspx?QS=YaoUfOzxry0R0MWalHm1ENf0wba52mCAPDBKT6EMnhDV%2fUB9wOBVPFLY1...    2/2



```
CFN 2016R0326277
OR BK 30100 Pgs 1925-1926 (2Pgs)
RECORDED 06/03/2016 14:51:22
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA
```

**THIS INSTRUMENT PREPARED BY:**

Gregory R. Elder

Law Offices of Gregory R. Elder, LLC

108 SE 8th Avenue, Suite 114

Fort Lauderdale, Florida 33301

## CLAIM OF LIEN

**KNOW ALL MEN BY THESE PRESENTS THAT:** Schecher Group, Inc., d/b/a SG Sixty Shared Components, a Florida Corporation, whose address is 120 Piper Blvd., Port Orange, Florida 32128, claims a lien against the following property:

Condominium Unit No. CU-2, in SIXTYSIXTY CONDOMINIUM, a Condominium, according to the Declaration of Condominium thereof, recorded April 10, 2016, in Official Records Book 24411, at Page 1780 of the Public Records of Miami-Dade County, Florida.

The record owner of such property is: SIXTY SIXTY CONDOMINIUM ASSOCIATION, INC .

The amount due as of June 3, 2016 is $143,945.56 as follows:

General and special charges...............$143392.56

Attorney's Fees and costs..................... $553.00

Total     $143945.56

This Claim of Lien secures all unpaid general and special charges (hereinafter, collectively "Shared Costs") and legal fees incurred by the Schecher Group, Inc., d/b/a SG Sixty Shared Components, pursuant to the Declaration of Condominium and By- Laws, and applicable law.

DATED this 3rd day of June, 2016.

Signed, sealed and delivered by the Schecher Group, Inc., d/b/a SG Sixty Shared Components.

Presence of:

_Kristie Scarola_

_Richard Schech_

By: _____

Authorized Agent for Schecher Group, Inc.,

d/b/a SG Sixty Shared Components

1 of 2

OR BK 30100 PG 1926
LAST PAGE

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

The foregoing instrument was acknowledged before me, a notary public, this 3rd day of June, 2016, by _Amrit Rojas_____, who is personally known to me and who did take an oath.

Notary

Gregory R. Elder
COMMISSION # FF 047787
EXPIRES: AUG. 22, 2017
WWW.AARONNOTARY.com

Gregory R. Elder
COMMISSION # FF047787
EXPIRES: AUG. 22, 2017
WWW.AARONNOTARY.com

2 of 2



CFN 2016R0326278
OR BK 30100 Pss 1927-1928 (2Pss)
RECORDED 06/03/2016 14:51:22
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

**THIS INSTRUMENT PREPARED BY:**

Gregory R. Elder
Law Offices of Gregory R. Elder, LLC
108 SE 8th Avenue, Suite 114
Fort Lauderdale, Florida 33301

## CLAIM OF LIEN

**KNOW ALL MEN BY THESE PRESENTS THAT:** Schecher Group, Inc., d/b/a SG Sixty Shared Components, a Florida Corporation, whose address is 120 Piper Blvd., Port Orange, Florida 32128, claims a lien against the following property:

Condominium Unit No. CU-3, in SIXTYSIXTY CONDOMINIUM, a Condominium, according to the Declaration of Condominium thereof, recorded April 10, 2016, in Official Records Book 24411, at Page 1780 of the Public Records of Miami-Dade County, Florida.

The record owner of such property is: SIXTY SIXTY CONDOMINIUM ASSOCIATION, INC .

The amount due as of June 3, 2016 is $66,318.75 as follows:

General and special charges...............$65765.75
Attorney's Fees and costs....................$553.00
Total      $66318.75

This Claim of Lien secures all unpaid general and special charges (hereinafter, collectively "Shared Costs") and legal fees incurred by the Schecher Group, Inc., d/b/a SG Sixty Shared Components, pursuant to the Declaration of Condominium and By- Laws, and applicable law.

DATED this 3rd day of June, 2016.

Signed, sealed and delivered by the Schecher Group, Inc., d/b/a SG Sixty Shared Components.

Presence of:

Kristi Scarola

Richard Schecher

By: _____
Authorized Agent for Schecher Group, Inc., d/b/a SG SixtyShared Components

1 of 2

OR BK 30100 PG 1928
LAST PAGE

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

The foregoing instrument was acknowledged before me, a notary public, this 3rd day of June, 2016, by _Arnst Rojas_____, who is personally known to me and who did take an oath.

_____
Notary

Gregory R. Elder
COMMISSION # FF047737
EXPIRES: AUG. 22, 2017
WWW.AARONNOTARY.com

2 of 2



CFN 2016R0326279
OR BK 30100 Pss 1929-1930 (2Pss)
RECORDED 06/03/2016 14:51:22
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

**THIS INSTRUMENT PREPARED BY:**

Gregory R. Elder
Law Offices of Gregory R. Elder, LLC
108 SE 8th Avenue, Suite 114
Fort Lauderdale, Florida 33301

## CLAIM OF LIEN

**KNOW ALL MEN BY THESE PRESENTS THAT:** Schecher Group, Inc., d/b/a SG Sixty Shared Components, a Florida Corporation, whose address is 120 Piper Blvd., Port Orange, Florida 32128, claims a lien against the following property:

Condominium Unit No. CU-4, in SIXTYSIXTY CONDOMINIUM, a Condominium, according to the Declaration of Condominium thereof, recorded April 10, 2016, in Official Records Book 24411, at Page 1780 of the Public Records of Miami-Dade County, Florida.

The record owner of such property is: SIXTY SIXTY CONDOMINIUM ASSOCIATION, INC .

The amount due as of June 3, 2016 is $57,853.00 as follows:

General and special charges...............$57300.00
Attorney's Fees and costs....................$553.00
Total        $57853.00

This Claim of Lien secures all unpaid general and special charges (hereinafter, collectively "Shared Costs") and legal fees incurred by the Schecher Group, Inc., d/b/a SG Sixty Shared Components, pursuant to the Declaration of Condominium and By- Laws, and applicable law.

DATED this 3rd day of June, 2016.

Signed, sealed and delivered by the Schecher Group, Inc., d/b/a SG Sixty Shared Components.

Presence of:

By:_____
Authorized Agent for Schecher Group, Inc.,
d/b/a SG Sixty Shared Components

Krista Scarola

Richard Schecher

1 of 2

```
OR BK 30100 PG 1930
           LAST PAGE
```

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

The foregoing instrument was acknowledged before me, a notary public, this 3rd day of June,
2016, by _Annet Royas_____, who is personally known to me and who did take an
oath.

_____
Notary

Gregory R. Elder
COMMISSION # FF 047737
EXPIRES: AUG. 22, 2017
WWW.AARONNOTARY.com

2 of 2

CFN: 20160680584 BOOK 30322 PAGE 1179
DATE:11/28/2016 03:56:17 PM
HARVEY RUVIN, CLERK OF COURT, MIA-DADE CTY

THIS INSTRUMENT PREPARED BY:
STEVEN M. DAVIS
Becker & Poliakoff, P.A.
Alhambra Towers
121 Alhambra Plaza, 10th Floor
Coral Gables, FL 33134
(305) 262-4433

### CLAIM OF LIEN FOR ASSESSMENTS

STATE OF FLORIDA       :
               : SS
COUNTY OF MIAMI-DADE    :

BEFORE ME, the undersigned notary public, personally appeared MILY LOPEZ, AGENT of SCHECHER GROUP,
INC., D/B/A/ SG SIXTY SIXTY SHARED COMPONENTS  a Florida corporation, on behalf of the corporation,
Affiant took an oath, and is (✓) personally known to me or (__) has produced _____ as identification that
Affiant is the Agent of SCHECHER GROUP, INC., D/B/A/ SG SIXTY SIXTY SHARED COMPONENTS, whose
post office address is 120 Piper Boulevard Port Orange, FL  33128, and that pursuant to Declaration of Condominium
for SIXTY SIXTY CONDOMINIUM, said Association is owed the following amounts for shares of the common
expenses:

| Description | Amount |
|---|---|
| Balance due on 11/01/16 | $  66,205.80 |

plus interest at the rate of 18% per annum from the due dates.

This Claim of Lien shall also secure all unpaid assessments, interest,   costs, and attorneys fees which are due and
which may accrue subsequent to the date of this Claim of Lien and prior to entry of a final judgment of foreclosure.

The Lienor claims this lien on the following described property in Miami-Dade County, Florida:

      **Unit No. 505 of SIXTY SIXTY CONDOMINIUM, a Condominium, according to
      the Declaration of Condominium thereof, recorded in  Official Records Book
      24111 at Page 1780 of the Public Records of Miami-Dade County, Florida.**

the current owner of which is **Sixty Sixty Condominium Association, Inc.**.

The amount due to the Lienor remains outstanding as of  November 18, 2016.

