# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

**IN RE:**

**SIXTY SIXTY CONDOMINIUM**         **CASE NO.: 16-26187-RAM**
**ASSOCIATION, INC.**         **Chapter 11**

      **Debtor.**

_____/

## SECURED CREDITOR, SCHECHER GROUP, INC.'S (I) OBJECTION TO FIRST AMENDED DISCLOSURE STATEMENT IN SUPPORT OF FIRST AMENDED PLAN OF REORGANIZATION OF SIXTY SIXTY CONDOMINIUM ASSOCIATION, INC. [ECF NO. 246] AND (II) MOTION FOR DISMISSAL OF CHAPTER 11 CASE

**SCHECHER GROUP, INC.** (the "Schecher Group" or "Secured Creditor"), by and through counsel, and pursuant to 11 U.S.C. §1125, §1129 & §1112(b), Rule 3017(a), Fed. R. Bankr. P. and Local Rule 3017-1 for the S.D. Fla., files this Secured Creditor, Schecher Group, Inc.'s (I) Objection To First Disclosure Statement (the "Amended Disclosure Statement") In Support Of First Amended Plan Of Reorganization (the "Amended Plan") of Sixty Sixty Condominium Association, Inc. filed by the Debtor, Sixty Sixty Condominium Association, Inc. (the "Debtor" or "Association") [ECF No. 246] And (II) Motion For Dismissal Of Debtor's Chapter 11 Case (the "Objection")[1] and in support thereof states, as follows:

## I.    INTRODUCTION.

By way of this Objection, the Schecher Group objects to approval of the Amended Disclosure Statement on the grounds that, among other things, the disclosure statement: (i) fails to contain and provide "Adequate Information" that enables creditors to make an informed decision and judgment about the Amended Plan; (ii) fails to describe significant aspects of the Amended Plan or its implementation; (iii) demonstrates that the Amended Plan is not confirmable; (iv) fails to explain whether the Debtor and its Board have proposed the Plan in good faith and in the best interests of all members and creditors of the Association; (v) provides for implementation of the Plan of Reorganization through means forbidden by law and the

---

[1] All capitalized terms as used herein shall have the same meaning as set forth in the Declaration, the Amended Disclosure Statement and Amended Plan, and the Objections referenced herein as previously filed by the Schecher Group.

Declaration; (vi) fails to provide any factual and legal basis, including a valuation for recoveries against the Litigation Targets (Exhibit "F"); and (vii) fails to provide the basis for the estimate of administrative expenses all administrative expenses, including professional fees (and just who will be paying these administrative expenses).

Further, the Amended Disclosure Statement fails to provide any financial information, data and other analysis necessary to support the "liquidation test" under a Chapter 7 liquidation and "feasibility analysis" under the Amended Plan, including the valuation of all estate property, pro-forma projections of collections and generation of revenues that would be relevant to creditors' determinations of whether to accept or reject the Amended Plan. Pragmatically, this Chapter 11 bankruptcy case continues to find little traction in the Amended Disclosure Statement in support of the Amended Plan. For brevity, however, the Schecher Group will attempt to limit the Objection to those matters which have not been previously briefed and argued before the Court, and to address new issues which have arisen under the Amended Disclosure Statement.

## II.    **PROCEDURAL BACKGROUND.**

1.    On December 5, 2016 (the "Petition Date"), the Sixty Sixty Condominium Association, Inc. (the "Debtor" or "Association") filed a voluntary petition for relief under Chapter 11 (the "Petition") of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Case") [ECF No. 1]. Since that time, the Debtor has operated as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    The real property that is the subject of the Bankruptcy Case is known as the Sixty Six Condominium located at 6060 Indian Creek Drive, Miami Beach, Florida (the "6060 Building"), which is a Hotel-Condominium containing eighty-seven (87) units consisting of (a) eighty-two (82) "Residential Units" or hotel rooms owned by the Residential Unit Owners (the "Residential Unit(s)" or RUO(s)"); (b) four (4) "Commercial Units" owned by the Association (the "CUO"); and (c) one non-residential unit designated as the "Hotel Unit" owned by the Schecher Group (the "HUO"), that encompasses the "Shared Components" of the 6060 Building.

3.    Generally, the Schecher Group possesses ownership of the structural components of the 6060 Building by virtue of the Shared Components, including other property rights, to maintain continuity of the Hotel Unit, and, in accordance with Article 16.7 and the provisions of

2

the Declaration, is authorized to establish regulations and procedures to allow "owners and hotel guests to be well integrated into a unified structure and operation."

4.      Since acquiring the Hotel Unit, the Schecher Group has operated the 6060 Building as a hotel, offering short term rentals and other common hotel amenities and services for the Residential Unit Owners participating in its rental program (the "HU Rental Program"). Like other rental programs, individual Units are placed into a rental pool whereby visitors and vacationers alike to the greater Miami area, arrange for lodging on a transient basis (typically less than 30 days) and pay a customary room charges, applicable state and municipal taxes, including a resort fee charged by the Hotel Unit for use of the Shared Components.

5.      While the Debtor argues that the Residential Owners are not required to participate in the HU Rental Program and free to rent (or lease) their own Units outside of the Rental Program, nonetheless, the Declaration expressly provides that the "hotel services" are exclusively within the province of the Hotel Unit, and by acceptance of a deed for a Unit, the RUOs have knowingly agreed to this form of ownership and management of the 6060 Building.

6.      In this regard, the Debtor is nothing more than a not-for-profit corporation formed only for the purpose of acting as the statutory condominium association for the 6060 Building, with limited powers over the operation, maintenance, repair, replacement or protection of "Association Property" and "Common Elements".

7.      From its inception, the Association did not own any of the Units, but sometime later in 2009, acquired the Commercial Units (CUO) and one (1) Residential Unit #505 ("RU #505") from the Developer. This decision was completely voluntary and has contributed to its own financial problems or "circular assessments" having nothing to do with the Schecher Group.

**A.      The Disclosure Statement and Plan**

8.      On March 17, 2017, the Debtor filed a Disclosure Statement in Support of Plan of Reorganization of Sixty Sixty Condominium Association, Inc. ("Disclosure Statement") [ECF No. 150], together with a Plan of Reorganization of Sixty Sixty Condominium Association, Inc. ("Plan") [ECF No. 149]. For purposes of this Objection, and to avoid duplication of arguments, references to specific areas of the initial Disclosure Statement and Plan shall also be discussed within this section to the extent applicable to the contents of the Amended Disclosure Statement and Amended Plan.

3

9.    In the initial Disclosure Statement and Plan, like the Amended Disclosure Statement, the Debtor asserts that in order to maximize the value of the Commercial Units and RU#505, the Association has been negotiating with potential purchasers and/or managers of its Units and other non-debtor Units, and to sell or rent same, as the means for effectuating the Plan.

10.    According to the Debtor (i) a market for the Debtor's Commercial and Residential Units exist only as part of a bulk sale requiring a minimum number of Residential Units to participate or "opt in" the sale of their units (the "Bulk Sale"); (ii) that buyers would not dedicate the resources necessary to perform adequate due diligence unless they obtained certain buyer protections (in the form of exclusive rights to make offers to RUO's to participate in the Bulk Sale with the Debtor's cooperation); and (iii) Debtor would greatly benefit by the support of a real estate professional to assist in and facilitate a process to achieve a "highest and best" offer.

