**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

In re:

Sixty Sixty Condominium Association, Inc.           Case No. 16-26187-RAM

        Debtor-in-Possession.                                  Chapter 11

_____/

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING**
**SALE OF DEBTOR'S REAL PROPERTY LOCATED AT 6060 INDIAN**
**CREEK DRIVE, MIAMI, FLORIDA 33140 TO KINGFISHER ISLAND,**
**INC. AND PAYMENT OF COSTS ASSOCIATED THEREWITH**

Sixty Sixty Condominium Association, Inc., the Chapter 11 debtor and debtor-in-possession herein (the "Association" or "Debtor"), by and through undersigned counsel, pursuant to Sections §§ 327, 330, 331, 363(b), 363 (f), 365 and 1123(b) of the United States Bankruptcy Code and Rules 2002(a)(2), 2002(c)(1), 2014 and 6004 of the Federal Rules of Bankruptcy Procedure, and Rule 6005-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Florida, and this Court's November 2, 2017 *Order Granting Motion to Approve Bid Process, Setting Deadline for Debtor to File Sale Motion and Setting Hearing* (ECF #427) (the "Process Approval Order"), files this *Debtor's Motion for Entry of an Order Authorizing Sale of Debtor's Real Property Located at 6060 Indian Creek Drive, Miami, Florida 33140 to Kingfisher Island, Inc. and Payment of Costs Associated Therewith* (the "New Sale Motion"), and in support thereof states as follows:

## I.    PRELIMINARY STATEMENT

Debtor's efforts to build a fair and equitable deal in the best interests of all constituencies continue.

Debtor's proposal contemplates a bankruptcy reorganization that pays all claims 100% of what claimants are actually owed; **but not more.**

To do this, a bulk sale must close. This New Sale Motion seeks to advance that goal.

## II.    JURISDICTION AND BACKGROUND

1.      This Court has jurisdiction to consider the New Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334. *See also Order Interpreting Right of First Refusal* (ECF #349) (the "#349 Sale Order").    This matter is a core proceeding within the meaning of 28 U.S.C. §157(b)(2)(A), (M), (N) and (O).

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1404 and 1409.

3.      The statutory basis for the relief requested herein is 11 U.S.C. §§ 363(b) and (f).

4.      In the interest of brevity, the Debtor hereby further adopts the Jurisdiction and Background section of its April 7, 2017, *Debtor's Expedited Motion for Entry of an Order: (I) Approving Jason Welt and Trustee Realty, Inc. as Debtor's Real Estate Professional; (ii) Approving Proposed Bidding Procedures; (iii) Approving Form and Notice Thereof; and (iv) Scheduling Hearing to Consider Approval Of "Highest And Best" Bid* (ECF #174) (the "Original Sale Motion"), as supplemented and restated herein.

5.      On December 5, 2016, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. (ECF #1).

6.      The April 7, 2017, Original Sale Motion sought, among other things, authority to: (i) engage Jason Welt of Trustee Realty, Inc. (together, the "Broker") as the Debtor's broker to help facilitate a bulk sale; (ii) approve a process to submit bids and approve the notice to proposed purchasers of the instructions detailing the proposed process; and (iii) setting a final hearing to approve a bulk buyer.

2

7.      On April 27, 2017, Debtor commenced an adversary proceeding[1] by filing its *Complaint to Determine Validity, Priority and Extent of Liens, Setoff, Objection to Claim & Request for Declaratory Judgment* (the "Complaint") (AP ECF #1) against the Schecher Group, Inc. (the "Schecher").

8.      The Complaint asserts claims against Schecher for declaratory relief to determine the validity extent and priority of liens, claims and encumbrances in Debtor's real property (Count I); objection to claim (Count II); improper setoff (Count III); to avoid preferential liens against Unit 505 and commercial units (Count IV); and to avoid improperly perfected liens against commercial units and Unit 505 (Count V).

9.      One of the goals of the Adversary Proceeding is to determine a "Base Line" number of all amounts that Schecher is allowed – under the Declaration and applicable law – to charge to unit owners, including the Debtor.

10.     Debtor and Schecher filed their *Preliminary Pretrial Stipulation* on August 28, 2017 (AP ECF #60) (the "Pretrial Stipulation").

11.     The Pretrial Stipulation identifies, among other things, several disputed legal issues regarding the propriety of Schecher's charges to unit owners that must be resolved to determine the "Base Line" number (the "Disputed Legal Issues").

12.     After considerable litigation of which this Court is aware, including extensive written briefing, oral argument, and a multi-day evidentiary trial taking place on July 13, 14, and 21, 2017, and a final hearing on August 18, 2017, this Court entered, among other orders, its *Final Order Approving Bulk Sale Contract Including 363 Sale Of Debtor's Property Free And*

---

[1] Adversary Proceeding Case No. 17-01171-RAM (the "Adversary Proceeding" or "AP").

*Clear Of Claims, Liens And Interests And Awarding Broker Real Estate Commission* on August 22, 2017 (the "Final Sale Order"). (ECF #336).

13.     The Final Sale Order approved a contract submitted by Marc Realty Capital (the "MRC Contract"). Under the MRC Contract, it was contemplated that the due diligence period would terminate on October 23, 2017 and closing would occur on or before December 22, 2017.

14.     Organizing the Adversary Proceeding on a parallel track, the Court entered its *Order (1) Granting in Part and Denying in Part Motion to Dismiss, and (2) Setting Deadlines and Filing Requirements; and (3) Setting Status Conference* (the "AP Scheduling Order") on August 7, 2017. (AP ECF #43).

15.     The AP Scheduling Order preliminarily set the hearing on Disputed Legal Issues for October 4, 2017 and trial for October 11, 12, and 13, 2017.

16.     Having lined up the potential buyer on an approved contract and having scheduled the trial in the Adversary Proceeding, Debtor moved *ore tenus* to compel Schecher to mediation or a judicial settlement conference.

17.     On August 7, 2017, this Court entered its *Order Referring Proceeding to Judge Hyman to Conduct a Judicial Settlement Conference*. (AP ECF #44).

18.     On September 15, 2017, Debtor, Schecher, certain Residential Unit Owners ("RUOs")[2] and Marc Realty Capital, LLC ("MRC", together with Debtor, Schecher and RUOs, the "Settlement Parties") participated in a judicial settlement conference facilitated by the Honorable Judge Paul Hyman (the "Settlement Conference").

---

[2] Counsel for Residential Unit Owners and two of the Intervenor owners attended the judicial settlement conference in accordance with the Order entered in the adversary proceeding 17-01171-RAM (ECF #44).

19.     Prior to the conclusion of the Settlement Conference, Debtor and others attending the Settlement Conference understood that a resolution had been achieved with certain deal points to be finalized between Schecher and MRC (the "Settlement").

20.     Relying on these representations, among other things:

   a.  On September 22, 2017, the Honorable Judge Hyman filed his *Report of Mediator* indicating that the Settlement Parties had resolved all issues during the Settlement Conference (AP ECF #75);

   b.  On September 18, 2017, Debtor filed, **with the consent and input Schecher's counsel** and the RUOs, its *Agreed Motion for Extension of Exclusivity Pending Documenting Settlement Agreement with Schecher Group, Inc.* (ECF #373), **which included the material terms of the Settlement**;

   c.  On September 25, 2017, Debtor filed its *Second Amended Disclosure Statement in Support of its Amended Plan of Reorganization of Sixty Sixty Condominium Association, Inc.* (ECF #381) and its *Second Amended Plan of Reorganization of Sixty Sixty Condominium Association, Inc.* (ECF #380), which plan and disclosure statement incorporated the terms of the Settlement;

   d.  On September 26, 2017, Debtor, Schecher and the RUOs filed their *Joint Agreed Motion for Extension of Time to Comply with All Pretrial Deadlines and to Extend the Pretrial Conference and Trial* (AP ECF #80); and

   e.  On September 27, 2017, this Court entered its *Order Cancelling Trial and Pretrial Conference* (AP ECF #82).

21.     However, on September 29, 2017, Schecher unilaterally declared an impasse of the Settlement Conference and withdrew all of its settlement offers. Over the ensuing weeks, Schecher refused attempts to reconvene the Judicial Settlement Conference.

22.     On October 23, 2017, Debtor received an e-mail correspondence from counsel to MRC attaching MRC's notice of termination of the MRC Contract.

23.     On October 25, 2017, the Debtor received two formal written offers to stand in as the bulk buyer on substantially the same non-economic terms as the previously court-approved MRC Contract with certain modifications (the "Substitute Contracts").

24.     Thereafter, also on October 25, 2017, counsel for the Debtor informed counsel for Schecher of the Debtor's receipt of the Substitute Contracts.

25.     Later on October 25, 2017, Schecher filed its objection to the disclosure statement and renewed motion to dismiss the bankruptcy case (the "Motion to Dismiss"). ECF ##385 & 396.

26.     On October 26, 2017, the Debtor filed its *Emergency Motion for Entry of Order Approving Bid Process* (ECF No. 397) ("Process Motion").

27.     On October 30, 2017, Debtor filed its response to Schecher's Motion to Dismiss (ECF #413) (the "Response"). In the Response, among other things, Debtor discloses the identities of the parties that tendered the Substitute Contracts, Kingfisher Island, Inc, (the previous backup bidder, "KFI")[3] and 6060 Condo Holdings, LLC (a company to be formed by Artemis Capital, LLC ("Holdings"), together the "Prospective Bidders"). *See* Response at FN 2.

28.     On November 1, 2017, this Court held a hearing on, among other things, the Process Motion. Representatives of both Prospective Bidders attended the hearing.

29.     At the November 1, 2017 hearing, the Court approved a deadline of November 1, 2017 at 5:00 pm to submit best last and final Substitute Contracts (the "Submission Deadline").

30.     On November 2, 2017, this Court entered the Process Approval Order, memorializing the Submission Deadline, approving the Process Motion, and setting other deadlines with respect to approval of a Substitute Contract.

---

[3] As was previously disclosed in connection with the Original Sale Motion, and among other instances, the April 7, 2017 *Notice of Filing Updated Declaration of Thomas M. Messana, Esq., Managing Shareholder of Attorney For Debtor-in-Possession, Messana, P.A.* (ECF #176), counsel for the Debtor "have represented and presently represent certain entitles affiliated with KFI. Upon information and belief, the nature of the affiliation is generally as follows: Todd Mikles is a beneficiary of the owner of KFI. This firm previously and currently represents business entities in which Todd Mikles has some authority or control. [Debtor's counsel] do not and will not represent KFI, Mr. Mikles or any of their affiliates in connection with any matter relating to the Debtor." ECF #176 at ¶3(B)(iii). Debtor had no affiliation to KFI prior to the instant bankruptcy case.

31.     The Prospective Bidders both tendered best last and final offers to the Debtor prior to the Submission Deadline.  An offer was submitted by KFI (the "KFI Offer")[4] and Holdings (a company to be formed by the Yanko Group, LLC) (the "Holdings Offer").[5]

32.     On November 2, 2017, the Debtor selected the KFI Offer as the highest and best offer, and the Holdings Offer as the back-up offer.