_____ Witness       SCHECHER GROUP, INC., D/B/A/SG SIXTY SIXTY
                                      SHARED COMPONENTS
_____ Witness       BY:_____(SEAL)
                                        MILY LOPEZ, AGENT

SWORN TO AND SUBSCRIBED before me this 28 day of NOV 2016, by MILY LOPEZ,  AGENT.

                                  _____(SEAL)

AIDA ANDINO
MY COMMISSION # FF984717
EXPIRES April 21, 2020
(407) 398-0153  FloridaNotaryService.com

NOTARY PUBLIC SIGNATURE
STATE OF FLORIDA AT LARGE

Aida Andino
Printed Name of Notary Public

My Commission Expires: 4/21/20

# EXHIBIT "B"

February 24, 2017

Brett Lieberman
Messana, P.A.
401 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, FL 33301

**RE:  6060 Association and Residential Units, Miami Beach, FL.**

                ("**KFI**") is pleased to submit this letter of intent ("**LOI**"), on behalf of a to be formed entity ("**Purchaser**"), for the purchase of condominium interests (the "**Transaction**") in the 82 Residential Units ("**Residential Units**") and 4 Commercial Units ("**Commercial Units**", together with the 82 Residential Units, the "Property") located at 6060 Indian Creek Road, Miami Beach, FL and all other improvements located thereon, to Sixty Sixty Condominium Association and its' Residential Unit owners (the "**Sellers**").

Please note the following:

- The Purchaser would consider acquiring the Property for a total consideration of Ten Million Three Hundred Twenty Thousand Dollars ($10,320,000).

- The Purchaser would deposit into escrow, a Fifty Thousand ($50,000) earnest money deposit upon signing a Purchase and Sale Agreement which deposit shall become non-refundable upon the expiration of the Due Diligence Period (defined below) in the event that the Purchaser elects to proceed with the Transaction.

- The Debtor shall execute this LOI immediately upon Court Approval and sign a Purchase and Sale Agreement (PSA) consistent with same.

- The Sixty Sixty Condominum is governed by its Declaration and other governing documents found in the Official Records Book 24411, Page 1780 of the Public Records of Miami-Dade County, Florida.

This approach provides the Sellers with the certainty of close and the comfort of dealing directly with a high quality counterparty that can purchase the Property in a compressed time-line and not be reliant on capital market vagaries.

The following is an outline of the indicative terms and conditions underlying this expression of interest, which are subject to change and modification, completion of tax, legal and commercial due diligence, and final investment committee approval:

**Purchaser:**  Newly formed entity affiliated with KFI.

**Property:**  The Property is so many of those certain condominium interests in a hotel resort consisting of 82 Residential Units and 4 Commercial Units as will participate in the bulk sale contemplated by this LOI. The condominium also includes a Hotel Unit, but the purchase and sale of such Hotel Unit is not contemplated by this LOI. The Property is located at 6060 Indian

Creek Road, Miami Beach, FL. The Property shall be sold free and clear of all liens and encumbrances.

**Purchase Price:**  One Hundred Twenty Thousand Dollars ($120,000) per Residential and Commercial Unit. If all Units are purchased, the total purchase price for the entire Property shall be Ten Million Three Hundred Twenty Thousand Dollars ($10,320,000).

**Deposit:**  Fifty Thousand Dollars ($50,000) (the "**Deposit**"), to be deposited with First American Title upon signing the PSA, which will become non-refundable at the end of the Due Diligence Period.  The deposit shall either (i) be refunded to Purchaser in the event a condition precedent of the Purchase and Sale Agreement has not been met or (ii) will act as a credit to the Purchase Price at closing.

**Due Diligence:**  Ninety (90) days (the "**Due Diligence Period**") following the later of i) delivery of the due diligence materials to Purchaser and ii) the execution of a Purchase and Sale Agreement.  In addition to standard legal and property due diligence, KFI will include the satisfactory review of the condominium documents and rules and regulations.

**Dispute Resolution Contingency:**  Purchaser and Sellers acknowledge that the Property is subject to certain disputes and bankruptcy proceedings. Purchaser will seek to settle any outstanding claims with the Hotel Unit owner (including the elimination of the "Administrative Fee" charged by the Hotel Unit operator pursuant to certain rules and regulations imposed by the Hotel Unit Owner) and amend or create certain documents to maintain control of the Residential and Commercial Units. If a resolution is not negotiated or adjudicated by a court of competent jurisdiction upon the expiration of the Due Diligence Period, Purchaser has the right to extend due diligence for an additional sixty (60) day period (the "**Extended DD Period**").

**Exclusivity:**  Purchaser shall have the exclusive right to purchase the Property for 180 days from the acceptance of this LOI (the "**Exclusivity Period**"). The Association shall not solicit or provide any Property or ownership information to any parties other than Purchaser during the Exclusivity Period.

**Minimum Purchase Units:**  Purchaser is paying a premium for the Property and, therefore, requires that it will purchase no less than a minimum of 58 of the Residential Units and all four of the Commercial Units. Purchaser's intent is to purchase all of the residential and commercial units and if Purchaser is unable to purchase One Hundred Percent (100%) of the commercial and residential units, Purchaser reserves the right to adjust the Purchase Price accordingly.

**Anticipated Closing Date:** The transaction will close Thirty (30) days following the later of (i) expiration of Due Diligence Period (ii) if elected by Purchaser, the Extend DD Period, (iii) receipt of approvals from the Minimum Purchase Units to sell their Units.

**Governing Law & Jurisdiction:**  This LOI shall be governed by Florida Law.

**Confidentiality:**  This LOI, is delivered to the Association and Purchaser on the condition that neither Seller nor Purchaser shall not issue any press release or make public disclosure as to the existence of this LOI except: (i) to the owners of the Commercial and Residential Units; (ii) to the extent necessary to seek and obtain bankruptcy court approval in that certain bankruptcy case, *In re: Sixty Sixty Condominium Association, Inc.,* Case No. 16-26187-RAM, pending before the United States Bankruptcy Court Southern District of Florida (including attaching a copy of this LOI to a motion seeking authority for the Debtor to execute this LOI, any related Purchase and Sale Agreement, and advance with a bulk sale process of the Commercial and Residential Units

(the "LOI Motion")). It is expressly contemplated that said LOI Motion will contemplate the opportunity for other potential bulk sale purchasers to make offers higher and better than this LOI and the Purchaser expressly reserves the right to revise and modify the terms of this LOI at or before any hearing on the LOI Motion.

Except as expressly set forth herein, this LOI is not intended to be binding and, except for the Confidentiality provisions, shall not give rise to any legal right or obligation between Purchaser and Seller. A binding obligation between the parties will be created only upon the execution of a subsequent formal written PSA, delivered and executed by both parties.

**IN WITNESS WHEREOF**, each of the parties has caused this LOI to be duly executed on its behalf as of the day and year first above written.

Very truly yours,

By: _____

Name: Jonathan Reaver

Title: Authorized Agent

**AGREED AND ACCEPTED**

**Sixty Sixty Condominium Association, Inc.**
By:_____

Print Name:_____

Print Title:_____

Date of Execution:_____, 2017

# Exhibit "C"

 Watch YouTube videos with Chrome. <u>Yes, get Chrome now</u>

    Search



THE DEAL

SIXTY-SIXTY BUY OUT
$15,000,000

▶  ▶|  🔇  0:01 / 9:38                    cc  ⚙  ⬜  ⛶

📷 SIXTY SIXTY THE DEAL ON THE TABLE TODAY
!

Richard J. Schecher, Sr

▶ Subscribe  2                                          68 views

➕ Add to    ➤ Share   ••• More                    👍 1   👎 2

Published on May 15, 2017
There has been a huge interest from several individuals, investment groups, and other hotel owners in purchasing my Hotel Unit which is basically the building and property at the Sixty Sixty.

Today, I have decided to place a DEAL on the table for the prospective or potential buyers to consider and the first one with cash in hand can make a deal to either buy me out or become my JV Partner at the Sixty Sixty.

This DEAL is currently on the table and will remain on the table until 7/21/2017 or until a DEAL is inked with a buyer or JV Partner whichever comes first.

I am tired of dealing with Deadbeat Owners at the Sixty Sixty and I am now ready to share my stress and ultimate financial future with either a Buyer or a Partner.

If you would like to meet with me and talk, simply drop me a line or give me a call.

Email: rschecher@schechergroup.com

Telephone: (954) 304-4956



★ Watch YouTube videos with Chrome   You get Chrome now.

 **YouTube**

Search



# Price Point

- Hotel Unit (Building & Property) $6,000,000

- 86 Individual Units $10,750,000

- Lien Removal (APO-FBS) $2,800,000

**TOTAL PRICE $ 19,550,000**

**Less Foreclosures $ 6,200,000**

**NET DEAL COST $ 13,350,000**

▶  ▶|  🔇  1:00 / 9:38                    CC  ⚙  ▭  ⛶



🖼 SIXTY SIXTY THE DEAL ON THE TABLE TODAY !