11.    The Plan also contemplated one of two options for the sale and/or management of the Debtor's property and other non-debtor Units, as follows: (a) the Debtor along with a sufficient number of unit owners will participate in a bulk sale of their units to a bulk purchaser (the "Bulk Purchase"); or (b) the Debtor, along with other unit owners, will participate in a rental program ("Rental Program") managed by a Manager. These concepts continue infect the Amended Disclosure Statement and Amended Plan.

**B.    The Application to Employ Broker and Approve Bid Procedures.**

12.    On April 7, 2017, in connection with the Disclosure Statement and Plan, and in support of the proposed Bulk Sale, the Debtor filed its Expedited Motion for Entry of an Order: (I) Approving Jason Welt and Trustee Realty, Inc.'s as Debtor's Real Estate Professional; (II) Approving Proposed Bidding Procedures; (III) Approving Form and Notice Thereof; and (IV) Scheduling Hearing to Consider Approval of "Highest and Best" Bid [ECF No. 174] (the "Application to Employ Broker and Approve Bid Procedures" or "Application").

13.    Pursuant to the Application, the Debtor seeks the entry of an Order (i) approving the retention of Jason Welt and Trustee Realty, Inc. (together, "Broker") as Debtor's real estate broker to assist in and to facilitate a process to sell Debtor's real property and provide an option to RUO's within the Condominium to participate in a Bulk Sale, subject to the terms and conditions delineated herein (the "Process"); (ii) approving proposed Process; (iii) approving

4

form and notice of the Process; and (iv) scheduling a hearing to consider approval of "highest and best" offer and setting an objection deadline regarding same.

14.     As part of the Application to Employ Broker and Approve Bid Procedures, the Debtor attached as Exhibit "B", a Letter of Intent ("LOI") dated February 24, 2017, tendered by Kingfisher Island, Inc. ("KFI") offering to purchase all units (Commercial and Residential) for a total sum of $10,320,000, with a per Unit price of $120,000 each, provided that KFI is able to purchase 100% of all units. There is no price provided if KFI does not obtain 100%, rather KFI offers an unspecified "lower" price.  The LOI is subject to "higher and better" offers. The Debtor seeks authority to engage the Broker to carry out a process to obtain a "highest and best" offer.

15.     Pursuant to the terms of the Plan, the Purchaser shall have an exclusive 180 day period to solicit RUO's to participate in the Bulk Sale (the "Sale Offer Period") commencing on the date of the delivery of the Purchase and Sale Agreement. All RUOs are invited to opt-in to the LOI and attendant PSA and participate in the Bulk Sale. If a sufficient number of unit owners "opt-in" to satisfy the Minimum Unit Participation requirement, the Debtor shall advance towards closing of the PSA. *See, Disclosure Article II, section D (iv) pgs. 27-28.*

16.     On March 24, 2017, this Court entered its Order (I) Setting Hearing to Consider Approval of Disclosure Statement; (II) Setting Deadline for Filing Objections To Disclosure Statement; And (III) Directing Plan Proponent to Serve Notice (the "Disclosure Order"). Pursuant to the Disclosure Order, the Schecher Group, among other creditors, objected to the Disclosure Statement and Plan.

17.     On April 7, 2017, the Debtor also filed a Motion for Authority to Engage Property Manager and Approve Management Terms (the "Property Manager Motion") [ECF No. 175]. In response, on April 28, 2017, the Schecher Group filed its Response and Objection By Secured Creditor, Schecher Group, Inc. to Debtor's Motion For Authority to Engage Property Manager and Approve Management Terms (the "Property Manager Objection")[ECF No. 223], which is incorporated by reference herein and made a part of this Objection.

18.     On April 12, 2017, the Schecher Group filed its Response And Objection By Secured Creditor, Schecher Group, Inc. To Debtor's *Expedited* Motion For Entry Of An Order: (I) Approving Jason Welt And Trustee Realty, Inc. As Debtor's Real Estate Professional; (II) Approving Proposed Bidding Procedures; (III) Approving Form And Notice Thereof; And (IV)

Scheduling Hearing To Consider Approval Of "Highest And Best" Bid (the "Objection to Realtor and Bid Procedures Motion") [ECF No. 200].

19.    In the Objection to Realtor and Bid Procedures Motion, the Schecher Group objected to the relief requested by the Debtor on the grounds that (i) the employment of the Broker was premature; (ii) the Debtor has no legal right to propose a sale of non-debtor property; (iii) the proposed Bulk Sale is in violation of the Declaration, 11 U.S.C. §363 and other provisions of the Bankruptcy Code and Florida law; and (iv) improperly seeks to alter, amend and impair the voting rights of Schecher Group by amending the condominium Declaration and ousting it of control as the Hotel Unit Owner, which issue has been resolved by the Court.

20.    On April 12, 2017, Kingfisher Island, Inc. ("KFI") filed its Limited Objection to Debtor's Proposed Bid Procedures to the Motion filed by Kingfisher Island, Inc. [ECF No. 201], to the Realtor and Bid Procedures Motion.

21.    On April 21, 2017, the Court entered its Order Granting In-Part Debtor's Expedited Motion For Entry Of An Order: (I) Approving Jason Welt And Trustee Realty, Inc. As Debtor's Real Estate Professional; (II) Approving Proposed Bidding Procedures; (III) Approving Form And Notice Thereof; And (IV) Scheduling Hearing To Consider Approval Of "Highest And Best" Bid And Setting Further Hearing [ECF No. 212] (the "Order on Expedited Motion"). Among other things, the Order on Expedited Motion was very limited in scope providing for the retention of Mr. Welt "to explore Potential Purchasers for the opportunity to submit an LOI in a contemplated Bulk Sale of the Commercial Units and Residential Units."

22.    On April 25, 2017, the Schecher Group filed its Secured Creditor, Schecher Group, Inc.'s (I) Objection To Disclosure Statement In Support Of Plan Of Reorganization Of Sixty Sixty Condominium Association, Inc. filed by the Debtor, Sixty Sixty Condominium Association, Inc. [ECF No. 150] And (II) Request For Dismissal Of Debtor's Chapter 11 Case (the "Objection to Disclosure Statement") [ECF No. 218], which is incorporated by reference herein and made a part of this Objection.

23.    The hearing to consider approval of the Disclosure Statement and Objection to Disclosure Statement, along with other matters, was conducted by the Court on May 2, 2017 at 2:00 p.m. [ECF No. 159].

24.    Significantly, on May 3, 2017, the Court entered its Order (1) Setting Hearing and Deadlines on Amended Disclosure Statement (2) Setting Briefing Schedule on Right of First Refusal Issue (3) Sustaining In Part Objection to Disclosure Statement and (4) Continuing Hearings on Application to Employ Manager and Application to Employ Broker and Approve Bid Procedures (the "Order Setting Deadlines") [ECF No. 230] which provided, among other relief, in ¶1(b) that "[I]n the disclosure relating to the bulk sale alternative, the Debtor shall disclose the Right of First Refusal Issue and shall describe the two possible outcomes."