33.     The key terms of the KFI Offer track the language of the previously court-approved MRC Contract with certain modifications including, among others:[6]

    a.  <u>Price</u>.  The "*Purchase Price*" for the Condominium Property shall be as follows:

        i.  $1,0900,000.00 for the Association's units ((i) CU-1, $250,000; (ii) CU-2, $250,000; (iii) CU-3, $250,000; (iv) CU-4, $250,000; and (iv) Association unit 505, $90,000) (the "Association's Units").

        ii.  $90,000.00 for each residential unit which executes the KFI Offer and closes on the sale. At least 50 residential units (the "*Minimum Participation Requirement*") must execute the KFI Offer within 25 days of the Commencement Date (defined therein) and close, otherwise KFI may terminate the KFI Offer.

        iii.  $4,100,000.00 or less paid to the Schecher Group, Inc. D/B/A SG Shared Components (the "*Schecher Claim Amount*") at Closing, in full and final satisfaction of its claims asserted against all units subject to the sale under this KFI Offer, including any and all claims asserted in Case No. 16-26187-RAM, in the United States Bankruptcy Court, Southern District of Florida, Miami Division.

        iv.  $90,000.00 paid toward non-debtor Sellers' legal fees and costs, at Closing. *See* KFI Offer at ¶ 2.

    b.  Deposit. KFI will deposit a $30,000 (Thirty Thousand Dollars) (the "*Initial Deposit*"), which amount shall be non-refundable in favor of the Association, towards the purchase of the Association's Units within three (3) business days of the United States Bankruptcy Court, Southern District of Florida, Miami Division (Case No. 16-26187-RAM) (the "*Bankruptcy Court*") approving the KFI Offer; the Deposit to be held by the law firm of Messana, P.A.

---

[4] A copy of the KFI Offer is attached hereto as Exhibit "A".
[5] A copy of the Holdings Offer is attached hereto as Exhibit "B".
[6] To the extent of any inconsistency with this New Sale Motion and the KFI Offer, the terms of the KFI Offer shall control.

On the thirtieth (30th) day following the Commencement Date, KFI shall deposit (i) an additional $200,000.00 (Two Hundred Thousand Dollars) with Coastal Title of Ft. Lauderdale, Florida unless otherwise agreed, in writing, by KFI and Seller (the "Escrow Agent") with proof given to Seller's attorneys and the title company (the "*Refundable Deposit*"); and (ii) an additional $70,000.00 (Seventy Thousand Dollars) which shall be non-refundable and allocated to the Association's Units to be held by the law firm of Messana, P.A. (the "*Second Non-Refundable Deposit*") The Refundable Deposit, together with the Initial Deposit and Second Non-Refundable Deposit, the "*Deposits*" shall be applied to the Purchase Price in the event of a Closing. Where a Closing does not occur, the Refundable Deposit shall be returned to KFI.

All interest accrued or earned on the Refundable Deposit shall be paid to KFI except in the event of a default by Buyer, in which event all of the interest shall be disbursed to Sellers, together with the Deposits, as liquidated damages in accordance with the default provisions. *See* KFI Offer at ¶ 4.

c. Due Diligence Exception: KFI may not terminate the Agreement solely because, as of the expiration of the Initial Due Diligence Period, or any extension thereof, it has not entered into an agreement with the Schecher Group, Inc. regarding the sale, cooperation or otherwise, relative to the Hotel Unit. *See* KFI Offer at ¶ 7(e).

34. The key terms of the Holdings Offer also track the language of the previously court-approved MRC Contract with certain modifications including, among others:[7]

a. <u>Price</u>. The "*Purchase Price*" for the Condominium Property shall be as follows:

  i. For the Association's Units: (i) Unit CU-1, C-2, C-3, C-4 and Unit 505, $1,300,000;
  ii. $85,000.00 for each residential unit which executes the Contract. At least 50 residential units (the "*Minimum Participation Requirement*") must execute the Contract and close, otherwise the Buyer may terminate the Holdings Offer and immediately receive the return of its Deposit, as described in Paragraph 4 below.
  iii. Holdings will accept the purchase of the Condominium Property subject to amounts owed, not to exceed $4,100,000 to the current hotel operator from the Condominium Property owners as well as the Association. *See* Holdings Offer at ¶ 2.

b. Deposit. Holdings will deposit a $300,000.00 (Three Hundred Thousand Dollars) towards the purchase of the Condominium Property within three (3) business days after the Commencement Date (as defined in paragraph 5 below) to be held by an

---

[7] To the extent of any inconsistency with this New Sale Motion and the Holdings Offer, the terms of the Holdings Offer shall control.

8

escrow agent selected by Holdings, with proof given to the Sellers' attorneys and the title company. From the $300,000.00 deposit, $100,000.00 shall be non-refundable and excepted from Due Diligence Section 7. *See* Holdings Offer at ¶ 4.

c. However, the non-refundable portion of the deposit shall become refundable in the event the Sellers fail to close or meet any of the conditions in Section 8 of the Holdings Offer or if Holdings terminates the Holdings Offer during the month the Holdings Offer is fully executed. *See* Holdings Offer at ¶ 8(i).

d. Due Diligence. Notwithstanding any other provision of the Holdings Offer, Holdings may terminate the Holdings Offer for any reason or for no reason within its sole and absolute discretion at any time before 6:00 pm EST on or before the end of the Due Diligence Period. *See* Holdings Offer at ¶ 7.

35.    Under both the KFI Offer and Holdings Offer, the Association and RUOs are responsible for paying their pro-rata portion of the Florida Building and Supply, Inc. allowed claim.

36.    Both the KFI Offer and Holdings Offer employ language identical to the court-approved MRC Contract with respect to Schecher's right of first refusal.

37.    Debtor respectfully requests that this Court approve the KFI Offer as the winning bidder, the Holdings Offer as the back-up bidder, and permit the Debtor to take any and all steps necessary to effectuate a closing on same.

**RUO REORGANIZATION EFFORTS**

38.    Upon information and belief, approximately 37 of the participating RUOs have executed the KFI Offer and assigned and transferred the rights thereunder and their respective units to a limited liability company in which said RUOs hold membership interests ("RUO LLC").[8]

39.    Upon information and belief, the RUO LLC filed for relief under Chapter 11 of the Bankruptcy Code in order to, among other things, participate in and facilitate a closing of a

---

[8] Case No. 17-23573-LMI.

sale contemplated herein.[9]

### III.    RELIEF REQUESTED

#### A.    Sale of Association's Assets

40.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  Section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

41.    Section 363(f) permits a sale fee and clear of interests.

42.    A sale of the Association's Units ought to be authorized pursuant to Section 363 of the Bankruptcy Code if a sound business reason exists for doing so.  See *In re Martin,* 91 F.3d 389, 395 (3d Cir. 1996) citing *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991).

43.    Debtor asserts, and this Court has previously found, that "…the Debtor cannot effectively market or sell its assets independent of a sale of non-debtor units, and without a sale of the Debtor's assets, the Debtor cannot reorganize." #349 Sale Order at p. 5.

44.    The proposed sale is the product of good faith negotiations, in which the Debtor and its Broker bargained for the highest and best offer and facilitated a bid process as authorized by this Court's Process Approval Order.

45.    As this Court knows, the sale of the Debtor's units and those owned by the RUOs has now twice gone through a competitive process. The first round unfortunately resulted in a terminated contract on the last day of due diligence. Accordingly, critical to the Debtor was a non-refundable deposit that would, among other things, further commit the proposed purchaser

---

[9] RUO LLC has requested that its bankruptcy case be transferred to this Court for administration along with the Association's bankruptcy case.

to close on the contract and provide the Debtor resources to advance the sale process.

46.    In the Debtor's view, the KFI Offer includes the more concrete non-refundable deposit.[10]

47.    Moreover, the total aggregate sale price under the KFI Offer (assuming 50 unit owners participate) is approximately up to $9,780,000. Comparatively, the Holdings Offer is approximately $9,650,000.

48.    Additionally, the KFI Offer commits to paying Schecher up to $4,100,000 to satisfy its claims and liens against all units sold in conjunction with the KFI Offer at closing. The Holdings Offer provides that it would accept the units sold in conjunction with the Holdings Offer "subject to" claims of Schecher up to $4,100,000, but does not explicitly state that it would pay same at closing.

49.    For these reasons and others, the Debtor believes that the KFI Offer is the highest and best offer.

50.    The Debtor appreciates the participation of the Holdings Offer and has approved it as a back-up offer subject to this Courts approval. Holdings has agreed to stand in as a back-up offer on the terms of the Holdings Offer.

51.    Section 363 of the Bankruptcy Code provides that a trustee may sell property "after notice and hearing."

52.    A debtor in possession has the authority of a trustee. 11 U.S.C. §1107.

53.    This New Sale Motion, and the notice of hearing on same,[11] shall be served via

---

[10] Holdings Offer provides, among other things, that the non-refundable portion of its deposit shall become refundable in the event … Holdings terminates the Holdings Offer during the month the Holdings Offer is fully executed. *See* Holdings Offer at ¶ 8(i).

[11] The hearing on this New Sale Motion has been set by the Process Approval Order and was served by this Court on counsel to the Debtor, counsel to Schecher, counsel to certain RUOs and the Office of the U.S. Trustee.

CM/ECF, and/or U.S. Mail upon those parties listed on the service list attached hereto. Such notice complies with the applicable Bankruptcy Rules and Local Rules.

54.     The creditors are being provided notice of the salient details regarding the sale of the Association's Units in this New Sale Motion. Accordingly, the creditors will receive sufficient notice as is contemplated by Section 363(b) of the Bankruptcy Code.

**B.    Modification of Broker Fee**

55.     On April 21, 2017, this Court granted the Original Sale Motion in-part to authorize Debtor to engage Jason Welt and Trustee Realty, Inc. as its broker ("Broker") and approved a certain compensation scheme therewith (the "Original Compensation").

56.     Under that Original Compensation scheme, Broker was to earn the following compensation

    i.   The Broker's compensation is a "contingency fee" model. That is, the Broker is entitled to a fee in an amount equal to one percent (1.0%) of the final purchase price of all units participating in the Bulk Sale at closing.[12]

    ii.  Any "Cooperating Broker"[13] shall not be paid out of the sale proceeds; rather such payment shall be borne solely by the Potential Purchaser. Broker's compensation will be paid upon closing out of the proceeds of a successful Bulk Sale.

    iii. However, if the KFI LOI is ultimately the Highest and Best LOI, Broker shall only be entitled to a quarter of a percent (.25%) commission.

    iv.  In the event a Highest and Best LOI is approved and executed by the Debtor but (i) the Bulk Sale does not close and (ii) any deposit is retained by the Debtor, the commission to be paid Broker shall be the lesser of: one-half (1/2) of the amount of the deposit, or $6,000.

57.     In this case, the terms of the proposed deal have changed considerably from that proposed in April of 2017. Under the Original Compensation, an argument can be made that Broker would be entitled to 1% of the total purchase price of $9,780,000; or approximately

---

[12] The 1% Broker's compensation shall be paid out of the proceeds allocable to each unit including all Residential Units who participate in the Bulk Sale and the Debtor's Units.