Richard J. Schecher, Sr

▶ Subscribe  2                                                                    68 views

+ Add to     ↪ Share     ••• More                                    👍 1   👎 2

Published on May 15, 2017
There has been a huge interest from several individuals, investment groups, and other hotel owners in purchasing my Hotel Unit which is basically the building and property at the Sixty Sixty.

Today, I have decided to place a DEAL on the table for the prospective or potential buyers to consider and the first one with cash in hand can make a deal to either buy me out or become my JV Partner at the Sixty Sixty.

This DEAL is currently on the table and will remain on the table until 7/21/2017 or until a DEAL is inked with a buyer or JV Partner whichever comes first.

I am tired of dealing with Deadbeat Owners at the Sixty Sixty and I am now ready to share my stress and ultimate financial future with either a Buyer or a Partner.

If you would like to meet with me and talk, simply drop me a line or give me a call.

Email: rschecher@schechergroup.com

Telephone: (954) 304-4956



Watch YouTube videos with Chrome.    Yes, get Chrome now.



Search



# Deal Benefits

**TOTAL PRICE** $ 19,550,000
**Less Foreclosures** $ 6,200,000
**NET DEAL COST** $ 13,350,000

HU has majority of RUOs in Foreclosure
RUOs Receivable in Excess of $6 Million
75% of Process is Complete
Control Destiny & Costs

Just A Matter Of Time
Option Guarantees Price

▶  ▶|  🔇   9:25 / 9:38                          CC  ⚙  ▭  ⛶

📄 SIXTY SIXTY THE DEAL ON THE TABLE TODAY
!

Richard J. Schecher, Sr

▶ Subscribe  2

68 views

+ Add to     ↪ Share     ••• More                          👍 1   👎 2



**Published on May 15, 2017**
There has been a huge interest from several individuals, investment groups, and other hotel owners in purchasing my Hotel Unit which is basically the building and property at the Sixty Sixty.

Today, I have decided to place a DEAL on the table for the prospective or potential buyers to consider and the first one with cash in hand can make a deal to either buy me out or become my JV Partner at the Sixty Sixty.

This DEAL is currently on the table and will remain on the table until 7/21/2017 or until a DEAL is inked with a buyer or JV Partner whichever comes first.

I am tired of dealing with Deadbeat Owners at the SIxty Sixty and I am now ready to share my stress and ultimate financial future with either a Buyer or a Partner.

If you would like to meet with me and talk, simply drop me a line or give me a call.

Email: rschecher@schechergroup.com

Telephone: (954) 304-4956

 Watch YouTube videos with Chrome.    Yes, get Chrome now.

≡  You Tube     Search



# **Deal Options**
### TOTAL PRICE $ 19,550,000
### Less Foreclosures $ 6,200,000
### NET DEAL COST $ 13,350,000

**Option #1** - Take Out HU Owner Pay $7,800,000
HU, APO, HU Foreclosures & Debt
BUYER BECOMES HU OWNER
BUYER FORECLOSES ON RUOs
BUYER EARNS 24% on $1,800,000
BUYER DRIVES DOWN RUO PRICES

▶  ▶|  🔇  3:26 / 9:38                    CC  ⚙  ☐  ⌞⌝

🖻 SIXTY SIXTY THE DEAL ON THE TABLE TODAY
!

 Richard J. Schecher, Sr

▶ Subscribe  2

68 views

➕ Add to    ➤ Share    ••• More                    👍 1  👎 2

Published on May 15, 2017
There has been a huge interest from several individuals, investment groups, and other hotel owners in purchasing my Hotel Unit which is basically the building and property at the Sixty Sixty.

Today, I have decided to place a DEAL on the table for the prospective or potential buyers to consider and the first one with cash in hand can make a deal to either buy me out or become my JV Partner at the Sixty Sixty.

This DEAL is currently on the table and will remain on the table until 7/21/2017 or until a DEAL is inked with a buyer or JV Partner whichever comes first.

I am tired of dealing with Deadbeat Owners at the Sixty Sixty and I am now ready to share my stress and ultimate financial future with either a Buyer or a Partner.

If you would like to meet with me and talk, simply drop me a line or give me a call.

Email: rschecher@schechergroup.com

Telephone: (954) 304-4956

★  Watch YouTube videos with Chrome.  Yes, get Chrome now.



Search



# Deal Options

**TOTAL PRICE** $ 19,550,000

**Less Foreclosures** $ 6,200,000

**NET DEAL COST** $ 13,350,000

**Option #2** - JV with HU Owner Pay $1,000,000
As OPTION MONEY
Fund Purchase of RUOs & Association Units
Fund Legal Costs to Defeat Association & Capture Control
Earn 18% on All Advance Funding
Obtain Percentage To Close Out Association
Collapse Condo Association
Buy Out HU At Set Price

▶  ▶|  🔇  5:00 / 9:38                               CC  ⚙  ▭  ⛶

🖼 SIXTY SIXTY THE DEAL ON THE TABLE TODAY !



Richard J. Schecher, Sr

▶ Subscribe  2

68 views

+ Add to     ➤ Share     ••• More                    👍 1  👎 2

Published on May 15, 2017

There has been a huge interest from several individuals, investment groups, and other hotel owners in purchasing my Hotel Unit which is basically the building and property at the Sixty Sixty.

Today, I have decided to place a DEAL on the table for the prospective or potential buyers to consider and the first one with cash in hand can make a deal to either buy me out or become my JV Partner at the Sixty Sixty.

This DEAL is currently on the table and will remain on the table until 7/21/2017 or until a DEAL is inked with a buyer or JV Partner whichever comes first.

I am tired of dealing with Deadbeat Owners at the SIxty Sixty and I am now ready to share my stress and ultimate financial future with either a Buyer or a Partner.

If you would like to meet with me and talk, simply drop me a line or give me a call.

Email: rschecher@schechergroup.com

Telephone: (954) 304-4956

# Exhibit "D"

# <u>*MANAGEMENT AGREEMENT*</u>

by and between

## Florida Luxury Rentals

*And*

## Sixty Sixty Condominium Owners

## MANAGEMENT AGREEMENT

This AGREEMENT dated this ____ day of _____, 2017, by and between Unit #_____Located: 6060 Indian Creek Drive, Miami Beach, 33140 (hereafter called "Owner") and Florida Luxury Rentals (hereinafter "Manager").

WHEREAS, the Manager has the right to collect rents from, lease and manage a certain property, described in Schedule A hereto affixed and made a part hereof, and the Owner desires to engage the Manager to manage and operate the same.

NOW, THEREFORE, the parties agree as follows:

## ARTICLE 1. THE APPOINTMENT

1.1 <u>Management</u>. The Owners hereby appoints the Manager and the Manager hereby accepts the appointment, to manage in accordance with the terms of this Agreement, the real property described in Schedule A attached hereto (herein called the "Property") for the term set forth in Article 2.

1.2 <u>Leasing</u>. The Owners hereby appoints Manager, and the Manager hereby accepts the appointment, as the sole and exclusive leasing agent of the Property to rent rooms and other facilities on a daily basis and to lease appropriate portions of the Property to further the hotel business being conducted on the Property.

## ARTICLE 2. TERM

2.1 <u>Term</u>. The Manager's duties and responsibilities under this Agreement shall commence the _____ day of _____ 2017 and shall expire on the date that is three (3) years after the commencement date, unless sooner terminated as herein provided.

2.2 <u>Renewal Term</u>.    After expiration of the initial term, this Agreement shall automatically continue on a two year (2) basis, unless canceled with or without cause, in writing by the Manager.

2

## ARTICLE 3. MANAGER'S RESPONSIBILITIES

3.1 <u>Management</u>. The Manager shall manage, operate and maintain each Property unit in an efficient and satisfactory manner in accordance with this Agreement and all applicable laws, rules and regulations.  Manager shall act in a fiduciary capacity with respect to the proper protection of and accounting for Owner's assets. Throughout the term of this Agreement, Manager shall have responsibility for all management decisions consistent with industry standards and Owner agrees not to impede Manager, counterman instructions by Manager to its employees or otherwise interfere with Manager's performance of its duties.

3.2 <u>Employees</u>. The Manager shall insure a sufficient number of capable employees to enable it to properly, adequately, safely and economically manage, operate, maintain, and account for the Property.  Employees will be Managers employees.  All matters pertaining to the employment, supervision, training, compensation, promotion and discharge of such employees are the responsibility of the Manager. Manager may negotiate with any union lawfully entitled to represent such employees and may execute with Owner Approval as agent for Owner, collective bargaining agreements or labor contracts resulting therefrom.  Manager shall fully comply with all applicable laws and regulations with respect to worker's compensation, social security, unemployment insurance, hours of labor, wages, working conditions, and other employer-employee related subjects.  Manager represents that it is and will continue to be an equal opportunity employer.