1.    More importantly, the Court made the following findings in the Order:

"The Court finds that the Debtor cannot rely on 11 U.S.C. §1123(a) (5) (I) to dilute the voting rights of the Schecher Group in a chapter 11 plan. The Schecher Group has vested property rights to the votes provided to it in the Declaration and the By-Laws, both of which are covenants that run with the land and that define the property rights between the Debtor, Unit Owners, and the Schecher Group. *Woodside Vill. Condo. Ass'n v. Jahren*, 806 So. 2d 452, 456 (Fla. 2002)("A declaration of a condominium is more th17an a mere contract spelling out mutual rights and obligations of the parties thereto-it assumes some of the attributes of a covenant running with the land, circumscribing the extent and limits of the enjoyment and use of real property."). Because the Debtor seeks to affect the property rights of third parties, it is an impermissible use of section 1123(a) (5). *In re Irving Tanning Co.*, 496 B.R. 644, 664 (1st Cir. BAP 2013)("[F]or both statutory and constitutional reasons, the preemptive effect of § 1123(a) cannot extend to laws defining and protecting the property rights of third parties.")."

## C.    The Amended Disclosure Statement and Amended Plan.

25.    Accordingly, on May 26, 2017, the Debtor filed its First Amended Disclosure Statement in Support of First Amended Plan of Reorganization of Sixty Sixty Condominium Association, Inc. (the "Amended Disclosure Statement")[ECF No. 246] and First Amended Plan of Reorganization of Sixty Sixty Condominium Association, Inc. (the "Amended Plan") (collectively, the "First Amended Plan") [ECF No. 245].  In the First Amended Plan, the Debtor adopts substantially the same terms and conditions of the Proposed Sale (Bulk Sale Alternative) and Rental Program as described above in the Plan.[2]

---

[2]  The HUO *Deal* Video is no longer on YouTube and does not reflect the position of the Schecher Group with respect to the Hotel Unit which is not for sale nor should be considered as part of any LOI submitted by any prospective purchaser in the Bankruptcy Case.

26.     In Article XVIII of the Amended Disclosure Statement and Article 6 of the Amended Plan, the Debtor addressed the issue of the Right of First Refusal Issue (the "ROFR"), but failed provide adequate disclosures to support the framework and implementation for the Proposed Sale due to its inherent conflict with Section 17 of the Declaration.

27.     The Debtor has attached as Exhibit "B" to the Amended Disclosure Statement, the LOI previously submitted by KFI. However, the LOI appears to moot, since KFI has submitted an entirely new LOI dated June 6, 2017 (the "Amended LOI"). A true and correct copy of the Amended LOI is attached hereto as **Exhibit "A"**.

28.     According to the Amended LOI, the terms of "consideration" by KFI to acquire the 6060 Building, have materially changed and includes the potential purchase by the "Purchaser" (a soon-to-be-formed entity), for the purchase of interests "in all Residential Units, Commercial Units and Hotel Units". Although the "Purchase Price" increased to $15,474,000, this amount includes, among other terms, an allocation of (i) $6,000,000 for the Hotel Unit (which includes loans made to the Schecher Group of approximately $1,850,000); (ii) $107,000 for the Residential Units conditioned on a minimum of 60 Residential Units; and (iii) $175,000 for a total of for the Commercial Units.

29.     On May 31, 2017, pursuant to the Order Setting Deadlines [ECF No. 230], the Schecher Group filed Secured Creditor, Schecher Group, Inc.'s, Objection to Application to Employ Broker and Approve Bid Procedures And For Enforcement of Hotel Unit Owner's Right of First Refusal Under Declaration (the "ROFR Objection")[ECF No. 251], which is incorporated by reference herein and made a part of this Objection.

30.     Further, on May 31, 2017, the Schecher Group also filed its Motion And Application By Schecher Group, Inc. For (I) Allowance And Compelling Payment Of Administrative Expense Claim Pursuant To 11 U.S.C. §§ 503(a) & (b)(1)(A) And/Or, Alternatively (II) Relief From The Automatic Stay Pursuant To 11 U.S.C. §362(d) (the "Administrative Expense Claim Motion")[ECF No. 252], which is also incorporated by reference herein and made a part of this Objection.

31.     Pursuant to the Order Setting Deadlines, the Court will hold a hearing to consider approval of the Amended Disclosure Statement, on June 21, 2017 at 2:00 p.m., at which time the Court shall also consider the ROFR and other related matters.

### III.    OBJECTIONS TO DISCLOSURE STATEMENT.

#### i.    Standard for Approving Disclosure Statement.

The standard for approving the Disclosure Statement is governed under Section 1125(b) of the Bankruptcy Code, which requires that a disclosure statement in connection with the solicitation of votes accepting or rejecting a plan of reorganization contain "adequate information." 11 U.S.C.§1125(b). Pursuant to Section 1125(a)(1), a disclosure statement contains adequate information if it includes "information of a kind, and in sufficient detail,. . . that would enable . . .a hypothetical investor of the relevant class to make an informed judgment about the plan . . ." 11 U.S.C. § 1125(a)(1).  "The Bankruptcy Code requires that every holder of a claim or interest receive a court-approved written disclosure statement containing 'adequate information' about a proposed plan before its vote on that plan may be solicited."  *Enron Corp. v. The New Power Co. (In re New Power Co.),* 438 F.3d 1113, 1117 (11th Cir. 2006).

The sufficiency of a disclosure statement and what constitutes adequate protection is to be considered on a case by case basis.  *Texas Extrusion Corp v. Lockheed Corp., (In re Texas Extrusion Corp.),* 844 F.2d 1142, 1157 (5th Cir. 1988); *In re Diversified Investors Fund XVII,* 91 B.R. 559, 560 (Bankr. C.D. Cal. 1988); *In re Reilly,* 71 B.R. 132, 134-35 (Bankr. D. Mont. 1987); *Eubanks v. Federal Deposit Ins. Corp*., 977 F.2d 166 (5th Cir. 1992)(Adequacy of the content of a disclosure statement depends upon the facts and circumstances of each case). However, many courts have adopted an extensive list of the type of information often needed to be included in a disclosure statement. *See In re Ferretti*, 128 B.R. 16 (Bankr. D.N.H. 1991); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168 (Bankr. S.D. Ohio 1988); *In re Metrocraft Pub. Services, Inc*., 39 B.R. 567 (Bankr. N.D.Ga. 1984).

In addition, a court may refuse to approve a disclosure statement "when it is apparent that the plan which accompanies the disclosure statement is not confirmable." *In re Atlanta West VI,* 91 B.R. 620 (Bankr. N.D. Ga. 1988); *see also In re Valrico Square Ltd. P'ship,* 113 B.R. 794 (Bankr. S.D. Fla. 1990) ("Soliciting votes and seeking approval on a clearly fruitless venture is a waste of the time of the Court and the parties."); *In re Mahoney Hawkes, LLP,* 289 B.R. 285 (Bankr. D. Mass. 2002) (plan which failed to provide sufficient justification for non-debtor injunction and releases was unconfirmable as a matter of law).  Such a refusal is appropriate to avoid the time consuming and expensive solicitation and confirmation process for a plan that is

9

unconfirmable as a matter of law.  As set forth below, the Debtor's Plan is unconformable. The only possible result of the Plan is further delay and expense of the Bankruptcy Case. For this reason, the Disclosure Statement should not be approved, and this Bankruptcy Case dismissed.

ii.      **The Amended Disclosure Statement Fails Adequately Address the Problems with the Bulk Sale And Impact of the ROFR by the Schecher Group.**

The Amended Disclosure Statement outlines the mechanics of the Bulk Sale no differently than the process proposed in the Disclosure Statement. However, as argued in the ROFR Objection [ECF No. 251], the Declaration and controlling Florida law prohibits to the sale of the Residential Units without affording the Schecher Group the opportunity to purchase Units from participating RUOs upon such terms of an "Outside Offer".  Currently, the only possibility for the Bulk Sale or Proposed Sale, appears to be the Amended LOI recently submitted by KFI See, Exhibit "A", except the Amended Disclosure Statement does not address the terms of the Amended LOI, which is necessary to considering the viability of the treatment of allowed claims and interests under Article 4, 4.1 *The Bulk Sale – Alternative "A"*.