[13] A "Cooperating Broker" is any duly licensed real estate broker who properly registers a client who purchases the Property.

$97,800.

58.    Under the KFI Offer, Broker's fee would be reduced to $50,000 and paid by the Debtor (the "Modified Compensation").

59.    Broker has generously agreed to the reduction in compensation and Debtor believes that the Modified Compensation is fair and reasonable. Debtor is grateful to Mr. Welt and his consistent efforts to support the Debtor and its sale process.

60.    Accordingly, Debtor requests that the Broker's compensation be approved in the amount of $50,000 consistent with the KFI Offer and contingent on the closing of the sale of the KFI Offer (or, the Holdings Offer if the backup offer is ultimately approved and closed).

WHEREFORE, the Debtor respectfully requests that this Court enter an order (i) Granting this New Sale Motion; (ii) approve the KFI Offer as the highest and best offer; (iii) approve the Holdings Offer as the back-up offer; (iv) authorizing the Debtor to take any and all action necessary to consummate the sale of the Association's Units pursuant to the KFI Offer; (v) authorizing the Debtor to take any and all action necessary to consummate the sale of the Association's Units pursuant to the Holdings Offer in the event that the sale to KFI does not close; (vi) find that both the KFI Offer and Holdings Offer are fair, reasonable, negotiated in good faith and that both KFI and Holdings are good faith purchasers as is contemplated by Section 363(m) and (n); (vii) finding the Modified Compensation fair and reasonable and approving the Modified Compensation to Broker; (viii) authorizing the Association to pay the Broker his Modified Compensation at closing; and (ix) granting such other and further relief as is

just.

Respectfully submitted this 10th day of November, 2017.

> MESSANA, PA
> *Counsel for the Debtor*
> 401 East Las Olas Boulevard, Suite 1400
> Fort Lauderdale, FL 33301
> Telephone: (954) 712-7400
> Facsimile: (954) 712-7401
> Email: blieberman@messana-law.com
>
> /s/ Brett D. Lieberman
> Thomas M. Messana
> Florida Bar No. 991422
> Brett D. Lieberman
> Florida Bar No. 69583

Exhibit "A"

## CONTRACT FOR PURCHASE AND SALE

THIS CONTRACT FOR PURCHSSE AND SALE (this *"Agreement"* or *"Contract"*) is made this **1ST** day of November 2017, by and between KINGFISHER ISLAND, INC., a Delaware corporation, or its assigns (hereinafter *"Buyer"*), and the parties listed on the attached "Schedule A" (collectively referred to as *"Sellers"*).

## WHEREAS

A.    Sellers are owners of residential and commercial condominium units located at 6060 Indian Creek, Miami Beach, Florida 33140, including all common areas and appurtenances thereto (collectively, the *"Condominium Property"*).

B.    Buyer presented an offer to the Sellers for their review and determination whether they wish to participate in the sale of their interest in the Condominium Property in one transaction to Buyer.

C.    The parties have prepared this Contract based upon Buyer's recent offer and, upon the acceptance of the offer through this Contract, Sellers desire to sell, and Buyer desires to purchase, the Condominium Property described herein in accordance with the provisions of this Contract.

D.    The 6060 Condominium Association, Inc., a Florida not-for-profit corporation (the *"Association"*) is one of the Sellers.

NOW, THEREFORE, in consideration of the mutual covenants and promises herein set forth, the parties agree as follows:

The foregoing recitals are true and correct and are incorporated herein by this reference.

1.    <u>Purchase and Sale</u>.    Upon the terms and conditions set forth herein, Buyer agrees to buy from Sellers and Sellers agree to sell to Buyer all of Sellers' right, title and interest in the Condominium Property, together with all easements, privileges, and other appurtenances pertaining to or accruing to the benefit of the Condominium Property, including all intangible rights.  This Contract is effective upon mutual execution by the parties. The Condominium Property is being sold AS IS.  No personal property is included with this sale.

2.    <u>Price</u>.  The *"Purchase Price"* for the Condominium Property shall be as follows:

   a.    $1,090,000.00 for the Association's units ((i) CU-1, $250,000; (ii) CU-2, $250,000; (iii) CU-3, $250,000; (iv) CU-4, $250,000; and (iv) Association unit 505, $90,000) (the *"Association's Units"*)).

Sellers _____    Buyer _____

2

b.  $90,000.00 for each residential unit which executes the Contract and closes on the sale. At least 50 residential units (the "*Minimum Participation Requirement*") must execute the Contract within 25 days of the Commencement Date (defined herein) and close, otherwise the Buyer may terminate the Contract.

c.  $4,100,000.00 or less paid to the Schecher Group, Inc. d/b/a SG Shared Components (the "*Schecher Claim Amount*") at Closing, in full and final satisfaction of its claims asserted against all units subject to sale under this Agreement, including any and all claims asserted in Case No. 16-26187-RAM, in the United Stated Bankruptcy Court, Southern District of Florida, Miami Division.

d.  $90,000.00 paid toward non-debtor Sellers' legal fees and costs, at Closing.

3.  <u>Term of Contract</u>.    This Contract shall expire after one hundred twenty (120) days, unless extended pursuant to the provisions of this Contract described below.

4.  <u>Deposit</u>.    Buyer will deposit $30,000.00 (Thirty Thousand Dollars) (the "*Initial Deposit*"), which amount shall be non-refundable in favor of the Association, towards the purchase of the Association's Units within three (3) business days of the United States Bankruptcy Court, Southern District of Florida, Miami Division (Case No. 16-26187-RAM) (the "*Bankruptcy Court*") approving the Agreement; the Deposit to be held by the law firm of Messana, P.A.

On the thirtieth (30th) day following the Commencement Date, unless extend pursuant to Section 7(b) Buyer shall deposit (i) an additional $200,000.00 (Two Hundred Thousand Dollars) with Costal Title of Ft. Lauderdale, Florida, unless otherwise agreed, in writing, by Buyer and Seller, (the "*Escrow Agent*") with proof given to the Seller's attorneys and the title company (the "*Refundable Deposit*"); and (ii) an additional $70,000.00 (Seventy Thousand Dollars) which shall be non-refundable and allocated to the Association's Units to be held by the law firm of Messana, P.A. (the "*Second Non-Refundable Deposit*") The Refundable Deposit, together with the Initial Deposit and Second Non-Refundable Deposit, the "*Deposits*" shall be applied to the Purchase Price in the event of a Closing. Where a Closing does not occur, the Refundable Deposit shall be returned to Buyer.

All interest accrued or earned on the Refundable Deposit shall be paid to Buyer except in the event of a default by Buyer, in which event all of the interest shall be disbursed to Sellers, together with the Deposits, as liquidated damages in accordance with the default provisions below. Damages to any party shall be limited to those set forth herein.

5.  <u>Commencement Date</u>. The Commencement Date is the first day on which all of the following have occurred:

a.  The number of non-debtor residential unit owners necessary to satisfy the Minimum Participation Requirement have executed this Contract and delivered a copy to Buyer;

Sellers _____    Buyer 

3

    b.      The Association has executed this Contract and delivered a copy to Buyer; and

    c.      The Bankruptcy Court described herein has approved the sale of the Condominium Property.

6.    <u>Right of First Refusal.</u>  The package of residential units subject to the right of first of refusal in favor of the Schecher Group, Inc., is subject to the right of first refusal under the Declaration. Upon the expiration of the Due Diligence Period (defined herein), if the Buyer has not elected to terminate the Contract, this Contract shall be presented to the Schecher Group, Inc., for its consideration to give the Schecher Group, Inc., an opportunity to exercise its right of first refusal as to the package of residential units subject to the right of first refusal under the Declaration. The Schecher Group, Inc. shall have no obligation to purchase any unit not subject to its right of first refusal in order to exercise its right of first refusal under the Declaration. If the Schecher Group, Inc., exercises its right of first refusal by acquiring the package of all residential units subject to the right of first refusal, this Contract shall terminate and Buyer's Refundable Deposit will be immediately returned to Buyer.

7.    <u>Due Diligence Period</u>. The due diligence period shall be as follows:

(a) For a period of thirty (30) calendar days, beginning one day after the Commencement Date (the "*Initial Due Diligence Period*"), Buyer and/or its agents shall be entitled to access to the Condominium Property to conduct such non-invasive investigations, tests, surveys and other analyses as Buyer determines is necessary, provided (i) Buyer conducts such tests or investigations so as not to unreasonably interfere with current activities on the property, (ii) Buyer restores the property to its condition immediately prior to any such tests and investigations, normal wear and tear excepted, and (iii) Buyer indemnifies, defends, and holds Sellers harmless from and against all claims, costs, expenses, and liabilities arising out of Buyer's entry upon the property and/or the performance of the tests and investigations conducted by Buyer on the property, but not for matters caused by Sellers or otherwise pre-existing and discovered or disclosed by Buyer's inspections.

(b) Upon request of Buyer, and subject to the agreement of Sellers, memorialized in writing, the Initial Due Diligence Period may be extended by fifteen (15) calendar days (the "*Extended Due Diligence Period*").

(c) During the Initial Due Diligence Period, Sellers shall deliver (or cause the Association to deliver) copies of all tax bills, existing title insurance policies and claims, surveys, leases, environmental reports, and other documents reasonably requested by Buyer, if in their possession.

(d) Subject to Section 8(c) and Section 7(e), below, Buyer may terminate this Contract before the end of the Initial Due Diligence Period or Extended Due Diligence Period, if applicable, by delivering written notice of its decision to terminate ("*Notice of Termination*") to the Notice Party as set forth in Paragraph 25. Buyer's timely delivery of a Notice of Termination will

Sellers _____  Buyer _____

4

relieve the parties of any further obligations under this Contract and the deposit shall be immediately returned to Buyer.

(e) The Schecher Group, Inc., currently operates a hotel within the Condominium Property (the "*Hotel Unit*"). Buyer may not terminate this agreement solely because, as of the expiration of the Initial Due Diligence Period, or any extension thereof, it has not entered into an agreement with the Schecher Group, Inc. regarding the sale, cooperation or otherwise, relative to the Hotel Unit.

(f) Where the interests owned by any Seller are subject to a foreclosure proceeding or any other action which actually or potentially clouds title to the Seller's interest, as of the Closing, Buyer may terminate this Agreement.

(g) If Buyer fails to timely deliver a Notice of Termination, then Buyer accepts the Condominium Property in its present condition (subject to the representations, warranties and covenants expressly stated herein or in the closing documents), and the deposit becomes non-refundable, except in the event of a default by Sellers, failure of title, condemnation, or failure to satisfy any other conditions precedent to closing hereunder.

8. <u>Additional Conditions</u>.    The following shall be additional conditions which must be satisfied prior to Buyer's obligation to close:

(a)    Sellers shall have paid, or shall have entered into an agreement to pay from its portion of the Purchase Price, the <u>allowed</u> claim of Florida Building Supply, Inc. (the "*FBS Claim*") at the Closing. Sellers shall agree to pay the FBS Claim direct from escrow at Closing or shall have otherwise paid the FBS Claim prior to Closing.

(b)    A minimum of fifty (50) residential units shall have agreed to enter into the Agreement.