3.3 <u>Compliance with Laws, Mortgages, etc.</u> Manager shall be responsible for full compliance with federal, state and municipal laws, ordinances, regulations and orders relative to the leasing, use, operation, and maintenance of the Property.  Manager shall promptly notify Owner of any violation of any such law, ordinance, rule, regulation or order which comes to Manager's attention and, at Owner's expense and prior approval, promptly remedy any such violation.

Manager shall, at its own expense, keep in full force and effect all licenses and permits necessary or convenient to operate its management services similar to other hotels of comparable size, class and standing, including, but not limited to, licenses and permits, required for the rental of rooms. Manager shall also obtain all new and renewal licenses and permits necessary to accomplish the foregoing.

Actions in remedying violations may be implemented prior to obtaining Owner's approval if the estimated expenses to be incurred do not exceed $1,500.00 in any one instance. When more than such amount is required or if the violation is one for which the Owner might be subject to penalty, Manager shall notify Owner so that prompt arrangements may be made to remedy the violation.

Manager shall be responsible for full compliance with all terms and conditions contained in any ground lease, space lease, mortgage, deed of trust, restrictive covenant, management and brokerage agreement or other instrument affecting the Property; provided, however, Manager

3

shall not be required to make any payment or incur any liability on account thereof.  Owner shall assist Manager in obtaining copies of any existing ground, space or other lease affecting the property.

Owner shall cooperate with Manager and keep Manager advised of any mortgage, lease, deed of trust, covenant, law, regulation, ordinance or other requirement of which it has actual knowledge, which concerns the operation of the Property.

3.4 <u>Approved Budgets</u>. Manager shall prepare and submit to Owner, prior to December 1 of each year, a proposed operating budget and a proposed capital budget for the promotion, operation, repair, management and maintenance of the Property for the forthcoming calendar year.  The operating budget shall include a price schedule for room sales, licensing, concessions and other services provided by the hotel business being conducted on the Property.

The Owner will consider the proposed budgets and will consult with the Manager prior to the commencement of the forthcoming calendar year in order to agree on an "Approved Operating Budget" and an "Approved Capital Budget".

Manager agrees to use diligence and to employ all reasonable efforts to ensure that the actual costs of maintaining and operating the Property shall not exceed the amount necessary. All expenses must be charged to the proper account in accordance with Uniform System of Accounts for Hotels, as approved and adopted by the American Hotel & Motel Association (the "Uniform Accounting System"). Manager shall secure Owner's prior written approval for any expenditure that will result in an excess of the annual budgeted amount in any one accounting category of the Approved Operating Budget or the Approved Capital Budget.

During the calendar year the Manager shall inform the Owner of any major increases in costs and expenses that were not foreseen during the budget preparation period and thus are not reflected in either Approved Budget.

Manager shall prepare budget and either arrange necessary maintenance, cleaning services with Unit owner or with Hotel owner, whichever is appropriate under current rules as outlined in the Condo Documentation or otherwise approved by a State or Federal court.

3.5 <u>Reports</u>. Within twenty (22) days after the end of each month, Manager shall prepare and submit to Owner a monthly report summarizing the operations of the Property for the previous month.

Manager shall also prepare and forward to the Owner monthly reports set forth in Schedule C attached hereto within twenty (22) days after the end of each month.

Manager shall also keep the accurate books and records of the Property in accordance with the Uniform Accounting System consistently applied.  Owner shall have the right from time to time to inspect the books and records of the Property in the Manager's office at the Property or at the Manager's main office.  All books and records of accounts are and shall remain the

4

property of the Owner; and shall be delivered to Owner upon termination of this Agreement within five (5) business days of any written demand by Owner, subject to the provisions of Paragraph 7.5.

3.6 <u>Collection of Rents and Other Income</u>. Manager shall use diligent efforts to collect all room rents, and other charges due from guests, tenants, concessionaires and other use of the facilities of the Property. (Including percentage rents and tenants' share of operating expenses, taxes) and other charges which may become due at any time from any tenant or from others for services provided in connection with or for the use of the Property or any portion thereof. Manager shall collect and identify any income due the Owner from miscellaneous services provided to tenants or the public including, but not limited to, parking income, tenant storage, and coin operated machines of all types (e.g., vending machines, pay telephones, etc.). All monies will be deposited immediately in a separate checking account and maintained by the Manager at a bank approved by the Owner (the "Owner's Account"). No funds of the Manager or of any other property shall be deposited in the Owner's Account. The Manager shall have two (2) officers of the Manager as designated check signers and all checks over $1,500.00 shall require two signatures. The Owner shall also have designated check signers. Manager may not, without the prior written approval of Owner, terminate any lease; lock out a tenant, institute suit for rent or for use and occupancy, or proceedings for recovery of possession. In connection with any collection efforts, only legal counsel or a collection firm designated by Owner shall be retained. All legal and collection fees and expenses incurred in bringing such approved suit or proceeding shall be submitted to Owner for its approval. Manager shall not write off any income without prior approval of Owner.

3.7 <u>Competitive Bidding</u>. All contracts for repairs, capital improvements, goods and services exceeding $2,000.00 shall be awarded on the basis of competitive bidding, solicited in the following manner:

(a)     A minimum of two (2) written bids shall be obtained for contract up to $10,000.00. A contract for over $10,000.00 will require a minimum of three bids;

(b)     Each bid will be solicited in a form prescribed by Owner so that uniformity will exist in the bid quotes;

(c)     Manager may accept low bid without prior approval from Owner, if the expenditure is for a line item on an Approved Budget and such expenditure, together with previously incurred and estimated future expenditures for such line item, will not result in an excess of the annual budgeted amount of the applicable Approved Budget for such line item; otherwise, approval of a bid will be required by Owner;

(d)     If Manager advises acceptance of other than the lowest bidder, Manager shall adequately support, in writing its recommendations to Owner;

(e)     Except as set forth in (c) above, Owner shall be free to accept or reject any and all bids;

5

(f)    Manager shall prepare bids and arrange necessary maintenance, cleaning services with Unit owner or with Hotel owner, whichever is appropriate under current rules as outlined in the Condo Documentation or otherwise approved by a State or Federal court.

3.8 <u>Service Contracts</u>. Manager shall not enter into any contract service for cleaning, maintaining, repairing or servicing the Property or any of the constituent parts of the Property except as consistent with the Approved Operating Budget.

All service contracts shall: (a) be in the name of the Owner, (b) be assignable, at Owner's option, to Owner's nominee, (c) not be for a term of more than one year and include a provision for cancellation thereof by Owner upon not more than 30 days written notice, and upon three (3) days notice for cause, (d) shall require that all contractors provide evidence of sufficient insurance and (e) shall be within the guidelines set forth in the Approved Operating Budget. Unless Owner specifically waives such requirement, all service contracts shall be subject to bid under the procedure as specified in Section 3.8.

3.9 <u>Repairs</u>. The Manager shall supervise all ordinary and extraordinary repairs, decorations and alterations, capital improvements, remodeling and tenant improvements, all subject to the terms of this Agreement.

In case of an emergency, Manager may make expenditures for repairs without prior written approval of the Owner, if such repair is necessary to prevent damage or injury. Owner must be informed of any such expenditure before the end of the next business day.

3.10 <u>Taxes</u> The Manager shall obtain and pay bills approved by Owner and for all Florida transient taxes (509) and remit to the State of Florida (Treasury).

3.11 <u>Advertising</u>. Manager shall prepare advertising plans and promotional material for the benefit of the Property. Advertising and promotional materials shall be prepared in full compliance with Federal, State and Municipal laws, rules, regulations and orders.

3.12 <u>Cooperation</u>. Should any claims, demands, suits or other legal proceedings be made or instituted by any person against Owner, the Manager shall give Owner all pertinent information and reasonable assistance in the defense or other disposition thereof.

## ARTICLE 4. PAYMENT OF EXPENSES

4.1 <u>Processing of Invoices</u>. Manager shall receive, review and approve all invoices for expenses incurred in operating the Property and shall timely pay such invoices if they are within the Approved Budget or if they have otherwise been approved by the Owner.

4.2 <u>Manager's Reimbursable Costs</u>. The following costs paid by Manager in connection with the management of the Property shall be reimbursed by the Owner:

(a)     Actual cost of all items set forth in the Approved Operating Budget.

(b)     Actual cost set forth in the Approved Capital Budget after the approval of Owner of the contractors' contracts and plans and specifications, if appropriate.

(c)     Cost of collection of delinquent rentals collected through a collection agency, which has been approved in writing in advance by Owner.

(d)     Legal fees of attorneys provided such attorneys have been approved by Owner in advance of retention and the specific amount of such attorney's fee has been approved of by Owner in advance of payment.

(e)     Cost of Owner approved advertising.

(f)     Costs associated with filing of state/local taxes and incorporation.

4.3 <u>Non-reimbursable Costs</u>. The following expenses or costs incurred by Manager in connection with the management of the Property shall be at the sole cost and expense of Manager and shall not be reimbursable by Owner:

(a)     Cost of gross salary and wages, payroll taxes, insurance, worker's compensation and other benefits of Manager's office personnel not identified in the Approved Operating Budget.