Importantly, the Schecher Group has rejected the Amended LOI and has made clear to KFI and, if necessary, will advise any other prospective purchaser that may be interested in acquiring the 6060 Building in a bulk sale, the Hotel Unit is <u>not</u> for sale, especially under the procedures contemplated by the Application to Employ Broker and Approve Bid Procedures. Despite the ill-fated attempt to disparage and undermine the Schecher Group's right to freely market and solicit offers for the purchase of, or to obtain a joint venture partner for, the Hotel Unit such activities are wholly independent of the Bankruptcy Case. Should the Schecher Group decide tomorrow to move forward with a sale of the Hotel Unit nothing would prevent it from doing so and any suggestion by the Debtor to the contrary is unfounded.

And, while the Debtor desperately tries to find solace in the HUO *Deal* Video as set forth in Exhibit "C" of the Amended Disclosure Statement, which has since been taken down from YouTube, this posting is immaterial to the reorganization of the Debtor. First, the so-called "HUO *Deal* Video" does not mention the Amended Disclosure Statement and Amended Plan. Second, the Debtor has no right to dictate how, when and under what circumstances the Schecher Group can offer its interest in the Hotel Unit, which it owns, to any third party willing to negotiation with the Schecher Group. Third, there is no basis to assert that the video in anyway

10

interferes with the Exclusivity Period, Exclusivity Violation Order and the Automatic Stay. Because the Hotel Unit exists separately and independently of the Association, it's illogical to argue that the Schecher Group must stand idly as the Bankruptcy Case continues to spiral downward while the RUOs continue to drive down the value of the Units by starving the Hotel Unit and Debtor of even undisputed Shared Costs and Association assessments.

As previously noted in the Objection to Disclosure Statement, throughout the Bankruptcy Case, the Debtor has complained about the so-called "circular assessments" as it relates to the Schecher Group, created when the Association obtained title to the Commercial Units and RU #505. Among other things, the Debtor is seeking to use this Court as a means of extricating itself from the assessments in violation of the Declaration (as defined below) and Florida state law. Yet, the Debtor has now been in bankruptcy over four (6) months and has taken no action to collect delinquent assessments due to the Association from the RUO's, but rather, is seeking to undermine and improperly subjugate and dilute the property rights of the Schecher Group under the Amended Plan in clear violation of the Bankruptcy Code and Florida law.

Even with the latest advent of the Reorganization Special Assessment in the Amended Disclosure Statement, which is really a disguised administrative expense claim assessment being heaped on the RUOs, there is no financial projections that demonstrates the successful exit by the Debtor from bankruptcy and feasibility of the Amended Plan. In the event that the Amended Plan is confirmed, it remains unclear if the Debtor will resolve the circular assessment problem with the Schecher Group, unless the Commercial Units and RU#505 are sold in a bulk sale.

### iii.    The Administrative Expenses Are Excessive and Unwarranted

The Debtor is a not-for-profit corporation formed in April, 2006, to act as the condominium association for the 6060 Building. Apart from the Commercial Units and RU#505, the Debtor has very limited cash in its DIP account, virtually no employees, corporate offices, day to day operations and activities to speak of, and exhibits no other traditional attributes of a business entitled to reorganization.  Moreover, the Debtor has limited powers and is restricted by its own governing documents, namely, the Articles of Incorporation, By-Laws and Declaration, and applicable state statutes (Chapters 617 and 718, *Fla. Stats*.), from taking certain actions adverse to the property rights and interests of Association members, which includes the Schecher

Group. For years, the Debtor has neglected its primary duties and responsibilities to the Association by failing to collect assessments and enforce its lien rights under the Declaration, while refusing to pay its own assessment obligations due to the Schecher Group and other debts owed to its creditors.

In fact, the Debtor has not undertaken any meaningful efforts to collect delinquent assessments from the RUOs and HUO to resolve its financial difficulties, thus sinking deeper into financial distress. Furthermore, notwithstanding the filing of the Administrative Expense Claim Motion and pending Adversary Proceeding[3] to determine the amount of Shared Costs owed by the Debtor to the Hotel Unit, the proportional amounts due by the Debtor for usage of Utilities is an administrative expense claim against this Chapter 11 estate, however, the Debtor has not paid for such administrative expenses since the Petition Date nor going forward in the Bankruptcy Case.

During the administration of the Bankruptcy Case, the Debtor has filed the Debtor's Standard Monthly Operation Reports (the "DIP Monthly Reports"). As of May, 2017, the Debtor has collected approximately $54,779.89, in assessments from the RUOs.  Meanwhile, the administrative fees, particularly, the professionals retained by the Debtor continue to mount without any real prospects of proposing a viable plan of reorganization. For example, the Debtor's general bankruptcy counsel, Messana, has estimated professional fees in the amount of $200,000, while special condominium counsel, Eisinger Law, has estimated fees of $42,000. Moreover, as set forth in the Disclosure Statement, "the Debtor also anticipates hiring a real estate appraiser, forensic accountant and other professionals to be approved by the Bankruptcy Court….to help facilitate the Debtor's First Amended Plan." [ECF No. 246, pg. 24]. The need for so many bankruptcy professionals for this not-for-profit Association is not apparent. Indeed, this Debtor needs such professionals "about as much as a fish needs a bicycle." *In re The Marion and Alfred Charles Foundation, Inc.*, 538 B.R. 611 (S.D. Fla. 2015). With nearly a quarter million dollars in administrative expenses before a single dollar would go to pay unsecured creditors, there is a real possibility that the Amended Plan is far from confirmable. While the Debtor has introduced seemingly new concepts such as a "Rental Program

---

[3] Adv. Case No. 17-01171-RAM-BKC.

Deficiency" and "Reorganization Special Assessment", the Amended Disclosure Statement does not advance the objects of the Debtor with respect to actual assets over which it has control.

     **iv.**     **The "Rental Program" Is Prohibited Under the Declaration**

In the Amended Disclosure Statement, the Debtor proposes the establishment of a rental program in direct competition of the Hotel Unit. The Schecher Group continues to oppose *The Rental Program – Alternative "B"* as being expressly prohibited under the Declaration. Alternatively, in the First Amended Plan, the Debtor is attempting to establish and facilitate the on-going operation of a rental program that would be made available for all Unit owners, including the Debtor (the "Rental Program"), in violation of the Declaration, in competition with the HUO, and purportedly occupying space on the same floor as the Hotel Unit's (HUO) office. Not only is the Rental Program operationally and financially absurd, it violates the Declaration of the Condominium. The Rental Program is yet another unworkable scheme to harm or destroy the HUO's business and vested property rights, provides no benefit to the Debtor, and in fact, will lead to the further financial demise of the 6060 Building.