(c)    The Association commenced Case No. 16-26187-RAM, in the Bankruptcy Court. The Bankruptcy Court shall have entered an Order or otherwise confirmed that the aggregate claims asserted by the Schecher Group, Inc. d/b/a SG Shared Components ("*Schecher Group*") against the units subject to this Agreement are equal to or less than the Shecker Claim Amount and that payment of the Schecher Claim Amount to Schecher Group at Closing would satisfy in full any and all claims and liens of Schecher Group against such units through Closing and that upon making the payment of the Schecher Claim Amount to Schecher Group at Closing such units would be transferred to Buyer from the Sellers free and clear of any and all claims and liens of Schecher Group. If the Bankruptcy court determines that the Schecher Claim Amount exceeds $4,100,000, Buyer may terminate this agreement within fifteen (15) days of such court determination and receive a full refund of its Refundable Deposit.

(d)    All of the representations and warranties of Sellers must be true and correct in all material respects as of Closing.

(e)    Sellers shall have delivered to Buyer an estoppel letter from the Sixty Sixty Condominium Association, Inc. (the "*Association*") for all of the units dated no earlier than fifteen (15) calendar days prior to Closing or a waiver of the estoppel letter by the Association.

Sellers _____    Buyer 

5

(f)    All directors and officers of the Association shall tender their resignations effective as of the Closing.

(g)    Sellers shall have complied with all of its obligations under this Contract.

(h)    The Association or any third party has not exercised its first right of refusal to purchase all the units included within this Contract.

(i)    This Contract is not contingent upon purchasing the Hotel Unit, or units in addition to the 50+ units herein, subject to allowing additional units or otherwise.

If any of these conditions is not satisfied or waived in writing by Buyer on or before the Closing Date, Buyer may terminate this Contract and the deposit will immediately be returned to Buyer, whereupon the parties shall be released from all further obligations under this Contract.

9.    Title Commitment.    Buyer has already obtained a title report for the units from First American Title Insurance Company (the "*Title Company*"). Therefore, within Twenty-Five (25) calendar days after the Commencement Date, the Title Company, will provide Buyer with a preliminary title insurance commitment ("*Preliminary Commitment*") for the Condominium Property, to the extent one has not already been provided and Buyer shall be reimbursed for the title reports that it has already obtained to the extent the Title Company would charge for producing the same reports in the Preliminary Commitment. Buyer shall be responsible for obtaining complete and legible copies of all exceptions and encumbrances noted on the Preliminary Commitment. Buyer shall have until the expiration of the Initial Due Diligence Period or the Extended Due Diligence Period, if applicable, to review title (the "*Title Review Period*"). Buyer, at Buyer's option, may obtain a survey ("*Survey*") of the land and improvements comprising the entire Condominium Property within the time period to examine title as aforesaid. If Buyer finds title to be unmarketable in accordance with the Florida Bar, including any defects reflected in the Survey, Buyer shall, no later than the expiration of the Title Review Period provided above, notify Sellers in writing specifying the defect(s); provided that if Buyer fails to give Sellers written notice of defect(s) before the expiration of the Title Review Period, the defects shown in the Preliminary Commitment shall be deemed to be waived as title objections to closing this transaction.

Buyer may raise as additional objections, however, any matters first shown by any endorsement of the Preliminary Commitment and/or recertifications of the Survey obtained by Buyer. If Buyer has given Sellers timely written notice of defect(s) and the defect(s) render the title other than as represented in this Contract, Sellers shall use good faith and diligent effort to cause such defects to be cured by the date of Closing. Sellers agree at or prior to Closing to satisfy all requirements shown on Schedule B, Section 1, of the Preliminary Commitment, and (ii) remove any matters appearing of record after the effective date of the Preliminary Commitment.

At either party's option, the date of Closing, as defined below, may be extended for a period not to exceed one hundred twenty (120) calendar days for purposes of eliminating any title defects (the "*Extended Closing Date*"). In the event that Sellers do not eliminate any defects as of the date of Closing as the same may be extended under the preceding sentence, Buyer shall have the

Sellers _____    Buyer 

6

option of either: (i) closing and accepting the title "as is", and deducting from the Purchase Price the amount of any lien or encumbrance which can be satisfied by a liquidated amount, or (ii) canceling this Contract in which event the deposit will be returned to Buyer, whereupon the parties shall be released from all further obligations under this Contract, except those obligations expressly stated to survive such termination.

10.    <u>Title Evidence</u>.        At least fifteen (15) business days before Closing a title insurance commitment with legible copies of instruments listed as exceptions attached thereto, and after Closing, an owner's policy of title insurance shall be obtained by Buyer at Buyer's expense. Buyer shall select the Title Company and closing agent. Sellers shall convey marketable title to the Condominium Property at the Closing with respect to the debtor's units. They shall be conveyed pursuant to a bankruptcy court approving the sale.

11.    <u>Closing Date</u>. Subject to Section 9, above, this transaction shall be closed on or before the later of <u>January 31, 2018; or within thirty (30) days of the final adjudication of the Schecher Claim Amount (the "<u>Closing</u>")</u>. If a court proceeding challenging any aspect of the sale is pending prior to the Closing, the Buyer, at its sole discretion may extend the Closing Date under this Contract until the court proceeding is concluded. The Closing shall take place at the offices of the Escrow Agent or at such other location which is mutually agreeable to the parties. The purchase and sale of all Condominium Property shall be simultaneously closed at the Closing. Debtor's units may only be closed upon entry of an order confirming a chapter 11 plan.

12.    <u>Closing Costs</u>.  Each party shall pay its own customary closing costs.  For example, Buyer is responsible for paying for title insurance, recording the deed, and its legal fees. Examples the Sellers are responsible for paying include the documentary stamp tax on the deed, update title, pro-rated property taxes, its legal fees, if any, and estoppel letters. Buyer will pay Sellers' reasonable closing agent's fees – e.g., document preparation and processing fee.

13.    <u>Delivery for Closing</u>.  At least fifteen (15) calendar days prior to Closing, Sellers shall deliver to the Title Company, to be held in trust until Closing, the following executed documents:

(a)    Warranty Deed in a form satisfactory to Buyer conveying title to the Condominium Property to Buyer.

(b)    Bill of Sale conveying title to any personal property left at the Condominium Property to Buyer.

(c)    Seller's affidavit as to the non-existence of construction liens and encumbrances, exclusive possession and "gap" representations, covenants, and indemnities sufficient to allow removal of the standard title exception for mechanic's liens, the "gap", and possession.

(d)    FIRPTA affidavit.

(e)    Association estoppel letter or waiver.

Sellers _____    Buyer 

7

(f)    Closing Statement.

(g)    All other documents reasonably required by Buyer or the Title Company to complete this transaction.

Notwithstanding the foregoing, Sellers shall undertake their best efforts to provide Buyer with a copy of the individual units' prior title policies and mortgage payoff statements within ten (10) calendar days of the Commencement Date. Buyer will assist Sellers in attempting to obtain short sale approval from lenders, as necessary.

14.    Risk of Loss.  Risk of loss or damage to the Condominium Property shall be borne by Sellers.  In the event of loss or damage to the Condominium Property prior to closing, Sellers shall be entitled to all insurance proceeds and Buyer will continue with Closing.

15.    Insurance Proceeds.  Any and all insurance proceeds related to the Condominium Property while Sellers are the owners are owned by Sellers.  Buyer has no interest in the insurance proceeds.

16.    Representations and Warranties of Seller.    Sellers represent and warrant to Buyer the following:

(a)    As of the Closing Date, Sellers shall have good, marketable, indefeasible title to the Condominium Property (including personal property), free and clear of all liens, claims and encumbrances. Sellers shall be current on their Association dues as calculated in the 2017 Association Budget.

(b)    Sellers who are not individuals will be duly organized, validly existing and in good standing under the laws of the state of incorporation or organization, as the case may be.  Sellers have the full right, power and authority to sell, transfer, and/or convey the Condominium Property to Buyer and to perform all of Sellers' obligations in this Contract.

(c)    There are no contracts or leases affecting the Condominium Property, other than tenant leases which will be terminated on or before Closing. If Sellers cannot terminate a hotel program contract, Buyer will take the Condominium Property subject to the contract.

These representations and warranties will survive Closing for a period of one (1) year.

17.    Representations and Warranties of Buyer.    Buyer represents and warrants to Sellers the following:

(a)    Buyer is duly organized, validly existing and in good standing under the laws of the state of incorporation or organization, as the case may be.  Buyer has full right, power and authority to purchase the Condominium Property from Sellers and perform all of Buyer's obligations in this Contract.

Sellers _____    Buyer 

8

(b)     There are no contracts or agreements which prevent Buyer from fulfilling its obligations in this Contract.

18.    Broker Fee.    Sellers and Buyer are aware that the Association engaged Jason Welt and Trustee Realty, Inc. ("*Broker*") and the Broker shall be paid a fee of $50,000.00 (Fifty Thousand Dollars) (the "*Broker Fee*"). The Association agrees to pay this Broker Fee at Closing.

19.    Not Contingent on Building Permits. This Contract is NOT contingent upon Buyer's ability to obtain any building permits, zoning changes, or any other development-related grant of rights.

20.    Possession.    Buyer shall be entitled to exclusive vacant possession of the Condominium Property on the Closing Date.

21.    Governing Law.       This Contract is governed by the laws of Florida.

22.    Default.       If Buyer fails without legal excuse to complete the purchase of the Condominium Property, the non-refundable Deposit made by Buyer shall be forfeited to Sellers pro-rata, as the remedy available to Sellers.  The parties acknowledge that in such event the exact amount of Sellers' damages cannot be determined with any certainty and agree the non-refundable Deposit shall be forfeited as liquidated damages.  If Sellers fail to perform any covenant of agreement of Seller, Buyer may elect to pursue one of the following remedies: (a) terminate this Contract and receive the return of Buyer's Deposit and incurred costs, or (b) seek specific performance of Sellers' obligations under this Contract, including attorney fees and costs.

23.    Notices.  All notices required or permitted to be given hereunder shall be in writing and shall be transmitted by facsimile with written verification fax has been received, sent by U.S. certified mail return receipt requested, or nationally recognized overnight delivery service, addressed as set forth below:

SELLERS:             the Notice Party is:

Inger M. Garcia, Esq.
4839 Volunteer Road, Suite 514
Davie, Florida 33330
Email: attorney@ingergarcia.com

and

Brett Lieberman, Esq.
401 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, Florida 33301
Email: blieberman@messana-law.com

Sellers _____       Buyer 

9

BUYER:                  KINGFISHER ISLAND, INC.
                        2150 Palomar Airport Road, Suite 205
                        Carlsbad, CA 92011
                        Attn: Todd Mikles

With a copy to:         Inger M. Garcia, Esq.
                        4839 Volunteer Road, Suite 514
                        Davie, Florida 33330
                        Email: attorney@ingergarcia.com
            and
                        Brett Lieberman, Esq.
                        401 East Las Olas Boulevard, Suite 1400
                        Fort Lauderdale, Florida 33301
                        Email: blieberman@messana-law.com
            and
                        Adam T. Kent, Esq.
                        895 Dove Street, Suite 300
                        Newport Beach, CA 92663
                        Email: adam@propartnersgroup.com

24.    Successors.   This Contract is binding upon and inures to the benefit of the parties hereto and their respective successors, heirs, administrators, and assigns.