(b)     General accounting and reporting services which are considered to be within the Manager's office not associated with the operations of the Property.

(c)     Cost of forms, papers, ledgers, and other supplies and equipment used in the Manager's office not associated with the operations of the Property.

(e)     Manager's Office overhead not contained within the Approved Budget.

7

4.4 <u>Method of Reimbursement</u>. Manager may pay from Owner's Account all costs and expenses in this Article 5 and the payment of fees referred to in Section 6.1 and 6.2. Owner agrees to maintain a i.) balance in the Owner's Account and/or iii.) a line of credit accessible to Manager, which together total not less than $1/12^{th}$ of the Approved Operating Budget, so as to provide for sufficient liquidity in operation of the property. If the funds in the Owner's Account are not sufficient to pay amounts approved to be paid under this Agreement, Manager will give Owner at least ten (10) days written notice of any additional funds Owner must deposit in the Owner's Account.

4.5 <u>Use of Commercial Space by Manager owned by Owner:</u> Owner agrees to support all efforts of the Manager to obtain a lease with adequate space within property (Hotel) owned by the Sixty Sixty Association for the sum no greater than Five Hundred Dollars per month ($500), Starting on the effective date of this agreement.

# ARTICLE 5. COMPENSATION

5.1 <u>Management Fee</u>.

(a)     Each month the Manager shall receive a management fee for its services in managing the Property in the amount of Fifty Percent (50%) of the Gross Revenue (hereinafter defined) actually collected and remitted to the Owner during the month. The term "Gross Revenue" for the purpose of calculating the monthly management fee includes all room rent.

5.2 <u>Accounting Fee</u>. Manager shall receive a fee per month for centralized accounting services, actual expenses paid by manager.

5.3 <u>Late Fees</u>. All fees and reimbursable expenses are due and payable on the first $(1^{st})$ day of the month in advance. All fees and reimbursable expenses not received by the first of the month shall bear interest at the rate of one and one-half percent (1 1/2%) per month. If an attorney or collection agency is engaged by the Manager to collect any fees due under this Agreement, the Owner shall pay all collection, legal or court expenses, costs and fees including, but not limited to, reasonable attorney fees whether or not suit is actually filed or if filed, whether the suit proceeds to judgment or not.

8

# ARTICLE 6. TERMINATION

6.1 <u>Termination by Manager for Cause</u>.  Manager may terminate this Agreement for cause upon the Owner's material breach of this Agreement, including Owner's failure to pay fees or reimbursable expenses, or to fund Owner's Account.  Manager shall give Owner 15 day's notice of Manager's for cause termination under this paragraph.  Upon Manager does termination for cause under this paragraph Owner shall pay to Manager all monies then owe with all accrued interest.  Further, the Owner and Manager acknowledge and agree that any material breach of this agreement by Owner upon which Manager elects to terminate the Agreement under this paragraph, shall cause Manager to suffer actual and substantial damages which would be extremely difficult or impossible to accurately quantify in a reasonable and timely manner.  In recognition of the difficulty to Manager of quantifying its damages the Manager and Owner hereby agree that as reasonable compensation for damages Manager will suffer by way of the Owner's material breach Owner shall pay to Manager the equivalent of the remainder of the contract.  Payment of all monies called for under this paragraph shall be made by Owner to Manager within 10 days of Owner's receipt of the notice of Termination by Manager for Cause.

6.2 <u>Termination by Owner for Cause</u>.  In the event that the Manager is in material breach of its responsibilities under Article 3 of this Agreement, the Owner shall provide Manager with a written notice which states the breach and the steps necessary to cure the breach.  Upon receipt by the Manager of the aforesaid notice, the Manager shall have a period of one hundred and eighty days (180) to cure the breach.  If the Manager has not cured the breach at the end of such one hundred and eighty days (180) period, Owner can terminate this Agreement for cause.  Upon the Owner's termination for cause under this paragraph, Owner shall pay to Manager all monies then owing with all accrued interest as of the date of termination.

6.3 <u>Termination on Sale</u>. This Agreement shall terminate upon the sale of the Property with ninety (90) days' notice.

6.4 <u>Termination Without Notice</u>. This Agreement shall terminate immediately without notice upon cessation on the Manager's part to continue to do business; or bankruptcy, insolvency, or assignment for the benefit of the creditors of the Manager, or theft by Manager.

6.5 <u>Final Accounting</u>. Upon termination of this Agreement for any reason, Manager shall complete the necessary accounting work for the property upon its departure for 90 days at a cost of one month's management fees, payable upon termination.  Upon completion Manager will immediately deliver to Owner all records, books, accounts, contracts, leases, receipts for deposits, unpaid bills and other papers or documents which pertain to the Property with the exception of employee records which must be retained by Manager according to law.  Owner shall have the right to inspect Manager's employee records, upon reasonable notice, or in the alternative, Manager shall provide Owner with copies of these records, upon Owner's request.

9

Manager shall have the right to keep and maintain copies of any records, which it delivers to Owner, provided that the same is kept in confidence by Manager.   Upon such termination or withdrawal Owner will assume responsibility for payments of all approved or authorized unpaid bills of the Property.

6.6 <u>Final Payment of Taxes</u>.  Upon termination of this Agreement for any reason, at the time Manager delivers to Owner all records, books, accounts, contracts, leases, receipts for deposits, unpaid bills and other papers or documents which pertain to the Property, Manager shall provide Owner with an estimate of all accrued taxes as of the date of termination for which the Manager may be held legally responsible for nonpayment.  By way of example, and not by way of limitation, said taxes may be:  unemployment insurance tax, sales and use tax and taxes specific to the sale and/or consumption of liquor.

Within ten (10) days of its receipt of Manager's estimate of accrued taxes, Owner agrees to place an amount equal to the Manager's estimate of accrued taxes in an interest bearing escrow account which will provide for the payment of said taxes at the same bank where the Owner's Account is located.  Owner agrees to provide Manager with written verification of the existence and the balance of the escrow account within three (3) days thereafter.  The escrow account funds may only be disbursed by the direction and with the written approval of both Owner and Manager.  Such approval not to be unreasonably withheld.

# ARTICLE 7. MISCELLANEOUS

7.1 <u>Notices</u>. All notices, demands, consents and reports and other notices provided for in this Agreement shall be in writing and shall be given by Express Mail, return receipt requested, with postage prepaid, or delivered by a recognized overnight delivery service, which service obtains a signature on delivery.

> MANAGER:  Fredrick Scott House & Diane J. Schaffer
> Florida Luxury Rentals
> 2501 E. Commercial Blvd. Suite 208
> Ft. Lauderdale, Florida 33308
>
> OWNER:    Unit #       (Owner
> 6060 Indian Creek Drive, Miami Beach

Any party may designate another addressee (or a different address) for notices hereunder by notice give pursuant to this Section.  A notice sent in compliance with the provisions of this Section shall be deemed given on the business day next following the day on which the notice is sent.

7.2 <u>Consent and Approvals</u>. Owner's consent or approval may be given only by

10

representatives of Owner from time to time designated in writing by Owner. All such consents or approvals shall also be in writing.

    7.3 <u>Amendments</u>. No amendments, additions or deletions to this Agreement shall be effective unless approved by the parties in writing, excepting that change in the Leasing Guidelines set forth in Schedule B and in the Monthly Report Forms set forth in Schedule C and the Uniform System of Accounting may be made by Owner, effective upon written notice thereof by Owner to Manager, so that upon receipt of such notice by the Manager, the respective schedule shall be deemed to have been amended.

    7.4 <u>Headings</u>. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

    7.5 <u>Indemnification by Manager</u>. Manager shall indemnify, defend and hold Owner harmless from any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including attorney's fees and court costs, sustained or incurred by or asserted against Owner by reason of or arising directly from Manager's Gross Negligence.

    7.6 <u>Indemnification by Owner</u>. Owner shall indemnify, defend and hold Manager harmless from any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including attorney's fees and court costs sustained or incurred by or asserted against Manager in performing its duties under this Agreement, except in cases of gross negligence of the Manager, said indemnity expressly to include Owner's reimbursement to Manager for Manager's payment of any accrued taxes in the event Owner violates the terms of paragraph 7.5 above.

    7.7 <u>Arbitration</u>.    Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, including the Emergency Interim Relief Procedures, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The Arbitrator shall be limited to an award of actual loss to a party arising directly from a breach of this Agreement, and shall not be permitted to award to either party its expense associated with the arbitration (including the expense of attorney fees) it being the intent of the parties that each party shall bear its own costs in such arbitration, provided however, that the arbitrator may award to the prevailing party the fees it has paid to the American Arbitration Association, including the initial filing fee, the case service fee, and the arbitrator's fee. Notwithstanding any provision to the contrary, Manager may file suit to recover any fees or other obligations owed to it under this Agreement for any amount not to exceed $10,000.00.

    The place of arbitration shall be Ft. Lauderdale, Florida. The language of the arbitration shall be English.

Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties.