From an operational standpoint, a typical guest would walk in from the street or parking area and be directed to the HUO front desk on the ground floor lobby, only to be told that they are not registered, are at the wrong front desk, and/or need to go up the elevator (3rd floor) to a different front desk. From a security perspective, and notwithstanding that such a process would violate the Declaration, such procedures would be an added burden on HUO personnel, the cost of which would be borne by the Rental Program. From a "guest experience" standpoint, such a process would detract from the overall hotel guest experience. Numerous other operational challenges, such as addressing guest inquiries, servicing rooms, and supplying room amenities, would render a second competing front desk a detriment to the uniformity of the hotel.

Additionally, putting the front desk in CU-1, where the restaurant is supposed to operate, would eliminate the possibility of having a restaurant amenity for years. And, if the HUO provided for a fee and check-in services to the competing Rental Program, the financials of such Rental Program would make even less sense. The Amended Disclosure Statement does not disclose how the proposed Rental Program benefits the Debtor and would operationally generate sufficient revenues when the proposed Manager is already taking fifty (50%) percent of the

rental fees before the Amended Plan is funded. What it does disclose, though, is incongruent and inconsistent hotel services, displacement of duties of the Hotel Unit, and an invitation of further litigation extending far beyond the Bankruptcy Case.

Financially, the Amended Disclosure Statement provides no details with regard to the Rental Program. The Association owns one Residential Unit and four Commercial Units, which ultimately it wants to unload to a third party. The Commercial Units are comprised of three terraces of dubious rental value, and in the new age of the 6060 Building, the restaurant/proposed front desk space for an unproven manager. Significantly, all of these Units have remained vacant and unrented, providing no income to the Debtor.[4] The Rental Program cannot succeed financially with only one Unit to rent. The Rental Program could not possibly operate its own front desk 24 hours a day with income coming in from only one Unit. Significantly, only half of the income would go towards the Rental Program, while the other half would purportedly go to the Debtor and any RUO who are part of the Rental Program.

The Debtor asserts that it has received several offers to manage the Association's property and any Unit Owner who wants to participate in the Rental Program referenced in the Plan (the "Management Offers"). To date, the most competitive Management Offer has been submitted by, Florida Luxury Rentals ("FLR"), presently the Proposed Manager (the "Management Proposal").[5] Furthermore, the Debtor provides no financial information with respect to the proposed rental rates offered to participants in the Rental Program, anticipated future operations of the Rental Program, and any accompanying financial projections. Conceivable, if the new Rental Program alternative front desk pays $500 per month for the Debtor owned commercial space, and the management company is going to convert and occupy CU-1, the Rental Program would operate at a loss for the Debtor as the $500/month is less than half of the monthly maintenance on CU-1 and represents a huge ongoing loss to

---

[4] The Debtor removed RU #505 from the HU Rental Program several months ago. Had it remained in the program, it would have been generating revenue, which would go towards paying administrative expenses, operational expenses of the 6060 Building, and the overall health of the building. The Debtor's spite and desire to hurt the HUO's business has long overtaken its goal of reorganization, to the extent it ever had that goal.

[5] Separately, the Debtor filed the *Property Manager Motion* to manage and rent the Debtor's Units and offer RUO's the option of engaging the property manager for the rental of their Units.  In essence, the Debtor is seeking to displace the Schecher Group from its management role in contravention of the Declaration and tortiously interfere with the rental contracts held by Casablanca Rental Services.

the Debtor from day one of its administration. Clearly, the Rental Program does nothing to improve the Debtor's financial viability.

Moreover, the Amended Disclosure Statement provides no details as to whether and how the proposed Manager will have access to the Condominium in accordance with the Declaration. There are no accounting and valuation methods used to produce the financial information in the Disclosure Statement within which to evaluate when and how the Debtor would be able to confirm a feasible Plan. Certainly, with millions of dollars in scheduled claims and without understanding the future management of the Debtor, including the amount of compensation to be paid to any insiders, Board members, and/or officers of the Debtor, the risks being taken by the creditors and interest parties with the Rental Program remains a mystery. The proposed First Amended Plan fails to disclose any details as to how it could become financially viable, how it could successfully and legally compete with the existing HU Rental Program, how it could possibly provide any additional benefit to the Debtor and the other individual Residential Unit Owners and, more importantly, how it can pass the smell test as anything another than overt effort to harm the Hotel Unit.

The Amended Disclosure Statement does not contain sufficient information concerning the appropriate corporate entity under which FLR is operating, its licensing under the Florida Department of Professional Regulation, applicable insurances and licenses and other financial information necessary for creditors to consider FLR for the job. The Schecher Group opposes any attempt by the Debtor to retain and permit a separate, independent management company, particularly, FLR with no known track record, to enter upon the 6060 Building to perform hotel rental and/or related services, which rights, powers and duties have clearly been delegated as the bargained for property rights running with the land to the HUO under the Declaration.

The prohibition against the Management Proposal is set forth in Sections 3 and 16 of the Declaration governing "Easements" and "Occupancy and Use Restrictions" at the 6060 Building, which contain the following language:

> 3.4(e)  <u>Ingress and Egress</u>. A non-exclusive easement in favor of each Unit Owner and resident, their guests and invitees, for each member of the Association…shall exist….subject to regulation as may be established from time to time by the Hotel Unit Owner and

subject to other provisions of this Declaration, specifically Section 3.3 above [governing Parking].

*** 

Notwithstanding the foregoing, the aforesaid easement over the Hotel Unit is limited and solely for use of the named beneficiaries' obtaining access to and from their Unit and shall not be used for the provision of any services, including, without limitation, any hotel related services including, but not limited to, solicitation and/or provision of housekeeping, personal services (i.e., massage, personal training, dry cleaning, etc.) and/or food and beverage service, it being understood and agreed by all Unit Owners that any such services may only be provided by the Owner(s) of the Hotel Unit. The provisions of this section 3.4(e) may not be amended without an affirmative vote of not less than 4/5ths of all voting interests of all Unit Owners.

*** 

16.3    Third Party Service Providers. **The Hotel Unit Owner shall have the right, in its sole and absolute discretion, to establish reasonable regulations from time to time with respect to the provision of hotel and/or transient rental services by third party providers, Including, but not limited to, solicitation and/or provision of housekeeping, personal services (i.e., massage, personal training, dry cleaning, etc.) and/or food and beverage service, to the Condominium, the Unit Owners and their guests, tenants and invitees.** No amendment to this Declaration or rule of the Association shall be adopted to impair or abridge the rights herein granted without an affirmative vote of not less than 80% of the voting interests of the Unit Owners. (emphasis added).