25.    Assignability. It is anticipated Buyer may enter a partnership for the development of the property. As a result, the purchasing entity at Closing may be different than the Buyer named in this Contract. Therefore, Buyer has the right to assign this Contract without Sellers' prior consent, so long as all conditions remain the same otherwise, and the Court approval is had, if necessary, and the Buyer is an affiliate or insider of the assignee of the contract.

26.    Exclusivity.  By execution of this Contract, Sellers acknowledge their interest in the sale of the Condominium Property to Buyer.

27.    Entire Agreement.    This Contract contains the entire understanding between the parties and supersedes any prior agreements between them. Buyer may incorporate additional units into this Contract with a corresponding increase in the purchase price without the consent of Sellers.

28.    Counterparts. This Contract may be executed in several counterparts, which shall be treated as originals for all purposes, and all counterparts so executed shall constitute one agreement, binding on all the parties hereto, notwithstanding that all the parties are not signatory to the original or to the same counterpart. Copies shall be treated as originals.

29.    Radon Gas.    The following notice is incorporated into this Contract pursuant to the requirements of the Florida Statutes:

    Radon Gas: Radon is a naturally occurring radioactive gas that, when it has
    accumulated in a building in sufficient quantities, may present health risks to

Sellers _____    Buyer _____

10

persons who are exposed to it over time.  Levels of radon that exceed Federal and State guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your County Public Health Unit.

30.    <u>Invalid Provision.</u>    If any term or provision of this Contract is held illegal, unenforceable, or inoperative as a matter of law, the remaining terms and provisions will not be affected thereby, but will be valid and remain in full force and effect, provided that the inoperative provisions are not essential to the interpretation or performance of this Contract in accordance with the clear intent of the parties.

31.    <u>Saturday, Sunday and Legal Holiday</u>. If any date set forth in this Contract for the performance of any obligation by Buyer or Sellers or for the delivery of any instrument or notice should be on other than a business day, the compliance with such obligations or delivery will be deemed acceptable on the next following business day.

WHEREFORE, the parties have executed this Contract for Purchase and Sale as indicated below.

BUYER:

**KINGFISHER ISLAND, INC.**
a Delaware corporation


Todd A., Mikles, Managing Member

Date: November _____1_____, 2017


SELLERS:

See "Schedule A".


Sellers _____    Buyer _____

Exhibit "B"

## CONTRACT FOR PURCHASE AND SALE

THIS AGREEMENT is made this 1ˢᵗ day of November, 2017, by and between 6060 Condo Holdings, LLC, a Florida Limited Liability Company and/or assigns (a company formed by the Yanko Group LLC), together with its partners, assigns, and special purpose entity to be created (hereinafter "Buyer"), and the parties listed on the attached "Schedule A" (collectively referred to as "Sellers").

### WHEREAS

A.      Sellers are owners of residential and commercial condominium units in the Sixty Sixty Condominium located at 6060 Indian Creek Drive, Miami Beach, Florida 33140, including all common areas and appurtenances thereto (collectively, the "Condominium Property").

B.      This offer is being presented to the Sellers for their review and determination whether they wish to participate in the sale of their interest in the Condominium Property in one transaction to Buyer.

C.      Upon the acceptance of this offer by Sellers, Sellers desire to sell, and Buyer desires to purchase, the Condominium Property described herein in accordance with the provisions of this Contract.

NOW, THEREFORE, in consideration of the mutual covenants and promises herein set forth, the parties agree as follows:

The foregoing recitals are true and correct and are incorporated herein by this reference.

1.      Purchase and Sale.     Upon the terms and conditions set forth herein, Buyer agrees to buy from Sellers and Sellers agree to sell to Buyer all of Sellers' right, title and interest in the Condominium Property in which they have an interest, together with all easements, privileges, and other appurtenances pertaining to or accruing to the benefit of the Condominium Property, including all intangible rights.  This Contract is effective upon being signed by Buyer and a sufficient number of Sellers to satisfy the Minimum Participation Requirement (defined herein). The Condominium Property is being sold AS IS.  No personal property is included with this sale, however, any personal property remaining in the Condominium Property after the closing shall be deemed abandoned by the respective owner and conveyed to Buyer.

2.      Price.  The purchase price for the Condominium Property shall be as follows:

      a.      For the Sixty Sixty Condominium Association, Inc.'s (the "Association"): (i) Unit C-1, C-2, C-3, C-4 and Unit 505 $1,300,000.00;

      b.      $85,000.00 for each residential unit which executes the Contract. At least 50 residential units (the "Minimum Participation Requirement") must execute the Contract and close, otherwise Buyer may terminate the Contract and immediately receive the return of its Deposit, as described in Paragraph 4 below."

Sellers _____    Buyer _____

-2-

     c.     Buyer will accept the purchase of the Condominium Property subject to amounts owed, not to exceed $4,100,000, to the current hotel operator from the Condominium Property owners as well as the Association.

Sellers may unilaterally amend this Contract by the addition of the owners of additional residential units in the Condominium Property who agree to the terms hereof and such additional sellers will then be within the definition of "Sellers" and the additional condominium units will then be within the definition of "Condominium Property".

3.    <u>Term of Contract</u>.    This Contract shall expire after sixty-five (65) days from the Commencement Date, unless extended pursuant to the provisions of this Contract described below with the accompanying right to terminate within those provisions.

4.    <u>Deposit</u>.    Buyer will deposit $300,000.00 (Three Hundred Thousand Dollars) towards the purchase of the Condominium Property within three (3) business days after the Commencement Date (as defined in paragraph 5 below) to be held by an escrow agent selected by Buyer, with proof given to the Sellers' attorneys and the title company. From the $300,000.00 deposit, $100,000.00 shall be non-refundable and excepted from Due Diligence Section 7.

All interest accrued or earned on the deposit shall be paid to Buyer except in the event of a default by Buyer, in which event all the interest shall be disbursed to Sellers, together with the deposit, as liquidated damages in accordance with the default provisions below.

The escrow agreement shall allow Buyer to unilaterally withdraw the deposit if Buyer terminates this Agreement within the Due Diligence Period.

5.    <u>Commencement Date</u>. The Commencement Date is the first day on which all of the following have occurred:
     a.     The number of non-debtor residential unit owners necessary to satisfy the Minimum Participation Requirement have executed this Contract and delivered a copy to Buyer;
     b.     The Association has executed this Contract and delivered a copy to Buyer; and
     c.     The Bankruptcy Court described herein has approved the sale of the Condominium Property.

6.    <u>Right of First Refusal</u>.  The package of residential units subject to the right of first of refusal in favor of the Schecher Group, Inc., is subject to the right of first refusal under the Declaration. Upon the expiration of the Due Diligence Period, if the Buyer has not elected to terminate the Contract, this Contract shall be presented to the Schecher Group, Inc., for its consideration to give the Schecher Group, Inc., an opportunity to exercise its right of first refusal as to the package of residential units subject to the right of first refusal under the Declaration. The Schecher Group, Inc. shall have no obligation to purchase any unit not subject to its right of first refusal in order to exercise its right of first refusal under the Declaration. If the Schecher Group, Inc., exercises its right of first refusal by acquiring the package of all residential units subject to the right of first refusal, this Contract shall terminate and Buyer's deposit will be immediately returned to Buyer.

Sellers _____    Buyer _____

-3-

7.    Due Diligence Period. For a period of thirty (30) calendar days, beginning one day after the Commencement Date ("Due Diligence Period"), Buyer and/or its agents shall be entitled to access to the Condominium Property to conduct such investigations, tests, surveys and other analyses as Buyer determines is necessary, provided (i) Buyer conducts such tests or investigations so as not to unreasonably interfere with current activities on the property, (ii) Buyer restores the property to its condition immediately prior to any such tests and investigations, normal wear and tear excepted, and (iii) Buyer indemnifies, defends, and holds Sellers harmless from and against all claims, costs, expenses, and liabilities arising out of Buyer's entry upon the property and/or the performance of the tests and investigations conducted by Buyer on the property, but not for matters caused by Sellers or otherwise pre-existing and discovered or disclosed by Buyer's inspections.

        (a)    Sellers shall deliver (or cause the Association to deliver) the following which are the Due Diligence Materials, if in Sellers' possession: Uniform Commercial Code personal property financing statement searches pertaining to Sellers and/or the Condominium Property; copies of all tax bills for the last three tax years, all service contracts, title insurance claims, surveys, leases, environmental reports, copies of any and all public or private utility easements, access agreements, special assessment arrangements, tap-in or connection fee agreements or procedures and any public financial assistance relating to the Condominium Property, any building and use restrictions or operating agreements, including, if any, condominium declaration and any other condominium and/or homeowner's association documents and declarations or declarations of easements, covenants and restrictions affecting the Condominium Property and, other documents reasonably requested by Buyer,

        (b)    Notwithstanding any other provision of this Contract, Buyer may terminate this Contract for any reason or for no given reason within its sole and absolute discretion at any time before 6:00 pm Eastern Standard Time on or before the end of the Due Diligence Period by delivering written notice of its decision to terminate ("Notice of Termination") to the Notice Party as set forth in paragraph 25. Buyer is not required to explain its decision to terminate this Contract and cannot be required to proceed with this Contract for any reason if Buyer terminates this Contract. Buyer's timely delivery of a Notice of Termination will relieve the parties of any further obligations under this Contract and the deposit shall be immediately returned to Buyer.

If Buyer fails to timely deliver a Notice of Termination, then Buyer accepts the Condominium Property in its present condition (subject to the representations, warranties and covenants expressly stated herein or in the closing documents), and the deposit becomes non-refundable, except in the event of a default by Sellers, failure of title, condemnation, or failure to satisfy any other conditions precedent to closing hereunder.

8.    Additional Conditions.    The following shall be additional conditions which must be satisfied prior to Buyer's obligation to close:

(a)    All the representations and warranties of Sellers must be true and correct in all material respects as of Closing.

Sellers _____    Buyer  _L/C_

-4-

(b)    Sellers shall have delivered to Buyer an estoppel letter from the Association for all the units dated no earlier than fifteen (15) calendar days prior to Closing or a waiver of the estoppel letter by the Association.

(c)    The Association and individual unit owner Sellers shall be responsible for satisfying their pro rata allocation of the allowed claim of Florida Building and Supply, Inc., attributable to the Condominium Property, and shall release, indemnify and hold harmless Buyer from all allowed claims of Florida Building Supply, Inc., in connection with same.

(d)    All directors and officers of the Association shall tender their resignations effective as of the Closing.

(e)    Sellers shall have complied with all its obligations under this Contract.

(f)    The Association or any third party has not exercised its first right of refusal to purchase any or all the units included within this Contract.

(g)    The Schecher Group, Inc. shall not have exercised its right of first refusal and the period within which the Schecher Group, Inc. could have exercised its right of first refusal has lapsed.

(h)    Buyer's obligation to acquire the Association's units is specifically contingent on the Schecher Group, Inc. failing to exercise its right of first refusal and the period within which the Schecher Group, Inc. could have exercised its right of first refusal to have lapsed.