7.8 <u>Complete Agreement</u>. This Agreement and Schedules A, B and C attached hereto and made a part hereof, supersede and take the place of any and all previous management agreements entered into between the parties hereto relating to the Property covered by this Agreement.

7.9 <u>Governing Law</u>. This Agreement shall be governed, construed and interpreted by the laws of the State of Florida, as a contract under seal.

7.10 Manager shall Manage, arrange necessary maintenance, cleaning services with each Unit owner or with Hotel owner, whichever is appropriate under current rules as outlined in the Condo Documentation or otherwise approved by a State or Federal court.

IN WITNESS WHEREOF the parties hereto have executed this Agreement under seal as of the date and year first written above:

OWNER:  Unit #

By:_____
Authorized Signature

MANAGER:  Florida Luxury Rentals

By:_____
Authorized Signature

## SCHEDULE A

Property Description

Unit #      (Owner)
6060 Indian Creek Drive, Miami Beach
Ft. Lauderdale, Florida 33304

13

## SCHEDULE B

## LEASING GUIDELINES

[Intentionally left blank]

## SCHEDULE C

## MONTHLY REPORTS

Manager shall generate, update and maintain the following reports, using the Uniform Accounting System:

> Income Recaps
> Rents Receivable Report
> Property Profit and Loss Statement
> Capital Expenditure and Leasing Commissions Report
> Management Reports

Income Recap, Identify all income and security deposits billed and amounts collected. The ending accounts receivable balance equal the sum of: 1) The beginning accounts receivable, plus 2) The billing of the current month, less 3) Amounts collected. The ending accounts receivable balance should agree to the Accounts Receivable Report. The advance deposit report should reflect the Owner's total liability for advance deposits outstanding at report date.

Property Profit & Loss Statement: Report monthly and year to date property income and expenses using Uniform Code of Accounts Schedules and Chart of Accounts. Prepare budget variance analysis. Explain any significant operating issues and significant budget to actual variances. Include cash receipts and disbursements journals, reconciled bank statements and reconciliations. Reconcile the bank statement cash balance to the operating statement ending balance. Indicates the amount available to be available by the Owner (Owner's Cash Flow).

Capital Expenditure, Describe and cost all capitalized disbursement items.

# Exhibit "E"

## SCHEDULE OF RECEIPTS AND DISBURSEMENTS
### FOR THE PERIOD BEGINNING December 5,2016 AND ENDING December 31, 2016

Name of Debtor: Sixty Sixty Condominium Association, Inc.    Case Number 16-26187-RAM

Date of Petition: December 5, 2016

| | CURRENT MONTH | | CUMULATIVE PETITION TO DATE | |
|---|---|---|---|---|
| 1. FUNDS AT BEGINNING OF PERIOD | $ 4,502.11[1] | (a) | 4,502.11 | (b) |
| 2. RECEIPTS: | | | | |
| A. Cash Sales | | | | |
| Minus: Cash Refunds | (-) | | | |
| Net Cash Sales | | | | |
| B. Accounts Receivable | | | | |
| C. Other Receipts (See MOR-3) | $11,895.11 | | $11,895.11 | |
| (If you receive rental income, | | | | |
| you must attach a rent roll.) | | | | |
| 3. TOTAL RECEIPTS (Lines 2A+2B+2C) | $11,895.11 | | $11,895.11 | |
| 4. TOTAL FUNDS AVAILABLE FOR | | | | |
| OPERATIONS (Line 1 + Line 3) | $11,895.11 | | $11,895.11 | |
| 5. DISBURSEMENTS | | | | |
| A. Advertising | | | | |
| B. Bank Charges | $30.00 | | $30.00 | |
| C. Contract Labor | | | | |
| D. Fixed Asset Payments (not incl. in "N") | | | | |
| E. Insurance | $5,981.21[2] | | $5,981.21 | |
| F. Inventory Payments (See Attach. 2) | | | | |
| G. Leases | | | | |
| H. Manufacturing Supplies | | | | |
| I. Office Supplies | | | | |
| J. Payroll - Net (See Attachment 4B) | | | | |
| K. Professional Fees (Accounting & Legal) | | | | |
| L. Rent | | | | |
| M. Repairs & Maintenance | | | | |
| N. Secured Creditor Payments (See Attach. 2) | | | | |
| O. Taxes Paid - Payroll (See Attachment 4C) | | | | |
| P. Taxes Paid - Sales & Use (See Attachment 4C) | | | | |
| Q. Taxes Paid - Other (See Attachment 4C) | | | | |
| R. Telephone | | | | |
| S. Travel & Entertainment | | | | |
| Y. U.S. Trustee Quarterly Fees | | | | |
| U. Utilities | | | | |
| V. Vehicle Expenses | | | | |
| W. Other Operating Expenses (See MOR-3) | | | | |
| 6. TOTAL DISBURSEMENTS (Sum of 5A thru W) | $6,011.21 | | $6,011.21 | |
| 7. ENDING BALANCE (Line 4 Minus Line 6) | $10,386.01 | (c) | $10,386.01 | (c) |

I declare under penalty of perjury that this statement and the accompanying documents and reports are true and correct to the best of my knowledge and belief and based on documents available to date subject to the explanations and notations contained in this report. Debtor recently engaged an accountant and reserves all rights to amend and supplement the instant report as is necessary.

This 20th day of January, 2017.

(Signature)

(a)This number is carried forward from last month's report. For the first report only, this number will be the balance as of the petition date.

(b)This figure will not change from month to month. It is always the amount of funds on hand as of the date of the petition.

(c)These two amounts will always be the same if form is completed correctly.

---

[1] Subsequent to the preparation of the documents underlying this report an additional account was identified holding pre-petition funds of the Debtor. All future reports will reflect this asset and the Debtor anticipates amending the schedules to reflect same.

[2] A certain repayment of prepetition financed insurance and a prepayment refund was inadvertently made post-petition. As of the filing of the instant report, all such funds have been returned to the Debtor.

MOR-2

## SCHEDULE OF RECEIPTS AND DISBURSEMENTS
### FOR THE PERIOD BEGINNING December 5,2016 AND ENDING January 31, 2017

Name of Debtor: Sixty Sixty Condominium Association, Inc.  Case Number 16-26187-RAM
Date of Petition: December 5, 2016

| | CURRENT MONTH | | CUMULATIVE PETITION TO DATE | |
|---|---|---|---|---|
| 1. FUNDS AT BEGINNING OF PERIOD | $10,386.01 | (a) | 4,502.11 | (b) |
| 2. RECEIPTS: | | | | |
| A. Cash Sales | | | | |
| Minus: Cash Refunds | (-) | | | |
| Net Cash Sales | | | | |
| B. Accounts Receivable | | | | |
| C. Other Receipts (See MOR-3) | $31,872.47 | | $43,767.58 | |
| (If you receive rental income, | | | | |
| you must attach a rent roll.) | | | | |
| 3. TOTAL RECEIPTS (Lines 2A+2B+2C) | $31,872.47 | | $43,767.58 | |
| 4. TOTAL FUNDS AVAILABLE FOR | | | | |
| OPERATIONS (Line 1 + Line 3) | $42,258.48 | | $48,269.69 | |
| 5. DISBURSEMENTS | | | | |
| A. Advertising | | | | |
| B. Bank Charges | $ 49.80 | | $79.80 | |
| C. Contract Labor | | | | |
| D. Fixed Asset Payments (not incl. in "N") | | | | |
| E. Insurance | $2,508.95 | | 8,490.16 | |
| F. Inventory Payments (See Attach. 2) | | | | |
| G. Leases | | | | |
| H. Manufacturing Supplies | | | | |
| I. Office Supplies | 188.16 | | 188.16 | |
| J. Payroll - Net (See Attachment 4B) | | | | |
| K. Professional Fees (Accounting & Legal) | | | | |
| L. Rent | | | | |
| M. Repairs & Maintenance | | | | |
| N. Secured Creditor Payments (See Attach. 2) | | | | |
| O. Taxes Paid - Payroll (See Attachment 4C) | | | | |
| P. Taxes Paid - Sales & Use (See Attachment 4C) | | | | |
| Q. Taxes Paid - Other (See Attachment 4C) | | | | |
| R. Telephone | | | | |
| S. Travel & Entertainment | | | | |
| Y. U.S. Trustee Quarterly Fees | | | | |
| U. Utilities | | | | |
| V. Vehicle Expenses | | | | |
| W. Other Operating Expenses (See MOR 3) | 2,005.00 | | 2,005.00 | |
| 6. TOTAL DISBURSEMENTS (Sum of 5A thru W) | $4,751.91 | | $10,763.12 | |
| 7. ENDING BALANCE (Line 4 Minus Line 6) | $37,506.57 | (c) | $37,506.57 | (c) |

I declare under penalty of perjury that this statement and the accompanying documents and reports are true and correct to the best of my knowledge and belief and based on documents available to date subject to the explanations and notations contained in this report. Debtor recently engaged an accountant and reserves all rights to amend and supplement the instant report as is necessary.
This 21st day of February, 2017.