Based upon the foregoing, the Rental Program cannot operate without violating the Declaration. The easement that the Unit Owners have over the Hotel Unit is limited and solely for their use in obtaining access to and from their Units and cannot not be used for the provision of any services, including hotel related services such as housekeeping as such services may only be provided by the HUO. Thus, the Rental Program operator has no easement to provide hotel services, including reaching their proposed office to operate a competing rental program, Moreover, the HUO has the right to regulate, in its discretion, hotel and/or transient rental services by third party providers. By way of example, but not limitation, the Hotel Unit is

16

responsible for the Life Safety systems at the 6060 Building, and would have no way of ensuring that the Manager would not conduct its operations in violation of municipal laws. Also, because of sanitary concerns, having a competing rental program invites problems with pests and concerns over other mismanagement of hotel services.

The competing rental program simply cannot operate within the restrictions set forth in the Declaration. Additionally, Article 16.7 obliges every occupant to comply with HUO rules and regulations including mandatory check-in at the HUO front desk. This is addressed in the Declaration:

> 16.7    Leases. It is intended that the Residential Units may be used for transient and/or hotel rentals. As such, leasing of Units or portions thereof shall not be subject to the approval of the Association and/or any other limitations, other than as expressly provided herein.
>
> ***
>
> Every lease of a Unit shall specifically provide (or, if it does not, shall be automatically deemed   to provide) that a material condition of the lease shall be the tenant's full compliance with the covenants,   terms, conditions and restrictions of this Declaration  (and all Exhibits hereto) and with any and all rules and regulations adopted by the Hotel Unit Owner and/or Association from time to time, including, without limitation, any and all regulations and/or procedures adopted by the Hotel Unit Owner  regarding mandatory check-in for  Owners  and residents, coordination of charging privileges and other matters reasonably necessary to allow Owners and hotel  guests to be well integrated into a unified  structure and operation. (emphasis added).

As illustrated above, a second front-desk is not needed, not appropriate, and does nothing to further the interests of the Debtor's reorganization. In evaluating the contents of the Amended Disclosure Statement and Amended Plan, the Court can look to the Declaration and words of common usage contained therein construed in their plain and ordinary sense. *Schmidt v. Sherrill,* 442 So.2d 963, 965 (Fla. 4th DCA 1983). This Court recognized in *In re Bayshore Yacht & Tennis Club Condo. Ass'n., Inc.*, 336 B.R. 866 (S.D. Fla. 2006) that under Florida condominium law, members of the Association are obligated to follow the Declaration. There is no material difference between the Management Proposal and the Easements and Occupancy and Use Restrictions which the Unit owners agreed to abide by when purchasing their Units. The most

17

significant section above is the clearly worded objective of the Declaration: "to allow Owners and hotel guests to be well integrated into a unified structure and operation". Such an objective simply cannot be met with two competing rental programs in the same building.

     **v.**     **The Litigation Targets**

To the extent the Debtor has sufficient information to suggest that it may have a possible cause of action against the Litigation Targets or others, those "known" causes of action must be disclosed. *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.,* 337 F.3d 314, 322-23 (3d Cir. 2003), cert denied, 124 S. Ct. 2172 (2004). Indeed, "the disclosure statement must give those creditors holding allowed claims who are entitled to participate in the confirmation process adequate notice of information regarding the claims that the debtor as reorganized will be bringing against them under then plan." *Mickey's Enters., Inc. v. Saturday Sales, Inc. (In re Mickey's Enters., Inc.),* 165 B.R. 188 (Bankr. W.D. Tex. 1994). Furthermore, the Amended Disclosure Statement should explain how the Debtor proposes to ensure payment of administrative expenses which may be significant and the manner in which these claims are to be paid by assessments of the Association and Hotel Unit.

The history of the Association is one that is plagued with litigation and take-over attempts by groups of owners who are now finding themselves being foreclosed upon for their failure to pay what the Declaration mandates them to pay. The history of the Debtor is further illustrated by the now millions of dollars spent on litigation with the current HUO and its predecessor, trying to run rough-shod over the Condominium Documents by judicial fiat and forcing the Association into bankruptcy apparently without attempting to meet with or negotiate beforehand with the Association's creditors. While certain owners including, President Velez, and the Board try to fight the HUO in a sustained effort to strip the HUO of its vested ownership rights through the First Amended Plan, other owners see the value of the Hotel Unit as the only way to guarantee a future for the Association with cooperation between the HUO and Association where these entities work together, in accordance with the Declaration, for a unified 6060 Building focused on preserving property values and increase rental revenues for all owners at the Association.

Not only does the proposed Amended Disclosure Statement fail to disclose how it could

18

operate without violating the governing documents, it fails to disclose how it could comply with local law. It is well known that the City of Miami Beach is one of the strictest jurisdictions in the country when it comes to transient occupancy. The Amended Disclosure Statement fails to disclose how the Rental Program could meet the terms of the Declaration to provide a unified hotel, while operating within the confines of local ordinances already in effect within the City of Miami Beach (emphasis added):

> Sec. 102-386. - Property owner's responsibilities regarding legally permissible transient rental and occupancy (short-term) of residential property.
>
> Prior to receiving a business tax receipt, resort tax registration certificate or advertising the property, a property owner must comply with the following provisions:
>
> (a)    An owner of a residential property is prohibited from advertising the residential property, or any portion thereof, for its transient rental or occupancy, unless:
>
>> (1)    The property owner submits an affidavit to the city, under penalty of perjury, for each residential property or unit (or any portion thereof), which states that the property owner:
>>
>>> a.    Has confirmed that the city's land development regulations, which are applicable to the residential property, authorize the property owner to engage in the transient rental or occupancy of the residential property or unit; and
>>>
>>> b.    Has obtained a business tax receipt that has been issued to the property owner for the purpose of engaging in the transient rental or occupancy of the residential property or unit, as authorized by the city's land development regulations; and
>>>
>>> c.    Has registered the residential property with the city finance director, and obtained the appropriate resort tax registration certificate pursuant to chapter 102, article IV, division 4 of this Code;
>>>
>>> d.    Has complied with those applicable requirements of the American Disabilities Act Regulations and design standards, as may be required for the residential property or unit, in conjunction with attaining compliance with the Florida Fire Prevention Code and the Florida Building Code;

      e.      Has obtained written authorization from the condominium association that expressly authorizes the property owner to engage in the transient rental or occupancy of the residential property or unit. The written authorization must be attached to, and incorporated within, the affidavit submitted to the City of Miami Beach;

      f.      Has disclosed the business tax receipt number for each residential property or unit in the advertisement, and that the property owner has fully complied with those provisions set forth within section 102-386.

(b)     Notwithstanding the requirements of subsection (a), a property owner of a residential unit(s), which is located within an apartment-hotel or a condominium-hotel, must disclose within the affidavit that **each prospective guest receives written notification that the unit(s) is/are not affiliated with the primary hotel operator at the property, and whether or not the prospective guest is entitled to those benefits and amenities that are offered by the primary hotel operator. The advertisement of the residential unit(s) by the property owner must include a disclaimer that the unit(s) is/are not affiliated with the primary hotel operation at the property and whether or not there is entitlement to those benefits and amenities that may be offered by the primary hotel operator. A property owner of a residential unit(s), as set forth herein must provide the contact information (name, telephone number and email address) to the guest at the time of the reservation of the non-affiliated unit(s) at the property.**

Today, the only problem is getting the delinquent owners to pay what they owe or realize the longer they delay paying, the more costs and delinquent fees they are incurring, making their balances almost impossible to pay as the market value of their Units decrease while their balances increase, and the Association falls further into financial ruin.