(i)    The non-refundable portion of the deposit shall become refundable in the event Sellers fail to close or meet any of the conditions in section 8 or if Buyer terminates this contract during the month the contract is fully executed.

(j)    The Bankruptcy Court shall enter an order approving the terms of the purchase and sale contemplated by this Contract.

If any of these conditions is not satisfied or waived in writing by Buyer on or before the Closing Date, Buyer may terminate this Contract and the deposit will immediately be returned to Buyer, whereupon the parties shall be released from all further obligations under this Contract.

9.    <u>Title Commitment</u>.    Within thirty-five (35) calendar days after the Commencement Date, the title insurance company will deliver to Buyer a preliminary title insurance commitment from a title insurance company selected by Buyer ("Preliminary Commitment") for the Condominium Property, along with complete and legible copies of all exceptions and encumbrances noted on the Preliminary Commitment. Buyer shall have a period of fifteen (15) business days following receipt of the Preliminary Commitment and all title exception documents to review title. Buyer, at Buyer's option, may obtain a survey ("Survey") of the land and improvements comprising the entire condominium property within the time period to examine title as aforesaid. If Buyer finds title to be unmarketable in accordance with the Florida Bar, including any defects reflected in the Survey, Buyer shall, no later than the expiration of the title review period provided above, to notify Sellers in writing specifying the defect(s) or

Sellers _____    Buyer _____

-5-

objections Buyer has to the Preliminary Commitment; provided that if Buyer fails to give Sellers written notice of defect(s) before the expiration of the title review period, the defects shown in the Preliminary Commitment shall be deemed to be waived as title objections to closing this transaction.  Sellers shall use good faith and diligent effort to cause such defects to be cured by the date of Closing.

Buyer may raise as additional objections, however, any matters first shown by any later date title reports, endorsement of the Preliminary Commitment and/or recertifications of the Survey obtained by Buyer.  If Buyer has given Sellers timely written notice of defect(s) and the defect(s) render the title other than as represented in this Contract, Sellers shall use good faith and diligent effort to cause such defects to be cured by the date of Closing.  Sellers agree at or prior to Closing to (i) satisfy all requirements shown on Schedule B, Section 1, of the Preliminary Commitment, (ii) remove by payment, bonding or otherwise any lien against any of the units capable of removal by the payment of money or bonding (except for the liability assumed under Section 18(a)), and (iii) remove any matters appearing of record after the effective date of the Preliminary Commitment.

At either party's option, the date of Closing may be extended for a period not to exceed one hundred twenty (120) calendar days for purposes of eliminating any title defects.  In the event that Sellers do not eliminate any defects as of the date of Closing as the same may be extended under the preceding sentence, Buyer shall have the option of either: (i) closing and accepting the title "as is", and deducting from the Purchase Price the amount of any lien or encumbrance which can be satisfied by a liquidated amount, or (ii) canceling this Contract in which event the deposit will be returned to Buyer, whereupon both parties shall be released from all further obligations under this Contract, except those obligations expressly stated to survive such termination.

10.    _Title Evidence_.        At least fifteen (15) business days before Closing a title insurance commitment with legible copies of instruments listed as exceptions attached thereto, and after Closing, an owner's policy of title insurance shall be obtained by Buyer at Buyer's expense. At the Closing,  at Buyer's expense, the Title Company, shall deliver to Buyer an ALTA owner's title insurance policy in the amount of the Purchase Price (the "Title Policy") conforming with the title insurance provisions of this Contract and otherwise reasonably satisfactory to Buyer, with full extended coverage over the general exceptions, a separate tax parcel endorsement and encroachment and/or restrictions endorsements, as may be required based on a review of the Survey and the Commitment.  Buyer shall have the right to obtain, at its sole expense (a) a 3.1 zoning endorsement insuring the current use of the Property as a permitted use endorsement (the availability of such an endorsement shall be a condition to closing); (b) an access endorsement; (c) a contiguity endorsement if any parcel of the Property is comprised of more than one parcel or lot; (d) a survey endorsement; and (e) any other endorsements required to remove or insure over any unpermitted exceptions.  The issuance of the foregoing endorsements is a condition precedent for the benefit of Buyer only, and may be waived by Buyer, to Buyer's obligations to purchase the Property and if such endorsements are not reasonably available, Buyer may elect to terminate this Contract pursuant to this Section, then: (i) all Earnest Money shall be returned to Buyer, and (ii) the parties shall be released of all of their obligations hereunder.  Buyer shall select the Title Company and closing agent.  The Association shall convey marketable title to the

Sellers _____    Buyer _____

-6-

Condominium Property at the Closing. With respect to the Association's units, such units shall be conveyed pursuant to a bankruptcy court order approving the bundled sale contemplated herein.

11.    Closing Date.  This transaction shall be closed on or before December 30, 2017, (referred to as "Closing", the latest allowable date of Closing, the "Closing Date"). The Term of this Contract as provided in paragraph 3 above shall automatically be extended to the Closing Date as described in the foregoing sentence. Additionally, if a court proceeding challenging any aspect of the sale is pending prior to the Closing, the Closing Date under this Contract shall automatically be extended until the court proceeding is concluded, however, at any time during this extension period Buyer may either: (i) by written notice terminate this Contract and the deposit will immediately be returned to Buyer, whereupon the parties shall be released from all further obligations under this Contract; or (ii) if no stay has been imposed to prevent Closing (notwithstanding that there is a challenge to the sale), set a date for Closing and close on this transaction. The Closing shall take place at the offices of the escrow agent or at such other location which is mutually agreeable to the parties. The purchase and sale of all Condominium Property shall be simultaneously closed at the Closing.

12.    Closing Costs.    Each party shall pay its own customary closing costs.  For example, Buyer is responsible for paying its brokers' commissions, title insurance, recording the deed, and its legal fees.  Examples the Sellers are responsible for paying include the documentary stamp tax on the deed, updating title, pro-rated property taxes, its legal fees, if any, and estoppel letters. Buyer will pay Sellers' closing agent's fees – e.g., document preparation and processing fee.

13.    Extension of Contract Term.  This Contract may be extended by agreement of the Buyer and the Association (but does not require the consent of any other Seller), to provide any notices required to be sent concerning a right of first refusal.

14.    Delivery for Closing.  Drafts of all documents to be delivered to Buyer at Closing will be provided by the Title Company to Buyer for review and approval at least four (4) business days before the Title Company distributes the documents for execution.  At least fifteen (15) calendar days prior to Closing, Sellers shall deliver to the Title Company, to be held in trust until Closing, the following executed documents:

(a)    Warranty Deed in a form satisfactory to Buyer conveying title to the Condominium Property to Buyer.

(b)    Bill of Sale conveying title to any personal property left at the Condominium Property to Buyer.

(c)    Seller's affidavit as to the non-existence of construction liens and encumbrances, exclusive possession and "gap" representations, covenants, and indemnities sufficient to allow removal of the standard title exception for mechanic's liens, the "gap", and possession.

(d)    FIRPTA affidavit.

Sellers _____    Buyer _____

-7-

(e)    Association estoppel letter or waiver.

(f)    Closing Statement.

(g)    All other documents reasonably required by Buyer or the Title Company to complete this transaction.

Notwithstanding the foregoing, Sellers shall undertake their best efforts to provide Buyer with a copy of the individual units' prior title policies and mortgage payoff statements within ten (10) calendar days of the Commencement Date. Buyer will cooperate at no cost to the Buyers with the Sellers in attempting to obtain short sale approval from lenders, as necessary.

15.    Risk of Loss.  Risk of loss or damage to the Condominium Property shall be borne by Sellers.  If, prior to the Closing, there shall be any casualty affecting the Condominium Property, Sellers shall so notify Buyer and Buyer may, in its sole and absolute discretion within ten (10) days after such notification by Sellers (and the Closing Date shall be reasonably extended to allow such 10-day period): (i) terminate this Agreement and the deposit shall be returned to Buyer, if the aggregate cost of repair or replacement (collectively, "repair and/or replacement") is in excess of $250,000.00, in the opinion of Buyer's contractor or engineering consultants (ii) proceed with this Agreement as provided hereunder and remain bound to all provisions of this Agreement.

16.    Insurance Proceeds.  Any and all insurance proceeds related to the Condominium Property while Sellers are the owners are owned by Sellers.  Buyer has no interest in the insurance proceeds.

17.    Buyer Assumed Liability.  Buyer assumes all liability for the debt alleged to be owed by Sellers and the Association to Schecher Group, Inc., Condominium Hotel Management Corporation Inc. ("CHMC"), and all "shared costs" (as defined in the condominium documents) of Schecher Group, Inc., d/b/a Sixty Sixty Shared Components. Furthermore, Buyer shall indemnify and hold harmless Sellers for personal liability related to the claims of Schecher Group, Inc., and CHMC related to the "shared costs". If the amount owed by the Sellers to the Schecher Group, Inc. and CHMC has been determined by the bankruptcy court or by agreement of the Schecher Group, Inc., CHMC, the Association and the Buyer prior to Closing, Buyer shall pay such amount to the Schecher Group and CHMC at the Closing.

18.    Representations and Warranties of Seller.    Sellers represent and warrant to Buyer the following:

(a)    As of the Closing Date, Sellers shall have good, marketable, indefeasible title to the Condominium Property (including personal property), free and clear of all liens, claims and encumbrances, except concerning the Schecher Group, Inc., CHMC, and all "shared costs", as defined in the condominium documents, of Schecher Group, d/b/a Sixty Sixty Shared Components. Sellers shall be current on their Association dues through closing as calculated in the 2017 Association Budget. Buyer shall take title subject to said claims of Schecher Group,

Sellers _____    Buyer _____

-8-

Inc., and CHMC related to "shared costs" and allow such claims and liens, if any, as exceptions to any title commitment.

(b)    Sellers who are not individuals will be duly organized, validly existing and in good standing under the laws of the state of incorporation or organization, as the case may be. Sellers have the full right, power and authority to sell, transfer, and/or convey the Condominium Property to Buyer and to perform all of Sellers' obligations in this Contract.

(c)    There are no contracts or leases affecting the Condominium Property, other than tenant leases which will be terminated on or before Closing. If Sellers cannot terminate a hotel program contract, Seller shall advise Buyer of that fact at least 30 days before Closing.

These representations and warranties will survive Closing for a period of one (1) year.

19.    Representations and Warranties of Buyer.    Buyer represents and warrants to Sellers the following:

(a)    Buyer is duly organized, validly existing and in good standing under the laws of the state of incorporation or organization, as the case may be. Buyer has full right, power and authority to purchase the Condominium Property from Sellers and perform all of Buyer's obligations in this Contract.

(b)    There are no contracts or agreements which prevent Buyer from fulfilling its obligations in this Contract.