(Signature)

(a)This number is carried forward from last month's report. For the first report only, this number will be the balance as of the petition date.
(b)This figure will not change from month to month. It is always the amount of funds on hand as of the date of the petition.
(c)These two amounts will always be the same if form is completed correctly.

[1] Subsequent to the preparation of the documents underlying this report an additional account was identified holding pre-petition funds of the Debtor. All future reports will reflect this asset and the Debtor anticipates amending the schedules to reflect same.

MOR-2

## SCHEDULE OF RECEIPTS AND DISBURSEMENTS
**FOR THE PERIOD BEGINNING February 1, 2017 AND ENDING February 28, 2017**

Name of Debtor: Sixty Sixty Condominium Association, Inc.        Case Number 16-26187-RAM

Date of Petition:  December 5, 2016

| | CURRENT MONTH | | CUMULATIVE PETITION TO DATE | |
|---|---|---|---|---|
| 1. FUNDS AT BEGINNING OF PERIOD | $37,506.57 | (a) | $4,502.11 | (b) |
| 2. RECEIPTS: | | | | |
| A. Cash Sales | | | | |
| Minus:  Cash Refunds | (-) | | | |
| Net Cash Sales | | | | |
| B.  Accounts Receivable | | | | |
| C.  Other Receipts *(See MOR-3)* | $3,055.43 | | $46,823.10 | |
| (If you receive rental income, | | | | |
| you must attach a rent roll.) | | | | |
| 3.  TOTAL RECEIPTS *(Lines 2A+2B+2C)* | $3,055.43 | | $46,823.10 | |
| 4.  TOTAL FUNDS AVAILABLE FOR | | | | |
| OPERATIONS *(Line 1 + Line 3)* | $40,562.00 | | $51,325.21 | |
| 5.  DISBURSEMENTS | | | | |
| A. Advertising | | | | |
| B.  Bank Charges | 71.69 | | $151.49 | |
| C.  Contract Labor | | | | |
| D.  Fixed Asset Payments (not incl. in "N") | | | | |
| E.  Insurance | | | 8,490.16 | |
| F.   Inventory Payments  *(See Attach. 2)* | | | | |
| G.  Leases | | | | |
| H.  Manufacturing Supplies | | | | |
| I.   Office Supplies | | | 188.07 | |
| J.   Payroll - Net *(See Attachment 4B)* | | | | |
| K.  Professional Fees (Accounting & Legal) | | | | |
| L.   Rent | | | | |
| M.  Repairs & Maintenance | | | | |
| N.   Secured Creditor Payments *(See Attach. 2)* | | | | |
| O.  Taxes Paid - Payroll *(See Attachment 4C)* | | | | |
| P.  Taxes Paid - Sales & Use *(See Attachment 4C)* | | | | |
| Q.  Taxes Paid - Other *(See Attachment 4C)* | | | | |
| R.  Telephone | | | | |
| S.   Travel & Entertainment | | | | |
| Y.  U.S. Trustee Quarterly Fees | | | | |
| U.  Utilities | | | | |
| V.  Vehicle Expenses | | | | |
| W.  Other Operating Expenses *(See MOR-3)* | 61.25 | | 2,066.25 | |
| 6.  TOTAL DISBURSEMENTS *(Sum of 5A thru W)* | $132.94 | | $10,895.97 | |
| 7.  ENDING BALANCE *(Line 4 Minus Line 6)* | $40,429.06 | (c) | $40,429.06 | (c) |

**I declare under penalty of perjury that this statement and the accompanying documents and reports are true and correct to the best of my knowledge and belief and based on documents available to date subject to the explanations and notations contained in this report.**

This 20th day of  March, 2017.

_____
(Signature)

(a)This number is carried forward from last month's report.  For the first report only, this number will be the balance as of the petition date.

(b)This figure will not change from month to month.  It is always the amount of funds on hand as of the date of the petition.

(c)These two amounts will always be the same if form is completed correctly.

## SCHEDULE OF RECEIPTS AND DISBURSEMENTS
### FOR THE PERIOD BEGINNING <u>March 1, 2017</u> AND ENDING <u>March 31, 2017</u>
Name of Debtor: <u>Sixty Sixty Condominium Association, Inc.</u>   Case Number <u>16-26187-RAM</u>
Date of Petition: <u>December 5, 2016</u>

| | CURRENT MONTH | CUMULATIVE PETITION TO DATE |
|---|---|---|
| **1. FUNDS AT BEGINNING OF PERIOD** | $40,429.06 (a) | $4,502.11 (b) |
| **2. RECEIPTS:** | | |
| A. Cash Sales | | |
| Minus: Cash Refunds | (-) | |
| Net Cash Sales | | |
| B. Accounts Receivable | | |
| C. Other Receipts *(See MOR-3)* | $7,708.83 | $54,531.93 |
| (If you receive rental income, you must attach a rent roll.) | | |
| **3. TOTAL RECEIPTS** *(Lines 2A+2B+2C)* | $7,708.83 | $54,531.93 |
| **4. TOTAL FUNDS AVAILABLE FOR OPERATIONS** *(Line 1 + Line 3)* | $48,137.89 | $59,034.04 |
| **5. DISBURSEMENTS** | | |
| A. Advertising | | |
| B. Bank Charges | 33.92 | $185.59 |
| C. Contract Labor | | |
| D. Fixed Asset Payments (not incl. in "N") | | |
| E. Insurance | 2,340.75 | 10,830.91 |
| F. Inventory Payments *(See Attach. 2)* | | |
| G. Leases | | |
| H. Manufacturing Supplies | | |
| I. Office Supplies | | 188.07 |
| J. Payroll - Net *(See Attachment 4B)* | | |
| K. Professional Fees (Accounting & Legal) | | |
| L. Rent | | |
| M. Repairs & Maintenance | | |
| N. Secured Creditor Payments *(See Attach. 2)* | | |
| O. Taxes Paid - Payroll *(See Attachment 4C)* | | |
| P. Taxes Paid - Sales & Use *(See Attachment 4C)* | | |
| Q. Taxes Paid - Other *(See Attachment 4C)* | | |
| R. Telephone | | |
| S. Travel & Entertainment | | |
| Y. U.S. Trustee Quarterly Fees | 325.25 | 325.25 |
| U. Utilities | | |
| V. Vehicle Expenses | | |
| W. Other Operating Expenses *(See MOR-3)* | | 2,066.25 |
| **6. TOTAL DISBURSEMENTS** *(Sum of 5A thru W)* | $2,699.92 | $13,596.07 |
| **7. ENDING BALANCE** *(Line 4 Minus Line 6)* | $45,437.97 (c) | $45,437.97 (c) |

**I declare under penalty of perjury that this statement and the accompanying documents and reports are true and correct to the best of my knowledge and belief and based on documents available to date subject to the explanations and notations contained in this report.**

This <u>20th</u> day of April, 2017.

_____
(Signature)   SOACPA

(a)This number is carried forward from last month's report. For the first report only, this number will be the balance as of the petition date.

(b)This figure will not change from month to month. It is always the amount of funds on hand as of the date of the petition.

(c)These two amounts will always be the same if form is completed correctly.

## SCHEDULE OF RECEIPTS AND DISBURSEMENTS
### FOR THE PERIOD BEGINNING April 1, 2017 AND ENDING April 30, 2017

Name of Debtor: Sixty Sixty Condominium Association, Inc.     Case Number 16-26187-RAM

Date of Petition: December 5, 2016

|  | CURRENT MONTH |  | CUMULATIVE PETITION TO DATE |  |
|---|---|---|---|---|
| **1. FUNDS AT BEGINNING OF PERIOD** | $45,437.97 | (a) | $4,502.11 | (b) |
| **2. RECEIPTS:** |  |  |  |  |
| A. Cash Sales |  |  |  |  |
| Minus: Cash Refunds | (-) |  |  |  |
| Net Cash Sales |  |  |  |  |
| B. Accounts Receivable |  |  |  |  |
| C. Other Receipts *(See MOR-3)* | $14,868.42 |  | $69,400.35 |  |
| (If you receive rental income, |  |  |  |  |
| you must attach a rent roll.) |  |  |  |  |
| **3. TOTAL RECEIPTS *(Lines 2A+2B+2C)*** | $14,868.42 |  | $69,400.35 |  |
| **4. TOTAL FUNDS AVAILABLE FOR** |  |  |  |  |
| **OPERATIONS *(Line 1 + Line 3)*** | $60,306.39 |  | $73,902.46 |  |
| **5. DISBURSEMENTS** |  |  |  |  |
| A. Advertising |  |  |  |  |
| B. Bank Charges | 33.20 |  | $218.79 |  |
| C. Contract Labor |  |  |  |  |
| D. Fixed Asset Payments (not incl. in "N") |  |  |  |  |
| E. Insurance | 934.15 |  | 11,765.06 |  |
| F. Inventory Payments *(See Attach. 2)* |  |  |  |  |
| G. Leases |  |  |  |  |
| H. Manufacturing Supplies |  |  |  |  |
| I. Office Supplies |  |  | 188.07 |  |
| J. Payroll - Net *(See Attachment 4B)* |  |  |  |  |
| K. Professional Fees (Accounting & Legal) |  |  |  |  |
| L. Rent |  |  |  |  |
| M. Repairs & Maintenance |  |  |  |  |
| N. Secured Creditor Payments *(See Attach. 2)* |  |  |  |  |
| O. Taxes Paid - Payroll *(See Attachment 4C)* |  |  |  |  |
| P. Taxes Paid - Sales & Use *(See Attachment 4C)* |  |  |  |  |
| Q. Taxes Paid - Other *(See Attachment 4C)* |  |  |  |  |
| R. Telephone |  |  |  |  |
| S. Travel & Entertainment |  |  |  |  |
| Y. U.S. Trustee Quarterly Fees | 325.25 |  | 650.50 |  |
| U. Utilities |  |  |  |  |
| V. Vehicle Expenses |  |  |  |  |
| W. Other Operating Expenses *(See MOR-3)* |  |  | 2,066.25 |  |
| **6. TOTAL DISBURSEMENTS *(Sum of 5A thru W)*** | $1,292.60 |  | $14,888.67 |  |
| **7. ENDING BALANCE *(Line 4 Minus Line 6)*** | $59,013.79 | (c) | $ 59,013.79 | (c) |