     **vi.**    **Dismissal of the Bankruptcy Case.**

Lastly, the Schecher Group moves to dismiss this Bankruptcy Case for cause under 11 U.S.C. §1112(b)(1) and pursuant to the Disclosure Order. The Amended Disclosure Statement and Amended Plan (i) fail to meet the fair and equitable standards required by the Bankruptcy Code to overcome a contested confirmation process, and (ii) suffer from a myriad of other deficiencies, including a lack of feasibility. Regarding the financial condition and performance of the Debtor during the Bankruptcy Case, the Disclosure Statement lack of financial transparency, coupled with the DIP Monthly Reports, supports a finding that the Debtor has not put forth any

efforts to diligently pursue collection of assessments from the Unit owners and has no other sources of revenues to fund a Plan during and after emerging from bankruptcy. In particular, the Debtor admits that the Commercial Units have no real financial value to the estate other than in the Bulk Sale, which is almost illusory.

The instant Petition, proposed First Amended Plan have been filed in bad faith. The Debtor's attempt to create the Rental Program is just one indicia of bad faith. See, for example, *In re O'Quinn*, 98 B.R. 86 (Bkrcy.M.D.Fla.1989). Two factors which are quite apparent in the instant case are that (a) the Debtor's financial problems are essentially a dispute between the debtor and its secured creditors, which can be resolved in state court, and (b) he Debtor is seeking to use the bankruptcy provisions to create and organize a new business, not to reorganize or rehabilitate an existing enterprise. *Id.* Here, the Debtor's financial morass is due to the Debtor's continued attempts at litigation and its inability or unwillingness to foreclose on delinquent Unit owners.

The Eleventh Circuit advises that there is no particular test for determining whether a debtor has filed a petition in bad faith. Instead, the courts are advised to consider any factors which evidence "an intent to abuse the judicial process and the purposes of the reorganization provisions" or, in particular, factors which evidence that the petition was filed "to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *In re Natural Land Corp.,* 825 F.2d 296, 298 (11th Cir.1987); *See also, In re Brandywine Associates, Ltd.,* 85 B.R. 626 (Bkrtcy.M.D.Fla.1988). The litany of factors which case law suggests is evidence of bad faith are:

(i) The debtor has one asset, such as a tract of undeveloped or developed real property;

(ii) The debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors;

(iii) The debtor's financial problems involve essentially a dispute between the debtor and the secured creditors which can be resolved in the pending state court action;

(iv) The property is the subject of a foreclosure action as a result of arrearage on the debt;

(v) The timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

(vi) There is a lack of a realistic possibility of an effective reorganization;

(vii) The debtor has few employees;

(viii) The debtor is seeking to use the bankruptcy provisions to create and organize a new business, not to reorganize or rehabilitate an existing enterprise or to preserve going concern value of a viable or existing business; and

(ix) The debtor appears to be merely a shell corporation.

*See, In re Little Creek Development Corp., supra; In re Albany Partners, Ltd.,* 749 F.2d 670 (11th Cir.1984); *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393 (11th Cir.1988); *In re RAD Properties, Inc.,* 84 B.R. 827 (Bkrtcy.M.D.Fla.1988); *In re Brandywine Associates, Ltd.,* 85 B.R. 626 (Bkrtcy.M.D.Fla.1988); *In re Bell Partners, Ltd.,* 82 B.R. 593 (Bkrtcy.M.D.Fla.1988); *In re Sar–Manco, Inc.,* 70 B.R. 132, 141 (Bkrtcy.M.D.Fla.1986).

As an initial matter, a bankruptcy plan must be proposed in "good faith" and "not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "[C]ourts have interpreted 'good faith' as requiring that there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Code." *In re McCormick*, 49 F.3d 1524, 1526 (11th Cir. 1995); *In re Buttonwood Partners, Ltd.,* 111 B.R. 57, 59 (Bankr. S.D.N.Y. 1990) ("it must be construed that the term 'means forbidden by law' subsumes some conduct in connection with obtaining confirmation of such proposal"); 7 *Collier on Bankruptcy,* ¶ 1129.02[3][b], 1129–28 (16th ed. 2013) ("the statute requires denial of confirmation if the plan is 'proposed' by 'forbidden' means"). Because the Amended Disclosure Statement seeks to propose a plan by forbidden means, the Amended Plan itself has not been proposed in good faith.

The Amended Disclosure Statement does not contain adequate information regarding the estimated return to creditors under a Chapter 7 liquidation or feasibility of the Amended Plan. Rather than set forth a liquidation analysis, the Amended Disclosure Statement reflects the Debtor's unsupported statement that moving forward with the Plan is superior to conversion of the case to Chapter 7. Without a detailed liquidation or feasibility analysis creditors will be unable to determine whether the Plan is in their best interests. Additionally, the Amended Disclosure Statement does not provide adequate information about the existence, likelihood and possible success of post-confirmation avoidance actions and/or non-bankruptcy litigation.

Meanwhile, the administrative expenses for the Shared Costs due by the Debtor continues to accrue and remains unpaid.

Although truly operating businesses use the bankruptcy process to reorganize, the Association is not such a debtor, instead opting to propose an unorthodox Amended Plan, which is not confirmable. Significantly, the Debtor is seeking to conduct an unauthorized bulk sale masquerading as a Section 363 sale of substantially all estate property, which consists largely of non-estate property, to artificially inflate the dubious value of its assets. Alternatively, the Debtor wants to install a "property manager" to effectively run an impermissible "Rental Program" expressly forbidden under the Declaration. However, the Disclosure Statement reveals the true intentions of the Debtor in attempting to wrestle control of the Sixty Sixty Condominium away from the Schecher Group through means of stripping vested voting and property rights granted to the Secured Creditor, which are firmly rooted within the condominium documents, rather than proposing a "fair and equitable" Plan to pay creditors.

Accordingly, dismissal of the Bankruptcy Case under §1112 for cause is warranted because there is no reasonable likelihood that the First Amended Plan can be confirmed and there is continuing loss to the estate in the absence of a reasonable likelihood of rehabilitation. Section 1112(b)(4) contains a list of factors that may constitute "cause." *In re Vallambrosa Holdings, LLC*, 419 B.R. 81 (S.D. Ga. 2009)("[T]he court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate if the movant establishes cause ..." 11 U.S.C. § 1112(b)(1). "[T]he burden is on the movant to establish by a preponderance of the evidence that cause justifying either conversion or dismissal of the case exists." *In re Pensignorkay, Inc.,* 204 B.R. 676, 680 (Bankr.E.D.Pa.1997); *see also In re Bal Harbour Club, Inc.,* 316 F.3d 1192, 1195 (11th Cir.2003). The Debtor has shown an inability to manage the affairs of the Condominium both prior to the Petition Date and during the Bankruptcy Case. Apart from its continuing disputes with the Schecher Group, the First Amended Plan does nothing to resolve and harmonize the various factions of the Association members. Regretfully, the First Amended Plan continues to exacerbate the tensions that already existed between the Board, the Schecher Group and Residential Unit owners without regard to creditors of the Estate.