20.    Broker Fee.    Sellers are not responsible for any real estate commission or brokerage fee with this transaction with the exception of the brokerage commission owed to Jason Welt and Trustee Realty, Inc., as provided for in his order of employment, and except for any pre-existing broker agreement between an individual seller and a broker which the individual seller will be required to honor. Buyer has engaged the services of brokers whom Buyer shall pay a real estate commission pursuant to a separate agreement. Any entity exercising a right of first refusal shall pay the same real estate commission to Buyer's and Sellers' agents as would be due under this Contract if such right of first refusal was not exercised. This provision shall survive termination of this Contract

21.    Not Contingent on Building Permits. This Contract is NOT contingent upon Buyer's ability to obtain any building permits, zoning changes, or any other development-related grant of rights.

22.    Possession.    At the Closing possession of the Condominium Property shall be delivered to Buyer, vacant and free from all liens and rights or claims of possession and otherwise in accordance with this Contract and the physical condition of the Condominium Property shall be substantially the same on the Closing Date as on the Commencement Date, reasonable wear and tear excepted, subject to the terms of the Section of this Contract pertaining to Casualties.

23.    Governing Law.    This Contract is governed by the laws of Florida.

Sellers _____    Buyer _____

-9-

24.   Default.       If Buyer fails without legal excuse to complete the purchase of the Condominium Property, the deposit made by Buyer shall be forfeited to Sellers pro-rata, as the sole and exclusive remedy available to Sellers.  The parties acknowledge that in such event the exact amount of Sellers' damages cannot be determined with any certainty and agree the deposit shall be forfeited as liquidated damages.  If Sellers other than the Association fails to perform any covenant of agreement of Seller, Buyer may elect to pursue one of the following remedies: (a) terminate this Contract and receive the return of Buyer's deposit and incurred costs, or (b) seek specific performance of Sellers' obligations under this Contract, including attorney fees and costs. If the Association fails to perform any covenant of agreement of the Association, Buyer's exclusive remedy is to terminate this Contract and receive the return of Buyer's deposit.

25.   Notices.  All notices required or permitted to be given hereunder shall be in writing and shall be transmitted by electronic mail, facsimile with written verification fax has been received, sent by U.S. certified mail return receipt requested, or nationally recognized overnight delivery service, addressed as set forth below. Notices may be served by the attorney for the Buyer and only by the Notice Party for Sellers:

|          | SELLERS: | the Notice Party is: |

          SELLERS:       the Notice Party is:

                         Inger M. Garcia, Esq.
                         4839 Volunteer Road, Suite 514
                         Davie, Florida 33330
                         Email: attorney@ingergarcia.com
              and
                         Brett Lieberman, Esq.
                         401 East Las Olas Boulevard, Suite 1400
                         Fort Lauderdale, Florida 33301
                         Email: blieberman@messana-law.com


          BUYER:         6060 Condo Holdings, LLC
                         3098 Stirling Road
                         Hollywood, FL 33021
                         Email: oren@legalelitetitle.com


25.   Successors.    This Contract is binding upon and inures to the benefit of the parties hereto and their respective successors, heirs, administrators, and assigns.

26.   Assignability.  Buyer has the right to assign this Contract without Sellers' prior consent so long as all conditions remain the same otherwise, and Bankruptcy Court approval is had, if necessary. However, Buyer shall not be relieved of any obligation under this Contract even if an assignment occurs.


Sellers _____   Buyer _____

-10-

27.    Submit to Bankruptcy Court Jurisdiction.    Buyer and all sellers, including non-debtor individual unit owners, are aware that the Association has filed for bankruptcy protection with the United States Bankruptcy Court for the Southern District of Florida, Miami Division, under In re: Sixty Sixty Condominium Association, Inc., Case Number 16-26187-RAM, and understand the bankruptcy case may have an effect on the units being sold in this Contract. To allow a full and complete determination of the rights of the Association and the other unit owners under this Contract, Buyer and the individual unit owners hereby expressly submit to personal and subject matter jurisdiction of the bankruptcy court to the greatest extent necessary in all aspects to interpret this Contract, resolve disputes concerning the sale of the Condominium Property to Buyer and any other matter related to the sale of the Condominium Property. Buyer and the individual unit owners also agree to be bound by any decisions of the Bankruptcy Court.

28.    Entire Agreement.    This Contract contains the entire understanding between the parties and supersedes any prior agreements between them. Buyer may incorporate additional units into this Contract with a corresponding increase in the purchase price without the consent of Sellers.

29.    Counterparts. This Contract may be executed in several counterparts, which shall be treated as originals for all purposes, and all counterparts so executed shall constitute one agreement, binding on all the parties hereto, notwithstanding that all the parties are not signatory to the original or to the same counterpart. Copies shall be treated as originals. Furthermore, executed counterparts of this Contract may be delivered by facsimile or other reliable electronic means (including emails of pdf documents), and such facsimile or other electronic transmission shall be valid and binding for all purposes when transmitted to and actually received by the other party.

30.    Radon Gas.    The following notice is incorporated into this Contract pursuant to the requirements of the Florida Statutes:

> Radon Gas:  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed Federal and State guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your County Public Health Unit.

31.    Invalid Provision.    If any term or provision of this Contract is held illegal, unenforceable, or inoperative as a matter of law, the remaining terms and provisions will not be affected thereby, but will be valid and remain in full force and effect, provided that the inoperative provisions are not essential to the interpretation or performance of this Contract in accordance with the clear intent of the parties.

32.    Saturday, Sunday and Legal Holiday.    If any date set forth in this Contract for the performance of any obligation by Buyer or Sellers or for the delivery of any instrument or notice should be on other than a business day, the compliance with such obligations or delivery will be deemed acceptable on the next following business day.

Sellers _____    Buyer _____

-11-

33.    <u>Tax Deferred Exchange</u>.  The parties acknowledge that either Buyer or Sellers may desire that this transaction constitute a tax deferred exchange under the meaning of Section 1031 of the Internal Revenue Code.  Provided there is no cost, expense or liability imposed upon the non-requesting party, and the non-requesting party is not required to take title to any other property then each party agrees to execute any and all additional documentation that may by reasonably necessary to assist the requesting party in concluding this transaction as part of a tax deferred exchange.  Neither party makes any representation or warranty whatsoever regarding whether or not this transaction will qualify as a part of a tax deferred exchange.  In no event shall any such tax deferred exchange result in any delay in the Closing.

34.    <u>Operating Covenants</u>.  Sellers agree, represent and warrant through the Closing Date the following: (a) Sellers will continue to operate the Condominium Property and pay for all expenses in a manner similar to its operation prior to the execution of this Contract, including, but not limited to the providing of full replacement cost and liability   insurance, management, maintenance and services; (b) except as specifically agreed to in writing by Buyer, no leases, service contract, easements, restrictions, declarations, agreements or options shall be entered into, amended or terminated prior to the Closing Date; (c) Sellers shall promptly furnish Buyer copies of all notices of violation by Sellers or the Condominium Property of federal, state or municipal laws, ordinances, regulations, orders, or requirements of departments of housing, buildings, fire, labor, health, or other federal, state or municipal departments or other governmental authorities; (d) Sellers shall promptly notify Buyer of any change of which Sellers have knowledge regarding any condition with respect to the Condominium Property or of any event or circumstance which makes any representation or warranty of Sellers to Buyer under this Contract untrue or misleading, or any covenant of Sellers under this Contract incapable or less likely of being performed.


WHEREFORE, the parties have signed this Contract as indicated below.

BUYER:

6060 Condo Holdings, LLC

By:_____          Signed on November 1, 2017.
          Evan Kagan
          Manager


SELLERS:


See "Schedule A".




Sellers _____    Buyer _____

-12-

**Schedule A**

Unit 501 _____ _____ Date: June \_\_\_\_, 2017
Owner Signature             Owner Signature
Print Name(s):_____ _____
Address: _____
_____
Email Address: _____

Unit 502 _____ _____ Date: June \_\_\_\_, 2017
Owner Signature             Owner Signature
Print Name(s):_____ _____
Address: _____
_____
Email Address: _____

Unit 503 _____ _____ Date: June \_\_\_\_, 2017
Owner Signature             Owner Signature
Print Name(s):_____ _____
Address: _____
_____
Email Address: _____

Unit 504 _____ _____ Date: June \_\_\_\_, 2017
Owner Signature             Owner Signature
Print Name(s):_____ _____
Address: _____
_____
Email Address: _____

Sellers _____ Buyer *h/c*

-13-

Unit 505 _____  _____  Date: June ____, 2017
             Owner Signature             Owner Signature
Print Name(s):_____  _____
Address: _____
_____
Email Address: _____


Unit 506 _____  _____  Date: June ____, 2017
              Owner Signature             Owner Signature
Print Name(s):_____  _____
Address: _____
_____
Email Address: _____


Unit 507 _____  _____  Date: June ____, 2017
              Owner Signature             Owner Signature
Print Name(s):_____  _____
Address: _____
_____
Email Address: _____


Unit 508 _____  _____  Date: June ____, 2017
              Owner Signature             Owner Signature
Print Name(s):_____  _____
Address: _____
_____
Email Address: _____


Sellers _____  Buyer _____

-14-

Unit 601 _____  _____  Date: June ____, 2017
　　　　　　Owner Signature　　　　　Owner Signature
Print Name(s):_____  _____
Address: _____
　　　　　_____
Email Address: _____

Unit 602 _____  _____  Date: June ____, 2017
　　　　　　Owner Signature　　　　　Owner Signature
Print Name(s):_____  _____
Address: _____
　　　　　_____
Email Address: _____

Unit 603 _____  _____  Date: June ____, 2017
　　　　　　Owner Signature　　　　　Owner Signature
Print Name(s):_____  _____
Address: _____
　　　　　_____
Email Address: _____

Unit 604 _____  _____  Date: June ____, 2017
　　　　　　Owner Signature　　　　　Owner Signature
Print Name(s):_____  _____
Address: _____
　　　　　_____
Email Address: _____

Unit 605 _____  _____  Date: June ____, 2017
　　　　　　Owner Signature　　　　　Owner Signature
Print Name(s):_____  _____
Address: _____
　　　　　_____
Email Address: _____

Sellers _____  Buyer _____

-15-

Unit 606 _____  _____   Date: June \_\_\_\_, 2017
 Owner Signature  Owner Signature
Print Name(s):_____  _____
Address: _____
 _____
Email Address: _____

Unit 607 _____  _____   Date: June \_\_\_\_, 2017
 Owner Signature  Owner Signature
Print Name(s):_____  _____
Address: _____
 _____
Email Address: _____

Unit 608 _____  _____   Date: June \_\_\_\_, 2017
 Owner Signature  Owner Signature
Print Name(s):_____  _____
Address: _____
 _____
Email Address: _____

Unit 701 _____  _____   Date: June \_\_\_\_, 2017
 Owner Signature  Owner Signature
Print Name(s):_____  _____
Address: _____
 _____
Email Address: _____

Unit 702 _____  _____   Date: June \_\_\_\_, 2017
 Owner Signature  Owner Signature
Print Name(s):_____  _____
Address: _____
 _____
Email Address: _____

Sellers _____  Buyer _LF_

-16-

Unit 703 _____  _____  Date: June ____, 2017
              Owner Signature        Owner Signature
Print Name(s):_____   _____
Address:    _____
            _____
Email Address: _____

Unit 704 _____  _____  Date: June ____, 2017
              Owner Signature        Owner Signature
Print Name(s):_____   _____
Address:    _____
            _____
Email Address: _____