**I declare under penalty of perjury that this statement and the accompanying documents and reports are true and correct to the best of my knowledge and belief and based on documents available to date subject to the explanations and notations contained in this report.**

.

This 20ᵗʰ day of May, 2017.

_____     JEACPA
(Signature)

(a) This number is carried forward from last month's report. For the first report only, this number will be the balance as of the petition date.

(b) This figure will not change from month to month. It is always the amount of funds on hand as of the date of the petition.

(c) These two amounts will always be the same if form is completed correctly.

# Exhibit "F"

# Litigation Targets

**Debtor identifies the following claims:**

1.	Claims against Schecher Group, Inc., its affiliates, subsidiaries, agents, officers, and employees potentially sounding in contract, tort, statute and/or other basis.  All rights are hereby reserved.

2.	Claims against Richard Schecher potentially sounding in contract, tort, statute and/or other basis.  All rights are hereby reserved.

3.	Claims against Annet Rojas potentially sounding in contract, tort, statute and/or other basis.  All rights are hereby reserved.

4.	Claims against Mirco Morales potentially sounding in contract, tort, statute and/or other basis.  All rights are hereby reserved.

5.	Claims against Gregory Elder potentially sounding in contract, tort, statute and/or other basis.  All rights are hereby reserved.

6.	Claims against Law Offices of Gregory R. Elder, LLC, its affiliates, subsidiaries, agents, officers, and employees potentially sounding in contract, tort, statute and/or other basis.  All rights are hereby reserved.

7.	Claims against Condominium Hotel Management Corporation, Inc., its affiliates, subsidiaries, agents, officers, and employees potentially sounding in contract, tort, statute and/or other basis.  All rights are hereby reserved.

8.	Claims against Casablanca Rental Services, its affiliates, subsidiaries, agents, officers, and employees potentially sounding in contract, tort, statute and/or other basis.  All rights are hereby reserved.

9.	Claims against Sharma and Associates, Inc., its affiliates, subsidiaries, agents, officers, and employees potentially sounding in contract, tort, statute and/or other basis.  All rights are hereby reserved.

10.	Claims against Vishnu Sharma potentially sounding in contract, tort, statute and/or other basis.  All rights are hereby reserved.

11.	Claims against A1 Fire & Safety, its affiliates, subsidiaries, agents, officers, and employees potentially sounding in contract, tort, statute and/or other basis.  All rights are hereby reserved.

12.	Claims against Florida Building & Supply, Inc., its affiliates, subsidiaries, agents, officers, and employees potentially sounding in contract, tort, statute and/or other basis.  All rights are hereby reserved.

# Exhibit "G"

## ESTIMATED OPERATING BUDGET FOR SIXTY SIXTY CONDOMINIUM ASSOCIATION, INC.

## FOR THE ONE YEAR PERIOD FROM JANUARY 1, 2017 THROUGH DECEMBER 31, 2017

|  | 2017 Monthly Budget | 2017 Annual Budget |
|---|---|---|
| **INCOME:** |  |  |
| Common Assessments | 64,918.06 | 779,016.70 |
| Total Income | 64,918.06 | 779,016.70 |
| **EXPENSES** |  |  |
| Operating Expenses |  |  |
| Legal Fees | 16,666.67 | 200,000.00 |
| Accounting | 1,305.00 | 15,660.00 |
| Insurance | 1,083.33 | 13,000.00 |
| Office Supplies & Postage | 125.00 | 1,500.00 |
| Annual Corporate Report | 5.10 | 61.25 |
| Fees Payable to Division | 29.00 | 348.00 |
| Real Estate Property Taxes For Association Owned Units | 2,464.25 | 29,571.00 |
| Expenses for Assessments of the Association Owned Units & Commercial Units | 2,121.70 | 25,460.45 |
| Contingency for 2017 Uncollected Assessments for Assoc Owned & Commercial Units | 3,825.00 | 45,900.00 |
| Shared Components - Expenses for Assoc. & Commercial Units per 2017 Budget of Hotel Unit Owner | 24,793.00 | 297,516.00 |
| Contingent Liabilities for Pending Litigation Matters - Payable over 5 Years | 12,500.00 | 150,000.00 |
| **Total Operating Expenses** | 64,918.06 | 779,016.70 |
| **Reserve Expenses** |  |  |
| Reserves for Roof Replacement | N/A | N/A |
| Reserves for Building Painting | N/A | N/A |
| Reserves for Pavement Resurfacing | N/A | N/A |
| TOTAL EXPENSES (INCLUDING RESERVES) | 64,918.06 | 779,016.70 |
| TOTAL EXPENSES (NOT INCLUDING RESERVES) | 64,918.06 | 779,016.70 |
| Net Income / (Loss) | 0.00 | 0.00 |

**SIXTY - SIXTY CONDOMINIUM ASSOCIATION, INC.**
**PERCENTAGE ALLOCATION BY UNIT 2017 PROPOSED BUDGET**

| Quantity | Unit % CE | Total | % | 2017 Proposed BUDGET | TOTAL | ANNUAL - 2017 Maintenance Per Unit Type | CU'S & # 505 | MONTHLY - 2017 Maintenance Per Unit Type |
|---|---|---|---|---|---|---|---|---|
| | | | | $779,016.70 | | | | |
| 000-A | 0.3696 | 20 | 7.392 | $57,584.91 | $57,584.91 | $2,879.25 | | $239.94 |
| 000-B | 0.3540 | 28 | 9.912 | $77,216.14 | $77,216.14 | $2,757.72 | | $229.81 |
| 000-C | 0.2996 | 8 | 2.3968 | $18,671.47 | $18,671.47 | $2,333.93 | | $194.49 |
| 0000-D | 0.3638 | 10 | 3.638 | $28,340.63 | $28,340.63 | $2,834.06 | $2,834.06 | $236.17 |
| 0000-E | 0.3706 | 10 | 3.706 | $28,870.36 | $28,870.36 | $2,887.04 | | $240.59 |
| 0000-F | 0.7149 | 2 | 1.4298 | $11,138.38 | $11,138.38 | $5,569.19 | | $464.10 |
| 0000-G | 0.3385 | 1 | 0.3385 | $2,636.97 | $2,636.97 | $2,636.97 | | $219.75 |
| 0000-H | 0.3404 | 1 | 0.3404 | $2,651.77 | $2,651.77 | $2,651.77 | | $220.98 |
| 0000-I | 0.3560 | 1 | 0.356 | $2,773.30 | $2,773.30 | $2,773.30 | | $231.11 |
| 0000-J | 0.3667 | 1 | 0.3667 | $2,856.65 | $2,856.65 | $2,856.65 | | $238.05 |
| UNIT C-1 | 2.0960 | 1 | 2.096 | $16,328.19 | $16,328.19 | $16,328.19 | $16,328.19 | $1,360.68 |
| UNIT C-2 | 1.8480 | 1 | 1.848 | $14,396.23 | $14,396.23 | $14,396.23 | $14,396.23 | $1,199.69 |
| UNIT C-3 | 0.8462 | 1 | 0.8462 | $6,592.04 | $6,592.04 | $6,592.04 | $6,592.04 | $549.34 |
| UNIT C-4 | 0.7373 | 1 | 0.7373 | $5,743.69 | $5,743.69 | $5,743.69 | $5,743.69 | $478.64 |
| HU | 64.5962 | 1 | 64.5962 | $503,215.19 | $503,215.19 | $503,215.19 | | $41,934.60 |

| Totals | | 87 | 100.00 | $779,015.92 | $779,015.92 | | $45,894.21 | |