**<u>Reservation of Rights</u>**

The Schecher Group reserves its rights to amend, modify or supplement this Objection in response to, or as a result of, the filing of any supplement to the Amended Disclosure Statement or the Amended Plan, any discovery being conducted in connection with confirmation of the Plan, and/or any submission in connection with the First Amended Plan in this Bankruptcy Case filed by the Debtor, any creditor or party-in-interest. The Schecher Group further reserves its rights to raise any objections to the First Amended Plan with regard to confirmation, including at any hearing in connection thereof.

**IV.    <u>CONCLUSION</u>.**

The Objections detailed above indicate that the Amended Disclosure Statement fails to meet the most basic requirements under the Bankruptcy Code. Accordingly, the Schecher Group urges the Court to deny approval of the Amended Disclosure Statement. Further, because the Amended Plan is not confirmable, the Bankruptcy Case should be dismissed.

**WHEREFORE**, the Schecher Group, Inc., respectfully requests that this Court enter an Order: (i) sustaining this Objection; (ii) denying approval of the Amended Disclosure Statement; (iii) dismissing the Bankruptcy Case; and (iv) granting such other and further relief as the Court deems just and proper.

**Respectfully submitted this   14th  day of June, 2017.**

**WE HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).**

**GENOVESE, JOBLOVE & BATTISTA, P.A.**
*Co-Counsel for Schecher Group, Inc.*
100 S.E. 2nd Street, Suite 4400
Miami, FL 33131
Tel: (305) 349-2300
Fax: (305) 349-2310

By:   /s/ Barry P. Gruher
       Barry P. Gruher, Esq.
       Fla. Bar No. 960993
       Email: bgruher@gjb-law.com

**BECKER & POLIAKOFF, P.A.**
*Attorneys for Schecher Group, Inc. and Casablanca Rental Services, Inc.*
121 Alhambra Plaza, 10th Floor
Coral Gables, FL  33134
(305) 262-4433 Telephone
E-mail: Sdavis@bplegal.com

By: _____
Steven M. Davis
Florida Bar # 894249

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished to all parties via CM/ECF notification on this  14th day of June, 2017.

By:   /s/ Barry P. Gruher
Barry P. Gruher, Esq.
Fla. Bar No. 960993
Email: bgruher@gjb-law.com

## SERVICE LIST

***Served Via CM/ECF Notification***

Magda Abdo-Gomez, Esq on behalf of Creditor Florida Building & Supply, Inc.
mabdoatty82@bellsouth.net

Chase A Berger on behalf of Interested Party Wilmington Savings Fund Society, FSB, D/B/A Christiana Trust as Owner Trustee of the Residential Credit Opportunities Trust III
chase@bergerfirm.com, paralegal@bergerfirm.com, trosenfeld@bergerfirm.com; lburgess@bergerfirm.com

David Marshall Brown on behalf of Creditor Penthouse 68, LLC
DavidBrownfll@gmail.com

David Marshall Brown on behalf of Creditor Rodrigo and Maria Veldez Family Trust
DavidBrownfll@gmail.com

David Marshall Brown on behalf of Creditor Sixty Sixty Condominium Unit Owners
DavidBrownfll@gmail.com

Steven M Davis on behalf of Creditor Schecher Group, Inc.
sdavis@bplegal.com

Steven M Davis on behalf of Creditor Richard J. Schecher, Sr.
sdavis@bplegal.com

Steven M Davis on behalf of Interested Party Condominium Hotel Management Corporation,
Inc.
sdavis@bplegal.com


Barry P Gruher on behalf of Creditor Schecher Group, Inc.
bgruher@gjb-law.com, vlambdin@gjb-law.com; gjbecf@gjb-law.com; cesser@gjb-law.com;
chopkins@gjb-law.com

Michael D Lessne on behalf of Interested Party Kingfisher Island, Inc.
mlessne@broadandcassel.com, jphillips@broadandcassel.com

Paula Levy on behalf of Interested Party PENTHOUSE 68, LLC
plevy@ritterchusid.com, lglatzer@ritterchusid.com

Brett D Lieberman on behalf of Debtor Sixty Sixty Condominium Association, Inc.
blieberman@messana-law.com, emair@messana-law.com; nbarrus@messana-law.com;
tmessana@messana-law.com; tzeichman@messana-law.com; thurley@messana-law.com;
mwslawfirm@gmail.com

Thomas M. Messana, Esq. on behalf of Debtor Sixty Sixty Condominium Association, Inc.
tmessana@messana-law.com, emair@messana-law.com;blieberman@messana-
law.com;thurley@messana-law.com;tmessana@bellsouth.net;nbarrus@messana-
law.com;ekates@bakerlaw.com;tzeichman@messana-law.com;mwslawfirm@gmail.com

Barry S. Mittelberg on behalf of Interested Party Elaine Robinson
barry@mittelberglaw.com, stacey@mittelberglaw.com

Barry S. Mittelberg on behalf of Interested Party Maria Schoentag
barry@mittelberglaw.com, stacey@mittelberglaw.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

Brian L Rosaler, Esq on behalf of Creditor Federal National Mortgage Association
ecfbankruptcy@popkinrosaler.com

Meredith Mishan Silver on behalf of Interested Party Setter, LLC
msilver@phillipslawyers.com,  wcapote@phillipslawyers.com

Ken Taninaka on behalf of Interested Party Ciaraso Corp.
ktaninaka@skdrlaw.com,  rsaetae@skdrlaw.com; vdamian@skdrlaw.com

Ken Taninaka on behalf of Interested Party Rino International, Inc.
ktaninaka@skdrlaw.com,  rsaetae@skdrlaw.com; vdamian@skdrlaw.com

Ken Taninaka on behalf of Interested Party Robys 1 Corp.
ktaninaka@skdrlaw.com,  rsaetae@skdrlaw.com; vdamian@skdrlaw.com

Ken Taninaka on behalf of Interested Party Sixty Sixty 706 & 906 LLC
ktaninaka@skdrlaw.com,  rsaetae@skdrlaw.com; vdamian@skdrlaw.com

Ken Taninaka on behalf of Interested Party Hansrah Bhojwani
ktaninaka@skdrlaw.com, rsaetae@skdrlaw.com; vdamian@skdrlaw.com

Ken Taninaka on behalf of Interested Party Martin Lange
ktaninaka@skdrlaw.com, rsaetae@skdrlaw.com; vdamian@skdrlaw.com

Ken Taninaka on behalf of Interested Party Mohini Hotchandini
ktaninaka@skdrlaw.com, rsaetae@skdrlaw.com; vdamian@skdrlaw.com

Ken Taninaka on behalf of Interested Party Nandini Bhojwani
ktaninaka@skdrlaw.com, rsaetae@skdrlaw.com; vdamian@skdrlaw.com

Ken Taninaka on behalf of Interested Party Richard Vasquez
ktaninaka@skdrlaw.com, rsaetae@skdrlaw.com; vdamian@skdrlaw.com

Ken Taninaka on behalf of Interested Party Sunjay Hotchandini
ktaninaka@skdrlaw.com, rsaetae@skdrlaw.com;vdamian@skdrlaw.com

Steve D Tran on behalf of Creditor WILMINGTON TRUST, NATIONAL ASSOCIATION,
NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY AS TRUSTEE FOR MFRA TRUST
2014-2
bk@exllegal.com