Unit 705 _____  _____  Date: June ____, 2017
              Owner Signature        Owner Signature
Print Name(s):_____   _____
Address:    _____
            _____
Email Address: _____

Unit 706 _____  _____  Date: June ____, 2017
              Owner Signature        Owner Signature
Print Name(s):_____   _____
Address:    _____
            _____
Email Address: _____

Unit 707 _____  _____  Date: June ____, 2017
              Owner Signature        Owner Signature
Print Name(s):_____   _____
Address:    _____
            _____
Email Address: _____

Sellers _____  Buyer _____

-17-

Unit 708     _____    _____    Date: June ____, 2017
                       Owner Signature       Owner Signature
Print Name(s):_____   _____
Address:     _____

Email Address: _____

Unit 801     _____    _____    Date: June ____, 2017
                       Owner Signature       Owner Signature
Print Name(s):_____   _____
Address:     _____

Email Address: _____

Unit 802     _____    _____    Date: June ____, 2017
                       Owner Signature       Owner Signature
Print Name(s):_____   _____
Address:     _____

Email Address: _____

Unit 803     _____    _____    Date: June ____, 2017
                       Owner Signature       Owner Signature
Print Name(s):_____   _____
Address:     _____

Email Address: _____

Unit 804     _____    _____    Date: June ____, 2017
                       Owner Signature       Owner Signature
Print Name(s):_____   _____
Address:     _____

Email Address: _____

Sellers _____ Buyer _____

-18-

Unit 805 _____ _____ Date: June ____, 2017
           Owner Signature        Owner Signature
Print Name(s):_____ _____
Address: _____
_____
Email Address: _____

Unit 806 _____ _____ Date: June ____, 2017
           Owner Signature        Owner Signature
Print Name(s):_____ _____
Address: _____
_____
Email Address: _____

Unit 807 _____ _____ Date: June ____, 2017
           Owner Signature        Owner Signature
Print Name(s):_____ _____
Address: _____
_____
Email Address: _____

Unit 901 _____ _____ Date: June ____, 2017
           Owner Signature        Owner Signature
Print Name(s):_____ _____
Address: _____
_____
Email Address: _____

Unit 902 _____ _____ Date: June ____, 2017
           Owner Signature        Owner Signature
Print Name(s):_____ _____
Address: _____
_____
Email Address: _____

Sellers _____ Buyer _____

-19-

Unit 903 _____    _____    Date: June ____, 2017
          Owner Signature         Owner Signature
Print Name(s):_____    _____
Address:          _____
          _____
Email Address: _____

Unit 904 _____    _____    Date: June ____, 2017
          Owner Signature         Owner Signature
Print Name(s):_____    _____
Address:          _____
          _____
Email Address: _____

Unit 905 _____    _____    Date: June ____, 2017
          Owner Signature         Owner Signature
Print Name(s):_____    _____
Address:          _____
          _____
Email Address: _____

Unit 906 _____    _____    Date: June ____, 2017
          Owner Signature         Owner Signature
Print Name(s):_____    _____
Address:          _____
          _____
Email Address: _____

Unit 907 _____    _____    Date: June ____, 2017
          Owner Signature         Owner Signature
Print Name(s):_____    _____
Address:          _____
          _____
Email Address: _____

Sellers _____    Buyer _____

-20-

Unit 908    _____    _____    Date: June ____, 2017
             Owner Signature       Owner Signature
Print Name(s):_____    _____
Address:     _____
             _____
Email Address: _____

Unit 1001    _____    _____    Date: June ____, 2017
             Owner Signature       Owner Signature
Print Name(s):_____    _____
Address:     _____
             _____
Email Address: _____

Unit 1002    _____    _____    Date: June ____, 2017
             Owner Signature       Owner Signature
Print Name(s):_____    _____
Address:     _____
             _____
Email Address: _____

Unit 1003    _____    _____    Date: June ____, 2017
             Owner Signature       Owner Signature
Print Name(s):_____    _____
Address:     _____
             _____
Email Address: _____

Unit 1005    _____    _____    Date: June ____, 2017
             Owner Signature       Owner Signature
Print Name(s):_____    _____
Address:     _____
             _____
Email Address: _____

Sellers _____    Buyer _____

-21-

Unit 1006 _____  _____  Date: June ____, 2017
          Owner Signature        Owner Signature
Print Name(s):_____  _____
Address:      _____
              _____
Email Address: _____
Unit 1007 _____  _____  Date: June ____, 2017
          Owner Signature        Owner Signature
Print Name(s):_____  _____
Address:      _____
              _____
Email Address: _____


Unit 1008 _____  _____  Date: June ____, 2017
          Owner Signature        Owner Signature
Print Name(s):_____  _____
Address:      _____
              _____
Email Address: _____


Unit 1101 _____  _____  Date: June ____, 2017
          Owner Signature        Owner Signature
Print Name(s):_____  _____
Address:      _____
              _____
Email Address: _____


Unit 1102 _____  _____  Date: June ____, 2017
          Owner Signature        Owner Signature
Print Name(s):_____  _____
Address:      _____
              _____
Email Address: _____


Unit 1103 _____  _____  Date: June ____, 2017
          Owner Signature        Owner Signature

Sellers _____  Buyer _____

-22-

Print Name(s):_____  _____
Address:    _____
            _____
Email Address: _____


Unit 1104    _____  _____    Date: June ____, 2017
             Owner Signature        Owner Signature
Print Name(s):_____  _____
Address:    _____
            _____
Email Address: _____


Unit 1105    _____  _____    Date: June ____, 2017
             Owner Signature        Owner Signature
Print Name(s):_____  _____
Address:    _____
            _____
Email Address: _____


Unit 1106    _____  _____    Date: June ____, 2017
             Owner Signature        Owner Signature
Print Name(s):_____  _____
Address:    _____
            _____
Email Address: _____


Unit 1107    _____  _____    Date: June ____, 2017
             Owner Signature        Owner Signature
Print Name(s):_____  _____
Address:    _____
            _____
Email Address: _____


Sellers _____  Buyer _____

-23-

Unit 1108      _____    _____    Date: June ____, 2017
                 Owner Signature        Owner Signature

Print Name(s): _____    _____
Address: _____
_____
Email Address: _____

Unit 1202      _____    _____    Date: June ____, 2017
                 Owner Signature        Owner Signature

Print Name(s): _____    _____
Address: _____
_____
Email Address: _____

Unit 1203      _____    _____    Date: June ____, 2017
                 Owner Signature        Owner Signature

Print Name(s): _____    _____
Address: _____
_____
Email Address: _____

Unit 1204      _____    _____    Date: June ____, 2017
                 Owner Signature        Owner Signature

Print Name(s): _____    _____
Address: _____
_____
Email Address: _____

Unit 1205      _____    _____    Date: June ____, 2017
                 Owner Signature        Owner Signature

Print Name(s): _____    _____
Address: _____
_____
Email Address: _____

Unit 1206      _____    _____    Date: June ____, 2017

Sellers _____ Buyer _____

-24-

           Owner Signature        Owner Signature

Print Name(s):_____  _____

Address:        _____

                _____

Email Address: _____

Unit 1207     _____  _____   Date: June ____, 2017

           Owner Signature        Owner Signature

Print Name(s):_____  _____

Address:        _____

                _____

Email Address: _____

Unit 1208     _____  _____   Date: June ____, 2017

           Owner Signature        Owner Signature

Print Name(s):_____  _____

Address:        _____

                _____

Email Address: _____

Unit 1401     _____  _____   Date: June ____, 2017

           Owner Signature        Owner Signature

Print Name(s):_____  _____

Address:        _____

                _____

Email Address: _____

Unit 1402     _____  _____   Date: June ____, 2017

           Owner Signature        Owner Signature

Print Name(s):_____  _____

Address:        _____

                _____

Email Address: _____

Sellers _____  Buyer _____

-25-

Unit 1403 _____  _____  Date: June ____, 2017
           Owner Signature        Owner Signature
Print Name(s):_____     _____
Address:       _____

Email Address: _____

Unit 1405 _____  _____  Date: June ____, 2017
           Owner Signature        Owner Signature
Print Name(s):_____     _____
Address:       _____

Email Address: _____

Unit 1407 _____  _____  Date: June ____, 2017
           Owner Signature        Owner Signature
Print Name(s):_____     _____
Address:       _____

Email Address: _____

Unit 1408 _____  _____  Date: June ____, 2017
           Owner Signature        Owner Signature
Print Name(s):_____     _____
Address:       _____

Email Address: _____

Unit 1501 _____  _____  Date: June ____, 2017
           Owner Signature        Owner Signature
Print Name(s):_____     _____
Address:       _____

Email Address: _____

Sellers _____ Buyer _____

-26-

Unit 1502 _____ _____ Date: June ____, 2017
          Owner Signature     Owner Signature
Print Name(s):_____ _____
Address: _____
         _____
Email Address: _____

Unit 1504 _____ _____ Date: June ____, 2017
          Owner Signature     Owner Signature
Print Name(s):_____ _____
Address: _____
         _____
Email Address: _____

Unit 1505 _____ _____ Date: June ____, 2017
          Owner Signature     Owner Signature
Print Name(s):_____ _____
Address: _____
         _____
Email Address: _____

Unit 1506 _____ _____ Date: June ____, 2017
          Owner Signature     Owner Signature
Print Name(s):_____ _____
Address: _____
         _____
Email Address: _____

Unit 1507 _____ _____ Date: June ____, 2017
          Owner Signature     Owner Signature
Print Name(s):_____ _____
Address: _____
         _____
Email Address: _____

Sellers _____ Buyer _____

-27-

Unit 1605    _____    _____    Date: June \_\_\_\_, 2017
                Owner Signature     Owner Signature
Print Name(s):_____    _____
Address: _____

Email Address: _____

Unit 1606    _____    _____    Date: June \_\_\_\_, 2017
                Owner Signature     Owner Signature
Print Name(s):_____    _____
Address: _____

Email Address: _____

Unit 1607    _____    _____    Date: June \_\_\_\_, 2017
                Owner Signature     Owner Signature
Print Name(s):_____    _____
Address: _____

Email Address: _____

Unit 1608    _____    _____    Date: June \_\_\_\_, 2017
                Owner Signature     Owner Signature
Print Name(s):_____    _____
Address: _____

Email Address: _____

Unit CU-1    _____    _____    Date: June \_\_\_\_, 2017
                Owner Signature     Owner Signature
Print Name(s):_____    _____
Address: _____

Email Address: _____

Sellers _____    Buyer _____

-28-

Unit CU-2 _____ _____ Date: June ____, 2017
                    Owner Signature              Owner Signature
Print Name(s):_____ _____
Address:          _____
                  _____
Email Address: _____

Unit CU-3 _____ _____ Date: June ____, 2017
                    Owner Signature              Owner Signature
Print Name(s):_____ _____
Address:          _____
                  _____
Email Address: _____

Unit CU-4 _____ _____ Date: June ____, 2017
                    Owner Signature              Owner Signature
Print Name(s):_____ _____
Address:          _____
                  _____
Email Address: _____

Sellers _____    Buyer _____